Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 1 of 84
Receipt number 9998-3405680

ORIGINAL

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

PALANTIR TECHNOLOGIES INC., and
PALANTIR USG, INC.

Plaintiffs,

-vs.-

UNITED STATES OF AMERICA,

Defendant.

Case No. 16-784 C

FILED
JUNE 30, 2016
U.S. COURT OF
FEDERAL CLAIMS

**COMPLAINT**

Hamish P.M. Hume
Stacey Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

# TABLE OF CONTENTS

NATURE OF THE CASE ........ 1

PARTIES ........ 12

JURISDICTION ........ 13

FACTUAL BACKGROUND ........ 13

A. The Law Requires The Army To Procure Commercial Items To The Maximum Extent Practicable To Satisfy Its Requirements ........ 13

B. The Army Admits It Has A Critical Requirement For A Data Management Platform That It Has Been Unable To Satisfy Despite Fifteen Years Of Effort And Billions Of Dollars In Expenditures. ........ 20

1. The Central Purpose Of The Army's Distributed Common Ground System ("DCGS-A") Is To Provide A Data Management Platform. ........ 20

2. After Spending Fifteen Years And Billions Of Dollars On "Increment 1" Of DCGS-A, The Army Has Failed To Develop A Working Data Management Platform. ........ 23

3. The Need For A Data Management Platform Is "The Heart" Of "Increment 2" Of The DCGS-A Program. ........ 27

C. Palantir Has Developed A Data Management Platform That Meets The Army's Requirements, That Is Available As A Commercial Item, And That Has Been Successfully Sold To Meet The Other Military And Intelligence Agencies. ........ 29

D. The Army Violated Its Legal Obligations By Issuing A Solicitation For DCGS-A2 That Makes It Impossible For Palantir To Offer Its Data Management Platform As A Commercial Item That Satisfies The Army's Requirements ........ 34

1. The Army's Market Research Was Based On The Unlawful Assumption That The Army Was Only Interested In A Developmental Project, And Would Not Even Consider The Acquisition Of A Commercial Item. ........ 36

2. The Army's Market Research Nonetheless Confirmed That The Army's Requirements Could Be Met By Palantir's Commercial Item. ........ 38

3. The Army Ignored Its Market Research And Issued A Solicitation For DCGS-A2 That Precludes Commercial Item Bids And Thereby Prevents Palantir From Competing. ........ 40

E. The DCGS-A2 Solicitation Is The Product Of Years Of Irrational And Bad Faith Conduct By Certain Sectors Of The Army's Program Owners—Consisting Of Bureaucratic Inertia, Resistance To Innovation, Bias Against Palantir, The Destruction Of Evidence, And The Creation Of Misleading And Deceptive Information. ........ 43

PROCEDURAL HISTORY........ 62

CLAIMS FOR RELIEF ........ 67

PRAYER FOR RELIEF ........ 81

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 4 of 84

Palantir Technologies Inc. and Palantir USG, Inc. (collectively, "Palantir"), through the undersigned counsel, allege as follows:

## NATURE OF THE CASE

### a. Overview

1. This case asks the Court to set aside as unlawful a procurement solicitation issued by the United States Army ("Army"). The solicitation is supposed to seek a solution that satisfies the requirements of a program referred to as the "Distributed Common Ground System" ("DCGS") (pronounced "DEE-sigs"). The DCGS program is intended to provide Soldiers with a data platform to gather, analyze, visualize, and share intelligence information from a multitude of sources. For over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors. As shown below, those efforts are widely recognized to have failed. The Army is therefore issuing a new solicitation for what it calls a "New Start" to its DCGS effort. Instead of being a "New Start," however, the Army's solicitation doubles down on its past failures.

2. This lawsuit is necessary for three reasons. First, it is necessary so that commercial software companies like Palantir have a chance to compete by offering commercial items that meet or exceed the Army's functional requirements. Palantir has developed a technology that solves the needs of DCGS. That technology has been successfully used by Army units and by numerous military and intelligence agencies. Army commanders in the field have repeatedly asked for Palantir's product to solve the needs DCGS is supposed to solve. Yet the Army has now issued a solicitation that makes it impossible for Palantir to compete for the new DCGS contract. That is irrational. It also directly violates the law. Section 2377 of Title 10 requires the Army to define its requirements in a manner that allows for the procurement of commercial items, such as Palantir's product, "to the maximum extent practicable." 10 U.S.C. §

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 5 of 84

2377. Despite widespread and repeated requests for Palantir from troops on the ground, the Army has done the opposite of what § 2377 requires.

3. Second, this lawsuit is necessary to disrupt the larger, recurring cycle of irrational procurement decisions that led the Army to issue a solicitation that, whether willfully or unwittingly, displays a profound ignorance of advances in commercial technology. Once again, this directly contradicts both the requirements and the overall purpose of § 2377. This Court has issued only one decision under § 2377, and that was in 1997. The statute was enacted in 1994. That makes this a seminal case the importance of which transcends this specific dispute between the Army and Palantir and has implications for all government procurements. The whole purpose of § 2377 is to require Government agencies to take advantage of private sector innovation and to acquire commercial and nondevelopmental products rather than try to build those products for themselves. Given the rapid pace of innovation in Silicon Valley and elsewhere, the mandates of § 2377 are even more important and relevant now than when they were enacted in 1994. It is time for this Court to tell the Government that it has to comply with both the letter and the spirit of § 2377 and cannot ignore it wholesale or merely pay lip service to it. This case is years in the making, with a large volume of documentary evidence, and its elements are tailor made to decide this important issue. Indeed, there could hardly be a case in which the violations of § 2377 are more clear or in which the need for compliance with § 2377 is so great.

4. Third, this lawsuit is necessary to prevent the Army from refreshing yet another failed development project that has already cost the taxpayers some $6 billion and is failing to support our troops—even to the point of putting lives at risk. Put simply, this case seeks to prevent the Army from embarking on an unlawful, risk-prone, and costly software development

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 5 of 84

project that seeks to replicate a commercial data management platform that already exists today, is combat tested, and is broadly fielded across public and private institutions, including United States intelligence agencies and military services. Yet the Army refuses even to consider the procurement of that technology. Instead, it plans to double down on its failed "developmental" effort. This Court should put a stop to that irrational, unlawful, and self-defeating conduct.

**b. <u>Palantir's Product Satisfies The Core Requirements Of DCGS And Has Been Repeatedly Requested By Army Units In The Field, Yet The Army's Solicitation Refuses To Consider The Procurement Of Palantir's Product.</u>**

5. In the late 1990s, the Department of Defense initiated the DCGS program to gather, analyze, visualize, and share Intelligence information within and across military services. Like the other services, the Army has long recognized the potential of such capabilities to transform the ability of warfighters to accomplish their missions and stay safe on the battlefield. In an attempt to realize that potential, the Army spent the past 15 years and nearly $6 billion on "Increment 1" of the Distributed Common Ground System-Army ("DCGS-A1"), far more than any other military service has invested in its version of the DCGS program.[1] Since the inception of DCGS, the central engineering challenge for the military services has been the same: the delivery of a functional data management platform. According to one Army commander, the lack of a functional data management platform on the modern battlefield "translates into operational opportunities missed and lives lost."

6. A data management platform performs three essential functions: (1) gathering data from numerous sources within a common data layer; (2) sharing and analyzing data

[1] The reference to "DCGS-A" refers to "DCGS-Army," to distinguish it from the DCGS efforts by the other military branches. Ultimately, the only rational goal for DCGS is for all of the military branches to have a combined DCGS solution that allows data gathering, analysis, and communication across the various military and intelligence branches.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 7 of 84

seamlessly across a suite of analytical tools; and (3) providing an efficient and effective visualization framework for use by commanders and Soldiers at home station and in the field. A system that performs these functions may be described in a number of different ways: it may variously be called a "data platform," a "data layer," an "Intelligence foundation layer," a "data management architecture" (also known as "DMA"), a "data integration, visualization, and analysis platform" (also known as a "DIVA platform"), or other, similar names. For simplicity, this Complaint generally uses the term "Data Management Platform" to refer to any system that performs each of the foregoing functions (or that seeks to do so).

7. This lawsuit challenges solicitation number W56KGY-16-R-0001 ("Solicitation") for what the Army calls "Increment 2" of its DCGS program (or "DCGS-A2"), and the Army's refusal to follow 10 U.S.C. § 2377 in issuing the Solicitation. As a matter of law, § 2377 *requires* government agencies, "*to the maximum extent practicable*," to procure commercial items or other "nondevelopmental" items—essentially, items that already exist, and do not have to be developed from scratch. Section 2377 even requires government agencies to modify their requirements to a reasonable extent to ensure those requirements can be met by commercial or nondevelopmental items, or by reasonable modifications to those commercial or nondevelopmental items. In this case, the Army's own documents show that (1) the Army needs a Data Management Platform and (2) Palantir offers a Data Management Platform as a commercial item that has been proven to be successful in the field. Nevertheless, the Solicitation *prevents* Palantir from offering that Data Management Platform as a commercial item to fulfill the Army's DCGS needs. This is a textbook violation of § 2377.

8. Palantir's Data Management Platform is called the Palantir Gotham Platform. It was initially developed between 2004 and 2009 with the help of an investment from, and a

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 8 of 84

partnership with, the venture capital arm of the Central Intelligence Agency, an entity known as In-Q-Tel. Since 2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ("SOCOM"), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies). These customers have overwhelmingly praised the Palantir Gotham Platform as highly effective and innovative in solving the very problems the DCGS program is intended to solve.

9. Moreover, numerous Army units in Afghanistan have seen the Palantir Gotham Platform in action through its use by SOCOM (Special Forces), and have responded by making urgent requests for the Army to acquire the Palantir Gotham Platform. Those requests have met with stiff resistance from the Pentagon bureaucracy, where the DCGS program owners appear to have adopted an attitude that effectively tells units in the field, "Don't let your war get in the way of our program." These DCGS program owners seem more intent on protecting their own failed program than on adopting a far superior commercially available technology that has been proven to work.

10. Wherever the Army has granted grudging permission for certain piecemeal acquisitions of Palantir's product for discrete units, Palantir's product has been praised as far more effective than the Army's existing DCGS product, which is uniformly panned as ineffective. This has led to more requests from Army units for the Palantir Gotham Platform to satisfy the requirements that DCGS is supposed to satisfy. Yet the Solicitation for DCGS-A2 makes it impossible for Palantir to offer the Palantir Gotham Platform to satisfy those DCGS requirements. In other words, the Army's procurement officials are refusing even to consider

buying the product that its troops on the ground are consistently telling Army headquarters they want. Thus, the Solicitation directly contradicts what the Army commanders in the field have been saying for the past six years, as illustrated by the following examples:

a. In [redacted] [redacted] the [redacted] serving as the [redacted] requested access to the Palantir Gotham Platform, explaining the failures of the Army's DCGS program as follows: [redacted]

b. On [redacted] [redacted] the [redacted] of the [redacted] wrote an email to the Department of Defense repeating a prior request for the Palantir Gotham Platform and explaining that DCGS did not work, as follows:

> [redacted]

c. On [redacted] [redacted] [redacted] of the [redacted], submitted a request for the Palantir Gotham Platform. This request first explained the deficiencies in the Army's DCGS program compared to the Palantir Gotham Platform as follows: "[redacted]

[redacted] It went on to [redacted]

d. In [redacted] in [redacted] submitted a request to replace DCGS-A, which he said led to [redacted] specifically requested [redacted]

[redacted] In December [redacted], [redacted], specifically requested [redacted], stating [redacted]

f. In February 2015, [redacted] submitted a request [redacted] stating

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 11 of 84

that [redacted]

11. These requests are just six of the twenty-eight requests the Army itself admits were submitted specifically requesting the Palantir Gotham Platform in place of DCGS as of 2015. The DCGS program owners' willingness to override these repeated requests for the Palantir Gotham Platform by constructing a Solicitation that makes it impossible for Palantir to offer its product to the Army is a discredit to the Army and deserving of public opprobrium. Numerous congressional hearings have been held and inquiries sent in an effort to unearth the basis for this irrational conduct—usually met with repeated overpromising by the Army about the impending success of the current DCGS effort, with the truth later revealed once again to be that the DCGS effort is still failing.[2] Likewise, a number of GAO reports have been issued confirming that the DCGS effort has been a profound failure, whereas Palantir offers a viable and highly effective product that can solve the DCGS requirements.[3] In addition, a number of independent investigations by journalists have highlighted the dysfunctional and irrational

---

[2] *See e.g.* Letter from Reps. Giffords and Smith to [redacted] Letter from Rep. Smith to Gen. Dempsey, Chief of Staff United States Army (May 23, 2011); Letter from Rep. Moran to the Honorable John McHugh and [redacted] (Sept. 27, 2011); Report 112-173, National Defense Authorization Act for Fiscal Year 2013, S. Armed Servs. Comm., 112th Cong. (June 4, 2012);Hearing on the Dep't of Defense Authorization of Appropriations for Fiscal Year 2014 and Future Years Defense Programs, S. Armed Servs. Comm., 113th Cong. (April 18, 2013); Hearing on the Budget Request from the Department of the Army, H. Armed Servs. Comm., 113th Cong. (April 25, 2013); Letter from Rep. Hunter to the Honorable Chuck Hagel and the Honorable James Clapper (May 1, 2014).

