[redacted]

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., and<br>PALANTIR USG, INC.<br><br>Plaintiffs,<br>-vs.-<br><br>THE UNITED STATES<br><br>Defendant. | Case No. 16-cv-784<br>Judge Marian Blank Horn |

# PALANTIR'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR A PERMANENT INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF

Hamish P.M. Hume
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
hhume@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

[redacted]

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

QUESTIONS PRESENTED.......................................................................................4

STATEMENT OF THE CASE...................................................................................6

A. The Law Requires The Army To "Ensure" That It Defines Its Requirements In A Manner That Allows Commercial Or Nondevelopmental Items To Be Procured To Fulfill Those Requirements.................................................................... 6

1. The Law Requires The Army To Conduct Market Research "To Determine" Whether Any Commercial Or Nondevelopmental Items Could Satisfy The Army's Requirements, Including Through Reasonable Modifications. ................. 8

2. The Law Requires The Army To Define Its Requirements So As To Ensure That Commercial And Nondevelopmental Items Can Be Procured To Satisfy Those Requirements. ..................................................................................... 9

B. The Army Needs A Data Management Platform, Which Is The Central Requirement For Increment 2 Of The Distributed Common Ground System ("DCGS-A2"). ........ 11

1. A Data Management Platform Is A Software Product That Integrates Data From Many Sources And Allows For Effective Visualization And Analysis Of That Integrated Data........................................................................................ 11

2. DCGS-A Is Intended To Help Commanders Integrate, Visualize, And Analyze Intelligence Data From Various Sources. .......................................................... 12

3. The Army Has Spent Fifteen Years And Billions Of Dollars On A Failed Effort To Build Its Own Data Management Platform. .................................................. 13

4. The Army Describes Its Need For A Data Management Platform As "The Heart" Of DCGS-A2. ........................................................................................ 15

C. Palantir Has Developed A Working Data Management Platform That Meets The Army's Requirements, Has Been Widely Used By Military And Intelligence Agencies, And Is Available As A Commercial And Nondevelopmental Item........... 16

D. The Solicitation For DCGS-A2 Makes It Impossible For Palantir To Offer Its Data Management Platform As A Commercial Or Nondevelopmental Item To Satisfy The Army's Requirements. ................................................................................... 19

1. The Army's Market Research Assumed That The Army Would Solicit A Development Effort Instead Of A Commercial Or Nondevelopmental Item. ...... 19

[redacted]

2. [redacted]

3. [redacted] A Solicitation That Precludes Bids From Offerors Of Commercial And Nondevelopmental Items. ....... 27

E. The Day After This Lawsuit Was Filed—More Than Six Months After The Solicitation Was Issued—The Army Hastily Issued A Two-Page "Determination" That Tries To Provide An Ex Post Justification For Precluding Bids By Offerors Of Commercial And Nondevelopmental Items. ....... 29

ARGUMENT ....... 31

I. PALANTIR IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD WITH RESPECT TO EACH COUNT IN ITS COMPLAINT. ....... 32

A. The Army Violated § 2377(a) & (b) When It Bundled Together Its Requirement For A Data Management Platform With its Requirement For Additional Enhancements (Count I). ....... 32

B. The Army Violated § 2377(a) & (b) When It Failed To Define Its Requirements So As To Procure Both The Data Management Platform And The Additional Enhancements Together As A Commercial Or Nondevelopmental Item (Count II). ....... 35

C. The Army Violated § 2377(c) By Failing To Use Market Research To Determine Whether The Army's Requirements Could Have Been Met By Commercial Or Nondevelopmental Items (Count III). ....... 36

D. The Army Violated 48 C.F.R § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed Price Contract (Count IV). ....... 39

E. The Army Violated 10 U.S.C. § 2304a(f) And DFARS Part 217.204 By Soliciting A Task Order Contract In Excess Of Five Years (Count V). ....... 40

F. The Army Violated 48 C.F.R. § 16.504 By Soliciting An Impermissibly Expensive Indefinite Delivery, Indefinite Quantity Task Order (Count VI). ....... 41

G. The Army Engaged In Arbitrary And Capricious Conduct By Doubling Down On Its Failed DCGS-A1 Development Efforts And By Rejecting Commercial Sector Innovation (Count VII). ....... 42

II. PALANTIR WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ENTERED. ....... 43

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 4 of 53

[redacted]

III. THE BALANCE OF HARDSHIPS AS BETWEEN THE LITIGANTS WEIGHS IN FAVOR OF AN INJUNCTION. ..... 44

IV. THE PUBLIC INTEREST WEIGHS IN FAVOR OF AN INJUNCTION. ..... 45

[redacted]

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Advanced Systems Technology, Inc. v. United States*,
69 Fed. Cl. 474 (2006) ........................................ 45

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
480 U.S. 531 (1987)........................................ 32

*ATA Defense Indus., Inc. v. United States,*
38 Fed.Cl. 489 (1997) ........................................ 36

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345 (Fed.Cir.2004)........................................ 31

*Cardinal Maint. Svcs, Inc. v. United States*,
63 Fed. Cl. 98 (2004) ........................................ 43

*Ceres Envtl. Servs., Inc. v. United States*,
52 Fed. Cl. 23 (2002) ........................................ 36

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971)........................................ 36

*Ellsworth Associates, Inc. v. United States*,
45 Fed.Cl. 388 (1999) ........................................ 44

*Global Computer Enterprises, Inc. v. United States*,
88 Fed. C1. 350 (2009) ........................................ 43

*Idea Int'l, Inc. v. United States*,
74 Fed. Cl. 129 (2006) ........................................ 43

*Informatics Corp. v. United States,*
40 Fed.Cl. 508 (1998) ........................................ 36

*Innovation Dev. Enterprises of Am., Inc. v. United States*,
108 Fed. Cl. 711 (2013) ........................................ 42

*KSEND v. United States*,
69 Fed.Cl. 103 (2005) ........................................ 32

*Overstreet Elec. Co., Inc. v. United States*,
47 Fed.Cl. 728 (2000) ........................................ 44

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004)........................................ 32

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 6 of 53

[redacted]

*PGBA, LLC v. United States*,
57 Fed.Cl. 655 (2003) ........................................ 45

*Raymond Express Int'l, LLC v. United States*,
120 Fed. Cl. 413 (2015) ........................................ 36

*RLB Contracting, Inc. v. United States*,
118 Fed. Cl. 750 (2014) ........................................ 42

*United Payors & United Providers Health Svcs, Inc. v. United States*,
55 Fed. C1. 323 (2003) ........................................ 43

*ViroMed Labs., Inc. v. United States*,
87 Fed.Cl. 493 (2009) ........................................ 43

*Wildflower Int'l, Ltd. v. United States*,
105 Fed. Cl. 362 (2012) ........................................ 31

**Statutes**

10 U.S.C. § 2304a(f) ........................................ 5, 39, 40

10 U.S.C. § 2304d ........................................ 40

10 U.S.C. § 2377 ........................................ passim

10 U.S.C. § 2377(a) ........................................ 9

10 U.S.C. § 2377(a)(1) ........................................ 34

10 U.S.C. § 2377(b) ........................................ 10

10 U.S.C. § 2377(c) ........................................ 2, 8, 19, 36

10 U.S.C. § 2733(b)(1) & (3) ........................................ 34

10 U.S.C. §2377(a)(2) ........................................ 32

28 U.S.C. § 1491(b)(4) ........................................ 31

41 U.S.C. § 2310 ........................................ 42

5 U.S.C. § 706 ........................................ 31, 42

**Regulations**

48 C.F.R. § 10.002(c) ........................................ 8, 37

48 C.F.R. § 10.002(d)(1) ........................................ 10

[redacted]

48 C.F.R. § 16.301-2(a) ........ 5, 38, 39

48 C.F.R. § 16.504 ........ 5, 41

48 C.F.R. § 2.101 ........ 7

[redacted]

Palantir Technologies Inc. and Palantir USG, Inc. (collectively "Palantir") hereby move for Judgment on the Administrative Record and for a Permanent Injunction prohibiting the United States Army from awarding a contract under Solicitation W56KGY-16-R-0001 ("the Solicitation"), setting that Solicitation aside as unlawful, and requiring the Army to issue a new solicitation that complies with the legal requirements addressed below.

## INTRODUCTION

In 1994, Congress enacted a law that requires all Government agencies, including the Army, to maximize the extent to which they procure "commercial items" or "nondevelopmental items" to fulfill their requirements. As applicable to the Army and other military agencies, that law is codified at 10 U.S.C. § 2377. The purpose of this law is to ensure that Government agencies take full advantage of private sector innovation, while also saving money and time by purchasing existing technologies and products, rather than paying government contractors to try to develop, build, or reinvent things that already exist. The law is therefore critical to improving the effectiveness and efficiency of the Government's procurement process. However, with the exception of one case that did not directly implicate the law's central purposes and requirements, § 2377 has not yet been the subject of any litigation, in this Court or elsewhere. That makes this case especially important. If the Army's actions in this case are any guide, this Court has a critical role to play in requiring agencies to comply with the clear mandates of § 2377.

