REDACTED VERSION

No. 16-784
(Judge Marian Blank Horn)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

---

PALANTIR TECHNOLOGIES, INC., and
PALANTIR USG, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 307-1111
Fax. (202) 514-8624

OF COUNSEL:

Scott A. MacGriff
Department of Justice

Scott N. Flesch
MAJ (P) Lawrence P. Gilbert
Frank A. March
Evan C. Williams
U.S. Legal Services Agency
Fort Belvoir

Debra J. Talley
Daniel J. Beuke
Army Material Command

July 22, 2016

Attorneys for Defendant

## TABLE OF CONTENTS


**PAGE**

ARGUMENT ....... 2

I. Criteria For Establishing Standing ....... 2

A. Prospective Bidder ....... 2

B. Direct Economic Interest ....... 2

II. Palantir Technologies Does Not Have Standing ....... 4

III. Palantir USG Does Not Have Standing ....... 6

A. The Complaint Does Not Come Within CGI's Exception ....... 6

B. The *CGI* Rule Is An Exception ....... 8

IV. Plaintiffs Are Not Qualified Bidders ....... 9

V. *National Air Cargo Group, Inc. v. United States* ....... *15*

VI. Application Of The Waiver Doctrine Should Result In Dismissal Of The Complaint ....... 19

VII. Palantir USG Did Not Raise All Its Claims And Allegations At GAO ....... 23

CONCLUSION ....... 24

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Blue & Gold Fleet, LP v. United States*,
492 F.3d 1308 (Fed. Cir. 2007) ........ passim

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) ........ 4

*CGI Federal, Inc. v. United States*,
779 F.3d 1346 (Fed. Cir. 2015) ........ 6

*COMINT Systems Corp. v. United States*,
700 F.3d 1377 (Fed. Cir. 2012) ........ 7, 20

*Eco Tour Adventures, Inc. v. United States*,
114 Fed. Cl. 6 (2013) ........ 21

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed. Cir. 2001) ........ 12

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005) ........ 5

*Golden Manufacturing Co., Inc. v. United States*,
107 Fed. Cl. 264 (2012) ........ 3

*Impresa Construzioni Geom. Domenico Garufi Impresa v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) ........ 13

*Information Technology & Applications Corp. v. United States*,
316 F.3d 1312 (Fed. Cir. 2003) ........ 14

*Infrastructure Defense Technologies, LLC v. United States*,
81 Fed. Cl. 375 (2008) ........ 21, 22

*Labatt Food Service, Inc. v. United States*,
577 F.3d 1375 (Fed. Cir. 2009) ........ 17, 18

*MCI Telecomms. Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989) ........ 2

*Micro-Research*,
B-200778, 1986 WL 63012 (Comp. Gen. Jan. 3, 1986) ........ 19

*Myers Investigative and Security Services, Inc. v. United States*,
275 F.3d 1366 (Fed. Cir. 2002) .......... 12, 13, 14, 15

*National Air Cargo Group, Inc. v. United States*,
126 Fed. Cl. 281 (2016) .......... 3, 15, 16

*Orion Tech., Inc. v. United States*,
704 F.3d 1344 (Fed. Cir. 2013) .......... 3

*Rex Serv. Corp. v. United States*,
448 F.3d 1305(Fed. Cir. 2006) .......... 2, 6

*Ry Lab. Executives' Ass'n v. United States*,
987 F.2d 806 (D.C. Cir. 1993) .......... 4

*Systems Application & Techs., Inc. v. United States*,
691 F.3d (Fed. Cir. 2013) .......... 16, 17

*Three S Consulting v. United States*,
104 Fed. Cl. 510 (2012),
*aff'd*, 562 Fed.Appx. 964 (Fed. Cir. 2014) .......... 14

*VION Corp. v. United States*,
122 Fed. Cl. 559 (2015) .......... 18, 19

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) .......... 2, 3

**STATUTES**

10 U.S.C. § 2377 .......... 8

28 U.S.C. § 1491(b)(1) .......... 2, 4

31 U.S.C. § 3553(d)(4) .......... 7

50 U.S.C.App. § 2168 .......... 10

**REGULATIONS**

4 C.F.R. § 21.0(d) .......... 7

4 C.F.R. § 21.2(a)(2) .......... 7

DFARS 234.201 .......... 11

DFARS 252.234-7001 .......... 11

DFARS 252.242-7006 .......... 11

FAR § 16.301-3 .......... 9, 10

FAR § 31.201-2 .......... 9

**OTHER AUTHORITIES**

Pub.L. No. 103-06.......... 4

REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| PALANTIR TECHNOLOGIES, INC., and PALANTIR USG, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 16-784 |
| | ) | (Judge Marian Blank Horn) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

Defendant moved to dismiss both plaintiffs, *i.e.*, Palantir Technologies, Inc. and Palantir USG, Inc., and raised the jurisdictional issue of standing, and the issue of waiver under the *Blue and Gold* doctrine. *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308 (Fed. Cir. 2007). Palantir Technologies and Palantir USG are separate legal entities and, according to the complaint, Palantir Technologies is the parent corporation of Palantir USG, owning 100 percent of its stock. Palantir Technologies holds an Enterprise Software Initiative (ESI) blanket purchase agreement (BPA) with the Department of Defense (DoD), which enables DOD to purchase licenses allowing for use of the Palantir Gotham Platform, a propriety product, and DoD has purchased such licenses from Palantir Technologies. A6793 (Tab 145); A6794 (Tab 146); A6795 (Tab 147). Palantir USG previously filed a bid protest before the United States Government Accountability Office (GAO) on February 16, 2016, which GAO denied on May 18, 2016. A61 (Tab 4); A6560 (Tab 122). Palantir Technologies was not a party in the GAO bid protest.