[3] *See e.g.* U.S. Gov't Accountability Office, GAO-13-327SU, *Distributed Common Ground System: Better Measures and Plans Needed to Help Achieve Enterprise Intelligence Sharing Goals* (2013) 13-15, *available at* http://images.military.com/PDF/gao-report-dcgs-063013.pdf; U.S. Gov't Accountability Office, GAO-16-558SU, *Distributed Common Ground System*: *Army is Applying Lessons Learned to Next Program Increment but Needs to Conduct a Technology Assessment*, (June 2016), *available at* Politico Pro https://www.politicopro.com/f/?id=00000155-9d3e-dfff-a1ff-bfbee6d30001

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 12 of 84

conduct that is causing the Army's DCGS program owners to double down on their failed procurement approach rather than to even consider acquiring Palantir's proven technology.[4]

**c. <u>There Is Evidence of Bad Faith Conduct</u>**

12. A complete understanding of the full extent of the irrational nature of the Solicitation requires a review of the Army's approach to DCGS over the past 15 years, and of the consistent hostility that certain DCGS "program owners" within the Army have shown to Palantir's innovative technology—which reveals all too plainly to them how their DCGS efforts have failed. This larger context shows that the DCGS program owners within the Army have committed the Army to a failed procurement approach that is unlawful, that benefits no one but the incumbent defense contracting industry, that irrationally resists innovation from Silicon Valley, that wastes billions in taxpayer dollars, and that even risks the lives and effectiveness of our Soldiers in uniform—all while having the gall to denounce the repeated requests for Palantir from the troops on the ground as "unpatriotic."

13. These DCGS program owners have even suppressed independent reports that were critical of DCGS-A and complimentary of the Palantir Gotham Platform. In 2012, the Army's Chief of Staff, General Raymond Odierno, directed the Army Test and Evaluation

---

[4] *See e.g.* Gordon Lubold, "**Pentagon Withholds Internal Report About Flawed $2.7 Billion Intel Program**," Foreign Policy (March 18, 2014), *available at* http://foreignpolicy.com/2014/03/18/exclusive-pentagon-withholds-internal-report-about-flawed-2-7-billion-intel-program/; TheBlaze TV, "**Armed and Unaccountable**," April 23, 2014, *available at* https://www.youtube.com/watch?v=3sUHzAV6Aqg; Robert Draper, "**Boondoggle Goes Boom: A Demented Tale of How the Army Actually does Business**," The New Republic (June 19, 2013), *available at* https://newrepublic.com/article/113484/how-pentagon-boondoggle-putting-soldiers-danger; Rowan Scarborough, "**Army's internal battle: Fight with GAO over battlefield intelligence system**," Washington Times (July 1, 2013), *available at* http://www.washingtontimes.com/news/2013/jul/1/gao-report-conflicts-with-army-over-battlefield-in/; Noah Shachtman, "**No Spy Software Scandal Here, Army Claims**," Wired Magazine (November 30, 2012), *available at* https://www.wired.com/2012/11/no-spy-software-scandal-here-army-claims/).

Command ("ATEC") to study the Palantir Gotham Platform after the Army received multiple requests for it from Soldiers in the field, many of whom were struggling to obtain situational awareness of the likely locations of Improvised Explosive Devices ("IEDs"). On April 25, 2012, ATEC issued a report in which it found that [redacted], and [redacted] The report should have led to reform in the Army's procurement process for a new Data Management Platform. Instead, the Army destroyed the report, and issued a second report [redacted]

14. A year later, the Army again suppressed an evaluation that was favorable to the Palantir Gotham Platform and that contradicted the Army's mischaracterizations of Palantir. In repeated reports to senior management in the Pentagon and to Congress, the Army's DCGS program managers have claimed that the Palantir Gotham Platform cannot satisfy the DCGS-A requirements because, according to the Army, the Palantir Gotham Platform is not an "open system," is not "interoperable" with other systems, and merely provides "link analysis" with no other capabilities. The Army continued to make at least some of these arguments in the proceedings in this case when it was before GAO. In 2013, the Under Secretary of Defense for Acquisition, Technology and Logistics commissioned an assessment by the MITRE Corporation—an independent non-profit entity that conducts federally funded research and development—to research and answer several questions about Palantir's capabilities. A July 2013 assessment prepared by MITRE showed that all of the claims about Palantir by the DCGS program owners were inaccurate. It found that Palantir was "an open system"; it found that "Palantir provides DoD-IC interoperability"; and it expressly asked "Is Palantir ONLY a link

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 14 of 84

analysis tool?" and answered that question with an unequivocal "***No***." To the contrary, the assessment found that Palantir had "robust" data integration and analytics capabilities and a "rich suite of apps" applicable to DCGS-A. Following the circulation of this favorable assessment, funding for MITRE's research on Palantir was cut off, and therefore MITRE was never able to issue a final and formal report with these findings.

15. In addition to deleting and suppressing reports, the DCGS program owners have created misleading presentations for Congress and senior Department of Defense officials with inaccurate descriptions of Palantir's capabilities. In addition, there is evidence that certain DCGS program owners discussed an effort to "kill Palantir."[5]

16. This conduct has been taken by a relatively small number of officials within the Army, and it is contrary to the stated policies of the Secretary of Defense. For example, Secretary of Defense Ashton Carter is on record as stating that "we're reaching out to America's wonderful innovative ecosystems, which are another great and unrivaled source of national strength, to build bridges to, partner with, and inspire those innovators who want to make a difference in our world. . . . We've embarked on initiatives like our start-up in Silicon Valley, the Defense Innovation Unit-Experimental, or DIUx, and there are more to come."[6] The conduct of the Army's DCGS program owners and procurement officers in this case directly contradicts this policy directive from Secretary Carter, further underscoring the irrationality of the Solicitation.

17. The motivation for the irrational conduct by the DCGS program owners at the Army may be a combination of a desire to cover up the failures of their own program, an instinct

[5] TheBlaze TV, "**Armed and Unaccountable**," at 21:40–22:20, April 23, 2014 *available at* https://www.youtube.com/watch?v=3sUHzAV6Aqg

[6] Remarks of Secretary Ashton Carter to Center for New American Security (June 20, 2016).

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 15 of 84

to preserve relationships with entrenched "inside the Beltway" contractors (and perhaps the "revolving door" relationships often entailed in those relationships), or the innate resistance to innovation and change that is inherent in every bureaucracy—or most likely, some combination of all of the foregoing. But whatever the precise motivation, the conduct is both irrational and in direct violation of the express requirements of 10 U.S.C. § 2377. Indeed, the Army has done precisely the opposite of what § 2377 requires: instead of taking advantage of innovation and maximizing the extent to which commercial items are procured to satisfy the Army's requirements, the Solicitation makes it impossible for innovative commercial items to be offered to satisfy the DCGS-A2 requirements.

**d. The Court Should Set Aside The DCGS-A2 Solicitation As Unlawful And Irrational.**

18. The Army admits that it needs a Data Management Platform. Numerous Army units in the field have reported that Palantir has a first-class Data Management Platform that meets their requirements. Nevertheless, the Army has constructed the solicitation for its Data Management Platform in such a way that *makes it impossible for Palantir to compete* by offering its Data Management Platform. This is unlawful and irrational.

19. We ask this Court to review the objective facts carefully, to enforce the law, and to set aside the unlawful and irrational conduct that is challenged here.

## PARTIES

20. Plaintiff Palantir Technologies Inc. ("PTI") is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California. PTI is the holder of the Palantir GSA schedule and many of Palantir's government contracts.

21. Plaintiff Palantir USG, Inc. ("PUSG") is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California. PTI

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 16 of 84

owns one hundred percent of the stock of PUSG. PUSG has a cleared facility "cage code," does not employ non-US citizens, and is used by Palantir for bids or contracts that require such an entity for certain kinds of work. This complaint uses the term "Palantir" to refer to PTI and PUSG collectively, as both are named Plaintiffs in this case.

22. The Defendant is the United States acting through the United States Army.

## JURISDICTION

23. This Court has jurisdiction over this challenge to the Army's DCGS-A2 bid solicitation pursuant to 28 U.S.C. § 1491(b)(1), which states that this Court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract[.]"

## FACTUAL BACKGROUND

### A. The Law Requires The Army To Procure Commercial Items To The Maximum Extent Practicable To Satisfy Its Requirements.

24. In 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA"). In FASA, Congress required federal agencies to solicit and procure "commercial items" and "nondevelopmental items" "to the maximum extent practicable." 10 U.S.C. § 2377; 41 U.S.C. § 3307. This requirement was imposed separately for both civilian, non-defense contracts, 41 U.S.C. § 3307, and for contracts entered into by agencies within the Department of Defense relating to national security, defense, or intelligence. 10 U.S.C. § 2377. Thus, Congress made clear that the law's mandatory preference for acquiring commercial items and nondevelopmental items applied to *all* government contracts, including those involving the most sensitive national security needs, and including those solicited by the Army.

25. One of FASA's primary purposes was to avoid the massive cost overruns and inefficiencies associated with "cost-plus" contracts for "developmental items." Especially in the

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 17 of 84

context of defense industry contracts, there is a long history of agencies within the Department of Defense entering into long-term contracts to develop certain technologies on a "cost-plus" basis, which has led to massive inefficiencies. First, "cost-plus" contracts tend to create perverse incentives for the contractor: the more costs it incurs, the more it can charge and the greater its profits. This removes the incentive for efficiency and replaces it with an incentive for inefficiency. Second, a "developmental" contract that seeks to build something from scratch overlooks the possibility that technology already developed by the private sector may be readily available—or easily adaptable—to satisfy the Government's needs. By failing to take advantage of private sector innovation, investment, and technology, a cost-plus developmental contract fails to meet the needs of the Government in the most efficient way possible, and it also fails to acquire the best available technology.

26. FASA was enacted to fix these problems. It created a clear and mandatory preference for the procurement of "commercial items" or "nondevelopmental items," rather than the use of cost-plus service contracts under which defense contractors are paid to develop products or technologies that already exist, in whole or in part. A "commercial item" is defined very broadly to include (among other things) items that are "customarily used by the general public or by non-governmental entities," *or* items that have "evolved" from such customarily used items and "will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation," *or* items that could satisfy one of the foregoing definitions but for certain "modifications" that are customarily made in the commercial marketplace or that are made to meet Federal requirements. 48 CFR § 2.101. In general, a commercial item is one that, perhaps with some modifications, is available to be sold or licensed

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 18 of 84

to the Government to satisfy a particular need and therefore does not need to be developed from scratch through a cost-plus contract.

27. To promote the procurement of commercial items or nondevelopmental items over the procurement of cost-plus developmental contracts, § 2377 of Title 10, which was enacted by FASA, imposes the following requirements, among others, on all agencies soliciting defense industry contracts, including the Army:

a. First, § 2377(a) imposes a "Preference" for "commercial items" and "nondevelopmental items" by providing that "*The head of an agency shall ensure that, to the maximum extent practicable*—(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—(A) functions to be performed; (B) performance required; or (C) essential physical characteristics; (2) *such requirements are defined so that commercial items* or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items**,** *may be procured to fulfill such requirements*; and (3) *offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements*." 10 U.S.C. § 2377(a)(1) (emphasis added).

b. Second, § 2377(b) has an "Implementation" provision requiring that, among other things, "*The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable*—(1) *acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency*; **. . .** (3) *modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's*

*needs are not available, nondevelopmental items other than commercial items*; (4) state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations . . . . " 10 U.S.C. § 2377(b) (emphasis added).

c. Third, § 2377(c) requires agencies to conduct market research and to use that market research to make specific determinations regarding the use of commercial and nondevelopmental items, as follows:

"(c) Preliminary Market Research.—

> (1) The head of an agency shall conduct market research appropriate to the circumstances—
>
> > (A) before developing new specifications for a procurement by that agency;
> >
> > (B) before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and
> >
> > (C) before awarding a task order or delivery order in excess of the simplified acquisition threshold.
>
> (2) *The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that*—
>
> > (A) meet the agency's requirements;
> >
> > (B) *could be modified to meet the agency's requirements*; or
> >
> > (C) *could meet the agency's requirements if those requirements were modified to a reasonable extent*."

10 U.S.C. § 2377(c) (emphasis added).

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 20 of 84

28. In short, the law unambiguously provides that where an agency *could* meet its requirements (or modifications thereof) by soliciting and procuring commercial items (or modifications thereof), it *must* do so. Thus, § 2377 divests the Army of discretion to define its requirements in any manner it wishes and then to say that those requirements cannot be fulfilled by the procurement of commercial items. Rather, as a matter of law, the Army *must*, to the "maximum extent practicable," define its requirements in a manner that allows for the procurement of commercial items.

29. The regulations implementing § 2377 provide that, "[i]f market research establishes that the Government's need *may* be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at Subpart 2.1, the contracting officer *shall* solicit and award any resultant contract using the policies and procedures in Part 12." 48 C.F.R. § 10.002(d)(1) (emphasis added). The regulations further state that "agencies *shall* . . . [d]efine requirements in terms that enable and encourage offerors to supply commercial items . . . in response to the agency solicitations[.]" 48 C.F.R. § 11.002(a) (emphasis added).

30. Similarly, the Defense Federal Acquisition Regulation Supplement ("DFARS") specifically addresses the Department of Defense's procurement of software products, stating: "Departments and agencies *shall* identify and evaluate, at all stages of the acquisition process (including concept refinement, concept decision and technology development), opportunities for the use of commercial computer software and other non-developmental software. . . ." DFARS § 212.212 (emphasis added).