Section 2377 provides that *before* an agency may develop specifications for a new procurement, *before* it may issue a solicitation for that new procurement, and *before* it issues any award for that procurement, the agency "shall conduct market research," and "shall use the results of market research to determine" if there are "commercial items" or "nondevelopmental items" that "(A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 9 of 53

[redacted]

to a reasonable extent." 10 U.S.C. § 2377(c). Section 2377 then requires the agency to "ensure" that its "requirements are defined so that commercial items or … nondevelopmental items … may be procured to meet those requirements." *Id.* at § 2377(a)(2). It further requires the agency to "ensure" that "offerors of commercial items and nondevelopmental items … are provided an opportunity to compete in any procurement to fill such requirements," *id.* at § 2377(a)(3), and to "ensure" that "procurement officials" in the agency "acquire commercial items or nondevelopmental items to meet the needs of the agency," *id.* at § 2377(b)(1), and "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or … nondevelopmental items." *Id.* at § 2377(b)(2).

In this case, the Army failed to comply with *all* of the foregoing requirements. In December 2014, the Army decided that it was going to issue a solicitation for a procurement of what it calls "Increment 2" of a program called the Distributed Common Ground System ("DCGS-A2"). The Army admits that the central requirement and "heart" of this procurement is the acquisition of a product that gathers data from numerous sources, integrates that data within a common data layer, provides an efficient and effective visualization framework, and allows the data to be shared and analyzed seamlessly across a suite of tools. A product that performs these functions may be called many things, but is referred to herein as a "Data Management Platform." The DCGS-A2 procurement requires a Data Management Platform because Increment 1 of DCGS ("DCGS-A1"), which took over 15 years and cost on the order $6 billion, failed to produce a working Data Management Platform.

Since its founding in 2004, Palantir's central mission has been to create a successful Data Management Platform that can be used by both government agencies and private sector companies. Through substantial investment and some of the best software engineering talent in

[redacted]

the world, Palantir has developed a Data Management Platform called the "Palantir Gotham Platform." This product has been successfully sold to both commercial entities and Government agencies, including military and intelligence agencies such as the Marines Corps, the Special Operations Command, and the Defense Intelligence Agency. Moreover, numerous units within the Army have made special orders for the Palantir Gotham Platform and have reported that it is far more effective at meeting their needs than the various tools the Army's traditional defense contractors have developed under the DCGS-A1 program. For example, a senior Special Operations Commander in the field has written in a formal request that [redacted]

Thus, the Army has a requirement for a Data Management Platform; Palantir has a Data Management Platform that is available as a commercial item; and the law requires the Army to meet its requirements through the procurement of commercial items "to the maximum extent practicable." 10 U.S.C. § 2377. Yet the Army chose to issue a Solicitation that makes it impossible for Palantir to compete through a bid that meets the Army's requirements by supplying its commercial item. That is a blatant violation of § 2377.

The Army's failure to comply with § 2377 is perhaps best illustrated by what it did the day after this lawsuit was filed. On July 1, 2016—the day after Palantir filed its complaint, but over six months after the Army issued its Solicitation on December 23, 2015—the Army's

---

[1] There is substantial additional evidence, which is not yet in the record, of [redacted] Palantir has been meeting and conferring with counsel for the Government over the supplementation of the record, but it appears that it will not be able to reach agreement on many of the materials. Accordingly, Palantir will shortly be filing a Motion to Supplement the Record with these (and other) documents to ensure that this Court can conduct effective judicial review. This motion, however, is based solely on materials in the administrative record.

[redacted]

Contracting Officer executed a document purporting to make a "determination" regarding the absence of commercial items that could meet the requirements of the DCGS-A2 procurement. *See* Tab 134. That the Army would feel the need to create such an *ex post* paper trail to try to demonstrate after-the-fact compliance with § 2377 speaks volumes. The creation of this July 1, 2016 document implicitly admits that the Army failed to make the determinations that § 2377 required be made *before* the Solicitation was issued. Moreover, as shown below, even the belated July 1, 2016 document fails to make most of the determinations required by § 2377(c). And the one determination it purports to make is demonstrably false, has zero support in the record, and is in fact disproven in the record (as well as by evidence Palantir seeks to have added to the record). The only thing the July 1, 2016 document proves is how the Army views § 2377—as an afterthought. This case should change that.

## QUESTIONS PRESENTED

In accordance with Rule 5.4(a)(1)(C), below are the questions presented by our motion.[2]

1. Did the Army violate § 2377(c) by failing to conduct market research that was designed to determine whether there were commercial or nondevelopmental items that could meet the Army's requirements, and by assuming from the outset that the procurement would be for a developmental contract?

2. Did the Army violate § 2377(c) by failing to analyze and failing to make any determination as to whether modifications to existing commercial or nondevelopmental items could fulfill the Army's requirements?

3. Did the Army violate § 2377(c) by failing to analyze and failing to make any determination as to whether modifications to its requirements could be made that would allow the requirements to be fulfilled by commercial or nondevelopmental items?

[2] These questions are listed in the approximate chronological order of the Army's legal violations. Our counts are structured slightly differently in order to focus on the most fundamental violations first. Thus, questions 1-6 above are covered by Count III and addressed in § I(C); question 7 is covered by Count I and addressed in § I(A); question 8 is covered by Count II and addressed in § I(B); question 9 is covered by Count IV and addressed in § I(D); question 10 is covered by Count V and addressed in § I(E); question 11 is covered by Count VI and addressed in § I(F); and question 12 is covered by Count VII and addressed in § I(G).

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 12 of 53

[redacted]

4. Did the Army violate §2377(c) by failing to make any of the determinations required by § 2377(c) until after this lawsuit was filed?

5. Does the Army's July 1, 2016 determination document violate § 2377(c) because it (a) was executed more than six months after the Solicitation was issued; (b) fails to make all of the determinations required by § 2377(c); and (c) provides no factual support for the one determination it does make, which is demonstrably erroneous?

6. Did the Army violate the requirements of the National Defense Authorization Act for Fiscal Year 2016 by failing to issue the guidance required by § 855 of that law, and by preparing the report required by § 222 of that law six months after issuing the Solicitation?

7. Did the Army violate § 2377(a) & (b) by bundling together the procurement of the Data Management Platform with the procurement of the Additional Enhancements (defined below)?

8. Did the Army violate § 2377(a) & (b) by constructing a Solicitation that precludes bids by offerors of commercial or nondevelopmental items, given that there are offerors that could satisfy the bundled procurement by offering commercial or nondevelopmental items on a fixed price basis?

9. Did the Army violate 48 C.F.R. § 16.301-2(a) by soliciting cost-plus bids rather than fixed-price bids?

10. Did the Army violate 10 U.S.C. § 2304a(f) and DFARS Part 217.204 by soliciting a task order contract with a duration of 6 years, given that the legal limit for such contracts is 5 years?

11. Did the Army violate 48 C.F.R. § 16.504 by soliciting an "indefinite delivery, indefinite quantity" ("IDIQ") contract with an estimated value that exceeds the $112 million legal limit for such contracts?

12. Did the Army act arbitrarily, capriciously, or otherwise not in accordance with law by taking the actions set forth above and by allowing bias and bad faith conduct to infect its decision-making process?

[redacted]

## STATEMENT OF THE CASE

### A. The Law Requires The Army To "Ensure" That It Defines Its Requirements In A Manner That Allows Commercial Or Nondevelopmental Items To Be Procured To Fulfill Those Requirements.

In 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA"). One of the central purposes of this statute was to require federal agencies (including the Department of Defense and other national security agencies) to satisfy their procurement needs by buying commercial products that have already been developed in the private sector, rather than by awarding cost-plus contracts to traditional government contractors who are paid to develop products that already exist. As the House Committee on Government Operations explained, FASA was designed to end the "all-too-common practice of buying expensive, specially-designed products, when off-the-shelf, commercial products would do the job just as well." H. Rep. 103-545(I), 1994 WL 261997 (Jun. 13, 1994). Similarly, the Senate Armed Services Committee ("SASC") explained: "It is critical that the Defense Department, in the future, rely to the maximum extent possible on the commercial sector rather than promote government-dependent sectors that are walled off by the acquisition system from the mainstream of American commerce. The time is ripe to transform an outmoded system of regulating defense-dependent industries into a new system that will [e]nable the government to buy goods and services cheaper and faster." S. Rep. 103-259, 1994 WL 184554, *6.[3]

The relevant provisions of FASA that apply to the Armed Forces are set forth in 10 U.S.C. § 2377. As shown below, this statute adopts an explicit and mandatory preference for the procurement of "commercial items" or "nondevelopmental items," and it effectively prohibits the

---

[3] The Senate Committee on Governmental Affairs further explained that FASA was intended to address the fact that "the government frequently sets standards for its purchases that make them more costly, but not substantially more useful, than other products available through normal commercial channels." S. Rep. 103-258, 1994 WL 188485, *14 (May 11, 1994).

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 14 of 53

[redacted]

use of cost-plus development contracts to build products that already are available for purchase in the private sector.