## ARGUMENT

### I. Criteria For Establishing Standing

As plaintiffs agree, Pl. Opp.10, for bid protests, "standing is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Each plaintiff must meet two prerequisites for standing: (1) "actual or prospective bidders or offerors," and (2) "direct economic interest that would be affected by award of the contract or by failure to award the contract." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

#### A. Prospective Bidder

Protesters are considered to be a "prospective bidder" when the company expects to submit an offer before the closing date of the solicitation, but the opportunity to qualify either as an actual or "prospective bidder ends when the proposal period ends." *Weeks Marine*, 575 F.3d at 1359; *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Thus, when a contractor forgoes submitting an offer, the protester is no longer considered to be a prospective bidder." *MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989); *Rex Serv.*, 448 F.3d at 1307.

#### B. Direct Economic Interest

There is a question as to whether the standard of a "reasonable likelihood" that the protester would have received the contract award but for the errors in the procurement standard applies in Palantir's case, which is a post-bid, pre-award bid protest. In *Weeks Marine*, the Federal Circuit established an exception to the general prejudice standard "in the case of pre-bid, pre-award protests because at that stage it is difficult, if not impossible, to establish a substantial chance of winning the contract[.]" *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed.

Cir. 2013). *See also Weeks Marine*, 575 F.3d at 1361. The Court thus affirmed the lower court's application of the *Winstar Communications standard*, "a non-trivial competitive injury," to a pre-bid, pre-award protest. *Weeks Marine*, 575 F.3d 1361-62.

The *Weeks Marine* "non-trivial competitive injury" standard, however, does not apply to every pre-award protest. In *Orion*, 704 F.3d at 1349, the Federal Circuit applied the "substantial chance" prejudice standard to a protest challenging the rejection of a proposal prior to the issuance of a contract award. Although the protest was pre-award, the Federal Circuit explained that, unlike in *Weeks Marine*, "an adequate factual predicate to ascertain [prejudice] under the traditional 'substantial chance' standard existed. *Id.* In other words, because the record showed that the agency had evaluated the protester's proposal against the solicitation's evaluation criteria, the Court was able to ascertain whether the agency's decision to exclude the protester harmed it. *Id.*

Decisions of this Court acknowledge that there is a question "as to whether the 'non-trivial competitive injury' test should apply in pre-award protests where bids have been received by the procuring agency." *Golden Manufacturing Co., Inc. v. United States*, 107 Fed. Cl. 264, 273 (2012)(collecting cases and holding that, in this post-bid, pre-award bid protest, the 'non-trivial competitive injury' test applied). Whether (a) the "non-trivial competitive injury" test or (b) the reasonable likelihood of winning the contract test applies in determining standing in a post-bid, pre-award protest depends upon the particular facts of each case. *Id.*; *see also National Air Cargo Group, Inc. v. United States*, 126 Fed. Cl. 281 (2016).

As demonstrated below, both Palantir Technologies and Palantir USG have not met their burden to establish standing.

## II. Palantir Technologies Does Not Have Standing

Palantir Technologies points to *Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005), which is not a bid protest, and which does not address standing for purposes of 28 U.S.C. § 1491(b)(1). Pl. Opp.3, n.2, 33. Palantir Technologies asserts that it is unnecessary for this Court to resolve the question whether Palantir Technologies has standing, because its wholly owned subsidiary, Palantir USG, has standing, and therefore the Court must address the merits. Pl. Opp.3 n.2, 33, also citing *Ry Lab. Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993).

*Centex Corp.* was a case regarding the effects of what is known as the Guarini Amendment, Pub.L. No. 103-06, § 13224, 107 Stat. 312, 485-86, which had the effect of disallowing the firms acquiring failing thrifts from later claiming reimbursed net liabilities as tax deductions. In *Centex Corp.*, 395 F.3d at 1283, both CTX Holding Company (CTX), and Centex Corp., its parent corporation, were named plaintiffs. CTX was a party to the Government contract, but Centrex Corp. was not. *Id.* at 1288. The Government contended that neither party was entitled to contract damages. On appeal, the Government argued that Centex Corp. lacked standing to sue for breach of contract because it was not a party to the Government contract. The Federal Circuit held that it was unnecessary to determine on appeal whether Centex Corp. in fact was a party to the Government contract. *Id.* at 1291. This was so "because even if Centex Corporation could not sue for breach of contract with the government, Centex Corporation' s wholly owned subsidiary, CTX, was a party to the Assistance Agreement and is fully entitled to enforce its provisions and to be awarded damages for its breach." *Id.* The Government raised separate arguments regarding CTX, contending that although it was a party to the Government contract, CTX (1) was not damaged by enactment of the Guarini amendment, and (2) was a

separate taxable entity and could not assert claims on behalf of Centex Consolidated Group. Regarding CTX's claim, the Federal Circuit rejected the Government's arguments and held:

> As member of the Centex Consolidated Group, CTX [Centex's subsidiary] was eligible to share its tax benefits with the Group, and it was severally liable for the Group's tax liabilities. . . . While it is true that CTX retained its status as a separate taxable entity, CTX was nonetheless a member of the Centex Consolidated Group that consented to the filing of a consolidated tax return. As a consequence, it enjoyed the benefits and was subject to the liabilities flowing from the consolidation of the tax accounts of the various affiliated entities. . . . CTX was therefore in a position to benefit, through the reduction of the Consolidated Group's tax liability, from deductions that would reduce the Consolidated Group's taxable income. For that reason, CTX has a legal stake in the question whether the Consolidated Group was entitled to the tax benefits that were assertedly revoked by the Guarini amendment. We therefore reject the government's argument that neither Centex nor CTX has standing to sue for breach of contract.