31. The Commercial Item Handbook, published by the Office of the Under Secretary of Defense for Acquisition, Technology and Logistics, further explains that items on the GSA's

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 21 of 84

Federal Supply Schedule, like the Palantir Gotham Platform, are presumed to be commercial items. It also states that if commercial items are available, "acquisition personnel *must* create acquisition strategies and plans that facilitate the introduction or incorporation of evolving commercial items into defense systems." (emphasis added).

32. As noted above, one purpose of § 2377 was to encourage the use of innovative technologies developed by the private sector and to encourage the use of fixed-price commercial contracts that would be more efficient and more effective than cost-plus, "developmental" contracts that seek to develop products that already exist. The Senate Armed Services Committee that considered FASA reported: "It is critical that the Defense Department, in the future, rely to the maximum extent possible on the commercial sector rather than promote government-dependent sectors that are walled off by the acquisition system from the mainstream of American commerce. The time is ripe to transform an outmoded system of regulating defense-dependent industries into a new system that will [e]nable the government to buy goods and services cheaper and faster[.]" S. Rep. 103-259, 1994 WL 184554, *6.

33. Similarly, the Senate Committee on Government Affairs that considered FASA reported that "[t]he purchase of proven products such as commercial . . . items can eliminate the need for research and development, minimize acquisition leadtime, and reduce the need for detailed design specifications or expensive product testing." S. Rep. 103-258, 1994 WL 188485, *6 (May 11, 1994); *see also id*. at *14 ("The literature on government procurement suggests that the government frequently sets standards for its purchases that make them more costly, but not substantially more useful, than other products available through normal commercial channels. Extra development costs and foregone economies of scale increase the cost of products produced

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 22 of 84

uniquely for the government. Increasing reliance on commercially available products would lower costs.").

34. Finally, the House Committee on Government Operations that considered FASA reported: "The Federal procurement system is still plagued with the all-too-common practice of buying expensive, specially-designed products, when off-the-shelf, commercial products would do the job just as well. In this era of fiscal restraint, the Federal Government must stop 're-inventing the wheel' and learn to depend on the wide array of products and services sold to the general public on a routine basis. Over the years, numerous commissions and studies have recommended that the Government revise its policies to improve its ability to buy commercial products." H. Rep. 103-545(I), 1994 WL 261997 (Jun. 13, 1994).

35. Just as current Defense Secretary Ashton Carter has expressed his commitment to embracing innovative commercial technologies, then-Defense Secretary William Perry did the same when Congress was deliberating FASA. *See* Secretary William Perry's Testimony to Congress, S. Rep. 103-259, 1994 WL184554, *5 ("Commercial technology advancements are outpacing DoD sponsored efforts in the same sectors that are key underlying technologies for military superiority (e.g., computers, software, integrated circuits, communications, and advanced materials). The current development and production of DoD systems takes too long. The design cycle for commercial technologies is approximately 3-4 years, in DoD it is 8-10 years. Many DoD systems are technologically obsolete at the time they are fielded.").

36. Today, Congress continues to support—indeed, demand—a preference for commercial items, both in federal procurements generally and with respect to DCGS-A in particular. In the National Defense Authorization Act ("NDAA") for Fiscal Year 2016 ("FY16"), Congress required the Department of Defense to issue guidance which "provide[s]

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 23 of 84

that the head of an agency may not enter into a contract in excess of the simplified acquisition threshold for information technology products or services that are not commercial items unless the head of the agency determines in writing that no commercial items are suitable to meet the agency's needs as provided in [10 U.S.C. § 2377(c)(2)]." P.L. 114-92, § 855, 129 Stat. 919. To our knowledge, the Department of Defense never issued this guidance.

37. Congress further placed restrictions on the Army's use of FY16 funds until after the Army submitted to Congress a report that, *inter alia*, includes a review of the segmentation of DCGS-A2, identifies each component of DCGS-A2 for which commercial software exists, and includes a plan that prioritizes the acquisition of commercial software components, including for a Data Management Platform. P.L. 114-92, § 222; 129 Stat. 776. This language constitutes an express congressional directive for the Army to determine whether the Data Management Platform for DCGS-A2 can be procured as a commercial item. To our knowledge, this congressionally-mandated report has not been created or submitted to Congress. As shown below, Palantir indisputably can provide the Data Management Platform for DCGS-A2 as a commercial item on a fixed-price basis, yet the Army has refused to allow Palantir to compete. This is both unlawful and irrational.

## B. The Army Admits It Has A Critical Requirement For A Data Management Platform That It Has Been Unable To Satisfy Despite Fifteen Years Of Effort And Billions Of Dollars In Expenditures.

### 1. The Central Purpose Of The Army's Distributed Common Ground System ("DCGS-A") Is To Provide A Data Management Platform.

38. Since the late 1990s, the various military services within the Department of Defense have been working to develop DCGS. DCGS is required because the United States military and intelligence services have a wealth of different databases and data sources, but these databases exist and are maintained independently of each other; they are not integrated. This

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 24 of 84

leads to a problem of data being "stove-piped," or isolated within particular databases that serve particular purposes, without being fully integrated as part of a single, overarching system for accessing, managing, and analyzing *all* available data that the military and intelligence agencies have at their disposal.

39. This problem is not unique to the Army or the Department of Defense. It exists in many large organizations that maintain multiple databases. Making a system that gathers, maintains, updates, organizes, and allows for analysis of *all* data from *all* databases has long been a vexing problem for major organizations, and in particular for the United States Government. For example, after the terrorist attacks of September 11, 2001, reports concluded that different government agencies had different pieces of data about the attackers, and if all of those data had all been available in one place, the attackers might have been apprehended.

40. Similarly, in the Army, a commander who is planning an attack against an enemy target may need information from a multitude of sources: he may need information about battlefield terrain and weather conditions from one source; he may need information about enemy and ally locations from a second source; he may need information about relevant cellular communications in the area from a third source; he may need human intelligence (e.g., observations from assets in the field) from a fourth source; and he may need to access other information from numerous other sources. The commander and his support personnel may not be able to gather all of these data in real time, and they may not be able to integrate all of those various sources of information in a manner that allows them to be effectively and efficiently analyzed in one comprehensive picture that is available and actionable on a prompt, real-time basis.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 25 of 84

41. DCGS was intended to solve these problems of data gathering, data management, data integration, data analysis, and data presentation (through visualization or otherwise). According to a 2013 report by GAO, the [redacted] The Army has told Congress that DCGS-A "is the Intelligence, Surveillance and Reconnaissance (ISR) System of Systems (SoS) for Joint, Interagency, Allied, Coalition, and National data analysis, sharing and collaboration." And the National Assessment Group, a Department of Defense-affiliated research organization, has explained that the "Department of Defense (DoD)and the Intelligence Community (IC) have sought out a scalable analytic toolset that will enable operators and analysts to perform data mining, link analysis, process flow modeling, and geospatial depiction in near real-time (NRT) to provide tactical and strategic decision makers critical information that affects the national security interests of the United States." Each branch of the military administers its own DCGS system. The Army's system is referred to as "DCGS-A" (as in "DCGS-Army").

42. The terminology that is used to describe this central goal of DCGS-A varies, but at its core it always involves the ability to do at least the following three things: (1) to gather data from numerous sources within a common data layer; (2) to share and analyze data seamlessly across a suite of analytical tools; and (3) to provide an efficient and effective visualization framework for use by commanders and Soldiers at home station and in the field. As the Army stated in its January 2015 Industry Day presentation, DCGS-A has three core notional building blocks: "data integration," "data analytics," and a "visualization framework."

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 26 of 84

As noted above, this Complaint refers to any product that attempts to accomplish all the foregoing functions as a "Data Management Platform."

**2. After Spending Fifteen Years And Billions Of Dollars On "Increment 1" Of DCGS-A, The Army Has Failed To Develop A Working Data Management Platform.**

43. Since the late 1990s, the Army has attempted several times to build its own Data Management Platform from the ground up—and through multiple iterations, it has continued to fail miserably, while costing taxpayers approximately $6 billion in the process. Development of new software is inherently risky, with a failure rate of approximately 90 percent. The risk of failure is particularly high when the software being developed is as complex as the Data Management Platform required for DCGS-A. Indeed, a representative of Northrup Grumman – one of the many government contractors that has had a hand in the development of DCGS-A – has stated that DCGS-A "is more complex as a software system than anything else the DoD has tried to accomplish." Northrup Grumman was paid almost $600 million for doing development work on just certain subcomponents of DCGS-A; according to Army officials, Northrup delivered "very little usable software."

44. While there are several factors that contribute to the multiple failures the Army has faced in developing a working Data Management Platform, the primary or overarching factor is the fallacy that the entire DCGS-A system is necessarily a "developmental item" that needs to be custom-built for the Army. When the Army decides to embark on a developmental process, it engages in expansive review processes that solicit input from disparate communities of stakeholders throughout the Army. This "design by committee" approach incentivizes each stakeholder to submit niche and esoteric (or ill-conceived) requests that are not essential to the core Data Management Platform capability, but are rather "gold plating" add-ons or features meant to protect their own esoteric views. The result is an unwieldy package that contains

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 27 of 84

thousands of requirements, most of which do not define or support the core mission of creating a working Data Management Platform. The Army then concludes (as it has in forming the Solicitation for DCGS-A Increment 2) that only a costly multi-year developmental "indefinite delivery indefinite quantity" ("IDIQ") contract can fulfill these sundry and diffuse requirements.

45. Understanding the challenges of building the entire DCGS-A software from scratch, the Army and the Systems Integrators that support it have relied upon using a "System of Systems" or modular approach to development. This approach to Systems Engineering identifies existing software applications and components and attempts to "glue" them together to behave as one unified system. Unfortunately, most "System of Systems" approaches select software applications and components that were never designed to work together. Because of this, it requires custom software development known as "glue code" to force interaction between independently developed and maintained software pieces that were never designed to interact with each other. This approach to software development is inherently risky and results in poor interoperability between software components. The integrations are also inherently brittle and often break when the independently developed components are updated or upgraded by independent software vendors.

46. This approach to Systems Integration has been repeated several times for the past 15 years, and a predictable pattern has emerged: (1) the expansive requirements process distracts the Army from focusing on its critical technology needs; (2) the Army incorrectly assumes that the project requires a Systems Integrator for a developmental custom software project; and (3) the Systems integrators rely on a flawed methodology of component based or "system of systems" approaches to software engineering. In essence, the whole approach is doomed to fail, as it repeatedly has done.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 28 of 84

47. Moreover, with cost-plus contracts, there are no incentives for the System Integrators to deliver a working solution. The Systems Integrators get paid for the work regardless of whether a working system has been delivered at the end of the multi-year contract. There has been a clear pattern of contractors who operate under "cost-plus" developmental contracts on DCGS-A that have failed to deliver solutions that meet the defined requirements and also fail on software quality, security, and usability checks at key milestones.

48. Rather than abandon this failed approach, the Army continues to recycle its acquisition and engineering methodology. This is evidenced by the multiple failed DCGS "Cloud" efforts. Myriad government contractors, incentivized to expand budgets and extend deadlines, have taken a design-by-committee approach. The resulting product does not work. It consists largely of what could be accurately described as "glueware"—i.e., different pieces of software that were created at different times by different developers with different approaches and have been "glued" together on an ad hoc basis. The Army itself has used the term "Glue Code" to describe this approach.

49. By 2012, after more than a decade of costly "developmental" work by myriad defense contractors, the DCGS-A program had undergone at least two major restructurings of program acquisition strategy, one in 2005 and the other in 2007. Another restructuring occurred in 2011. None of these restructurings achieved success. To the contrary, as explained by GAO, based on a June 2012 [redacted] it was found that [redacted] ATEC reached a similar conclusion in August 2012. [redacted] wrote to [redacted] that DCGS-A had "Significant Limitations" and was "Not Suitable and Not Survivable as a result of operational testing and evaluation."

50. According to GAO, DCGS-A failed its tests even though many of the “[redacted] As of 2013, DCGS-A had cost the Army almost $6 billion, yet it was not scheduled for full deployment until at least 2019—a full 18 years after the Army began trying to develop it.

51. According to an email sent to Congressman Duncan Hunter in April 2013, “DCGS-A servers deployed in Afghanistan [did] not share their databases with one another.” This defeated the ability to track combatants when they crossed from one area of operations into another. The DCGS-A cloud “fail[ed] to retrieve information available through other sources,” suffered from connectivity issues, and was “a recipe for disaster.”

52. A November 2013 memorandum from the [redacted] in Afghanistan describes difficulties in using DCGS-A across a wide variety of units in Afghanistan. For example, the [redacted] reported that [redacted]

53. In January [redacted] the [redacted] released a [redacted] on a live action training exercise involving DCGS-A. Soldiers reported an “[redacted] Intelligence analysis that took more than 10 hours to complete using the DCGS-A link analysis tool was lost after a system failure forced the analysts to use Microsoft PowerPoint instead.

54. Given the complexity of the problem, the perverse incentives created by the Army’s “cost-plus” development approach, and the technological challenge of cobbling together

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 30 of 84

products from various sources, it is no surprise that the Army's efforts to build a Data Management Platform have failed. Despite spending many years and billions of dollars, the Army has been unable to build a product that delivers the capabilities that warfighters need. As shown here, in the Nature of the Case above, and in Section E below, independent evaluations and the Army's own internal documents repeatedly confirm that the Army's development efforts have been a failure.

**3. The Need For A Data Management Platform Is "The Heart" Of "Increment 2" Of The DCGS-A Program.**

55. After more than a decade of failure with DCGS-A, the Army decided in December 2014 to terminate "Increment 1" (*i.e.*, DCGS-A1) and begin "Increment 2" (*i.e.*, DCGS-A2).