The regulations implementing § 2377 define the term "commercial item" broadly to include, among other things, items that are "customarily used by the general public or by non-governmental entities," or items that have "evolved" from such customarily used items and "will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation," or items that could satisfy one of the foregoing definitions but for certain "modifications" that are customarily made in the commercial marketplace or that are made to meet Federal requirements. 48 C.F.R. § 2.101. A "nondevelopmental item" includes, *inter alia*, "Any previously developed item of supply used exclusively for governmental purpose," or any such item that "requires only minor modification of a type customarily available in the commercial marketplace to meet the requirements of the procuring department or agency." *Id.*

Section 2377 also imposes a number of procedural requirements on Government agencies like the Army. In particular, agencies must conduct market research with the goal of identifying commercial or nondevelopmental items that can satisfy the agency's requirements; consider modifications to the agency's requirements so they can be satisfied by commercial or nondevelopmental items; consider modifications to commercial or nondevelopmental items to determine if they can satisfy the agency's requirements; make specific determinations regarding all of the foregoing; and define requirements in such a manner that maximizes the extent to which commercial and nondevelopmental items can be procured to satisfy those requirements.

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 15 of 53

[redacted]

### 1. The Law Requires The Army To Conduct Market Research "To Determine" Whether Any Commercial Or Nondevelopmental Items Could Satisfy The Army's Requirements, Including Through Reasonable Modifications.

Section 2377(c) required the Army to conduct "Preliminary market research" before it issued the Solicitation for DCGS-A2, as follows:

> **(c) Preliminary market research** –
>
> . . .
>
> (2) The head of an agency shall use the results of market research ***to determine*** whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that—
>
> (A) meet the agency's requirements;
>
> (B) ***could be modified*** to meet the agency's requirements; or
>
> (C) could meet the agency's requirements ***if those requirements were modified to a reasonable extent***.

10 U.S.C. § 2377(c) (emphasis added).

Regulations implementing § 2377(c) further provide that, if market research "indicates commercial or nondevelopmental items might not be available to satisfy agency needs, ***agencies shall reevaluate the need*** in accordance with [FAR] 10.001(a)(3)(ii) and ***determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs***." 48 C.F.R. § 10.002(c) (emphasis added).

Congress recently gave the Army specific instructions with respect to the application of § 2377(c) to DCGS. In the National Defense Authorization Act ("NDAA") for Fiscal Year 2016 ("FY16"), Congress required the Department of Defense to issue guidance to prohibit agencies from entering into contracts for "information technology products or services that are not commercial items unless the head of the agency determines in writing that no commercial items

[redacted]

are suitable to meet the agency's needs" as provided in § 2377. *See* P.L. 114-92, § 855(a)(1), 129 Stat. 919. Congress also capped the Department of Defense's use of FY16 funds until the Army submitted to Congress a report that, *inter alia*, identifies each component of DCGS-A for which commercial software exists and includes a plan that prioritizes the acquisition of commercial software components. *Id.*, § 222; 129 Stat. 775-76. Palantir's understanding is that the Army issued the § 222 report only after Palantir filed its notification of intent to file this lawsuit, and the Army has still not issued the issued the § 855 guidance despite a January 23, 2016 deadline.[4]

**2. The Law Requires The Army To Define Its Requirements So As To Ensure That Commercial And Nondevelopmental Items Can Be Procured To Satisfy Those Requirements.**

After conducting the market research and making the express determinations and evaluations required by § 2377(c) and its accompanying regulations, the Army was required to define its requirements in a manner that maximized its ability to procure commercial or nondevelopmental items. Section 2377(a) provides as follows:

> (a) **Preference** – ***The head of an agency shall ensure that, to the maximum extent practicable*** –
>
> (1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—
>
> > (A) functions to be performed;
> >
> > (B) performance required; or
> >
> > (C) essential physical characteristics;
>
> (2) ***such requirements are defined so that commercial items or***, to the extent that commercial items suitable to meet the agency's needs

[4] The June 28, 2016 § 222 report admits that "Palantir Gotham" is a "COTS" (i.e., a commercial off-the-shelf) product that can "Integrate, manage, secure, and analyze data on an enterprise." Report to Congress on DCGS-A2, Appx A at 26

[redacted]

are not available, ***nondevelopmental items other than commercial items, may be procured to fulfill such requirements***; and

(3) ***offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements***.

10 U.S.C. § 2377(a) (emphasis added).

After complying with §§ 2377(a) and (c), the Army was then required to comply with § 2377(b), which states that the Army must ensure that its procurement officials maximize the actual procurement of commercial or nondevelopmental items, as follows:

(b) **<u>Implementation</u>** – ***The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable*** –

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency; . . .

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items; [and]

(4) state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations . . . .

10 U.S.C. § 2377(b) (emphasis added).[5]

[5] *See also* 48 C.F.R. § 10.002(d)(1) ("If market research establishes that the Government's need ***may*** be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer ***shall*** solicit and award any resultant contract using the policies and procedures in part 12.").

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 18 of 53

[redacted]

In sum, § 2377 provides that where an agency *could* meet its requirements (or modifications thereof) by soliciting and procuring commercial or nondevelopmental items (or modifications thereof), the agency *must* do so. Section 2377's mandatory language divests the Army of discretion to define its requirements in any manner it wishes and thereby avoid the procurement of commercial or nondevelopmental items that are available to meet its needs.

**B. The Army Needs A Data Management Platform, Which Is The Central Requirement For Increment 2 Of The Distributed Common Ground System ("DCGS-A2").**

**1. A Data Management Platform Is A Software Product That Integrates Data From Many Sources And Allows For Effective Visualization And Analysis Of That Integrated Data.**

A Data Management Platform is a software product that performs three essential functions: (1) it gathers data from numerous sources within a common data layer; (2) it provides an efficient and effective visualization framework; and (3) it allows the data to be shared and analyzed seamlessly across a suite of tools.[6] *See, e.g.*, Tab 43 at A2226-27 (explaining that [redacted]; *see also* Tab 15 at A693; Tab 36 at A1894.

As discussed below, a Data Management Platform is the architectural foundation of the DCGS-A program. Once a Data Management Platform is in place, the Army may seek to customize it with additional capabilities and enhancements ("Additional Enhancements"). *See generally* Tab 15 at A691, A693. For example, the Army might require a chat function that

[6] A Data Management Platform also may be referred to as a "Data Platform," a "Data Layer," an "Intelligence Foundation Layer," a "Data Management Architecture" (or "DMA"), "Data Architecture," a "Data Integration, Visualization, and Analysis Platform" (or "DIVA Platform"), a "Data Integration Foundation," a "DIVA Turn-Key Platform," or other, similar names.

[redacted]

allows users in Afghanistan to exchange instant messages with users in Washington as they work together on a shared dataset, or the Army might require specialized algorithms to facilitate data analyses. *See id*. at A694.

**2. DCGS-A Is Intended To Help Commanders Integrate, Visualize, And Analyze Intelligence Data From Various Sources.**

The DCGS program was conceived in the late 1990s and was intended to address a challenge that exists throughout the Government, including in the Armed Forces and in the Intelligence Community: a massive amount of intelligence information is available, but it is often "stove-piped," meaning that it comes from different sources and resides in different, segregated databases. It is difficult to integrate all of that information in one place where it can be efficiently visualized and analyzed. For example, the congressionally appointed commission that studied the terrorist attacks of September 11, 2001 concluded that different Government agencies had different pieces of data about the attackers, and if all of those data had all been available in one place, the attackers might have been apprehended.[7]

Similarly, an Army Commander who is planning an operation may need information from many sources: he may need satellite images to discern enemy and ally troop locations; he may need geospatial intelligence to understand battlefield terrain; he may need signals intelligence to know the location and time of cellular communications among enemies; and he may need reports from agents in the field to understand the enemy's tendencies. The Commander may have access to a wealth of information, but he may not be able to integrate the information in a manner that allows it to be effectively and efficiently analyzed in one comprehensive picture that is available and actionable on a prompt, real-time basis. *See* Tab 85

[7] *See* Thomas H. Keane, Lee Hamilton, et al., *Final Report of the National Commission on Terrorist Attacks Upon the United States* at 402-03, 417-18 (2004).

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 20 of 53

[redacted]

at A3671 [redacted]

DCGS was intended to solve these challenges, with "DCGS-A" being the Army's version of DCGS. *See* Tab 13 at A418; *see also* Government Accountability Office Report No. GAO-13-327SU at 8 [redacted]

### 3. The Army Has Spent Fifteen Years And Billions Of Dollars On A Failed Effort To Build Its Own Data Management Platform.

Through what it calls "Increment 1" of the DCGS-A program ("DCGS-A1"), the Army has spent fifteen years and billions of dollars on a failed effort to develop its own Data Management Platform.[8] A principal reason the Army has been unable to build a functioning Data Management Platform is because it has relied on "Glue Code," whereby different pieces of software that were created at different times by different developers using different approaches have been cobbled together on an ad hoc basis. *See* Tab 1 at A22 (explaining that "pulling all of the pieces of the system into a single, common user experience, requires unique development

[8] *See, e.g.*, Government Accountability Office Report No. GAO-13-327SU at 19 [redacted] Robert Draper, *Boondoggle Goes Boom: A Demented Tale of How the Army Actually Does Business*, New Republic (June 19, 2013); Tab 15 at A689.