*Id.* at 1219. *See First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1315 (Fed. Cir. 2005) (ruling that plaintiff PDCI had standing to sue for breach of contract and therefore could be entitled to breach damages). In sum, it was unnecessary for the Federal Circuit to determine on appeal whether Centex Corp. was a proper party-plaintiff. *Centex Corp.*, 395 F.3d at 1291.

As noted, Palantir Technologies contends that it is not necessary for the Court to determine whether Palantir Technologies has standing, because Palantir USG has standing and the Court thus must address the merits of this case. Pl. Op.3 n.2, 33.

But, each named plaintiff must establish standing to remain in the case, and be entitled to a judgment. If the Court determines that Palantir USG possesses standing, but does not determine whether Palantir Technologies possesses standing, the judgment could only be entered in favor of Palantir USG, assuming the Court concludes both that Palantir USG has standing and prevails on the merits.

That said, the record is clear that Palantir Technologies does not possess standing. Palantir Technologies is not an actual or prospective bidder. Prospective bidders are those bidders that expect to submit offers before the closing date of the solicitation, and the opportunity to qualify as a "prospective bidder ends when the proposal period ends." *Rex Servs. Corp.*, 448 F.3d at 1307. Palantir Technologies did not submit an offer before the closing date and therefore cannot establish standing as either an actual or prospective bidder. Palantir Technologies was not a party to the GAO proceeding and therefore cannot come within the exception to the normal standard for establishing that a company is a prospective bidder set forth in *CGI Federal, Inc. v. United States*, 779 F.3d 1346, 1348-51 (Fed. Cir. 2015).

## III. **Palantir USG Does Not Have Standing**

### A. **The Complaint Does Not Come Within CGI's Exception**

As explained in our motion to dismiss at pages 15-16, the issue is whether Palantir USG falls within the exception established in *CGI Federal, Inc. v. United States*, 779 F.3d 1346, 1348-51 (Fed. Cir. 2015), for a protester that timely initiates a pre-bid protest at GAO, and when its GAO protest fails, "diligently and continuously" pursues that protest by "immediately" filing a complaint in the United States Court of Federal Claims. In *CGI*, a gap of three business days between the GAO denial of the protest and the COFC complaint satisfied the Court. *Id.* at 1351.

Palantir USG's 43-day delay in filing suit at the COFC after its GAO protest was denied on May 18, 2016, does not meet the stringent requirements of *CGI*. This delay is an order of magnitude greater than the three business days condoned in *CGI*; it is more akin to the three-month delay in *Rex Service Corp. v. United States*, 448 F.3d 1305 (Fed. Cir. 2006), which the *CGI* court viewed as excessive. *CGI*, 779 F.3d at 1350-51.

Regarding the question of what number of days would meet the CGI requirement of "diligently and continuously" pursuing a company's protest after obtaining an adverse GAO ruling, the *CGI* Court did not determine a precise number of days, other than three business days. The number of days that would constitute continuous and diligent pursuit of a protest should be akin to 10 calendar days, which is the period of time set forth in 31 U.S.C. § 3553(d)(4) ("10 days after the date of the contract award" to invoke the mandatory stay), and 4 C.F.R. § 21.2(a)(2)(10 days to file after the basis of the protest is known). GAO regulations define the ten day period as 10 calendar days, and if the last day falls on Saturday, Sunday, of a holiday, then the due date is the following day. 4 C.F.R. 21.0(d) ("Days are calendar days. In computing any period of time described in Subchapter C, Chapter 35 of Title 31, United States Code, including those described in this part, the day from which the period begins to run is not counted, and when the last day of the period is a Saturday, Sunday, or Federal holiday, the period extends to the next day that is not a Saturday, Sunday, or Federal holiday. Similarly, when the Government Accountability Office (GAO) or another Federal agency where a submission is due, is closed for all or part of the last day, the period extends to the next day of which the agency is open.").

The application of GAO rules in COFC protests has been favorably endorsed. *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) ("It would be incongruous to bar later GAO protests but to permit a later court challenge."). Accordingly, this Court should look to GAO regulations to determine the specific number of days that is appropriate to measure whether a company has continuously and diligently maintained its protest grounds after obtaining a denial

of its protest at GAO. Regarding the cases cited in plaintiffs' footnote 5, page 15, they all predate the *CGI* decision.

The 34 calendar days that elapsed in this case does not constitute a continuous and diligent pursuit of the protest grounds that were raised at GAO, and does not fall within the exception established in *CGI* for a case where a company timely filed a GAO protest, and immediately after obtaining an adverse GAO ruling, filed suit on the same grounds in the Court of Federal Claims.

There is also no merit in plaintiffs' argument that the 29 calendar days that elapsed between the GAO denial of its protest and its filing with the Court and the Government of a Pre-Filing Notification of its intent to file suit in this Court challenging the Solicitation as in violation of 10 U.S.C. § 2377 constitutes the continuous and diligent pursuit of its protest grounds after obtaining GAO's decision. Pl. Opp.10. For the same reasons stated, whether the relevant period is 34-days before filing the Complaint, or 29 days before filing a Pre-Filing Notification, Palantir USG did not diligently and continuously pursue the protest grounds set forth in its petition submitted to GAO, as required by the *CGI* decision.