56. Given the failure of DCGS-A1 to create a successful Data Management Platform, it is not surprising that "the heart" of DCGS-A2 is acquiring a working Data Management Platform, without which DCGS cannot accomplish anything. For example, in its Contracting Officer's Statement, the Army stated that one of its goals was to "componentiz[e] the major capabilities into distinct capability blocks," meaning that the Army separately identified each major capability that it wished to acquire. The Army further explained:

> "The components are broken down into three key groupings: the Data Integration Layer, the Data Analytics Platform (DAP), and the Visualization Framework. The Data Integration Layer and the DAP together make up the Data Management Architecture (DMA). . . . *The DMA will serve as the architecture foundation and the heart with which the rest of the capabilities depend on to function. The DMA development is therefore the focus of the first task order executed under the DCGS-A Increment 2 contract*."

57. Similarly, the Army stated at its 2014 Industry Day conference that the "focus" of DCGS-A2 is "usability improvements, visualization tools, analytical tools, and data integration

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 31 of 84

of the system while upgrading the infrastructure with the leading edge data integration technologies."

58. The "Data Management Architecture" described in the Contracting Officer's statement and the DCGS-A2 "focus" are two ways of describing the Data Management Platform as defined in this Complaint. In other words, the Army itself has acknowledged that the Data Management Platform is the core component— "the architecture foundation," "the focus," and "the heart" —of DCGS-A2.

59. The reason the Army says the Data Management Platform is the "heart" and the "focus" of DCGS-A2 is that a Data Management Platform is the central component *upon which the overall system depends* to provide basic functions, to ensure an effective and efficient user interface, and to meet the needs of Soldiers. Without an effective Data Management Platform, nothing else that the DCGS program may hope to accomplish is possible.

60. Acquiring a working Data Management Platform is a pre-requisite and is separate from DCGS-A acquiring additional capability and enhancements that the Army may require to fulfill identified mission needs. As an example, after the Data Management Platform has been established, the Army may seek to incorporate additional data sources, analytics, and capability into DCGS-A such as new sensors, video processing, and chat functions that allows users to efficiently discover and exploit data to support their intelligence priorities. Attempting any such additional enhancements will be ineffective unless there is a working Data Management Platform operating first as the central component upon which these enhancements are added.

61. While the "add-ons" requested by the Army are ancillary to the Data Management Platform, which is the core component of DCGS-A, they may also be commercial items that must be procured as such pursuant to § 2377. Moreover, in selling to its customers, Palantir

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 32 of 84

frequently offers to include such "add-ons" as commercial service items available as part of a fixed-price purchase of a license for the Palantir Gotham Platform.

62. To summarize, DCGS-A can be divided into two overall components: (a) the central component of the Data Management Platform, which is the core goal of DCGS, and (b) certain specialized enhancements, configurations, or ancillary additions that the Army may wish to be added to the core platform ("Additional Enhancements"). If either (or both) of these components can be provided by commercial or nondevelopmental items, then § 2377 requires the Army to solicit and procure them as such.

**C. Palantir Has Developed A Data Management Platform That Meets The Army's Requirements, That Is Available As A Commercial Item, And That Has Been Successfully Sold To Meet The Other Military And Intelligence Agencies.**

63. The Army's failure to build a Data Management Platform stands in stark contrast to Palantir's success. Whereas the Army has enlisted a cadre of government contractors who have been unable to build a fully functioning Data Management Platform, Palantir and its team of world-class engineers have built a Data Management Platform that is widely used in both the public and private sectors to solve some of the world's most complex and pressing challenges.

64. Palantir was founded in Silicon Valley in 2004. At the time of its founding, the nation's intelligence agencies and political leaders were still trying to understand what could have been done to prevent the September 11, 2001, terrorist attacks. In July 2004, the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"), published a report in which it explained that the September 11, 2001, attacks might have been prevented had Intelligence data from various sources been better integrated and less "stove-piped." These findings by the 9/11 Commission related directly to Palantir's central mission of creating a Data Management Platform to transform the way organizations gather, integrate, analyze, visualize, and share their data, while ensuring the protection of privacy and civil liberties.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 33 of 84

65. Not long after the 9/11 Commission's findings were released, an entity called In-Q-Tel, which operates as the venture capital arm of the CIA, invested $2 million in Palantir to produce a commercial Data Management Platform. In-Q-Tel also facilitated pilot programs in which Palantir worked closely with Intelligence analysts to design a commercial software solution that would address some of the data integration and analysis challenges identified in the 9/11 Commission's Report.

66. Palantir hired some of the most talented and dedicated software engineers in the world, and they concentrated their efforts on a singular focus: building a Data Management Platform that would help solve some of the world's most difficult and challenging problems.

67. Through years of effort, investment, and innovation, Palantir developed its flagship commercial item product, the Palantir Gotham Platform, a Data Management Platform. The Palantir Gotham Platform performs each of the core functions of a successful Data Management Platform: (1) it gathers data from numerous sources within a common data layer; (2) it shares and analyzes data seamlessly across a suite of analytical tools; and (3) it provides an efficient and effective visualization framework for use by commanders and Soldiers at home station and in the field. In effect, it solves the "stove-piping" problem that spurred the creation of the DCGS-A program in the first place.

68. Numerous prior and current contracts between Palantir and its government and commercial customers confirm that the Palantir Gotham Platform fully supports broad Data Management Platform functionality. For example, Palantir's April 2016 contract with SOCOM (Special Forces) expressly states that Palantir has a demonstrable history of "meeting mission critical needs" and filling "capability gaps" in DCGS. The Palantir Gotham Platform was procured by SOCOM on a commercial item basis as a "fully operational and proven commercial

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 34 of 84

software" platform that provides, among other things, "data integration and visualization," "enterprise-wide collaboration," "synchronization," "data security," "interoperability capabilities," "ease of use capabilities," "data management," and "investigative workspaces" as part of its core feature set, as well as numerous "additional capabilities" such as time-based helpers, analytic helpers, geospatial helpers, and certain types of intelligence signal helpers. In short, the Palantir Gotham Platform procured by SOCOM does exactly what the Army wants DCGS-A2 to do.

69. The reason why Palantir succeeded and the Army failed stems directly from differences in design. DCGS-A relies on "glueware," or custom software code, to cobble together independently designed products that were not developed to be interoperable. The Palantir Gotham Platform, by contrast, was developed as an open system that could be interoperable with *any* set of data that any of Palantir's customers might have. Unlike DCGS-A, the Palantir Gotham Platform uses a comprehensive and cohesive software baseline, which allows for the integration of data from multiple sources in a streamlined, user-friendly manner.

70. That is why, unlike the Army's approach to DCGS, the Palantir Gotham Platform actually works. Palantir's commercial software products, including the Palantir Gotham Platform, have been deployed at over 300 customers across a wide variety of industries, including defense, intelligence, law enforcement, financial services, health care, cyber security, retail, energy, aerospace, consumer packaged goods, and regulation and oversight. Within the U.S. federal government, agencies have procured the Palantir Gotham Platform on a commercial item basis to meet their Data Management Platform functional needs. For one current customer in the Department of Defense, for example, the Palantir Gotham Platform is deployed to enable data gathering, management, investigation, analysis, and sharing for more than 40,000 users

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 35 of 84

across all 17 intelligence organizations and 42 government agencies. Other government customers employ Palantir's commercial technologies to meet similar needs. For example, the needs met by the Palantir Gotham Platform have been described by customers using the following formulations: "a theater-wide web-based advanced analytical platform to store, organize, access, retrieve and enable full understanding of intelligence and information"; the Palantir Gotham Platform "commercial off-the-shelf (COTS) software and engineering support [can] improve complex data integration, search and discovery, advanced analytics, global knowledge management, and secure collaboration"; a "rapidly deployable web-based IT platform that can integrate, manage, analyze, visualize, report on and share . . . data"; and the Palantir Gotham Platform "provides a single technical infrastructure for a unified intelligence community through data integration, analysis, and knowledge management." Palantir's customers within the Department of Defense have included SOCOM, the Marine Corps, and the Defense Intelligence Agency. In addition, and as explained in more detail below, nearly half of the Army's brigades have acquired access to the Palantir Gotham Platform through Rapid Equipping Force ("REF") and other "urgent needs" procedures.

71. In the most fundamental respects, the needs of each of these national security, intelligence, and law enforcement customers are the same as those identified by the Army in its DCGS program: they need a Data Management Platform that gathers data from numerous sources within a common data layer; shares and analyzes data seamlessly across a suite of analytical tools; and provides an efficient and effective visualization framework for use by commanders and Soldiers at home station and in the field. That is what the Palantir Gotham Platform has done successfully for its customers, including those handling the most sensitive information related to our country's national security.

72. Whereas DCGS-A has been the subject of derision and criticism, the Palantir Gotham Platform has received overwhelmingly positive reviews from government customers, including military users. For example:

a. [redacted], who commanded the [redacted] Force in Afghanistan, praised Palantir in a February [redacted] [redacted] letter: “[redacted]

b. Similarly, the [redacted] in Afghanistan has said that “[t]here has not been a holistic analytical system with the appropriate and necessary tools to create timely and relevant intelligence before the arrival of Palantir.”

c. A commander at [redacted] in [redacted], Afghanistan described Palantir’s platform as “absolutely critical to the intelligence analysis operations in TAAC-S” and added that his unit does “not use any other system” for database searches and many types of intelligence analysis.

d. In reference to Palantir, a [redacted] said that “Marines today are alive because of the capability of this system.”

e. In September [redacted] an associate branch chief for the Army Research Laboratory wrote that Palantir “has provided software and services that exceed the Government’s expectations with minimal issues. The software services have enabled

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 37 of 84

Intelligence Analysts to collaborate complex intelligence from multiple sources giving the Government a tactical advantage in a hostile environment."

f. Customers at the Defense Intelligence Agency stated: "Palantir is critical to our daily operations"; "It is indispensable as an analytics tool"; "Palantir is the number one tool I use for all my analytics products"; and "Palantir is our primary source for putting together a clear, defined picture of the current threat so we can engage leadership to make rapid decisions."

73. Moreover, as shown summarily in the Nature of the Case and in more detail in Section E, below, the Army's own units in the field—having seen what Palantir can do for Special Forces—have repeatedly asked for the Palantir Gotham Platform, and they have repeatedly praised it as far more effective than the systems the Army and its traditional defense contractors have developed for DCGS.

**D. The Army Violated Its Legal Obligations By Issuing A Solicitation For DCGS-A2 That Makes It Impossible For Palantir To Offer Its Data Management Platform As A Commercial Item That Satisfies The Army's Requirements.**

74. One would expect the Army to embrace the Palantir Gotham Platform as an obvious solution to DCGS-A's problems. After all, DCGS-A had been based on a flawed business case, inadequate cost estimates, immature technologies and software, and poor contract incentives. The choice before the Army was clear: waste more time and more money trying to *build* a Data Management Platform or *buy* a proven commercial product that could be deployed immediately at a fraction of the cost. That should have been an easy decision. Yet the Army did the opposite of what common sense, basic rationality, and the unambiguous requirements of § 2377 all dictated.

75. In December [redacted], the Office of the Under Secretary of Defense for Acquisition, Technology and Logistics terminated DCGS-A1 pursuant to a request from then-Army

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 38 of 84

Acquisition Executive Heidi Shyu. This termination was necessitated by the repeated poor test results for DCGS-A, as shown above. The Army therefore set out to issue the Solicitation for DCGS-A2.

76. As explained above, Section 2377 required the Army to structure the Solicitation in a manner that allowed the Army to fulfill its requirements with commercial items to the maximum extent practicable. Those legal mandates are consistent with Defense Secretary Ashton Carter's commitment to technological innovation within the Army. For example, in a February 2015 speech, he said:

> "To win support from our fellow citizens for the resources we need, we must show that we can make better use of every taxpayer dollar. That means a leaner organization, less overhead, and reforming our business and acquisition practices. It also means embracing the future—and embracing change. We must be open to change in order to operate effectively in an increasingly dynamic world; to keep pace with advances in technology[.]"

77. Secretary Carter echoed this vision in recent remarks at the Defense One Tech Summit in Washington, D.C., where he stressed the importance of keeping the Department of Defense "imbued with a culture of innovation in people, organizations, operations, and technology" and praised DIUx, a Silicon Valley startup initiative established by the Secretary that strives to build bridges between the Department of Defense and technology companies.

78. However, instead of embracing innovation and commercial items and building bridges to Silicon Valley, the Army built walls between its failed procurement approach and the innovations of the private sector. The Army structured the Solicitation as a cost-plus development effort to develop a product that already exists, thereby doubling down on its failed efforts to *build* a Data Management Platform instead of *buying* one as a commercial item.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 39 of 84

**1. The Army's Market Research Was Based On The Unlawful Assumption That The Army Was Only Interested In A Developmental Project, And Would Not Even Consider The Acquisition Of A Commercial Item.**

79. From the outset, the Army approached the Solicitation in a manner that favored software development efforts and disfavored the procurement of commercial items. In fact, the Army's market research assumed from the beginning that DCGS-A2 would be a cost-plus development effort.

80. The Army's market research consisted in significant part of a series of Requests for Information ("RFIs") issued to potential bidders for the procurement of DCGS-A2. The Army's first RFI, issued in August 2014, failed even to inquire about the availability of commercial items that could meet the requirements of DCGS-A2. Instead, it "request[ed] respondents' corporate overview information and basic qualifications in *managing software development projects* that are similar in scope and process to the DCGS-A program." (emphasis added). The first RFI did not even contemplate the possibility of a fixed-price contract for the procurement of commercial items, stating instead that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years."