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 21 of 53

[redacted]

that is sometimes referred to as 'Glue Code.'"); Tab 2 at A57 [redacted] Tab 36 at A1886. Moreover, [redacted] *See* Tab 87 at A3883.

One illustration of the failure of the Army's approach to DCGS-A is the fact that more than half of the operational brigades in the Army have asked to replace the Army's current DCGS tools with the Palantir Gotham Platform. *See* Tab 15 at A689, A691; *see also* Tab 18 at A710; Tab 136 at A6631 (describing deployed units' requests for commercial items, including the Palantir Gotham Platform); Tab 1 at A8 [redacted][9]

The plodding pace, growing budget, and ineffective results of the DCGS-A program have led to criticism from both GAO and Congress. *See* Complaint ¶¶ 48-54, 102-153 (citing public reports and hearings). For example, SASC concluded that it "lacks confidence" in the Army's ability "to deliver a fully capable, end-to-end system to support the warfighter on an acceptable schedule and cost," particularly when the DCGS-A1 experience is contrasted with the pace of innovation for "big data" analytical platforms in the commercial sector. FY13 NDAA SASC Report, S. Rep. No.112-173 at 187 (2012). Last year, Senator Tom Cotton, Chairman of the SASC Subcommittee on Airland, explained during a congressional hearing:

---

[9] Senator Claire McCaskill explained during an April 2013 SASC hearing that the DCGS-A program managers within the Army often deny or resist Soldiers' requests: "it has been reported and I have personal awareness from folks that units have filed urgent needs—the ones who have gotten DCGS have filed urgent needs—these are warfighters—saying, '*Please give us this different program that has additional capability,' and the Army has resisted that.* If we—*if there is a program out there that is off-the-shelf and has this capability, in light of these programs and problems, shouldn't we be offering that to our units that are asking for it, who have used it and said, 'This is what we need right now'*?" SASC Subcommittee Hearing on Readiness, 2013 WL 1697854 (Apr. 18, 2013) (emphasis added).

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 22 of 53

[redacted]

> "Despite these investments, the failures of DCGS-A are well documented. They include a series of testing failures, program delays, cost overruns, and negative reports from deployed commanders and soldiers. The Army's promise that the next version of the software would fix the problems with the system, but units continue to report that it does not meet their needs in theater or at their home stations. Instead of leveraging existing technologies, the Army continues with an approach to delivering a major software platform. They continue to try to build core functions of the DCGS-A system according to customer requirements rather than adopting commercial components that work today."

SASC Subcommittee Hearing on Army Modernization, 2015 WL 1682985 (Apr. 14, 2015).

By the Army's own admission, [redacted] Tab 87 at A3883. [redacted] *See* Tab 5 at A91; Tab 22 at A1051. However, as shown below, the Solicitation for DCGS-A2 is not a "New Start"; it is a redoubling of the failed software development approach that led the Army to this point in the first place.

**4. The Army Describes Its Need For A Data Management Platform As "The Heart" Of DCGS-A2.**

A functioning Data Management Platform is the foundation of DCGS-A; without it, nothing that the Army hopes to accomplish through the DCGS-A program is possible. The Army repeatedly has acknowledged this. The Army's Contracting Officer has explained:

> "The DMA [i.e., Data Management Architecture] will serve as *the architecture foundation and the heart* with which the rest of the capabilities depend on to function. The DMA development is therefore *the focus* of the first task order executed under the DCGS-A Increment 2 contract."

Tab 1 at A16 (emphasis added). This "DMA" is just another way of referring to the Data Management Platform. (The DMA may need visualization added to constitute a Data

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 23 of 53

[redacted]

Management Platform, but there is nothing in what the Army calls the "DMA" that is not contained in a functional Data Management Platform such as the Palantir Gotham Platform.) The Army has also stated in an "Information Paper" that its four "Key Objectives" for DCGS-A2 are to modernize the "Data Integration Platform" (another name for the Data Management Platform), to obtain an easier to use visualization framework, to leverage industry to deliver these capabilities with a commercially supported infrastructure, and to execute the project in a funding constrained environment. *See* Tab 50 at A2363; *see also* Tab 46 at A2299 [redacted][10] Similarly, at a 2014 "Industry Day" conference, the Army reiterated that the "focus" of DCGS-A2 is "upgrading the infrastructure with leading edge data integration technologies," including "visualization tools, analytical tools, and data integration of the system." Tab 148 at A6802.

### C. Palantir Has Developed A Working Data Management Platform That Meets The Army's Requirements, Has Been Widely Used By Military And Intelligence Agencies, And Is Available As A Commercial And Nondevelopmental Item.

The Palantir Gotham Platform is a Data Management Platform. It is currently deployed extensively across the Intelligence Community and throughout the Department of Defense, including within the United States Marine Corps ("USMC") and the United States Special Operations Command ("SOCOM"). *See* Tab 15 at A689; Tab 36 at A887-88 (listing examples of contracts); Tab 40 at A1922 [redacted]

[10] *See also* Tab 43 at A2240 [redacted] Tab 87 at A3883 [redacted] Tab 48 at A2312 [redacted]

[redacted]

[redacted] SASC Subcommittee Hearing on Army Modernization, 2015 WL 1682985 (Apr. 14, 2015) (discussing use by USMC and SOCOM). More than half of the Army's operational brigades have requested access to the Palantir Gotham Platform. *See* Tab 15 at A691; Tab 18 at A710.

For example, on [redacted] submitted a formal [redacted] to Army Headquarters in which he stated that [redacted] wrote that the failures of DCGS-A1 created a [redacted] *Id.* at 6634 (emphasis in original). He then went on to explain that:

> [redacted]

[redacted]

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 25 of 53

[redacted]

[redacted] further explained that [redacted] *Id.* at 6637. [redacted]

In the administrative record, there are two additional examples of Senior Officers submitting Operational Needs Statements ("ONS") requesting the Palantir Gotham Platform. *See* Tab 138 at A6643 [redacted]

[11] In testimony before the SASC Subcommittee on Airland, Major General Cheeks stated that there have been "***28 requests for commercial, advanced analytic capabilities, to include Palantir.***" Tab 136 at A6631 (emphasis added). Senior Officers from more than half the brigades in the Army have made such requests. *See* Tab 15 at A691; Tab 18 at A710. Palantir is separately filing a Motion to Supplement the Record with additional examples of requests submitted by high-ranking Commanders in the field (and discovery requesting any we do not currently have). These requests demonstrate that the Army knew, or should have known, from its own experience that commercial items exist to meet the Army's central needs. In addition, in its Motion to Supplement the Record, Palantir seeks permission to show the Court certain Army-

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 26 of 53

[redacted]

The Army therefore knows from years of experience that Palantir offers a robust and proven Data Management Platform as a commercial item. Moreover, even though the Army failed to undertake the proper inquiries during the market research it conducted prior to issuing the Solicitation, its market research still confirmed that [redacted] Tab 41 at A1923 (emphasis in original), and [redacted] Tab 43 at A2230. The Army even produced an Information Paper stating that the Data Management Platform ***"could be a commercial stand alone solution,"*** specifically identifying Palantir as an example. Tab 50 at A2363.

**D. The Solicitation For DCGS-A2 Makes It Impossible For Palantir To Offer Its Data Management Platform As A Commercial Or Nondevelopmental Item To Satisfy The Army's Requirements.**

**1. The Army's Market Research Assumed That The Army Would Solicit A Development Effort Instead Of A Commercial Or Nondevelopmental Item.**

As explained above, the law required the Army to conduct market research to determine, *inter alia*, whether commercial or nondevelopmental items (or reasonable modifications of such items) are available to meet the Army's requirements (or reasonable modifications of such requirements). *See* 10 U.S.C. § 2377(c). From the outset, however, the Army conducted its market research based on the assumption that the DCGS-A2 Solicitation would result in a software *development* contract, not a procurement of a commercial or nondevelopmental item.

---

commissioned studies demonstrating that the Palantir Gotham Platform meets the Army's DCGS-related needs, including a study that recommended that the Army deploy more Palantir servers in Afghanistan; those recommendations were then deleted by the Army personnel responsible for the DCGS-A program. *See* Tab 140 at A6654; Compl. at ¶¶ 123-130.

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 27 of 53

[redacted]

Much of the Army's market research consisted of a series of Requests for Information ("RFI") issued to potential bidders. The first RFI failed to inquire about the availability of commercial or nondevelopmental items that could meet the requirements of DCGS-A2. *See* Tab 35. Instead, it requested "basic qualifications in *managing software development projects* that are similar in scope and process to the DCGS-A program." *Id*. at A1876 (emphasis added); *see also id*. at A1880 (describing "software *builds*") (emphasis added). The Army conceded in the first RFI that it was not even contemplating the possibility of a fixed-price contract for the procurement of commercial items, stating instead that the "Proposed contract types under consideration for this effort are cost-plus-incentive fee (CPIF) or cost-plus-fixed-fee (CPFF)." *Id*. at A1880. Palantir responded to the first RFI by explaining that the Army "does not need to *build* Increment 2 functionality; the Government can *buy* the core functionality from the commercial market and integrate any number of additional applications." Tab 36 at A1885 (second emphasis added).