**B. <u>The *CGI* Rule Is An Exception</u>**

Plaintiffs contend that the rule established in *CGI* is not an "exception" to the normal rule for demonstrating that a company is a "prospective bidder," and there is simply no requirement that a company demonstrate that it intends to submit a bid or proposal to the agency before the closing date for their submission in order to establish that it is a "prospective bidder." Pl. Opp.13.

This is incorrect. Indeed, in *CGI,* the Federal Circuit explicitly stated that "CGI's opportunity to qualify as a prospective bidder ends when the solicitation period ends does not

doom CGI because it had already achieved prospective bidder status with its timely GAO protest." *Id.* at 1350. The Federal Circuit further stated that its decisions in "*MCI, Federal Data* and *Digitalis* all make clear" that a company's opportunity to qualify as a prospective bidder ends when the solicitation period ends." *Id.* Thus, the normal rule, established in Federal Circuit precedent, is that a company must meet the prerequisite of being a "prospective bidder" and a company's opportunity to demonstrate that it has met that prospective bidder component of standing ends on the date for submission of bids or proposals to the agency. The exception is addressed in *CGI,* which applies where a company has filed a protest at the GAO. *Id.* at 1350.

IV. **Plaintiffs Are Not Qualified Bidders**

Plaintiffs contend that they are prospective bidders because they are able to meet all of the Army's requirements but cannot meet the solicitation terms requiring (1) a Cost Accounting Standards (CAS)-compliant cost accounting system and (2) a compliant EVMS and that such terms make it impossible for Palantir to submit a bid. Pl. Opp.11. Plaintiffs repeatedly argue that because they lack a cost accounting system that is compliant with the CAS, and also because they lack an Earned Value Management System (EVMS) it is impossible for plaintiffs to submit a bid that meets the solicitation requirements. Pl. Opp.11, 13, 18, 19, 20, 22, 23.

On Cost-Type contracts and cost CLINS, the Government pays allowable incurred costs to the extent prescribed in the contract, plus a fee. To be allowable, a cost must be reasonable, allocable, properly accounted for, and not specifically disallowed. FAR § 31.201-2. When a cost reimbursement-type contract is sought by the Government, the FAR requires that a "contractor must have an adequate cost accounting system." FAR 16.301-3. The reasoning for this is because the Government has an interest in only paying allowable incurred costs that are

properly accounted for by a contractor. FAR Part 30 contains the Cost Accounting Standards. FAR Part 31 and FAR Subpart 43.2 contain guidance on administration.

The term "CAS Accounting System" refers to both the CAS Rules and Regulations, and the Cost Accounting Standards required by the Government. In regards to the accounting system, FAR Appendix B, Cost Accounting Preambles and Regulations, begins with a general comment that cites the purpose: "The purpose of the regulations promulgated today by the Cost Accounting Standards Board is to implement section 719 of the Defense Production Act of 1950, as amended, 50 U.S.C.App. 2168, which provides for development of Cost Accounting Standards to be used in connection with negotiated national defense contracts and for disclosure of cost accounting practices to be used in such contracts."

As stated in the solicitation, Tab 20, A959, FAR 16.301-3 cites the limitation for utilizing a cost-reimbursement type contract. Specifically 16.301-3(a)(3) requires that "[t]he contractor's accounting system is adequate for determining costs applicable to the contract or order".

EVMS is addressed in the solicitation at Tab 20, A904, A959. Earned Value Management (EVM) is one of DoD's and industry's most powerful program planning and management tools. The purpose of EVM is to ensure sound planning and resourcing of all tasks required for contract performance. It promotes an environment where contract execution data is shared between project personnel and government oversight staff and in which emerging problems are identified, pinpointed, and acted upon as early as possible. EVM provides a disciplined, structured, objective, and quantitative method to integrate technical work scope, cost, and schedule objectives into a single cohesive contract baseline plan called a Performance Measurement Baseline for tracking contract performance. (from- http://www.acq.osd.mil/evm/)

Department of Defense policy provides:

**234.201 Policy.**

(1) DoD applies the earned value management system requirement as follows:

> (i) For cost or incentive contracts and subcontracts valued at $20,000,000 or more, the earned value management system shall comply with the guidelines in the American National Standards Institute/Electronic Industries Alliance Standard 748, Earned Value Management Systems (ANSI/EIA-748).
>
> (ii) For cost or incentive contracts and subcontracts valued at $100,000,000 or more, the contractor shall have an earned value management system that has been determined by the cognizant Federal agency to be in compliance with the guidelines in ANSI/EIA-748.

DFARS 234.201. The provision that implements this policy, DFARS 252.234-7001, at (a)(2) allows offerors' who do not have DCMA compliant EVMS systems the opportunity to submit a "comprehensive plan for compliance with the guidelines in ANSI/EIA-748". This review would take place before a contract award, but would not preclude an offeror from submitting a bid.

Regarding the company's cost accounting system, the DCGS-A Increment 2 solicitation stated that "[i]n the event an Offerors accounting system has not been evaluated":

> Consult the Audit Process Overview Information for Contractors Manual (under the Guidance tab on DCAAs website), specifically Enclosure 2, Preaward Surveys of Prospective Contractor Accounting System. After reading Enclosure 2, complete the Preaward Accounting System Adequacy Checklist and submit it to the Contracting Officer for this solicitation. In addition, you should refer to DFARS 252.242-7006, Accounting system administration, for requirements of an acceptable accounting system. The Contracting Officer will determine the need for a DCAA audit. Contracting officers can request DCAA audit services.