81. At no point did the RFI request information about the availability of commercial items or nondevelopmental items that would meet the Army's needs. This was a direct violation of § 2377(c)'s requirement that the Army conduct market research in order "to determine whether there are commercial items or….nondevelopmental items" that could "meet the agency's requirements," or could meet those requirements if the requirements or the commercial items were "modified" to some reasonable degree. 10 U.S.C. § 2377(c).

82. Nevertheless, while the Army failed to ask the right question, Palantir responded to the first RFI by explaining that commercial items were indeed available to meet the Army's

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 40 of 84

requirements, stating: "The Government does not need to build Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications." Palantir urged the Army to use a fixed-price contract, explaining that the Army's cost-plus approach was certain to result in unnecessary spending.

83. The Army apparently ignored Palantir's feedback. In its second RFI, the Army continued to frame the DCGS-A2 effort entirely in terms of *building* and *developing* the software needed to meet the requirements of DCGS-A2 instead of procuring it as a commercial item or nondevelopmental item. For example, the Army again did not ask about the availability of commercial items or nondevelopmental items that could meet its requirements, instead "request[ing] respondents' specific answers regarding the basic qualifications in *managing software development projects* that are similar in scope and process to the DCGS-A program." (emphasis added).

84. Instead of inquiring about commercial items and nondevelopmental items, the Army asked companies about their software development practices, whether they had cost accounting systems in place (for cost-plus developmental contracts), and whether they were qualified to manage software development projects similar in scope to the DCGS-A1 program.

85. In response to the second RFI, Palantir again alerted the Army to the availability of commercial items that could satisfy the DCGS-A2 requirements, noting that Palantir itself "provide[s] a commercially developed data integration and analytic platform[.]" Palantir "recommended that the Government pursue a different acquisition strategy than the long-term development used in Increment 1 [because] we believe the acquisition of an open architecture, [commercial] platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities." Palantir further stated: "We continue to

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 41 of 84

believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI [for DCGS-A2] is focused on collecting information on each respondent's capability to conduct services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps."

86. In its third RFI, the Army yet again framed DCGS-A2 as a "software development project[ ]," and it asked questions accordingly, including whether "your company ha[s] experience *developing* a product for an Acquisition Category 1 (ACAT1) Military program." (emphasis added). The Army did not ask whether any respondent could offer a commercial item or nondevelopmental item to meet any of the DCGS-A2 requirements.

87. Palantir responded to the third RFI with a document entitled, "Delivering INC2 [Increment 2] on a Commercial Platform." In it, Palantir reiterated its "concern[ ] that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate the risky long-term, services-based contracts that focus on large software development activities." Palantir again informed the Army that "[t]he data integration, visualization and analytic environment required for Increment 2 should use a fielded commercial solution that is accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DOD [Department of Defense], IC [Intelligence Community], and commercial industry."

**2. The Army's Market Research Nonetheless Confirmed That The Army's Requirements Could Be Met By Palantir's Commercial Item.**

88. Even though the Army's research stacked the deck to favor a cost-plus development contract, that market research *still* confirmed that the Solicitation could have been

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 42 of 84

structured for a fixed-price commercial item contract. Despite its efforts to pre-determine the results of the market research, the Army was unable to conceal an undeniable fact: commercial items exist to provide the Data Management Platform that DCGS-A2 is supposed to provide.

89. For example, the Army issued an Information Paper in which it stated that the "Increment 2 Key Objectives" were: "1. Modernize the Data Enterprise to a Data Management Platform[;] 2. Easier to use visualization framework[;] 3. Best Leverage industry to deliver these capabilities with a commercially supported infrastructure[;] 4. Execute in a funding constrained environment." This Information Paper then concedes: "***This infrastructure could be a commercial stand alone solution* (*Palantir*, IBM) or it could be a collection of capabilities . . . as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data." (emphasis added).

90. The Army also admits in its Contracting Officer's Statement that "***there are multiple acquisition approaches the government could have employed to procure DCGS-A Increment 2 infrastructure***." (emphasis added). These approaches included the following: "***Procure a commercial product as [the] basis of DCGS-A Increment 2 infrastructure. Integrate additional applications onto this infrastructure***."

91. The Army's market research and analysis further established that the Army could have—indeed, *should* have—structured the DCGS-A2 procurement as two separate contracts: one to procure the Data Management Platform and one to procure the Additional Enhancements. In its Market Research Report, the Army stated that its Integrated Product Team "***recommends*** PM [Project Manager] DCGS-A utilize separate contracts to develop and field DCGS-A Increment 2." This Report described the first contract, to which it referred as "Release 1," as "an

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 43 of 84

upgraded Data Architecture with some usability enhancements." The Report then described the second contract, Release 2, as "including several capability enhancements[.]"

92. The Army's Information Paper also establishes that the Army could have structured DCGS-A2 in installments, obtaining the Data Management Platform in the first installment. That document sets forth a sequenced procurement approach as follows: "DIVA Competition, Domain-specific Capabilities Updates, Integration Environment." The Army's Information Paper set forth a "bifurcation of the approach for the data integration layer to address the unique data value issues at the strategic vs. tactical implementations." According to the Army, a phased approach "clearly, in a competitive environment, addresses the critical concerns that DCGS-A needs a modernized data enterprise based on commercial technology[.]"

93. In sum, the record shows that, despite the Army's pre-determined conclusion that it would structure the Solicitation as a cost-plus development effort, the results of the Army's market research still established that the Army could have—and therefore *was required to have*—structured the Solicitation to procure commercial items.

**3. The Army Ignored Its Market Research And Issued A Solicitation For DCGS-A2 That Precludes Commercial Item Bids And Thereby Prevents Palantir From Competing.**

94. Notwithstanding the market research showing that the Data Management Platform—"the heart" and "foundation" of DCGS-A2—could have been procured as a commercial item, notwithstanding the law requiring the Army to procure commercial items to the maximum extent practicable, notwithstanding Secretary Carter's commitment to embracing commercial item innovation, and notwithstanding Congress' directives to the Army to evaluate the availability of commercial items for DCGS-A, the Army issued its Solicitation in a manner that *precluded* competition from offerors of commercial items.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 44 of 84

95. Contrary to the recommended approach of soliciting a separate contract to acquire the Data Management Platform, the Solicitation bundles together the procurement of the Data Management Platform and the procurement of the Additional Enhancements. Moreover, the Solicitation seeks offers only in the form of *developmental* offers for cost-plus service contracts, and it refuses to solicit bids that would meet the DCGS-A2 requirements through the offer of commercial items, nondevelopmental items, or fixed-price contracts. For example, (a) the Solicitation states that the Army "has the need to acquire Engineering, Manufacturing, and *Development services* in support of the [DCGS-A2] requirement" (emphasis added), and (b) the Performance Work Statement ("PWS") repeatedly defines the efforts required for the acquisition of services in terms of what the contractor "shall develop": development of new data architecture; development of visualization and analytical tools; development of cloud computing and "big data" analytic capabilities—the list goes on.

96. In addition, the PWS contains a clear instruction to "minimize or eliminate" the usage of commercial technologies.

97. It further states that "Task Order 0001 will be Cost Plus Incentive Fee (CPIF) and Cost Only" and that "[t]his is an indefinite-quantity contract for the supplies or services specified." The Solicitation states that "[t]he contractor shall report ALL contractor labor hours[,]" and it requires the contractor to have in place certain Cost Accounting Standards ("CAS"), which, among other things, "include methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs." The requirement to report labor hours and maintain Cost Accounting Standards is only appropriate for a cost-plus developmental contract, and it is inappropriate for the purchase of a commercial item or a nondevelopmental item.

98. In addition, even though the law requires the Army to structure the Solicitation in a manner that promotes the procurement of commercial items, the Army's Solicitation states that "The Government shall not award a task order or subsequent option that contains Commercial Software Licenses [sic] agreements under this IDIQ Contract unless the corresponding license agreements are reviewed and approved by the Contracting Officer."

99. The PWS accompanying the Solicitation makes clear that the Army is clinging to its failed experience with DCGS-A1, admitting: "DCGS-A Increment 2 is technically a New Start program. However, Increment 2 is a logical successor to DCGS-A Increment 1. It is envisioned that the hardware platforms and a percentage of the [software] capabilities developed in Increment 1 will be leveraged / used for Increment 2."

100. As noted above, the Army adopts a purely development-focused procurement approach for the DCGS-A2 Solicitation—commercial items are not being solicited. The Army has acknowledged the delay that will result from this approach, stating that each software release for DCGS-A2 will require a two to three year cycle "consisting of requirements definition, development, and [time and effort] activities."

101. The Army's PWS also emphasized the supposed need to "*develop*" a "data integration foundation," with "focus primarily on" a "Data Integration Layer," "Data Analytics Platform," and "Visualization Framework"—the very capabilities that are offered as commercial items today, including by the Palantir Gotham Platform. Thus, the Army seeks to "develop" something that already exists as a commercial item. That violates § 2377.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 46 of 84

### E. The DCGS-A2 Solicitation Is The Product Of Years Of Irrational And Bad Faith Conduct By Certain Sectors Of The Army's Program Owners—Consisting Of Bureaucratic Inertia, Resistance To Innovation, Bias Against Palantir, The Destruction Of Evidence, And The Creation Of Misleading And Deceptive Information.

102. The Solicitation is the result of the Army's flawed market research and irrational insistence on using a cost-plus development contract instead of the fixed-price commercial item contract that is required by law. But the Solicitation also is the culmination of a years' long effort by certain Army personnel to protect the original approach to DCGS-A—and its funding—as the Army's "program of record," while resisting innovation from the commercial software industry.

103. For years, commanders in the field (or "mission owners") have sought commercial solutions, including the Palantir Gotham Platform, to solve the commonly seen data management problem that DCGS-A was intended to address: Soldiers in the field have requested the Palantir Gotham Platform and noted their frustration with DCGS-A; the Department of Defense's senior leadership has expressed its commitment to embracing commercial innovation within the DCGS-A program; and Congress has criticized the Army's failures with DCGS-A and has directed the Army to use commercial solutions. Despite all of this, program owners in the Army—particularly within the Army's G-2's office, Intelligence and Security Command, and Intelligence and Information Warfare Directorate of the Communications-Electronics Research and Development Center—have resisted the Palantir Gotham Platform and protected the "developmental" approach to DCGS-A as the Army's official "program of record."[7]

[7] The list of DCGS program owners involved in or associated with the DCGS-A program include, among others, the following: Office of the U.S. Army Intelligence Directorate (G-2, oversight and "customer" of DCGS-A); Training and Doctrine Command; Program Executive Office Intelligence, Electronic Warfare, and Sensors (PEO IEW&S)

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 47 of 84

104. The Army had begun working on DCGS-A by the early 2000s. A decade later, it remained clear that the Army was unable to provide Soldiers the data integration, visualization, and analysis capabilities they required. Meanwhile, early adopters of commercially available alternatives began to appear in the warzone, particularly with Special Operations in Iraq and Afghanistan.

105. On July 2, 2010, [redacted], who served as the [redacted], submitted a Joint Urgent Operational Needs Statement ("JUONS"), in which he explained that [redacted] In this JUONS, [redacted] reported:

> [redacted]

106. [redacted] described [redacted]

---

(parent office of PM DCGS-A); Program Management Office, DCGS-A; U.S. Army Intelligence and Security Command (INSCOM) (responsible for all the cloud projects, etc.);
Office of the Assistant Secretary of the Army for Acquisition, Logistics, and Technology (ASA(ALT)); and various actors within the Defense Acquisition System, including the Joint Requirements Oversight Council (JROC), the Joint Capabilities Integration and Development System (JCIDS), and others.

[redacted]

107. In response to [redacted] request, [redacted], the point of contact for [redacted], prepared a proposal, or a "concept plan," identifying Palantir as a proven solution that was already in theater. [redacted] stated:

> [redacted]

The concept plan proposed allocating funds to purchase the Palantir Gotham Platform in response to [redacted] request.

108. Program owners of DCGS-A, however, rejected the concept plan, promising to develop a new version of DCGS-A, which would provide a "cloud" function and other requested capabilities within months. In a July 2010 letter to Congress, the Army stated, "The DCGS-A Cloud, together with a software upgrade planned for systems already in theater, provides the capabilities required." Army documents further explain, "a plan to meet advanced analytics JUONS was to field currently funded DCGS-A OEF cloud architecture and the DCGS-A 3.1.6 baseline." In effect, the Army told Congress not to fund the urgent request from Afghanistan, claiming that the DCGS-A Cloud efforts would soon provide a solution. But that was not the case.

109. Thus, rather than purchasing Palantir's available technology to meet the urgent request in [redacted] JUONS, the DCGS-A program owners responded to the JUONS by spending millions of additional dollars on continued DCGS-A Cloud development efforts, none of which turned out to be successful. The DCGS-A Cloud was the brainchild of

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 49 of 84

"Doctor" Russell Richardson, who reportedly received millions of dollars working as a Department of Defense contractor before joining the Army's Intelligence and Security Command in 2012, where he served as Chief Science Advisor to General Mary Legere, then the head of G-2. About two years later, the press discovered that "Doctor" Richardson had never actually received the Ph.D. he had claimed to have earned from Ohio State University. He had misrepresented his credentials, and the Army had misstated (or overpromised) what "Dr." Richardson's "cloud" efforts would produce.