The Army appears to have ignored Palantir's feedback. In its second RFI, the Army continued to frame the DCGS-A2 effort entirely in terms of *building* the software needed to meet the requirements of DCGS-A2 instead of *buying* it as a commercial or nondevelopmental item. The Army again failed to ask whether a commercial or nondevelopmental item was available, instead requesting information about "basic qualifications in *managing software development projects* that are similar in scope and process to the DCGS-A program." Tab 37 at A1900 (emphasis added); *see also id*. at A1904 (requesting information about companies' "experience developing and integrating" various capabilities); *id* at A1906 ("Does your company utilize best practices for software *development*?") (emphasis added). In response, Palantir again informed the Army that commercial items could satisfy the DCGS-A2 requirements. *See* Tab 38 at 1910.

[redacted]

In its third RFI, the Army *again* framed the DCGS-A2 Solicitation as a software development project and it *again* failed to ask about the availability of commercial or nondevelopmental items to meet the Army's needs. *See* Tab 39 at A1912 (asking about potential bidders' experience developing software). Again, Palantir reiterated its concern "that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities," rather than a commercial item. *See* Tab 40 at A1918.

**2.** [redacted]

Even though the Army's RFIs were based from the outset on the assumption that DCGS-A2 would be a development effort, the Army's market research [redacted][12]

---

[12] Moreover, the Army never inquired into the viability of structuring the Solicitation to acquire the entirety of its requirements—i.e., both the Data Management Platform and the Additional Enhancements—together as a commercial item. Had the Army done so, it would have learned that [redacted] Palantir is filing a Motion to Supplement the Record with a declaration from a Palantir employee who has expertise in this area and who will explain that Palantir frequently provides customers with such bundled procurements as a commercial item on a fixed price basis.

[redacted]

***First***, the Army commissioned a market research study of [redacted] This study [redacted] Tab 41 at A1923. [redacted] [redacted]"[13] *Id.* [redacted] *See* Statement of the Case § B(1), *supra*. [redacted]

> [redacted]

Tab 43 at A2245 (emphasis added). The DIVA Market Study further explained:

> [redacted]

---

13 [redacted] [redacted] [redacted] Tab 41 at A1923.

[redacted]

[redacted]

*Id.* at A2251 (ellipses in original, emphasis added). Thus, the DIVA Market Study [redacted] *Id.* This means that the DIVA Market Study recommended that [redacted]

The DIVA Market Study explained [redacted] Tab 43 at A2251 (emphasis in original). [redacted] *Id.* at A2242. In other words, the DIVA Market Study concluded that [redacted][14]

[14] The DIVA Market Study thus demonstrates that the Army failed to pursue the best procurement approach available to it; however, it is important to remember that Palantir need not prove that much to prevail in this case. As explained above, Statement of the Case § A, *supra*, the legal issue in this case is *not* whether the Army failed to pursue the *best* procurement approach (as occurred here) but is rather whether the Army solicited commercial items to the *maximum extent practicable*. *See* 10 U.S.C. § 2377. At a minimum, the DIVA Market Study

[redacted]

***Second***, the [redacted] performed a "Trade Space Analysis" that [redacted] *See* Tab 42. This market research study supports the DIVA Market Study's [redacted] Like the DIVA Market Study, the Trade Space Analysis examined various approaches and concluded that [redacted] Tab 42 at A1946.[15]

***Third,*** the record includes an Information Paper, which, [redacted] describes a phased procurement approach. *See* Tab 50. The Information Paper states that the "Key Objectives" of DCGS-A2 include modernizing the Data Management Platform, acquiring an easier to use visualization framework, leveraging industry to deliver these capabilities with a commercially supported infrastructure, and executing in a

---

established that the Army [redacted]

[15] The Trade Space Analysis [redacted] Tab 42 at A1946. [redacted] *Id.* at A1976-77 (emphasis added).

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 32 of 53

[redacted]

funding constrained environment. *See id.* at A2363. It then [redacted] *Id.* at A2363-64. The Information Paper specifically states:

> "***This infrastructure could be a commercial stand alone solution*** (***Palantir***, IBM) or it could be a collection of capabilities . . . as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data."

*Id.* at A2363 (emphasis added). The Information Paper then describes how [redacted] *Id.* at A2363-64. Finally, the Information Paper discusses [redacted] *Id.* at A2364. This admits the Army had the ability to define its requirements so as to allow it to satisfy its requirement for a Data Management Platform by procuring "a commercial stand alone solution."

***Fourth***, in [redacted]

> [redacted]

Tab 94 at A4244 (emphasis added). Nonetheless, as discussed below, the Army ignored this market research, chose *not* to solicit commercially available products to provide [redacted] and chose instead to define its requirements in such a way as to make it *impossible* to satisfy those requirements through the procurement of commercial items.

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 33 of 53

[redacted]

***Finally***, the record is replete with documents that correctly state the Army could have defined its requirements in phases (or "releases"), but which incorrectly assume that the first phase—the acquisition of a Data Management Platform—requires development work, rather than the procurement of a commercial or nondevelopmental item. These documents further show the [redacted] For example:

- The DCGS-A2 Acquisition Strategy Report describes [redacted] Tab 6 at A105; *see also id.* at A106 [redacted][16]

- The DCGS-A2 Market Research Report "*recommends PM DCGS-A utilize separate contracts* to develop and field DCGS-A Increment 2, Releases 1 and 2," the first of which "would consist of an upgraded Data Architecture with some usability enhancements," and the second of which "would include several capability enhancements including improvements to Data Fusion & Pattern Analysis and the addition of a Cyber analytics capability (Intelligence Support to Cyber)." Tab 33 at A1841-42 (emphasis added).

- The DCGS-A2 Cost Analysis Requirements Description describes [redacted] Tab 71 at A2748.

- The DCGS-A2 Contract Strategy Meeting Minutes state [redacted] Tab 73 at A3075.

- The DCGS-A2 Test and Evaluation Master Plan states [redacted] Tab 87 at A3883-84.

[16] The Acquisition Strategy Report [redacted] *See* Tab 6 at A107 [redacted]

[redacted]

**3. [redacted] The Army Constructed A Solicitation That Precludes Bids From Offerors Of Commercial And Nondevelopmental Items.**

Notwithstanding the market research showing that DCGS-A2's intended capabilities could have been procured on a commercial item or nondevelopmental item basis, and notwithstanding the law requiring the Army to procure commercial and nondevelopmental items to the maximum extent practicable, on December 23, 2015, the Army issued its Solicitation, along with Task Order 0001 and Performance Work Statements ("PWS"), which requires *developmental services* for DCGS-A2 and made it impossible for offerors to submit commercial item bids.

The Solicitation states that the Army "has the need to acquire *Engineering, Manufacturing, and Development services* in support of the [DCGS-A2] requirement." Tab 20 at A843 (emphasis added). The PWS accompanying both the Solicitation and Task Order 0001 provides that "The contractor shall be responsible for system and software *engineering*, product *design*, *development*, integration, testing, and limited deployment support to include software maintenance, configuration management, risk management, and quality assurance." Tab 22 at A1052 (emphasis added); Tab 24 at A1308 (emphasis added). Elsewhere, the Army repeatedly describes the DCGS-A2 procurement as a software development project.[17]

[17] *See, e.g.*, Tab 6 at A126 [redacted] (emphasis added); Tab 44 at A2263 [redacted] emphasis added); Tab 46 at A2299 [redacted] (emphasis added).

[redacted]

Because the Solicitation frames the DCGS-A2 acquisition as a development project instead of a commercial or nondevelopmental item procurement, it includes provisions that effectively bar offerors of commercial items from bidding. *See* Tab 15 at A692; Tab 18 at A710-11. For example, the Solicitation requires the winning bidder to have in place and comply with Cost Accounting Standards ("CAS"), *see* Tab 20 at A921, and it includes a requirement for "manpower reporting," stating the "contractor shall report ALL contractor labor hours (including subcontractor labor hours) required for performance of services provided under this contract," *id.* at A872; *see also* Tab 22 at A1161. The winning contractor also is required to have in place an Earned Value Management System ("EVMS"). *See* Tab 20 at A904-05; Tab 22 at A1146; Tab 24 at A1401. These requirements would be irrelevant and unnecessary in a solicitation seeking bids of commercial or nondevelopmental items on a fixed price basis. *See* Tab 40 at A1918.