Tab 20, A959. The contracting officer (with support from DCMA) would review the submission in the normal responsibility process. A CAS compliant Accounting System is needed for award of the DCGS-A Increment 2 contract, but this review/evaluation/determination can be done after the offeror's proposal submission and prior to award. Similarly, EVM is needed for award of the

DCGS-A Increment 2 contract, but this review/evaluation/determination also can be done after the offeror's proposal submission and prior to award. Tab 20, A904, A959.

Assuming that plaintiffs can meet all of the solicitation requirements but cannot meet the solicitation requirements for (1) a CAS-complaint cost accounting system and (2) an EVMS, that does not mean that either plaintiff is a "prospective bidder." Moreover, the determination of whether a company has a CAS-compliant Accounting System or EVM can be done after proposal submission, and does not prevent a company from submitting a proposal in response to the DCGS-A Increment 2 solicitation. Plaintiffs failure to have a CAS-compliant accounting system or EVM did not make it impossible for either to submit a proposal. Pl. Opp.11. Rather, plaintiffs made business decisions not to.

A prospective bidder must be a bidder that is qualified to perform the work. In *Myers Investigative and Security Services, Inc. v. United States*, 275 F.3d 1366, 1368 (Fed. Cir. 2002), the issue was whether the protestor had standing to challenge the award of two sole source contracts, and the trial court determined that it did possess standing. However, the Federal Circuit held that the protestor did not have standing because it failed to show that it was a responsible contractor and could have performed the contracts. *Id.* at 1369. The Federal Circuit explained that "prejudice (or injury) is a necessary element of standing." *Id.* at 1370. The Federal Circuit noted that the substantial chance rule had been applied in challenges to sole source contract awards and that in such cases a protester must demonstrate that it would have had a substantial chance of receiving the award in order to establish both prejudice and standing. Id. (citing *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001)).

In *Meyers*, the Federal Circuit stated that the Court in *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324 (Fed. Cir. 2001), had considered the question

of whether the burden of establishing that the protester had a substantial chance of receiving the award standard applies in cases "where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process)." *Id.* (citing *Impresa*, 238 F.3d at 1334). In cases where the protester claims that he Government was obligated to rebid the contract, to have standing the plaintiff must establish that it could compete for the contract if the bid process were made competitive. *Id.* The Federal Circuit ruled that Meyers had not established that if the procurement process were made competitive, it could compete for the contract. The mere fact that Meyers might have submitted a bid in a competitive procurement was not sufficient. *Id.* The Federal Circuit concluded that Meyers had not established that it could compete for the contract because Meyers "had to show that it would have been a qualified bidder [in a resolicitation]. This Meyers has not done." *Id.* at 1370-71.

Here also, plaintiffs challenge the solicitation and contend that the Government must issue a new solicitation, but plaintiffs cannot demonstrate that they in fact would have been qualified bidders, if the DCGS-A Increment 2 solicitation was reissued. *Meyers,* 275 F.3d at 1369, 1371. Plaintiffs admittedly do not possess CAS-compliant cost accounting systems or EVM. Pl. Opp.11. Therefore, although both plaintiffs allegedly could submit proposed solutions if the DCGS-A Increment 2 solicitation was reissued, as determinations on a CAS-complaint cost accounting system and EVM must be made before contract award, neither plaintiff would be a "qualified bidder." *Myers*, 275 F.3d at 1369.

Moreover, the fact that neither plaintiff possesses a CAS-compliant cost accounting system nor EVM was not caused by any defect in the solicitation that plaintiffs challenge. Plaintiffs do not have CAS-compliant cost accounting nor EVM because they did not see fit to

invest the necessary financial resources to develop a CAS-complaint cost accounting system nor EVM. Plaintiffs made their own business choices about where and how to invest their own financial resources in building their companies and do not have standing to challenge the solicitation where they fail to demonstrate that either "would have been a qualified bidder" in the event of a resolicitation for DCGS-A Increment 2. *Meyers*, 275 F.3d at 1371; *see also Information Technology & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003).

Similarly, in *Three S Consulting v. United States*, 104 Fed. Cl. 510, 519 (2012), *aff'd*, 562 Fed.Appx. 964 (Fed. Cir. 2014)(Mem), the Court ruled that an unsuccessful bidder for a Government contract did not have standing to challenge award of the contract to the successful bidder, MHLI. There, the solicitation required that bidders have a General Services Administration (GSA) Federal Supply Schedule (FSS), Mission Oriented Business Integrated Services (MOBIS) contract, and the protestor did not have such a contract at the closing date for receipt of proposals. *Id.* at 516, 521. The protestor alleged that the awardee did not have all of the required services within its MOBIS contract and therefore MHLI's contract contained non-FSS items that should have been competitively bid and not restricted to companies that have a MOBIS contract. *Id.* at 520. The Court ruled that the protestor did not have standing because the solicitation was restricted to FSS contractors with MOBIS contracts, and the protestor did not have one. *Id.* Plaintiff, as a non-FSS and therefore nonresponsive bidder, the Court ruled, lacked standing to challenge the award. *Id.*

As in *Three S Consulting*, plaintiffs, not possessing a CAS-compliant cost accounting system nor EVM, Pl. Opp.11, could not be qualified bidders for award of the contract, in the event of a resolicitation for DCGS-A Increment 2. *Three S Consulting*, 104 Fed. Cl. at 521 (the protester "simply was not a responsive bidder to begin with"). In *Three S Consulting*, "[o]nly a

party with a MOBIS contract for all of the required services would have standing to challenge the MHLI award." *Id.* In this case, only an offeror with both a CAS-compliant cost accounting system and EVM could potentially have standing. As demonstrated at pages , the Army did not make it impossible for plaintiffs to bid on the DCGS-A Increment 2 procurement, or for plaintiffs to obtain the contract. Pl. Opp.11. Instead, plaintiffs made their own business choices about how they would develop their own companies, and chose not to develop CAS-compliant cost accounting systems nor EVM. Pl. Opp.11. Accordingly, this is not a case where the Army made it impossible for the plaintiffs to: (1) submit a proposed solution in response to the DCGS-A Increment 2 solicitation; or (2) obtain the contract award.