110. In addition to "Dr." Richardson's claims, Lieutenant General Legere herself claimed that the DCGS-A Cloud would meet [redacted] 2010 JUONS and, more broadly, would serve as the Army's enterprise-wide data management solution. In 2011, DCGS-A program owners predicted a March 2011 date for the DCGS-A Cloud to reach Initial Operating Capability, with more robust capabilities planned for 2012. Accordingly, Members of Congress were briefed in May 2011 that the original 2010 JUONS had been fulfilled. But in contrast to the positive outlook espoused by DCGS-A program owners, Soldiers reported as late as 2013 that the DCGS-A Cloud had been "offline for months" and was not synchronizing data between data centers. Around that time, Lieutenant General Legere subtly shifted her story, claiming that the new version of the DCGS-A Cloud, now dubbed "Red Disk," would be operational by the end of 2013, and insisting that previous efforts were only "experimental," despite earlier assurances that these efforts were meeting critical Soldier needs. Yet now these prior efforts were deemed solely a "pilot program" by [redacted], a DCGS-A Program Manager, who stated, in direct contradiction to earlier claims, "the cloud is still a developmental pilot program and not part of the program of record…and DCGS, as this time, is not expected to connect to the cloud."

111. Throughout 2011, DCGS-A still was not operational, prompting the Senate Armed Services Committee to question the Army's earlier promises that the DCGS-A cloud would address [redacted] JUONS. The Senate Committee recounted the facts as follows:

> "The Army rejected this request [the JUONS], arguing that it could field a comparable government-developed capability in roughly the same timeframe. A major part of this Army-proposed solution was to be the Ozone Widget Framework [i.e., the cloud]. A year later, it is clear that the [cloud] and the development of widgets considerably lags the expectations that the Army created. The committee believes that opening up the widget development process to the broad information technology industry could speed up the satisfaction of urgent operational needs."

112. During a 2011 joint military exercise with [redacted] forces, DCGS-A became overwhelmed by the volume of information that it was being tasked with processing, and it froze as Army Intelligence analysts tried tracking simulated [redacted]. Out of 96 hours of planned operations, DCGS-A1 spent 10 of those hours either frozen or being rebooted.

113. Meanwhile, Soldiers in the field, who continued to complain about DCGS-A, requested the Palantir Gotham Platform. For example, in August 2011, [redacted] sent a memorandum to the [redacted], requesting the Palantir Gotham Platform. He explained that "Palantir fills a critical gap in [Special Operations Forces] automated analytical capability from the tactical to the operational levels," and he stated that he "ha[d] personally observed the operational value of the system in combat and *I am convinced there is no similar capability in existence, nor is there one on the horizon*." (emphasis

added). As noted above, by that time, the Palantir Gotham Platform had been purchased by multiple federal agencies, including those with national defense and intelligence missions.

114. A few months later, in November 2011, the Army's elite [redacted] was conducting high-stakes, high-risk operations in [redacted] the birthplace of the Taliban. The [redacted] was relying on DCGS-A to conduct threat assessments. The program proved useless. On [redacted] [redacted] a Soldier was killed by a roadside bomb. The next day, an improvised explosive device (IED) killed another Soldier. Three days later, two more Sol[redacted] were killed by IEDs. The [redacted] realized that they needed a new way to assess threats, and they began requesting alternative tools.

115. Palantir responded to the request by sending one of its Afghanistan field representatives to [redacted]. An intelligence analyst has been quoted in the press as describing what happened next as follows:

> [redacted]

Indeed, data available at the time indicated that use of the Palantir Gotham Platform corresponded with a significant improvement in troops' "find-and-clear" rates for IEDs, resulting in saved lives.

116. In response to this [redacted] exposure to Palantir's capabilities, the [redacted] under the command of [redacted] submitted an urgent REF request to obtain the Palantir Gotham Platform in Afghanistan. The [redacted] [redacted]

[redacted] stated as follows: “[redacted]

117. Another [redacted] sent an email on [redacted] reiterating what the [redacted] had officially requested: [redacted]

118. Instead of fulfilling [redacted]’ request to equip the [redacted] with the Palantir Gotham Platform, the Army sent more DCGS-A equipment. In the course of the resulting conflict between mission owners (*i.e.* commanders in the field) and the DCGS-A program owners, the [redacted] wrote an email on [redacted] stating:

> [redacted]

119. In separate communication to the Department of Defense on February 25, 2012, the same officer wrote:

> “[redacted]

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 53 of 84

[redacted]

120. Meanwhile, internal Army correspondence from [redacted] shows that the [redacted] was undertaking "[redacted] Thus, right when the commanders in the field are pleading for Palantir any way they can get it in order to improve operations and save lives, the Army [redacted] is blocking it by shutting down any funding that could be used to acquire Palantir. It would scarcely be an overstatement to characterize this response as reflecting an attitude of "Don't let your war get in the way of our program."

121. It was not until the end of February 2012, after then-[redacted] intervened, when the [redacted] request was finally approved. On [redacted] the [redacted] wrote, [redacted]

122. At around the same time—in [redacted] the National Assessment Group conducted an independent evaluation of the Palantir Gotham Platform. It found that most users in the USMC, the Army, and in civilian agencies favored the Palantir Gotham Platform, and almost none thought that existing systems, including DCGS-A, were adequate. The National Assessment Group report concluded:

[redacted]

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 54 of 84

[redacted]

123. At the same time, [redacted] also ordered "[redacted]." In response, ATEC—which is responsible for independent operational testing and independent evaluations, assessments, and experiments of Army equipment—conducted an "operational assessment," surveying Army Intelligence analysts and supervisors who had used the Palantir Gotham Platform.

124. From the outset, the DCGS program owners tried to shape the outcome of the ATEC assessment. For example, in February 2012, [redacted] conducting forward operational assessments of Palantir's use in [redacted], prepared an executive summary praising Palantir: "[redacted] The response from the Pentagon to [redacted] was clear: [redacted]

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 55 of 84

[redacted]

(emphasis added).

125. Similarly, even though [redacted] had ordered [redacted] at least one person conducting the evaluations was given different orders: [redacted] By this point, DCGS-A program owners knew such a comparison would not turn out well for DCGS-A.

126. Nevertheless, those initial attempts to shape the assessment failed. ATEC published its findings and recommendations in an [redacted] report s[redacted]. ATEC's report recommended that the [redacted] The report [redacted] The report [redacted]

127. In mid-April, [redacted], wrote to ATEC saying: [redacted] Separately, on [redacted] an ATEC director wrote: [redacted] That same day, [redacted] pressured [redacted], the [redacted],

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 56 of 84

to replace the report with a version that was less critical of DCGS-A and less favorable for the Palantir Gotham Platform.

128. In response to this pressure, on [redacted] One of the [redacted]

129. [redacted] then instructed [redacted] to [redacted]

130. Accordingly, [redacted]. In addition, ATEC circulated an email directing recipients of the [redacted] ATEC report to "ensure that any and all copies of the [redacted] report are *destroyed and not distributed*" and to confirm "that all copies of the original report dated [redacted] has [sic] been destroyed." (emphasis added).

131. At the same time that DCGS-A program owners were expressing concerns about "political considerations in DC" and were ordering the destruction of the [redacted] ATEC

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 57 of 84

report, Soldiers continued to request the Palantir Gotham Platform in response to additional casualties. In the two weeks between [redacted] Soldiers from the [redacted] were killed in Afghanistan. [redacted] the commander, [redacted], submitted a memorandum requesting access to the Palantir Gotham Platform, explaining:

> [redacted]
> (emphasis added).

132. [redacted] request for the Palantir Gotham Platform was denied. He requested the Palantir Gotham Platform again. The request was again denied. In September 2012, his unit returned home [redacted].

133. During an [redacted] Senate Armed Services Committee hearing, Senator Claire McCaskill asked Army General John Campbell about the [redacted] experience:

> "[I]t has been reported, and I have personal awareness from folks, that units have filed urgent needs—the ones who have gotten DCGS have filed urgent needs—these are warfighters—saying, 'Please give us this different program that has additional capability,' and the Army has resisted that. If we—if there is a program out there that is off-the-shelf and has this capability,

> in light of these programs and problems, shouldn't we be offering that to our units that are asking for it, who have used it and said, 'This is what we need right now'?"

134. General Campbell responded, "My son is a soldier in the 82nd. He's a specialist. He deployed to Afghanistan. He was one of the units that asked for DCGS—or his brigade did, not him, himself." General Campbell went on to state, "DCGS has saved lives." In fact, however, the 82nd Airborne had *not* "asked for DCGS," as General Campbell had testified. The opposite had happened: the 82nd Airborne *already had* DCGS, found it ineffective, and *requested the Palantir Gotham Platform*. General Campbell would later say that he had misspoken during the hearing.

135. As DCGS-A program owners in D.C. were defending DCGS-A, mission owners on the battlefield continued to request the Palantir Gotham Platform. On [redacted] [redacted] [redacted] stationed in [redacted] sent a request on behalf of [redacted] [redacted] to obtain the Palantir Gotham Platform. He explained:

> [redacted]

136. In response, [redacted] was told: "[redacted]

137. Congress continued to express its frustration with the plodding pace, growing budget, and ineffective results of DCGS-A, all in the face of a readily available commercial product that had been requested repeatedly by Soldiers in the field. In [redacted] the Senate

[redacted]

> [redacted]

> [redacted]

> [redacted]

138. The House Armed Services Committee expressed similar concerns about DCGS-A. In April 2013, Congressman Duncan Hunter questioned Army Chief of Staff General Odierno about DCGS-A during a Committee hearing. In response, on May 7 and 8, 2013, General Odierno and Secretary of the Army John McHugh held a press conference and wrote to Congressman Hunter, making inaccurate claims about DCGS-A and the Palantir Gotham Platform. For example, General Odierno and Secretary McHugh wrote that the Palantir Gotham

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 60 of 84

Platform "provides only a subset of the capabilities of DCGS-A," and General Odierno said, DCGS-A "works pretty damn good and has about a hundred apps that work very, very well, so I'm not going to throw that away because of one app, and that one app, by the way, is not interoperable with the other apps, so that's the problem." The Army also distributed to Members of Congress materials that contained misleading descriptions of the Palantir Gotham Platform and DCGS-A. The truth is that the Palantir Gotham Platform is not "one app," but instead provides a fully functional Data Management Platform that the DCGS-A program has been unable to develop despite more than 15 years of effort and approximately $6 billion of spending. The Marine Corps, SOCOM (Special Forces), and other military and intelligence agencies would not be purchasing the Palantir Gotham Platform as a comprehensive Data Management platform if it were merely "one app." Conversely, if DCGS-A worked as advertised, Army units would not be asking for an alternative.

139. Despite assurances from General Odierno, DCGS-A was not meeting mission critical needs. In [redacted] a Lessons Learned Collection Report from the U.S. Army Intelligence Center of Excellence stated, "DCGS-A does not provide the functionality needed by deployed intelligence Soldiers." In [redacted] while troops were coming under fire from the enemy, a Soldier in the impacted unit sent an email to Congressman Duncan Hunter explaining that his troops had to resort to calling a DCGS-A "help desk" for support, which they did not receive. [redacted]

140. During this time, the Department of Defense asked MITRE Corporation—an independent non-profit entity that operates federally funded research and development centers—

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 61 of 84

to research and answer several questions about Palantir's capabilities. The Army had incorrectly argued—as it does to this day—that the Palantir Gotham Platform is not "interoperable" with other military systems and databases, provides no meaningful capabilities beyond "link analysis," and operates on a "closed system." But the MITRE Corporation's research expressly contradicted the Army's position on all counts.

141. MITRE Corporation's findings, which were presented to the Department of Defense in a July 2013 slide deck, showed (a) that Palantir "provides DoD-IC interoperability"; (b) that Palantir was not "only a link analysis tool," but rather provides "a robust" data integration and analytics platform; and (c) that Palantir was "an open system," meaning its key interfaces were "specified, documented, and made publically available." In other words, everything that DCGS-A's proponents in the Army had been saying about Palantir was wrong. Following presentation of the findings, funding for the MITRE Corporation's research was cut off, and MITRE Corporation never issued a final and formal report. To this day, DCGS-A program owners continue to inaccurately assert that the Palantir Gotham Platform is not interoperable, not open, and that it merely performs link analysis.

142. Throughout this time period, it was not enough for the DCGS-A program owners to merely suppress favorable reports about the Palantir Gotham Platform or to obscure evidence about the failures of DCGS-A in combat and testing environments. In order to protect the relevance of the DCGS-A program, these program owners began to produce and circulate information papers, slide presentations, and other memoranda containing false and misleading information about the Palantir Gotham Platform. Over time, the Army's G-2, under the direction of [redacted] produced dozens of such documents alleging that the Palantir Gotham Platform was not interoperable, not open, and only a link analysis platform. The most

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 62 of 84

prominent and misleading of these documents was a slide deck containing a Venn diagram construing DCGS-A capabilities and Palantir Gotham Platform capabilities as having very little overlap.

143. Meanwhile, Soldiers in the field continued to request the Palantir Gotham Platform as a replacement for DCGS-A—and the Army continued to deny or delay those requests.

144. In [redacted] Operational Needs Statement requesting access to the Palantir Gotham Platform to support [redacted]. Colonel [redacted] request echoed the MITRE Corporation's research: "***Palantir's application programming interface (API) is open and interoperable with existing systems . . . including but not limited to . . . DCGS***." Colonel [redacted] also stated [redacted]

145. In [redacted] submitted an Operational Needs Statement for the Palantir Gotham Platform. [redacted]" [redacted] (emphasis added).