[redacted] Moreover, the Solicitation does not just make it difficult or impossible for offerors of commercial items to compete; it actually includes language that is expressly *hostile* to the acquisition of commercial items. For example, the PWS includes a clear instruction to "minimize or eliminate" the usage of commercial technologies. *See* Tab 24 at A1321 ("All software shall be designed in such a manner as to minimize or eliminate the usage of proprietary or commercial technologies except where specifically approved by the Government."). In

[18] *See* Tab 15 at A695 [redacted]

[redacted]

addition, the Solicitation is crafted as a "how to" manual for building a new Data Management Platform according to how *the Army* thinks such a system should be built; in that sense, it is inherently incompatible with purchasing a Data Management Platform that has already been developed and successfully deployed, whether by Palantir or by anyone else. *See* Tab 22; *see also* Tab 15 at A691; Tab 18 at A709.

**E. The Day After This Lawsuit Was Filed—More Than Six Months After The Solicitation Was Issued—The Army Hastily Issued A Two-Page "Determination" That Tries To Provide An Ex Post Justification For Precluding Bids By Offerors Of Commercial And Nondevelopmental Items.**

On June 30, 2016, Palantir filed this lawsuit, alleging that, among other things, the Army failed to make the determinations required under § 2377(c). On the very next day—July 1, 2016—the Army executed a document titled "Determination of Non-Commercial Item," signed by [redacted] the author of the Contracting Officer's Statement (Tab 1) and [redacted] the Principal Assistant Responsible for Contracting. This July 1, 2016, document states in relevant part:

> "Based upon market research conducted by the Program Manager (PM) DCGS-A, I find that some commercial software applications exist that could potentially satisfy portions of the DCGS-A Increment 2 requirement. The market research showed that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items."

Tab 134 at A6626 ("July 1, 2016 Determination").

That the Army felt the need to create and execute such a document *after* Palantir filed its lawsuit reveals that the Army knew it had not made the "determinations" required by § 2377(c). In any event, the July 1, 2016 Determination is wrong. There is zero support in the record (or elsewhere) for the proposition "that significant portions of the scope of work, such as, the

[redacted]

military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items." Palantir can provide all of the foregoing capabilities. *See* Tab 15 at A694-95; Tab 18 at A713.[19]

The July 1, 2016 Declaration appears to be merely parroting what the [redacted] *See* Tab 33. That document [redacted] *Id.* at A1840 [redacted] (emphasis added). This same language was then repeated once again in the Contracting Officer's Statement filed in opposition to Palantir's challenge to the Solicitation before the GAO. Tab 1 at A12 ("The Government was able to determine through the comprehensive market research analysis to include Program Office activities, the DIVA study, and the Trade Space Analysis, that *while commercial capabilities could potentially satisfy one or more portions of the DCGS-A requirement, there are significant portions of the scope of work, such as: Data Fusion, Intelligence Support to Cyber, and DIB upgrades that are not available as commercial products*.") (emphasis added). The Army appears to think that merely by repeating the same conclusory assertion, it somehow becomes true. But it does not. There is no

[19] Palantir's ability to provide all of the capabilities listed in the July 1, 2016 determination will be further established by testimony from a Palantir employee with expertise in this area. Palantir is filing a Motion to Supplement the Record with such testimony.

[redacted]

evidence—***none***—to support this repeated assertion. To the contrary, all the evidence in the record contradicts it. *See* Tab 42 at A1949 [redacted] Tab 36 at A1889 (discussing configurations available as commercial items on fixed price basis); Tab 15 at A694 (discussing data fusion, intelligence support to cyber, interoperability, DIB upgrade, and other enhancements); *see* Note 19, *supra*.

Finally, even the *ex post* July 1, 2016 Determination omits most of the determinations that are required by § 2377(c): first, it does not make any determination with respect to nondevelopmental items; second, it does not make any determination as to whether any commercial or nondevelopmental items "could be modified to meet the agency's requirements" (*see* § 2377(c)(2)(B)); third, it does not make any determination as to whether a commercial or nondevelopmental item "could meet the agency's requirements if those requirements were modified to a reasonable extent" (*see* § 2377(c)(2)(C)).

## ARGUMENT

A bid protestor is entitled to judgment on the administrative record by showing that there was a "clear and prejudicial violation of applicable statutes or regulations." *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 385 (2012) (*quoting Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004)). Here, the Army violated the clear mandates of 10 U.S.C. § 2377. In addition, while § 2377 divests the Army of discretion over the matters at issue, even if it had such discretion, it failed to provide a "coherent and reasonable explanation of its exercise of discretion," which is an independent basis for awarding judgment in Palantir's favor. In addition, the Army acted arbitrarily, capriciously, and otherwise not in accordance with law, and therefore in violation of the standards set forth in 5 U.S.C. § 706, made applicable to bid protests through 28 U.S.C. § 1491(b)(4).

[redacted]

Palantir is entitled to injunctive relief to address these legal violations because (1) it has demonstrated the merits of its claims and the Army's violation of the law; (2) it will suffer irreparable harm in the absence of injunctive relief; (3) the balance of hardships to the respective parties favors an injunction; and (4) it is in the public interest to grant an injunction. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (*citing Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, (1987)); *KSEND v. United States*, 69 Fed. Cl. 103, 113 (2005).

## I. PALANTIR IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD WITH RESPECT TO EACH COUNT IN ITS COMPLAINT.

### A. The Army Violated § 2377(a) & (b) When It Bundled Together Its Requirement For A Data Management Platform With its Requirement For Additional Enhancements (Count I).

Section 2377(a)(2) requires the head of the Army to "ensure that, to the maximum extent practicable," the Army's "requirements are defined so that commercial items or… nondevelopmental items other than commercial items, may be procured to fulfill such requirements." 10 U.S.C. §2377(a)(2). The Army violated this requirement. Specifically, the Army defined its requirements by bundling together the requirement for a Data Management Platform with the requirement for certain Additional Enhancements. By contrast, if the Army had defined its requirements by focusing separately on its need for a Data Management Platform and its need for Additional Enhancements, then the Army would indisputably have been able to fulfill its requirement for a Data Management Platform through the procurement of commercial or nondevelopmental items—including through the procurement of the Palantir Gotham Platform. Thus, by bundling the requirement for a Data Management Platform with the requirement for Additional Enhancements, the Army failed to "ensure" that it defined its

[redacted]

requirements in a manner that allowed its requirements to be fulfilled by the procurement of commercial or nondevelopmental items "to the maximum extent practicable."

There is no dispute that the Army could have defined its requirement for a Data Management platform on a stand-alone basis. The Army's own [redacted] Information Paper, [redacted] demonstrate and admit that the Army could have defined its requirements in phases—acquiring a Data Management Platform as a commercial item in the first phase and acquiring the Additional Enhancements in a second phase.[20] Moreover, the Army's DCGS-A2 Market Research Report expressly recommended that the Army should "*utilize separate contracts*" for (1) the procurement of "Release 1" which "would consist of an upgraded Data Architecture" (i.e., the Data Management Platform), and (2) the procurement of "Release 2" which consisted of all other "capability enhancements" (i.e., the Additional Enhancement Services). Tab 33 at A1841-42. Thus, the Army has no way to claim that it was not "practicable" to define its requirement for a Data Management Platform on a stand-alone basis to be procured as a commercial item under a separate contract. By failing to do so, the Army violated § 2377(c).[21]

In addition, the bundling of these two requirements caused the Army to violate other

[20] *See* Statement of the Case § D(2), *supra*; Tab 41 at A1923 [redacted] emphasis in original); Tab 42 at A1946 [redacted] Tab 50 at A2363 ("This infrastructure could be a commercial stand alone solution").

[21] This violation of § 2377 can be demonstrated even more powerfully with the information Palantir will seek to add to the administrative record, which shows (a) the overwhelming demand by the Army's Senior Officers in the field for the Palantir Gotham Platform to satisfy the Army's DCGS-related needs, (b) the successful deployment of the Palantir Gotham Platform to satisfy DCGS-type needs of other agencies, including the Marines and SOCOM, (c) the numerous GAO and congressional reports and hearings showing the Army's failed "developmental" approach to DCGS, and (d) the bad faith conduct of the Army in burying or rescinding reports confirming that the Palantir Gotham Platform fulfills the Army's need for Data Management Platform.

[redacted]

requirements set forth in § 2377. It violated § 2377(a)(3) by failing to "ensure" that "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fulfill such requirements." *Id.* at § 2377(a)(3). The Solicitation does the opposite of this: it ensures that offerors of commercial and nondevelopmental items are *not* "provided an opportunity to compete," even though the Army admits that commercial items exist that could fulfill the central DCGS-A2 requirement for a Data Management Platform. *See* Tab 20 at A842.

The Army also violated the requirements of § 2377(b), which required the Army to "ensure" that, "to the maximum extent practicable," it would "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency," and in doing so, the Army must "***modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or …. nondevelopmental items other than commercial items***." 10 U.S.C. § 2733(b)(1) & (3) (emphasis added). The Solicitation does the opposite of what § 2377(b) requires: it ensures that the Army will *not* acquire commercial or nondevelopmental items even though the Army admits such items exist to satisfy its need for a Data Management Platform; moreover, instead of making reasonable modifications to its requirements to ensure that it could procure commercial and nondevelopmental items, the Army did the opposite—it made a modification to its own recommendation in an effort *to prevent* commercial and nondevelopmental items from satisfying its requirements.