In sum, plaintiffs cannot demonstrate that either "would have been a qualified bidder" in a resolicitation for DCGS-A Increment 2, and neither can establish the requisite economic interest and prejudice to establish standing. *Meyers,* 275 F.3d at 1371.

V. ***National Air Cargo Group, Inc. v. United States***

The direct economic interest component of standing is addressed in *National Air Cargo Group, Inc. v. United States*, 126 Fed. Cl. 281, 292 (2016). As addressed above at pages 2-3, there is a question whether (a) the standard of a "reasonable likelihood that the protester would have received the contract award but for the alleged errors in the procurement or (b) a "non-trivial competitive injury" standard applies in this case, which is a post-bid, pre-award bid protest.

That issue was considered in *National Air Cargo Group*, where the Court decided to apply the "non-trivial competitive injury" standard in determining whether the protester had standing. *Id.* at 295. The agency awarded five indefinite-delivery/indefinite-quantity contracts (IDIQs) and one of the awardees was the protester, National Air Cargo Group. *Id.* at 284. The

IDIQs contemplated that the agency would issue task orders pursuant to the IDIQs. *Id.* at 286. Later, the agency made another award to United Air Lines Inc. bringing the total number of IDIQs awarded to six. *Id.* at 284. In response to various protests, the agency took corrective action reevaluating past performance for all offerors, and reaffirmed all six contracts. *Id.* National Air Cargo then challenged the reaffirmed IDIQ award to United Air Lines. *Id.*

The Court rejected the agency's argument that the protestor did not have standing because it was awarded one of the six contracts, and ruled that the protester had standing, relying on *Systems Application & Techs., Inc. v. United States*, 691 F.3d 1474, 1381 (Fed. Cir. 2013). *National Air Cargo Group*, 126 Fed. Cl. at 290-91. In that case, the agency announced that it would take corrective action in response to a GAO decision and revoke the contract awarded to the protester. *Systems Application & Techs*, 691 F.3d at 13277. The agency argued that the protestor had no standing because it was a contract awardee. *Id.* at 1381. The Federal Circuit rejected that argument, ruling that the fact that the protester was a contract awardee was not material to the question of jurisdiction. *Id.* The protester had objected to the agency's corrective action, and its attempt to enjoin the agency from terminating its contract did not transform its otherwise proper protest into a CDA claim. *Id.* at 1381.

National Air Cargo alleged a violation of procurement law in the award of the IDIQ contract to United Air Lines. *National Air Cargo Group*, 126 Fed. Cl. at 290. The Court ruled that it would apply a "non-trivial competitive injury" test in determining whether the protester had the requisite economic interest to establish standing. *Id.* at 294. In the Court's view, the agency's award of the sixth IDIQ contract to United Air Lines had the effect of significantly increasing competition for the other five IDIQ awardees, and this would be a "non-trivial competitive injury" to National Air Cargo. *Id.* at 295-96.

The case emphasizes that there are two standards that may be applied in determining whether the protestor has the requisite economic interest to establish standing, and that the determination of the proper standard depends upon the facts of each case.

However, in our view, the decision in *National Air Cargo Group* was wrongly decided. In our view, the Court's rejection of our argument that a contract awardee cannot establish standing and its reliance on *Systems Application & Techs., Inc.*, 691 F.3d at 1381, was improper. In *Systems Application*, the protester was determined to possess standing precisely because the agency was taking corrective action that would deprive the protester of its contract award. That was not the case in *National Air Cargo Group*, where the protester was awarded an IDIQ contract and faced no danger of losing such contract.

More importantly, plaintiffs do not meet either standard for establishing the requisite economic interest component of standing, which includes analysis of prejudice.

In the DCGS-A Increment 2 procurement, the rules and procurement procedures, including the solicitation of market research information, were applied to all potential offerors equally. *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009). Other potential offerors completed the chart in the Request for Information No.2 and provided information about their capabilities; however, Palantir USG declined to provide the information requested by the Army in its response to RFI No.2, and Palantir Technologies did not respond to any of the RFIs or provide comments on the draft solicitation.

Plaintiffs did not submit a proposed solution to the Army's requirements in response to the solicitation, and the Army did not preclude plaintiffs from submitting such a proposal. See discussion above at pages . As the Federal Circuit reasoned in *Labatt*, 577 F.3d at 1381, both the Army market research requests and the RFQ solicitation requirements were applied equally to all

parties. By failing to respond fully to Army Request for Information No.2, and by failing to submit a proposed solution that would meet all of the Army's requirements in response to the RFP, plaintiffs "become[] stranger[s] to the process, and [are][] disqualified from the procurement." *Id.* at 1381. As the Court held in *Labatt,* 577 F.3d at 1381, such parties have no more standing "than the proverbial man on the street."

Plaintiffs' alleged economic interest in the DCGS-A Increment 2 procurement is further attenuated by the fact that the Army has received multiple proposals in response to the solicitation. Tab 1, A19. Neither plaintiff can demonstrate that "but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378.

Application of the "non-trivial competitive injury" test should result in a determination that plaintiffs do not have the requisite economic interest to establish both standing and prejudice. Plaintiffs were not precluded from fashioning and submitting a proposal in response to the RFP before the closing date on February 16, 2016, and declined to do so. *See* pages 12-15 above.