Brigadier General [redacted] endorsed Colonel [redacted] request, describing the Palantir Gotham Platform as "essential" to support the troops' mission.

146. Colonel [redacted] submitted his request after the Senior Intelligence civilian and Mission Support Element G-2 conducted a demonstration of both the Palantir Gotham Platform and DCGS-A. An Army attendee later noted that "DCGS-A couldn't even demo their program" and yet G-2 Office personnel "did everything they could in a polite manner to turn Colonel [redacted] off from Palantir." Later, the Senior Intelligence civilian told Soldiers that "***requesting Palantir was unpatriotic***."

147. On [redacted] Army [redacted] submitted an Operational Needs Statement for the Palantir Gotham Platform to support [redacted] conducting operations [redacted]

148. On [redacted] also submitted an Operational Needs Statement for the Palantir Gotham Platform to support operations for the [redacted]

149. In [redacted] submitted an Operational Needs Statement for the Palantir Gotham Platform to support [redacted] He wrote that the Palantir

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 64 of 84

[redacted]

150. In [redacted] submitted an Operational Needs Statement for the Palantir Gotham Platform to support operations in [redacted]

151. By [redacted], over half the brigades in the Army had requested the Palantir Gotham Platform.

152. Despite evidence that the Palantir Gotham Platform was capable of meeting soldiers' mission needs, DCGS-A program owners have continued to oppose a commercial item solution that would allow Palantir to *even compete* for the DCGS-A2 procurement. The results of this hostility to Palantir is summarized above in Section D, which shows how the Army's Solicitation makes it impossible for Palantir to bid. A vivid illustration of just how irrationally hostile the DCGS program owners are to Palantir is found in email sent by an Army National Guard representative of "G-2" (the Army's intelligence unit that contains the DCGS program

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 65 of 84

owners): the email encourages its recipients to lobby Congress to block the commercial item requirement—informing them that G-2 "opposes the 'commercial off the shelf (COTS)' requirement written in the FY17 NDAA," and instructing them to "approach your Federal House of Representative and Senate leadership to provide them your input and advice." This is arguably illegal lobbying by the Executive Branch. At a minimum, it essentially amounts to an admission by G-2 that it needs to change the law on commercial items to avoid a procurement that allows Palantir to compete.

153. The intransigence of the DCGS program owners to innovation appears to be resistant to basic facts and reality. For example, in the theater of active military operations over the past several years up to the present day, it is not uncommon to see DCGS-A equipment powered off, stacked in a corner of operations tents collecting dust; in units fortunate enough to have access to Palantir, the dust-gathering on the DCGS equipment could be contrasted with the sight of Soldiers huddled around computers equipped with the Palantir Gotham Platform in order to plan and carry out their missions. As Congressman Duncan Hunter has explained, when he visited troops in eastern Afghanistan, "DCGS was shut down in the corner, piled with books and papers." As recently as earlier this year, battalion commanders have expressed their ongoing frustrations with the latest so-called "upgrade" to DCGS-A, explaining that they "did not find it very helpful during battle" and that they resorted to using "pencil and paper to track the fight and later added the details to the DCGS."

## PROCEDURAL HISTORY

154. On February 16, 2016, Palantir protested the Army's solicitation for DCGS-A2. Palantir explained: "[T]he Palantir Gotham commercial product has been implemented at numerous agencies throughout the US Government, including the [United States Marine Corps], Special Operat[ions], and Intelligence Community. As an end-to-end data integration and

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 66 of 84

analysis platform, Palantir is capable of meeting all foundational performance requirements set forth by the Army in the DCGS-A Increment 2 Solicitation, including the Army's need for a functioning data management architecture and related visualization and analytical capabilities."

155. In March 2016, the Army responded to Palantir's protest. The Army's response was littered with legal errors and factual misstatements that either were unsupported or contradicted by the record and that illustrated the Army's refusal to consider seriously the availability of commercial items or nondevelopmental items. Four examples are illustrative:

a. First, the Army stated: "Clearly, Protestor's proposed approach is both illegal and unaffordable." This statement is both legally and factually inaccurate. With no acknowledgement of Palantir's actual cost estimate, the Army overstated the costs by orders of magnitude. The Army then said that the price estimate it had just fabricated would violate 41 U.S.C. § 2310, a law that had expired more than year before the Solicitation issued. But even if applicable, this provision sets a cap *on the acquisition of services* under a performance-based contract—it is *completely irrelevant* to the Army's procurement of software licenses to operate the Palantir Gotham Platform on a firm, fixed-price basis. So the Army first invented an inaccurate price for the Palantir Gotham Platform, and then concluded that the price exceeded an expired and legally irrelevant limit.

b. Second, the Army conflated the concept of "proprietary software" with the concept of "closed systems." This reflects a fundamental misunderstanding of software in general, and the Palantir Gotham Platform in particular. The Army said that it used the term "commercial technology" and "proprietary" synonymously and that "the problem with both proprietary and commercial technology software is that other software must be

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 67 of 84

written for the particular proprietary and commercial technology software, e.g., Apple encryption, and the user is forced to stay with the system[,]" whereas "open-sourced commercial technologies would not have this problem." That is simply not accurate. Software can be—and very often is—both proprietary (meaning that the source code is the intellectual property of the developer) and *open* (meaning that it can incorporate and interact with varied other data sources and systems). The Army's own independent studies confirm that *the Palantir Gotham Platform is open and extensible*. Thus, the Army irrationally ignored these studies and the basic fact that Palantir's Gotham Platform is *both proprietary and open*.

c. Third, the Army assumed that "most" commercial items are not "interoperable" because they "do not support any of the military standards or message formats that the Army must meet." That is not correct. As noted in an RFI response, Palantir knows that a "commercial solution" for DCGS-A2 would have to be "accredited to operate on all necessary networks and is open and interoperable with the standards relevant to the DoD, IC, and commercial industry." Palantir provides a "wide range" of such solutions as commercial items—including the Palantir Gotham Platform—which "have been tested and awarded gold stars for interoperability using [Defense Intelligence Information Enterprise] standards." Because it is "designed for use in a variety of use cases and domains across . . . government clients," the Palantir Gotham Platform has supported many "deployments with Army, DoD, and the IC." Specifically, Palantir is operating today within IC reference frameworks and is aligned with government and commercial data and interoperability standards. This includes active participation in the development and implementation of standards in the DI2E, JIE, and IC ITE, DIB, and

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 68 of 84

other relevant communities. The Army, in making sweeping generalizations about commercial items, ignored the Palantir Gotham Platform's proven interoperability with military standards.

d. Fourth, after setting forth the language of § 2377 and its implementing regulations, the Army argued that "the DCGS-A Increment 2 requirement does not fit this definition, whether it is considered a software suite or service or both." That assertion is demonstrably incorrect: as shown above, the Army's own market research showed that commercial items (including the Palantir Gotham Platform) could meet the core requirement of DCGS-A2—namely, the Data Management Platform. Moreover, the Army effectively said the opposite to Congress just a few months later. A draft of the Senate Armed Services Committee's FY17 NDAA included language directing the Army to consider the availability of commercial items *specifically for DCGS-A2*. The Army opposed the language. But instead of telling Congress that commercial items simply cannot satisfy DCGS-A2 (as it disingenuously told GAO), the Army told Congress that "[t]he proposed language is duplicative and unnecessary, because preference for acquisition of commercial items and Non-Developmental Items is already prescribed by 10 USC Section 2377." In other words, the Army told GAO that § 2377 could not practically be applied to the requirements of DCGS-A2, and then turned around and told Congress that new legislation requiring the consideration of commercial items for DCGS-A2 was unnecessary because the Army was already considering such commercial items pursuant to § 2377 (even though it actually was not doing that).

156. GAO issued its decision on May 18, 2016. It acknowledged that the Army's market research "described a number of potential approaches involving the use of commercial

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 69 of 84

DIVA software, including the approach favored by the protestor, whereby the agency could first acquire the commercial platform necessary for DCGS-A2 data integration, visualization, and analysis capabilities, and could then acquire, separately, the systems integration and development or enhancement work necessary to provide or supplement other DCGS-A2 requirements." GAO further confirmed that "the market research revealed that commercial items were available to meet some of the DCGS-A2 requirements[.]"

157. Nonetheless, GAO upheld the Solicitation because it applied an incorrect legal standard, stating that a contracting agency has broad discretion to determine the best method to accommodate its needs and could use that discretion to exclude commercial items from the bidding process. That ruling contradicted the clear requirements of § 2377. In numerous ways, that statute expressly provides that the Army "shall ensure" that it procures commercial items and nondevelopmental items to "the maximum extent practicable," including by modifying how it defines its requirements and by considering modifications to existing commercial or nondevelopmental items. By requiring the Army to maximize the procurement of commercial items and nondevelopmental items, § 2377 divests the Army of discretion to construct a solicitation that deliberately attempts to avoid the acquisition of commercial or nondevelopmental items. Thus, the Army violated the legal requirements of § 2377, and GAO erred in failing to enforce those legal requirements, as well as the others itemized below.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 70 of 84

## CLAIMS FOR RELIEF

### COUNT ONE

**The Army Violated 10 U.S.C. § 2377 and 48 C.F.R. §§ 10.002 and 11.002 By Refusing To Solicit The Data Management Platform As A Commercial Item**

158. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

159. The law required the Army to solicit commercial items and nondevelopmental items to meet its requirements "to the maximum extent practicable." Instead of complying with that obligation, the Army did the opposite. It has sought to procure "developmental" service contracts on a cost-plus basis and to *avoid* the procurement of commercial items or nondevelopmental items "to the maximum extent practicable." This is unlawful. It is also arbitrary and capricious.

160. The decision-makers at the Army who constructed the unlawful Solicitation are irrationally committed to the proposition that the Army needs to develop and own for itself the technology that Palantir has *already developed*. The Army essentially wants to build for itself what Palantir already owns and is willing to sell. This is not only irrational, it is unlawful.

161. As a matter of law, the Army was required to "ensure" that the Solicitation define its requirements in such a manner that would allow for a commercial item or a nondevelopmental item to be procured to fulfill those requirements "to the maximum extent practicable." 10 U.S.C. § 2377(a)(2); *id.* at § 2377(b). By unnecessarily and irrationally bundling together the requirement for the Data Management Platform and the supposed requirements for certain Additional Enhancements, the Solicitation violated this statutory requirement.

162. As a matter of law, the Army was required to "ensure" that "offerors of commercial items and nondevelopmental items other than commercial items are provided an

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 71 of 84

opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 2377(a)(3). By making it impossible for Palantir and other offerors of commercial items to submit bids to satisfy the requirements of the Solicitation, the Solicitation violated this statutory requirement.

163. As a matter of law, the Army was required to "ensure" that it define its requirements in terms of "(A) functions to be performed; (B) performance required; or (C) essential physical characteristics." 10 U.S.C. § 2377(a)(1). By defining requirements solely in terms of cost-plus developmental efforts, rather than in terms of the ultimate "functions" or "performance" that is required by DCGS, the Solicitation violated this statutory requirement.

164. As a matter of law, the Army was required to "ensure" that it "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency." 10 U.S.C. § 2377(b)(1). By issuing a Solicitation that makes it impossible for the Army to meet its requirements through the procurement of commercial items or nondevelopmental items, the Army has violated this statutory requirement.

165. As a matter of law, the Army was required to "ensure" that it "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b)(3). By issuing a Solicitation that unnecessarily and irrationally bundles together the requirement for a Data Management Platform and the supposed requirements for certain Additional enhancements, and by refusing to modify this Solicitation in the way the Army itself recommended so as to unbundle these two separate requirements, the Solicitation violated § 2377(b)(3).

166. In sum, the law requires the Army to solicit and procure commercial items to the maximum extent practicable. Here, the Army has done precisely the opposite of what the law requires, and therefore has violated § 2377(a) & (b).

167. Indeed, while it was improperly conducted, the Army's own market research caused the Army *to admit* that it could have structured the DCGS-A2 acquisition through two different contracts, with the first being for the procurement of the Data Management Platform, and the second being for the procurement of the Additional enhancements. The Army's own Information Paper admitted that the Data Management Platform "could be a commercial stand alone solution." The Army's own Contracting Officer conceded that it was possible to "Procure a commercial product as basis of DCGS-A Increment 2 infrastructure"—i.e., to procure the Data Management Platform.

168. By failing to solicit bids for the procurement of the Data Management Platform as a commercial item, the Army contradicted its own admissions and violated the requirements of § 2377. It also violated numerous regulations, including those found at 48 C.F.R. § 11.002 (requiring Army to define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations), and at 48 C.F.R. § 10.002(d)(1) (requiring solicitation and award of a commercial item contract if market research establishes that its needs may be met by commercial items).

**COUNT TWO**
**The Army Violated 10 U.S.C. § 2377 And 48 C.F.R §§ 10.002 And 11.002**
**By Refusing To Solicit A Commercial Item For The Entirety Of DCGS-A2**

169. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 73 of 84

170. As alleged in Count 1, the Army violated § 2377 and related regulations by failing to issue a Solicitation to procure the Data Management Platform as a commercial item and by unnecessarily and irrationally bundling the requirement for the Data Management Platform with the requirement for certain Additional Enhancements. However, even if it were legally permissible for the Army to have defined its requirements by bundling together the requirements for the Data Management Platform and the Additional Enhancements, the Army still violated § 2377 and 48 C.F.R §§ 10.002 and 11.002 by refusing to solicit commercial items for that bundled set of requirements.