In addition, by defining its requirements in terms of a "developmental" services contract that bundles together the requirement for a Data Management Platform with the Additional Enhancements, the Army created a Performance Work Statement that violates the most basic requirement of § 2377(a): it fails to state the Army's requirements in terms of the "(A) functions

[redacted]

to be performed; (B) performance required; or (C) essential physical characteristics." 10 U.S.C. § 2377(a)(1). Instead of complying with this statute, the PWS states the Army's requirements in terms of a massive list of specific *developmental assignments* that the contractor must agree to perform as services on a cost-plus basis. *See e.g.*, Tab 22 at A1064, A1069-72, A1076 (repeatedly providing that "The contractor *shall develop*…" various systems, services, or capabilities). Thus, by failing to define the Army's requirements in terms of the ultimate functions and performance required, the Solicitation violates § 2377(a)(1).

**B. The Army Violated § 2377(a) & (b) When It Failed To Define Its Requirements So As To Procure Both The Data Management Platform And The Additional Enhancements Together As A Commercial Or Nondevelopmental Item (Count II).**

Even if it were legally permissible for the Army to have defined its requirements by bundling the Data Management Platform and the Additional Enhancements, the Army still violated § 2377 because the Solicitation makes it impossible to submit a commercial or nondevelopmental item bid to provide that bundle. Palantir could provide both the Data Management Platform and the Additional Enhancements on a commercial item basis for a fixed price, but the Solicitation does not allow for such a bid. *See* Note 12, *supra*.

At no point did the Army conduct market research to assess whether it could obtain both the Data Management Platform and the Additional Enhancements together as a commercial or nondevelopmental item. Had the Army bothered to conduct market research on this point, it would have learned that companies *do* in fact offer Additional Enhancements as fixed price commercial items. For example, [redacted]

[redacted]

[redacted] Had the Solicitation allowed it to do so, Palantir would have offered to provide a Data Management Platform *and each Additional Enhancement* as a bundled commercial item on a fixed price basis. *See generally* Tab 36 at A1889, A1892; *see also* Note 12, *supra*.

### C. The Army Violated § 2377(c) By Failing To Use Market Research To Determine Whether The Army's Requirements Could Have Been Met By Commercial Or Nondevelopmental Items (Count III).

Section 2377(c) required the Army to use the results of market research "to determine" whether commercial items or nondevelopmental items are available that (1) meet the agency's requirements; (2) *could be modified* to meet the agency's requirements; or (3) could meet the agency's requirements *if those requirements were modified to a reasonable extent*." 10 U.S.C. § 2377(c). The Army failed to make any of these determinations in a legally proper way and therefore violated § 2377(c).

First, the Army did not even purport to make any of these determinations until *the day after this lawsuit was filed*. Tab 134 at A6626. An *ex post* determination made more than six months after the Solicitation was issued, and obviously made only in response to this litigation, is entitled to no weight and cannot be relied on to satisfy § 2377(c).[22]

[22] *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (cautioning courts against allowing post hoc rationalization to explain agency's action); *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413, 424 (2015) ("in the court's experience, declarations from the contracting officer and other agency officials may proffer, in many cases, post-hoc rationalization and argument rather than a fact-driven explanation of the agency's decision-making process."); *Ceres Envtl. Servs., Inc. v. United States*, 52 Fed. Cl. 23, 31 (2002) ("the balance of the documents are post hoc rationalizations for the CO's determination, having been created after the solicitation was issued" and hence are accorded little or no weight); *Informatics Corp. v. United States,* 40 Fed. Cl. 508, 519 (1998) (determining that defendant's justifications for agency decision amounted to post hoc rationalizations); *ATA Defense Indus., Inc. v. United States,* 38 Fed. Cl. 489, 502 (1997) (determining that defendant's argument was a post hoc rationalization by government counsel that did not represent any decision actually made by contracting officer).

[redacted]

Second, even if it were entitled to weight, the July 1, 2016 Determination made only one conclusory determination "that significant portions of the scope of work, such as, the military unique capabilities classified up to the Top Secret level needed to meet the requirements associated with Signals Intelligence (SIGINT), Human Intelligence (HUMINT), Military Weather, Interoperability, Data Fusion, Intelligence Support to Cyber, and DCGS Integrated Backbone (DIB) upgrade are not available as commercial items." Tab 134 at A6626. That determination is unsupported by any factual support in the record (or elsewhere). It is also dead wrong. *See* Statement of the Case § E, *supra*; Note 19, *supra*.

Third, the July 1, 2016 Determination fails to make numerous determinations required by § 2377(c). At no point in time has the Army ever made a determination as to (1) whether nondevelopmental items are available to meet the Army's requirements, (2) whether commercial items or nondevelopmental *could be modified* to meet the Army's requirements, or (3) whether commercial items or nondevelopmental items could meet the Army's requirements *if the Army's requirements were modified* to a reasonable extent. Thus, even if fully credited, the July 1, 2016 Determination cannot save the Army from having violated § 2377(c).

Moreover, had the Army correctly addressed any of the questions § 2377(c) required it to address, it would have concluded that commercial and nondevelopmental items *are available* to meet the Army's requirements (or could be easily modified to do so). Most importantly, the Army should have determined that commercially available Data Management Platforms are available to meet the Army's needs. *See* Statement of the Case § C, *supra*; Note 12, *supra*; Tab 50 at A2363. At the very least, [redacted] [redacted] should have compelled a determination that a commercial or nondevelopmental item could be modified to meet the Army's requirements—or that the Army's

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 45 of 53

[redacted]

requirements could be modified to allow for the procurement of a commercial or nondevelopmental item. *See* Statement of the Case § D(2), *supra*. And even if that were not possible, the Army *still* would have been required to reevaluate its needs to determine whether they could "be restated to permit commercial or nondevelopmental items to satisfy the agency's needs." 48 C.F.R. § 10.002(c). The Army did not do any this.

The Army failed to make any of the determinations required by § 2377(c). Instead, it conducted market research that assumed that it was only ever going to award a cost-plus developmental services contract. *See* Statement of the Case § D(1), *supra*. The Army therefore failed to ask the questions required by § 2377(c). It asked potential bidders about their software *development* capabilities, not whether they could offer for sale a commercial item (or a modified commercial item) to meet the Army's requirements.

The Army has also defied Congress' specific instruction to apply § 2733(c) to the DCGS-A program. In FY16 NDAA, Congress gave the Army a January 23, 2016 deadline to "issue guidance to ensure that acquisition officials of the Department of Defense fully comply with the requirements of section 2377 of title 10, United States Code, regarding market research and commercial items," including by prohibiting the Army from entering into information technology contracts "unless the head of the agency determines in writing that no commercial items are suitable to meet the agency's needs as provided in subsection (c)(2) of such section." P.L. 114-92, § 855, 129 Stat. 920. The Army has failed to issue the required guidance. It also failed to submit the report required by the FY 2016 NDAA until after Palantir filed its notice of intent to file this lawsuit. *See* P.L. 114-92, § 222.

[redacted]

**D. The Army Violated 48 C.F.R § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed Price Contract (Count IV).**

Cost-reimbursement contracts may be used "only when (1) Circumstances do not allow the agency to define its requirements sufficiently to allow for a fixed-price type contract . . . or (2) Uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." 48 C.F.R. § 16.301-2(a). Given the Army's 15 years' of experience with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable "to define its requirements sufficiently to allow for a fixed-price contract" or that it is not possible for "costs to be estimated with sufficient accuracy to use any type of fixed-price contract."

The Army's violation of 48 C.F.R. § 16.301-2(a) was at least in part the direct result of its violation of § 2377. The Army concluded that a cost-plus contract was appropriate "[b]ecause the nature of this requirement is developmental and there's a lack of precise specifications, resulting in difficulties when developing accurate cost estimates." Tab 8 at A151. But that entire premise was based on the Army's incorrect assumption that the DCGS-A2 contract requirements could not be satisfied by commercial items.

That the Army *could have* defined its requirements sufficiently to allow for a fixed-price type contract is confirmed by the fact that offerors such as Palantir *would have* submitted firm fixed-price bids to meet the Army's requirements, as it has done for other customers in the Department of Defense and the Intelligence Community. *See* Tab 36 at A1189. [redacted]

[23] *See* Tab 33 at A1840 [redacted]

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 47 of 53

[redacted]

Thus, regardless of whether the Solicitation's requirements are considered "commercial items" or not, the fact that Palantir and others are willing to satisfy the requirements on a fixed-price basis—[redacted]confirms that it was unlawful for the Army to use a disfavored cost-plus contract instead.

### E. The Army Violated 10 U.S.C. § 2304a(f) And DFARS Part 217.204 By Soliciting A Task Order Contract In Excess Of Five Years (Count V).

A task order contract is "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d. The Solicitation is a task order contract subject to the laws governing such contracts.