Plaintiffs have not demonstrated that either could have, and would have, submitted a proposal with a solution that met all of the Army's requirements with only commercial or nondevelopmental items. Moreover, Palantir Technologies continues to earn substantial profits from selling the Army licenses to use its Palantir Gotham Platform. A6793 (Tab 145), A6794 (Tab 146), A6795 (Tab 147). There is no indication that its sales to the Army of licenses for its product will be affected during the period of performance of the DCGS-A Increment 2 contract. In Tab 20, the anticipated contract, in Clause 252-216-7006-Ordering states: "The Ordering base period is (72) months from date of contract award." A899 (Tab 20). It is anticipated that there would be a lengthy developmental period, and also testing.

Further, as Palantir Technologies is the corporate entity that sells the licenses to the Army for use of the Palantir Gotham Platform, A6793 (Tab 145), A6794 (Tab 146), A6795 (Tab 147), Palantir USG has not established that it has a sufficient economic interest that might possibly be affected. Palantir USG suggests that it might team-up with Palantir Technologies and thereby demonstrate that it possesses the requisite economic interest. Pl. Opp.32. However, that fact demonstrates that Palantir USG, standing alone, does not have the requisite economic interest. Accordingly, the alleged procurement errors have no significant bearing on each plaintiff's asserted economic interest.

## V. Application Of The Waiver Doctrine Should Result In Dismissal Of The Complaint

As demonstrated in our motion to dismiss at pages, the waiver doctrine established in *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308 (Fed. Cir. 2007), requires the dismissal of a protestor's complaint where it complains of an alleged defect in the solicitation that is patent and the protestor could have filed suit in the COFC before the close of the bidding process, but did not.

Also, in *VION Corp. v. United States*, 122 Fed. Cl. 559 (2015), VION, an unsuccessful bidder in a post-award bid protest, challenged among other things the agency's proof of concept plan. VION received the agency's proof of concept plan on June 20, 2014, and conducted its proof of concept testing in July 2014. The Court applied the *Blue & Gold* waiver doctrine and held that VION should have raised its objection to the agency's proof of concept plan before VION conducted its own proof of concept testing in July 2014. In addition to the Court's reliance on the *Blue & Gold* waiver rule, the Court found support for its ruling in *Micro-Research*, B-200778, 1986 WL 63012, at *1 (Comp. Gen. Jan. 3, 1986) (finding that a "[p]rotest against [a] known requirement to be imposed in a benchmark test is untimely when not filed with

the agency until after the date of the benchmark"). VION's challenge to the agency's proof of concept plan had to be filed with the Court before the protester's own proof of concept testing, which was due to be conducted before the submission of bids.

Similarly, application of the *Blue & Gold* waiver doctrine requires that the plaintiffs' challenge to the solicitation, which raises alleged defects that are solely patent in nature, had to filed before the deadline for the submission of bids, before February 16, 2016.

Plantiffs suggest that the *Blue & Gold* waiver doctrine ought not apply in a pre-award bid protect. Pl. Opp.36, 38. However, the Federal Circuit, in endorsing application of the waiver doctrine, did not restrict the application of such doctrine to only post-award bid protests. Instead, the Federal Circuit emphasized that the *Blue & Gold* waiver doctrine has broad application, and that "the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1381-82 (Fed. Cir. 2012). In *COMINT Systems Corp.*, the Federal Circuit held that the protester had waived its opportunity to challenge Amendment 5 in the COFC. The Court extended the waiver rule of *Blue & Gold* to a situation where the protester had no opportunity to challenge the term of the solicitation at issue before the close of the bidding process, as the disputed Amendment 5 was issued after bids were submitted. *Id.* at 1382. The Court explained that "the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *Id.*

Like the protesters in *Blue & Gold* and *COMINT Systems*, plaintiffs, having knowledge of alleged defects in the solicitation, chose not to file suit in the COFC before the deadline for submitting proposals, and seek to restart the bidding process, after not even submitting a

proposal. Application of the waiver rule, prevents both Palantir Technologies and Palantir USG "from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *COMINT Systems Corp.*, 700 F.3d at 1382 (quoting *Blue & Gold*, 492 F.3d at 1314).

The *Blue & Gold* waiver doctrine has been applied in pre-award cases. In a post-bid, pre-award bid protest, *Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6 (2013), the National Park Service (NPS) issued a prospectus for national park concessioners at Teton National Park. Per regulations, NPS entitled incumbent "preferred offerors" a "right of preference" to match a competing offer so long as it materially met the minimum requirements of the prospectus. Two competitors who had omitted certain specified financial information were nonetheless allowed to match Eco Tour's offer. *Id.* at 16. After they did so and the bidding closed, but before any award was made, Eco Tour filed its pre-award bid protest, arguing both that NPS should not have allowed the competitors to match and that the prospectus was illegal for a variety of reasons.

Relevant here, Eco Tour argued that NPS improperly made a determination as to whether the offers *materially* met the minimum requirements. It argued that this contradicted NPS regulations by limiting the requirement that offers meet minimum requirements of the prospectus. *Id.* at 25. The Court found this claim waived, because Eco Tour had the opportunity to object to that part of the prospectus during the bidding period and did not do so. *Id.* at 26. This was an argument that the prospectus itself was patently ambiguous, the Court found, so Eco Tour was required to object to it during the bidding period.