171. Offerors of commercial items, including Palantir, routinely provide both Data Management Platforms and associated Additional Enhancements together in one commercial offering. For example, if Palantir were permitted to submit a bid for all the requirements set forth in the Solicitation, it would propose to provide both the Data Management Platform and the Additional Enhancements as a commercial item on a fixed-price basis, just as it does for other customers. It would not submit a bid seeking to provide any of these services on cost-plus, developmental basis.

172. Thus, even if the Army's requirements were properly defined as a bundle (which they are not), those bundled requirements could still be fulfilled with a commercial item. That means that the law required the Army to ensure that the Solicitation would allow for bids that could meet the listed requirements by providing a commercial item or nondevelopmental item. By failing to allow for this, the Army violated § 2377 and the related regulations of 48 C.F.R §§ 10.002 and 11.002.

173. Stated differently, the unlawful nature of the Solicitation is not just that it rejects a "two contract" approach that would have allowed it to procure the Data Management Platform as

a commercial item. In addition, the Solicitation is unlawful because it precludes bids by offerors of commercial items or nondevelopmental items who could fulfill the entirety of the Army's *bundled* requirements for DCGS-A2. As such, the Army violated, *inter alia*: § 2377(a)(2)'s mandate that it define its requirements to the maximum extent practicable so that commercial items could be procured to fulfill such requirements; § 2377(a)(3)'s mandate that it ensure, to the maximum extent practicable, that offerors of commercial items are provided an opportunity to compete; § 2377(b)(1)'s mandate that it ensure to the maximum extent practicable that its procurement officials acquire commercial items; 48 C.F.R. § 10.002(d)(1)'s requirement that it solicit and award a commercial item contract if market research establishes that its needs may be met by commercial items; and 48 C.F.R. § 11.002's mandate that it define its requirements in terms that enable and encourage offerors to supply commercial items in response to the agency solicitations.

174. Once again, this unlawful Solicitation reflects an irrational commitment by the Army personnel who constructed the Solicitation to build and own for themselves what Palantir has already developed and is willing to sell to the Army. The Army wants to build Palantir's technology for itself. This is both irrational and unlawful.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 75 of 84

**COUNT THREE**
**The Army Violated 10 U.S.C. § 2377(c) By Failing To Determine Whether Its Needs Could Be Met By Commercial Items**

175. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

176. Section 2377(c) provides that "[t]he head of an agency shall use the results of market research to determine whether there are commercial items . . . that – (A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. § 2377(c)(2). The Army violated these requirements in several ways.

177. First, the Army failed to design its market research in such a way that was genuinely designed to "determine" if commercial or nondevelopmental items were available to meet its requirements. This is shown by the fact that the Army's RFIs all assumed that the solicitation for DCGS-A2 would be for a developmental, cost-plus contract, and failed to genuinely investigate the ability to satisfy the requirement for a Data Management Platform through a commercial or nondevelopmental item. While it is true that the market research nonetheless resulted in the admission by the Army that a commercial item could satisfy the requirement for a Data Management Platform, the market research was nonetheless flawed in its operating assumptions and in failing to investigate properly the availability of commercial and nondevelopmental items.

178. Second, the Army failed to investigate whether a commercial or nondevelopmental item could satisfy the full bundle of requirements contained in the Solicitation—*i.e.*, both the Data Management Platform and all of the Additional Enhancements. In particular, the Army failed to consider the fact that commercial offerors such as Palantir

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 76 of 84

routinely offer, on a commercial basis for a fixed-price, both their existing commercial products (such as the Palantir Gotham Platform) and the promise to perform certain enhancement, configuration, or implementation services for those products. Palantir does do that, as do others in the sector. The Army failed to consider that and failed to use the market research to determine the extent to which that could be done to fully satisfy all of the Army's stated requirements in the Solicitation.

179. Third, the Army failed to consider what *modifications* could reasonably be made to either the existing commercial and nondevelopmental items or to the Army's requirements in order to allow commercial or nondevelopmental items to satisfy those requirements. That is a direct violation of § 2377(c).

180. Properly conducted market research would have established that (1) the Palantir Gotham Platform could satisfy the Army's requirement for a Data Management Platform; (2) Palantir (and likely others) could satisfy all of the bundled requirements of the ultimate Solicitation on a commercial or nondevelopmental basis, as the Additional Enhancements are routinely offered as part a commercial contract; and (3) reasonable modifications to either the Army's requirements or to available commercial and nondevelopmental items could ensure beyond any doubt that commercial and nondevelopmental items were available to satisfy those requirements.

181. Had the Army undertaken the market research and made the determinations required by law, it would have issued one or more solicitations to procure commercial or nondevelopmental items to satisfy the DCGS-A2 requirements.

182. That the Army refused to make the proper investigation and determinations required by § 2377(c) is further proof that the Army personnel responsible for the Solicitation are

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 77 of 84

irrationally intent upon trying to build Palantir's Gotham Platform for themselves (essentially from scratch), rather than buying it for immediate use in a rational, effective, and efficient manner.

## COUNT FOUR
## The Army Violated 48 C.F.R. § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed Price Contract

183. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

184. Independent of the merit of the claims set forth in Counts One through Three, the Army separately violated the law by soliciting a cost-reimbursement contract instead of a fixed-price contract.

185. Cost-reimbursement contracts may be used "only when (1) [c]ircumstances do not allow the agency to define its requirements sufficiently to allow for a fixed-price type contract . . . or (2) [u]ncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract[.]" 48 C.F.R. § 16.301-2(a).

186. Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable "to define its requirements sufficiently to allow for a fixed-price contract" or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

187. Thus, the Army could have defined its requirements sufficiently to allow for a fixed-price type contract. This is confirmed by the fact that offerors such as Palantir would have submitted firm fixed-price bids to meet the Army's requirements. Indeed, the Army notes that Palantir and at least one other respondent to the Army's RFIs stated as much. Regardless of

whether the services called for by the Solicitation are considered "commercial items" or not, the fact that Palantir and others are willing to offer a fixed-price bids confirms that the Solicitation should have solicited fixed-price contracts, and not the disfavored cost-plus contracts.

188. Palantir has previously provided its customers, including many customers within the military and intelligence communities, with a Data Management Platform and Additional enhancements on a firm, fixed-price basis. These customers purchase the Palantir Gotham Platform and also call upon Palantir to configure, enhance, and support the Palantir Gotham Platform as they deploy it for their particular needs. There is therefore no reason the Army could not have solicited the entirety of the DCGS-A2 requirement on a fixed-price basis, and the Army violated 48 C.F.R. § 16.301-2(a) when it refused to do so.

189. Again, the Army's unlawful conduct and its insistence on using the disfavored cost-plus contract confirms that the personnel in charge of this Solicitation were committed to building the Palantir technology for themselves rather than purchasing it as a commercial item, and allowed that commitment to outweigh their obligations to taxpayers and the warfighters in the field.

## COUNT FIVE
## The Army Violated 10 U.S.C. § 2304a(f) and DFARS Part 217.204 By Soliciting A Task Order Contract In Excess of Five Years

190. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

191. A task order contract is "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 79 of 84

192. The base period of a task order contract may not exceed five years. *See* 10 U.S.C. § 2304a(f) ("The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract or a modification of the contract. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period."); *see also* DFARS Part 217.204(e)(i) ("[T]he ordering period of a task order or delivery order contract (including a contract for information technology) awarded by DoD pursuant to 10 U.S.C. 2304a . . . [m]ay be for any period up to 5 years[.]").

193. Contrary to the five-year maximum set forth above, the Solicitation in this case contemplates a task order with a base period of *six years*. The Solicitation, therefore, violates Section 2304a's time limitation for task orders.

194. The Army has not disputed that the Solicitation contemplates a task order with a base period of six years, nor has it disputed that the law limits task order base periods to five years. Indeed, the Army appears to have anticipated that it would face this very legal challenge as a result, without seeming to have any meaningful answer to it: during a June 11, 2015 meeting, Army representatives appear to have discussed the possibility that the DCGS-A2 acquisition strategy exceeded the law's five-year limitation. It does exceed the limit. And the Army has no excuse or exception for violating that limit. This violation of law has prejudiced Palantir by denying it the opportunity to compete for any subsequent DCGS-A contracts for an entire additional year.

195. Once again, this unlawful conduct reflects the commitment of the Army personnel in charge of the Solicitation to work only with their established relationship partners in the

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 80 of 84

defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build Palantir's technology for themselves rather than to license it in a rational and efficient fashion.

**COUNT SIX**
**The Army Violated 48 C.F.R. § 16.504**
**By Soliciting An Impermissibly Expensive Task Order**

196. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

197. "No [indefinite-delivery indefinite quantity] task or delivery order contract in an amount estimated to exceed $112 million (including all options) may be awarded to a single source unless the head of the agency determines in writing that" one of four circumstances exist. 48 C.F.R. § 16.504(d)(i)(C). The first exception exists where "task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work." *Id*. The second exception exists where "[t]he contract provides only for firm fixed price task or delivery orders for [p]roducts for which unit prices are established in the contract or [s]ervices for which prices are established in the contract for the specific tasks to be performed." *Id.* The third exception exists where "[o]nly one source is qualified and capable of performing the work at a reasonable price to the Government." *Id*. The final exception exists where "[i]t is necessary in the public interest to award the contract to a single source due to exceptional circumstances." *Id*.

198. The Army does not deny that it has solicited an IDIQ task order that exceeds $112 million and that is to be awarded to a single contractor. Nor could the Army deny these basic facts about the Solicitation, which states that "the expected value of this IDIQ contract will exceed $100M" and that "[t]he IDIQ base ceiling amount is $206M."

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 81 of 84

199. Instead of denying these facts, the Army has argued that a single source IDIQ task order exceeding $112 million is acceptable here because the second exception to Part 16.504(d)(i)(C) is satisfied—*i.e.*, that the task orders expected under the contract are "so integrally related that only a single source can reasonably perform the work."

200. That determination, however, flies in the face of the Army's own market research, which, as discussed above, concluded that the Army's requirements could have been performed through *different contracts*, with the first contract focused on procurement of the Data Management Platform, and the second on the Additional Enhancements. The Army's determination that the task orders are integrally related also contradicts Congress' mandate, in FY16 NDAA, that the Army analyze the segmentation of DCGS-A2 and identify each component that could be fulfilled by commercial software. It also violates the reasonable modification requirements of § 2377.

201. Thus, the Solicitation does not satisfy the second exception to 48 CFR § 16.504(d)(i)(C). It therefore unlawfully violates the $112 million limitation set forth in 48 C.F.R. § 16.504(d)(i)(C).

202. This additional legal violation again confirms that the Army personnel in charge of the Solicitation were willing to go to any lengths to try to protect their relationship with partners in the established defense contractor industry, to resist competition from "innovative ecosystems" like Silicon Valley, and to try to build their own version of the Palantir Gotham Platform.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 82 of 84

## COUNT SEVEN

**The Army Engaged In Arbitrary, Capricious, And Unlawful Conduct By Refusing To Allow Palantir To Bid, By Resisting Innovation, By Insisting On The Failed Approach Of DCGS-A1, And By Engaging In Bad Faith Conduct**

203. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

204. Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). As shown in each of the Counts set forth above, the Solicitation violated numerous provisions of law, and hence was "not in accordance with law." In addition, and independent of all of those specific legal violations set forth in Counts One through Six, the Army's conduct was also arbitrary and capricious. This is an independent ground for setting aside the Solicitation, as provided for in § 706(2)(A).

205. First, each of the legal violations described in each of the Counts above describes arbitrary and capricious action. Even if the Army were somehow able to concoct technical legal defenses to these claims, their conduct would still be arbitrary and capricious for all the reasons described in the foregoing Counts.

206. Second, the Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 83 of 84

DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

207. Third, the Army personnel in charge of this Solicitation are irrationally resisting innovation. Both Congress and the Secretary of Defense have exhorted and directed the military services to encourage and seek out innovation. Yet the Army's conduct in this case does the opposite. That is arbitrary and capricious.

208. Fourth, the Army's conduct ignores reality and the requests from the commanders and troops whose lives depend upon the effectiveness of their Data Management Platform. Over half the brigades in the Army have requested Palantir's Gotham Platform. Yet the Army has constructed a Solicitation that makes it impossible for Palantir to compete. That is arbitrary and capricious.

209. Fifth, there is ample evidence of malicious, bad faith conduct toward Palantir. The Army's staff in G-2 directed the deletion and destruction of the portions of 2012 ATEC report that were highly favorable toward the Palantir Gotham Platform and highly unfavorable in its review of DCGS-A1. For the Army to order these deletions is bad faith conduct that reveals a deep-seated level of bias against Palantir and in favor of the incumbent defense contractors who were used in the disastrous DCGS-A1 contract. Such bias is irrational, arbitration, and capricious.

210. Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the Solicitation should be set aside as reflecting arbitrary and capricious agency conduct.

Case 1:16-cv-00784-MBH Document 1 Filed 06/30/16 Page 84 of 84

## PRAYER FOR RELIEF

WHEREFORE, Palantir respectfully requests that the Court:

**1.** Enter a preliminary injunction prohibiting the Army from awarding a contract under the Solicitation, and/or from proceeding with any performance on any such contract that may be awarded, until such time as the Court has ruled on the merits of Palantir's legal claims;

**2.** Enter a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations, including at a minimum through the issuance of a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements; and

**3.** Enter such other relief as the Court considers just and proper.

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Stacey Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

Dated: June 29, 2016