One of those laws limits task order contracts to five years, provided that extensions may occur pursuant to options set forth in the contract. *See* 10 U.S.C. § 2304a(f) ("The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period *up to five years* and may extend the contract period for one or more successive periods pursuant to an option provided in the contract or a modification of the contract." (emphasis added)); *see also* DFARS 217.204(e)(i) ("the ordering period of a task order or delivery order contract (including a contract for information technology) awarded by DoD pursuant to 10 U.S.C. 2304a . . . [m]ay be for any period up to 5 years."). The Solicitation violates this five-year limitation by setting forth a "base period" of *six* years. *See* Tab 20 at A899 ("The Ordering base period is (72) months from date of contract award."). This is a clear violation of the law.

---

[redacted]

Case 1:16-cv-00784-MBH Document 14 [redacted] Filed 07/12/16 Page 48 of 53

[redacted]

The Army has not disputed that the Solicitation contemplates a task order contract with a base period of six years, nor has it disputed that the law limits the base period for a task order contract to five years. *See* Tab 1 at A52-54. Indeed, the Army anticipated that it would face this very legal challenge as a result.[24] The Army's only argument appears to be that the six-year contract period is permissible because the Principal Assistant Responsible for Contracting ("PARC") approved it under FAR 17.204, which allows the Army to *exercise options* that extend contracts beyond their base periods. *See* Tab 1 at A52-53. But that authority is entirely irrelevant here, as there is a legally significant difference between (1) entering into a five-year contract with options to extend it versus (2) entering into a six-year contract. The former is permitted; the latter is not.

**F. The Army Violated 48 C.F.R. § 16.504 By Soliciting An Impermissibly Expensive Indefinite Delivery, Indefinite Quantity Task Order (Count VI).**

The law provides that "No task or delivery order contract in an amount estimated to exceed $112 million (including all options) may be awarded to a single source unless the head of the agency determines in writing that," *inter alia*, "[t]he task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work." 48 C.F.R. § 16.504(c)(1)(ii)(D)(1). The Army admits that the expected value of the Solicitation exceeds $112 million, *see* Tab 1 at A47, but argues a single source task order contract is acceptable because the orders under the contract will be integrally related, *id.* at A48-50.

That determination, however, contradicts the Army's own market research which concluded that the Army's requirements could have been and should have been performed in two separate contracts, with the first used to procure the Data Management Platform. *See* Statement

[24] *See* Tab 47 at A2306 [redacted] Tab 108 at A4367 [redacted]

Case 1:16-cv-00784-MBH Document 34 Filed 07/27/16 Page 49 of 53

[redacted]

of the Case § D(2). The Army's determination that the task orders are so integrally related as to require a single source also contradicts Congress' mandate, in FY16 NDAA, that the Army analyze the segmentation of DCGS-A2 and identify each component that could be fulfilled by commercial software. *See* P.L. 114-92, § 222; 129 Stat. 776.

### G. The Army Engaged In Arbitrary And Capricious Conduct By Doubling Down On Its Failed DCGS-A1 Development Efforts And By Rejecting Commercial Sector Innovation (Count VII).

An agency action that reflects irrational, biased, or unsupported judgments constitutes arbitrary and capricious agency action under 5 U.S.C. § 706 and must be set aside.[25] Palantir has ample support to meet this standard and to prevail on Count VII. However, effective judicial review of Count VII will be precluded unless the Court grants Palantir's Motion to Supplement the Record and to permit discovery (as explained in that soon-to-be-filed motion).

Even without supplementation and discovery, there is evidence in the administrative record of the Army's irrational bias. First, all of the actions described above evidence an agency that has shown no regard for the proper process required by § 2377 and an absence of any good faith effort to consider commercial or nondevelopmental products. Second, the Army's attempt to manufacture an *ex post* justification for its actions through the July 1, 2016 Determination is a revealing sign of bad faith and irrational conduct. Third, the Contracting Officer's Statement relies on speculative (and inaccurate) conclusions. For example, the Contracting Officer claims that Palantir's "proposed approach is both illegal and unaffordable." Tab 1 at A33. To reach that conclusion, the Contracting Officer first manufactured a cost estimate for the Palantir Gotham Platform of roughly [redacted]—a figure that has no basis in reality, and is completely out of line with the actual prices Palantir has charged to other Government customers for similar

[25] *See, e.g.*, *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 760 (2014); *Innovation Dev. Enterprises of Am., Inc. v. United States*, 108 Fed. Cl. 711, 733 (2013).

[redacted]

needs. The Contracting Officer next said that the price estimate it had just fabricated was "illegal" because it would violate 41 U.S.C. § 2310. But that statute expired on November 24, 2013—two years before the Solicitation was issued. Moreover, that statute would not have been applicable in any event because it applied only to the procurement of services, and did *not* apply to the procurement of commercial *products*. *See* 41 U.S.C. § 2310. That the Contracting Officer would strain to make such frivolous arguments is further evidence that the agency's decision in this case was driven by an irrational, arbitrary, and capricious bias.

## II. PALANTIR WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ENTERED.

Palantir will suffer irreparable harm if the Court does not issue an injunction. Absent such relief, Palantir will be deprived of an opportunity to compete for the DCGS-A2 contract, which in and of itself constitutes irreparable harm. As this Court has explained: "Standing alone, the loss of an opportunity to fairly compete on future government contracts constitutes irreparable harm." *ViroMed Labs., Inc. v. United States*, 87 Fed.Cl. 493 (2009); *see also Global Computer Enterprises, Inc. v. United States*, 88 Fed. C1. 350, 452 (2009) ("It is well settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field" or "was excluded from the bidding process, perhaps solely because of the government's improper conduct."). If the Army is permitted to proceed with an award under the Solicitation, Palantir also would lose the opportunity to earn revenues and profits from the potential sale of the Palantir Gotham Platform to the Army. This type of loss also has been recognized to constitute irreparable harm since such lost profits cannot be recovered from the Government.[26]

---

[26] *See, e.g., Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 141 (2006); *Cardinal Maint. Svcs, Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004); *United Payors & United Providers Health Svcs, Inc. v. United States*, 55 Fed. C1. 323, 333 (2003).

[redacted]

## III. THE BALANCE OF HARDSHIPS AS BETWEEN THE LITIGANTS WEIGHS IN FAVOR OF AN INJUNCTION.

Palantir would be denied an opportunity to submit a bid for the DCGS-A2 contract were no injunction to issue; on the other hand, issuance of an injunction would cause no discernible harm to the Army, which would only be required to re-issue its Solicitation in a manner that complies with the law. An injunction likely would not result in net delays because the Army would be able to acquire immediately as a commercial item what it instead had intended to spend years developing. Any net delay that *does* result would be marginal in the context of a software development project that already has consumed fifteen years and is scheduled to consume at least six more.[27] In any event, "only in an exceptional case" would "the delay and inconvenience to be anticipated in the normal course of resoliciting the bid" warrant denial of an injunction. *Ellsworth Associates, Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999).[28]

The Army cannot be heard to claim hardship where it is required to re-issue the Solicitation in a manner that allows competition from offerors of the very product that Army Commanders have been requesting for years. Since 2010, high-ranking Commanders have requested access to the Palantir Gotham Platform, explaining that the Palantir Gotham Platform succeeds where DCGS-A fails. *See* Statement of the Case § C, *supra*. These statements from the battlefield are supported by independent, Department of Defense-commissioned studies. *See id*. Nor can the Army be heard to claim hardship where it is required to re-issue the Solicitation to allow for competition from offerors of products that are in use by other Department of

---

[27] *See* Tab 22 at A1051 (describing 24-36 month cycle for design and development activities); Tab 20 at A899 (setting forth 72 month base period for contract); Tab 6 at A120 [redacted]

[28] *See also Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000) (balance tipped in plaintiff's favor where "delay in question is occasioned by defendant's own failure to [abide by regulations and procedures].").

[redacted]

Defense and Intelligence Community agencies whose needs are materially indistinguishable from the Army's.

## IV. THE PUBLIC INTEREST WEIGHS IN FAVOR OF AN INJUNCTION.

There is a public interest in honest, open, and fair competition for government contracts, and the public has an interest in rectifying illegalities in the procurement process.[29] The public, therefore, has an interest in ensuring that the Army's Solicitation complies with the law. But the public's interest in this case reaches much further. The Army's Solicitation doubles down on development efforts that have taken fifteen years and cost billions of taxpayer dollars without equipping Commanders with the capabilities they need. Instead of hiring defense contractors to once again try to *build* the Data Management Platform they were unable to build the first time around, the Army can *buy* such a platform more promptly, less expensively, and with better results. Both the law and the public interest require it to do so.

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Stacey Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: July 12, 2016

---

[29] *See PGBA, LLC v. United States*, 57 Fed.Cl. 655, 663 (2003) ("Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."); *Advanced Systems Technology, Inc. v. United States*, 69 Fed. Cl. 474, 486 (2006) ("There is an overriding public interest in preserving the integrity of the procurement process.").

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th of July, 2016, a copy of the **MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR A PERMANENT INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF** was served electronically on counsel for the defendant, whose address appears below.

Domenique Kirchner
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044

/s/ Hamish P.M. Hume

HAMISH P.M. HUME
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com

(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*