In another post-bid, pre-award protest, *Infrastructure Defense Technologies, LLC v. United States*, 81 Fed. Cl. 375 (2008), the agency issued a sole-source solicitation for concertainers, a Hesco-brand product used as a substitute for sandbags. *Id.* at 377. Although it

was sole-source, the Presolicitation Notice "specifically invited other proposals, informed that alternates would be further analyzed and incorporated." *Id.* at 385. Nonetheless, plaintiff IDT, who manufactured a similar product, "did not submit a bid or a proposal, nor file a bid protest during the proposal period." *Id.* at 383. After the close of the bidding period, IDT filed a pre-award protest, arguing that the Solicitation should have used performance specifications and that it should not have been sole source. *Id.* at 389.

The Court determined that IDT's claims were waived in accordance with the *Blue & Gold* waiver doctrine, because IDT failed to protest during the bidding period, *Id.* at 388-89, and collected cases demonstrating that "*Blue & Gold* has been applied by the Court of Federal Claims in several situations." *Id.* at 389 (summarizing cases).

The Court suggested that even had IDT filed a bid or proposal, it still would have fallen under *Blue & Gold* waiver rule. *Id.* The Court reasoned that the clear instruction of the Federal Circuit that objection to the terms of the solicitation must be protested prior to the close of the bidding process, applies with no less force where, as here, the protester failed to submit a proposal to the agency. *Id.* The Court noted that the protestor in *Blue & Gold* had submitted a bid; nevertheless, its failure to file its protest during the bid period was found to be a waiver. The Court concluded that "[b]ecause IDT did not file a bid or proposal, the case for waiver is even stronger." *Id.* at 389.

The same is true here. Plaintiffs in this post-bid, pre-award protest declined to submit proposals to the Army in response to the solicitation, and now complain of alleged defects in the solicitation that are clearly patent, *i.e.*, obvious on the face of the document. The case for application of the *Blue & Gold* waiver rule here is even stronger than in *Blue & Gold*, because

plaintiffs did not even submit a proposal to the Army in response to the solicitation. *IDT*, 81 Fed. Cl. at 389.

## VI. <u>**Palantir USG Did Not Raise All Its Claims And Allegations At GAO**</u>

Plaintiffs cites to multiple pages of Palantir USG's petition (Tab 4) presented to GAO, but at no point does it demonstrate that Palantir USG presented Count II of the complaint and its assertion of bad faith as a protest ground at GAO. Pl. Opp. at 28-32. With regard to Count II of the complaint, that Palantir would have been able to perform all of the Army's requirements even if bundled together in one solicitation, Palantir USG selectively cites the GAO petition where it alleges that commercial technologies exist to provide the data management layer, not the miscellaneous other requirements that the Army needs developed. Pl. Opp. at 29, citing Tab 4, A70, A77-78. Palantir USG cites the vague argument that the Army should have considered whether commercial software can provide "all or some" of the capabilities. Pl. Opp. at 29, citing Tab 118, A6220. Palantir USG's other citations are similarly tangential. At no point did Palantir USG in its GAO petition, or post-hearing comments allege that it could perform the entire DCGS-A Increment 2 contract, and the GAO correctly determined in its decision that Palantir USG "does not argue that it could provide a commercial solution that would meet all of the agency's needs" but was protesting that the "agency should have used a phased approach." Tab 122, A6562. Indeed, plaintiffs' detailed Complaint filed with this Court never asserts that GAO was wrong in determining that Palantir USG "does not argue that it could provide a commercial solution that would meet all of the agency's needs." Tab 122, A6562.

With regard to the bad faith allegations in the COFC Complaint, Palantir did not raise such allegations or a claim of bad faith as a protest ground at GAO. Palantir USG's petition provides only two citations at Tab 4, A68 and A83, which is only a footnote (A83 n.19), alleging

as a factual matter, that the Army acted out of a "long-standing resistance to commercial solutions generally, and to Palantir specifically." Pl. Opp. at 30. Palantir USG stated at the most that its assertions suggest bad faith. Such general statements, one of which is only in a footnote (Tab 4, A83 (n.19)), were insufficient to bring the claim of bad faith to the GAO as a protest ground for decision. Palantir USG did not raise the bad faith claims in its court complaint to any degree that would have allowed the GAO to address them. Accordingly, Palantir USG cannot be said to have raised and maintained all of the protest grounds that it seeks to present to the Court before the GAO.

With regard to the new factual allegations first presented in the Court of Federal Claims complaint, Palantir USG (Pl. Opp. 31) offer cites to the agency record documents presented to the GAO, but not to: (1) its own petition (Tab 4, A61-90); (2) its comments on the agency report (Tab 118, A6202-6226), or (3) its post-hearing comments (Tab 119, A6227-6243), to support its argument that it raised particular allegations as a protest ground to the GAO. Palantir USG's arguments presented to the GAO, however, were contained in three documents: (1) Tab 4, its petition; (2) Tab 118, its comments on the agency report, and (3) Tab 119, its post hearing comments. All of Palantir USG's other citations could not possibly be a protest ground raised before the GAO for it to consider and decide.

## CONCLUSION

For these reasons and those in our motion to dismiss, the United States respectfully requests that the Court dismiss the plaintiffs' complaint. In the alternative, Palantir Technologies should be dismissed and the complaint should be restricted to Palantir USG, and further restricted to the protest grounds and allegations that Palantir USG presented to the GAO for consideration and decision.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 307-1111
Fax. (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
Scott A. MacGriff
Department of Justice

Scott N. Flesch
MAJ (P) Lawrence P. Gilbert
Frank A. March
Evan C. Williams
U.S. Army Legal Services Agency
Fort Belvoir

Debra J. Talley
Daniel J. Beuke
Army Material Command

July 22, 2016