IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PALANTIR TECHNOLOGIES, INC., | ) | |
| and | ) | Case No. |
| PALANTIR USG, INC., | ) | 16-784C |
| Plaintiffs, | ) | |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

Courtroom 6
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Monday, July 25, 2016
2:30 p.m.
Bid Protest Hearing

BEFORE: THE HONORABLE MARIAN BLANK HORN

Linda D. Metcalf, CER, Digital Reporter

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

HAMISH HUME, ESQ.
STACEY GRIGSBY, ESQ.
JON R. KNIGHT, ESQ.
Boies Schiller & Flexner LLP (DC)
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC 20015
(202) 220-9600
hhume@bsfllp.com

ON BEHALF OF THE DEFENDANT:

DOMENIQUE G. KIRCHNER, ESQ.
SCOTT A. MACGRIFF, ESQ.
DOUGLAS K. MICKLE, ESQ.
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-1111
domenique.kirchner@usdoj.gov

APPEARANCES (cont'd):

ALSO PRESENT:

Justin Holbrook, Esq., Palantir
Chapman Good, Paralegal, Boies Schiller & Flexner
Scott N. Flesch, Esq., U.S. Army
Evan Williams, Esq., U.S. Army
Doug Philippone, Palantir
Brian Choung, Palantir
Justin Mikolay, Palantir
Major P. Lawrence Gilbert, U.S. Army
Colonel Frank March, Retired, Esq., U.S. Army
Daniel Beuke, U.S. Army
Christopher Fisher, Contracting Officer, U.S. Army
James Whitacker, Legal Intern, U.S. Army
Kohei Oman, Legal Intern, U.S. Army
Michelle Sohn, Law Clerk to Judge Braden
Erika James, Lark Clerk to Judge Braden
Halirou Abdoulaye, Intern, Judge Braden
Kevin Sales, Intern, Judge Braden
Adi Williams, Intern, Judge Braden
Ryan Monahan, Intern, Judge Braden
Nathan Castellano, Law Clerk to Judge Reyna
Dan Rodriguez, Intern, Judge Reyna
Mickey Herman, Intern, Judge Reyna

APPEARANCES (cont'd):

Chris McNett, Law Clerk to Judge Reyna

Alex Ruge, Law Clerk to Judge Reyna

Sarah Jelsema, Law Clerk to Judge Reyna

# I N D E X

| EXHIBITS: | ID | ADMITTED |
|---|---|---|
| 1 | | 30 |
| 3 | | 47 |
| 4 | | 47 |
| 5 | | 47 |
| 6 | | 54 |
| 22 | | 64 |
| 23 | | 64 |
| 24 | | 71 |
| 44 | | 98 |
| 45 | | 98 |
| 46 | | 98 |

P R O C E E D I N G S

- - - - -

(Proceedings called to order, 2:37 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Marian Blank Horn presiding.

THE COURT: Go ahead and be seated.

A couple of preliminary matters. We obviously have a full house and we need to get everybody identified, I think. The record is sealed in this case. The case is not, at this point. And as I often say, the burden is on the attorneys if they think something ought to be sealed and, obviously, we can clear the courtroom at that point if we're going to be talking about something that is sealed.

So, I toss you that burden again, Mr. Hamish, and for the Government as well. And we'll go from that point of view.

We had a number of requests for people to come to the courtroom, and I'd like to -- as I say, I recognize some of the faces, not others. But among the ones that I don't, one of the requests was from someone from the Circuit and my -- the burden, again, I put on you. I don't know who you are, but it's a clerk from the Circuit, that it would be fine, but I don't think it

would be appropriate then for you to be involved in the appeal at the next stage if, in fact, there is an appeal. And, again, the burden is tossed to the individual to whom to this applies to self-enforce. But we'll be going potentially off the record occasionally. It just would not appear to be a good thing to have someone be sitting through this conference and then again working on the case if they are an appellate clerk at that point.

So, I think what we'll do at this point is to have counsel note their appearance for the record. And then -- hold on one second, I'm not finished -- and then proceed from there.

The other thing that I want to say, we now have four amendments to the original administrative record. That's not good. And if, of course, depending upon what happens down the line, there may really be some amendments to the record. That's what we're here to talk about today, obviously. But for there to be four what are apparently clerical errors for the most part, that's not okay. So, I know we're moving fast, but moving fast does not mean not moving accurately. So, I would ask all of you to pay closer attention so that we don't have a messed-up record.

I guarantee you this, that at the end of the day, when we do sort of draw this all together and we

have an administrative record, that is the point at which I'm going to want a complete administrative record on a CD and also a complete paper copy for our use. I do that for several reasons. First of all, we obviously want to use the correct version ourselves when we're going towards writing an opinion. But also in the event again that there's an appeal, I don't want to have to have the Court of Appeals ask for 15 different versions in order to get the right one, and I think you don't either because what that generates is potential mistakes.

So, let's see if we can't pay a little bit closer attention. This one happens to be on the Government's head, but it could be on either side, and going forward, I think everybody needs to pay a little bit better attention to it.

With that, Mr. Hamish?

MR. HUME: Good afternoon, Judge Horn. This is Hamish Hume appearing for Palantir, the Plaintiffs. With me today is my colleague, Stacey Grigsby from Boies Schiller and Flexner; my colleague, Jon Knight from Boies Schiller and Flexner, both of whom are attorneys at the firm. We also have at counsel table Chapman Good who's a paralegal at Boies Schiller assisting us with some of the documents.

Also, Your Honor, with us in the courtroom

today are four individuals from Palantir. In-house counsel Justin Holbrook is here from Palantir. In addition, Mr. Doug Philippone, the Global Defense Lead for Palantir is here and one of the declarants who submitted a declaration to the Court. In addition, Brian Choung, the Global Defense Engineering Lead for Palantir, who also submitted a declaration to the Court, is here today, and finally, Justin Mikolay, who is Palantir's -- the head of Palantir's government cyber business is here today.

We discussed this briefly with counsel before we began and I think they may object to the presence of the Palantir individuals based on the information that's under seal. Our view is that everything we're here to talk about today is information Palantir has in its possession and provided to us and that we believe should be supplemented into the record. So, we don't think there's anything that will be discussed today that they don't already know.

I'm happy to provide more background to the Court, but we've been trying for the last two weeks to provide a mechanism where in-house Palantir people can at least see the briefings and other material that talk about nothing other than what they already have, which is the vast majority of what's in most of the briefs.

There's actually -- even in the sealed administrative record, Your Honor, the majority of it was provided to Palantir at the GAO and only small portions, relatively speaking, were redacted, and we don't plan to rely on any of that redacted information in our presentation today and I don't think we rely on any of it in our motion to supplement our papers. That's -- I'll allow government counsel to address that.

THE COURT: First, let me apologize to you. I think I've been hanging around with three-year-olds too much. Everybody is Mister or Miss by their first name.

MR. HUME: It's quite all right.

THE COURT: And that was my whole weekend.

MR. HUME: Actually, it's quite common that people say Mr. Hamish. I'm quite comfortable with it.

THE COURT: Well, Mr. Hume, and I do apologize to you.

We had some discussion earlier about some of the Palantir people seeing some of the material. But I thought what we had agreed was -- and obviously the Government can be heard from, but I thought what we had agreed was that they would be admitted to the protective order before they did that. Has that happened?

MR. HUME: Yes, that was the idea and it was discussed a couple of weeks ago. The protective order,

itself, as written, says that the only people who can be admitted are outside counsel. So, there needs to be a technical amendment to it which we proposed I think early last week to the Government.

THE COURT: But it hasn't occurred. So, technically, they would be sitting here with no restrictions on them.

MR. HUME: No, they -- well, we would -- I'm sure they would all be happy to affirm right now -- we've tried to amend the protective order. The Government said on Thursday they would get back to us. It was actually their idea that they be admitted for limited purposes. We agree with that. We'd like to get that administrative matter cleared up if we could today.

THE COURT: Well, we'll have to do that before we go forward with them sitting here for sure. But, all right, let's -- Ms. Kirchner, let's turn to you and if you would introduce those that are with you and make an appearance for the record.

MS. KIRCHNER: Domenique Kirchner representing the United States. With me today I have Scott MacGriff from the Department of Justice. Also present in the courtroom is Douglas Mickle. We have from the Army, Scott Flesch. Present in the courtroom, we also have Major P. Lawrence Gilbert present in the courtroom; Evan

Williams present in the courtroom.

THE COURT: Now, what is it, Mr. Williams?

MS. KIRCHNER: Evan Williams.

THE COURT: What is Mr. Williams? What is his role?

MS. KIRCHNER: He’s counsel, Army counsel.

THE COURT: Pardon?

MS. KIRCHNER: Army counsel.

THE COURT: Army counsel, okay.

MS. KIRCHNER: We have two legal interns from the Army, Kohei Oman. That’s K-O-H-E-I and last name Oman, O-M-A-N. And James Whitacker. These are two interns that are here to observe. They’re aware of the protective order and fully understand it, Your Honor. They’re here for observation purposes.

We have on the telephone the contracting officer, Christopher Fisher.

THE COURT: Mr. Fisher, can you hear us?

MR. FISHER: Yes, Your Honor.

THE COURT: Very good, thank you.

MS. KIRCHNER: With agency counsel there, Daniel Bueke, B-U-E-K-E, and --

THE COURT: Mr. Bueke, can you hear us?

MR. BUEKE: Yes, Your Honor.

THE COURT: All right.

MS. KIRCHNER: And I think Frank March was also going to try to be in on the telephone.

THE COURT: Mr. Marsh, are you on the phone?

(No response.)

THE COURT: Apparently not.

MS. KIRCHNER: Okay. Maybe he's just not available.

THE COURT: And Mr. March's role?

MS. KIRCHNER: He's agency counsel.

THE COURT: All right. So, what's your response to the Palantir folks being in the room?

MS. KIRCHNER: Your Honor, I was, in my presentation, going to refer to --

THE COURT: Well, let's talk about it now.

MS. KIRCHNER: Yes, I understand. To certain documents that are in the administrative record. Some of them are under seal. For example, there is a market report from July of 2015. It's my understanding that document is under seal and I'm not aware --

THE COURT: Well, there are a number of documents under seal. Mr. Hume was suggesting that they try to amend the protective order. Is that one of the documents, Mr. Hume, that the Palantir folks have not seen?

MR. HUME: My understanding is they've seen

most of that document and there are certain portions that are redacted, which is true of basically every -- almost all the documents in the record. There are a few that are entirely redacted.

THE COURT: So, what we have in the record is a redacted document is what you're saying?

MR. HUME: No.

THE COURT: No? We have a full document?

MR. HUME: That's right. But a redacted version was given to Palantir during the GAO proceedings.

THE COURT: Okay, all right. Well, let's do one thing before we move to that. Let's try and figure out who else is in the room if we could. I know my interns are here as well. We don't have to go there. But the gentleman one in, the first gentleman on -- all right, let's start in the back of the room since you volunteered.

MR. ABDOULAYE: Halirou Abdoulaye, I'm an intern for Judge Susan Braden.

THE COURT: All right.

MR. SALES: Kevin Sales. I'm also an intern for Judge Braden.

THE COURT: Okay.

MR. WILLIAMS: Adi Williams, also with Judge Braden.

MR. MONAHAN: Ryan Monahan, the same.

MS. SOHN: Judge Horn, Michelle Sohn, law clerk to Judge Braden.

THE COURT: And I know who the next person is. She's going to protect us.

MR. CASTELLANO: Nathan Castellano, law clerk to Judge Reyna.

MR. RODRIGUEZ: Dan Rodriguez, intern to Judge Reyna.

MR. HERMAN: Mickey Herman, intern to Judge Reyna.

MR. MCNETT: Chris McNett, law clerk to Judge Reyna.

MR. RUGE: Alex Ruge, law clerk to Judge Reyna.

MS. JELSEMA: Sarah Jelsema, law clerk, Judge Reyna.

THE COURT: And, obviously, the remarks I made earlier reply to you all. I don't know how you do anything other than self-enforce it at this point, but I think it's probably -- you know, if it's in the public record and it's recorded, that's fine. I don't know whether I'm going to go off the record or not, but if we do, I think it becomes inappropriate for you all to participate and I don't know what your tenure is with Judge Reyna. But if it's a more extended one, that could

become an issue.

Mr. Mickle, I know you.

And, yes, ma'am?

MS. JAMES: Erika James, law clerk to Judge Braden.

THE COURT: And I know the two of you. How about the next aisle over? And you're the Palantir folks, so we're all set.

Okay. Without referring to documents, let's see if we can't solve this issue. What is it that -- and maybe we should clear the room with, you know, anybody who's not admitted to the protective order to talk about it? Is that your preference, Ms. Kirchner?

MS. KIRCHNER: Your Honor, I think I am going to adjust my argument because I understand that Palantir would like to be in the courtroom and I --

THE COURT: Well, it's much more than they would like to be in the courtroom.

MS. KIRCHNER: Right.

THE COURT: We operate in a world in which everything's public unless it has a very good reason not to be to, to put it in the vernacular. So --

MS. KIRCHNER: Right, I understand. My problem is I don't quite recall which portions of the market research report are redacted and which are not.

THE COURT: Well, that doesn't help us a whole lot here. What was the reason, Ms. Kirchner, that you couldn't work this out with Mr. Hume before? And what I'm hearing is that they didn't get a response at Boies Schiller, which is certainly not the way not to work something out.

MS. KIRCHNER: Your Honor, we simply haven't been able to reach agreement yet. But I'm --

THE COURT: That's not what I heard, but if that's what happened, that's fine.

MS. KIRCHNER: I'm happy to go forward and Palantir be present and it be a public proceeding. I think I can manage it, Your Honor.

THE COURT: Okay, but that's not really Mr. Hume's fundamental issue. It might work for today, but if I understand, again, I don't want to put words in anybody's mouth, but I understand that you're more interested in letting them be much more participatory than just today. Is that correct?

MR. HUME: That's correct, Your Honor. We have a very brief motion that we held off filing last week. I alerted the Court to it when we last -- I think we were on the phone one week ago.

THE COURT: Right.

MR. HUME: And there are two issues. One, the

simplest issue, which was raised actually by Mr. Mickle very helpfully two weeks ago was, we should at least be able to admit the Palantir people to the protective order for the limited purpose of seeing the documents they already have.

THE COURT: Right.

MR. HUME: And that should have been a no-brainer and I don't understand why we haven't been able to reach agreement on that.

A slightly more contentious issue has been our effort to reach agreement on an unsealing of the complaint. We don't think any of it should be sealed. The Government began with a large set of redactions and then narrowed them quite substantially. We gave them all the documents supporting all of our allegations. We showed them where we got those documents from in a chart showing the source for each one. We don't think any of that should be under seal. Certainly, the Government's last set of redactions redacted a lot of stuff that's already findable on the internet and that is public. So, that motion to unseal --

THE COURT: I think their argument was that it shouldn't have gotten there and, therefore, it should have a sealed status. What's your response to that?

MR. HUME: If it's public and it's been public

for a while and the Government has made no effort to take it down from the internet, it's public and that is not grounds for keeping it under seal. It may have been inadvertent, but, nonetheless, it's already public.

THE COURT: Ms. Kirchner, what's your response to that?

MS. KIRCHNER: Your Honor, there are a number of documents that are Army documents that --

THE COURT: No, just to respond to what he said. If it's out there and it's been out there for a while, why would we -- this isn't your standard clawback agreement. There isn't a clawback agreement here. What you're asking for, essentially, is the equivalent of a clawback opportunity. Why should you be permitted to do that?

MS. KIRCHNER: We think it's different from the analogy to a clawback agreement because these documents, although they are Army documents, were not officially released by the Army. Many of them were delivered to Congress and it may have been that members of Congress released the documents.

THE COURT: So, it's the members of Congress that are at fault here?

MS. KIRCHNER: I don't know how they were released. We do know that certain documents were

delivered to Congress and that certain documents then appeared, at some point, on the internet.

THE COURT: And what would you do to the members of Congress, just to ask the next obvious question?

MS. KIRCHNER: Your Honor, I'm just responding to how they got out there.

THE COURT: I understand. I'm trying to be somewhat practical about this --

MS. KIRCHNER: Right, I understand. I'm trying to, also.

THE COURT: -- and to try to figure out if it's out there and it's been out there for a while and it's been readily available, it's probably on a gazillion sources that could -- you know, where you could find it. And if Congress released it and you did nothing about it, even to inform them that it shouldn't have been released, which is what I gather you're essentially saying, I don't see how we now seal them.

MS. KIRCHNER: Your Honor, there are other documents also which are GAO documents. There are two official GAO reports, which when we contacted GAO, they told us that they had never released a public version.

THE COURT: Now, were they released by their bosses, the Congressmen, too?

MS. KIRCHNER: Your Honor, these were also done for Congress and delivered to Congress.

THE COURT: Of course, GAO is an arm of Congress.

MS. KIRCHNER: Yes. And they say in the text of the document that they are to be used for only official purposes and that when that official purpose -- that use is concluded, the document was supposed to be destroyed. They are, nonetheless, on the internet. That's a 2013 report and a 2016 report, which was issued -- I think it's a matter of days before the filing of the complaint. So, those are two documents that -- they're not Army documents, but --

THE COURT: Were they redacted or were they complete?

MS. KIRCHNER: No, complete documents are out there on the internet, Your Honor. I asked -- and Plaintiffs' counsel, they gave me the sites to check.

THE COURT: Well, and, Mr. Hume, what you're telling me essentially is that the Palantir folks have actually seen them.

MR. HUME: Yes.

MS. KIRCHNER: Yes, as I understand it, they are out there on the internet, but not officially --

THE COURT: So, we'd be talking about other

people in the room, not the Palantir folks, if they've already seen them. What's the harm here?

MS. KIRCHNER: Your Honor, we can't agree to -- the Court can order it, but we cannot agree to it.

THE COURT: Okay. If we were to -- Mr. Hume, if we were to go forward and -- as an officer of the Court, you would represent to the Court that the Palantir folks individually, and it might be different amongst all of them, have seen a particular document and it's on -- you know, it's widely spread, it's on the internet. I can't see any reason, at this point, to seal it from them. I think we could potentially seal it from others. We don't need to know if -- question for the GAO reports, same thing basically. I think we have to figure out a way in which we do this logically and sensibly.

I guess I don't understand why you all can't get together to make this work. I'm happy to do it for you, but I just don't understand.

MS. KIRCHNER: Well, Your Honor, we will resolve it. And then just -- I've been asked to clarify. Our information from Palantir was that these documents were released by congressional staffers. So, I misspoke if I said members of Congress. Congressional staffers is what we were told by Palantir.

MR. HUME: Your Honor, I will certainly, for

the record, 100 percent represent on behalf of the individuals from Palantir who are in the courtroom and anyone else at Palantir who sees the information that's discussed today that's the subject of the motion, that to the extent the -- to the extent the Government has sealed it in this case, they will respect the protective order's sealing of that information. However, most of that information, if not all of it, we believe should be and is already public. Most of it's already public, and the parts that are not already public, the Government has simply failed to provide a reason why it should be sealed.

And I really would urge the Court, we -- the last thing Palantir wants to do is jeopardize national security by putting information in the public domain that should not be in the public domain. And this is not a situation where we're counting upon something that Julian Assange just put out in the public domain.

THE COURT: Let's not get too dramatic here.

MR. HUME: But we're not doing that. What we're doing is saying that the things that Congress has put out in the public domain, that the GAO has written, and that on its face, there is no reason for it to be kept confidential. And --

THE COURT: Are these the four individuals from

Palantir that are the only ones that you're looking to have admitted to this material?

MR. HUME: Your Honor, I think that in addition to these four, there would probably be two others we would ask for, the general counsel and assistant to the chief executive who's monitoring this case. There are two additional individuals.

THE COURT: If we were to, Ms. Kirchner or maybe this would need to be kicked to Mr. Mickle -- we're never going to let you out of here, Mr. Mickle. If we were to kick this to you all with the six names and get them to sign the protective order or a modified protective order, which we could order into existence right now and you could follow up with a written version of it, would you be okay with just proceeding with those folks involved in -- present and involved in reviewing and helping Mr. Hume come up with a -- and I don't know that he would necessarily win, but with a just and fair result.

I'm troubled by the fact that, you know, you've kind of hamstrung them a bit and that the information is already out in the public domain released by whomever and that, you know, we can't really pull it off the internet -- I haven't figured out how to do that yet. What's your thought?

MS. KIRCHNER: The Court's solution is acceptable to the Government.

THE COURT: All right. So, as of this moment, the four gentlemen in the back from Palantir, you will be asked to sign a protective order, but you will be bound by that protective order from this moment forward and that will mean that you will share this information with them and other than the group that's submitted to the protective order, which means the folks from Boies Schiller and what will be the six of you at the end of the day and not with other Palantir folks. So, let me just go one by one here and make sure it's fully understood.

Sir, if you'd identify your name and offer your assent to the format that we've just outlined.

MR. PHILIPPONE: Douglas Philippone. I affirm and consent.

THE COURT: All right.

MR. MIKOLAY: Justin Mikolay, I consent.

MR. CHOUNG: Brian Choung, I consent.

MR. HOLBROOK: Justin Holbrook, Your Honor, I consent.

THE COURT: All right. And, Mr. Hume, you can get the other two folks and I assume that this is something that should be done sooner than later and in

writing. So, if you can exchange something and get this filed with the Court in this case -- I don't normally like to get admissions to the protective order, it just clutters up the record. But I think in this case, the six of them should be filed with the record.

MR. HUME: Yes, Judge.

THE COURT: And get it to us by the close of business tomorrow.

MR. HUME: We will do that, Your Honor. Just for clarification for the record, the protective order limits all of us from discussing with anyone outside of the protective order --

THE COURT: Right.

MR. HUME: -- the information that is sealed. The information that is in the case that the Government has agreed can be unsealed, for example the unredacted portions of the --

THE COURT: You can go to the street corner and shout it out if you want.

MR. HUME: Thank you, Your Honor.

THE COURT: If it's unsealed.

All right, okay. So, getting now to the business at hand. We have fairly carefully thought this through, admittedly without a lot of time. But I assume you have as well. And we've kind of divided up the

documents or the things that are in here. And I think we have to distinguish between documents that would be admitted as exhibits and then we have another category of requests for -- potentially for depositions or affidavits.

The object, obviously, for all of us, given that the Army has not consented to go beyond October 15th with the award and follow-through, is that we have a very narrow period of time in which to get this all done.

(Court conferring with clerk.)

THE COURT: I'm just getting a calendar.

We have divided these up into categories that we think, with respect to the documents, three of them are probably no problem. They can be admitted and the parties appear to agree that they can be admitted. But that's only three documents, so we have a lot left out of the 50-some odd. We've got a group that we feel probably need a little further discussion and then we have a group where, at this point at least, we're very much questioning whether or not they're appropriate for admission.

What we have beyond that, of course, is a request to depose the Lieutenant General, some methodology to assess commercial viability or commercial capability or equality, which may be some sort of expert

report or expert report followed by a deposition or something. I mean, we have to work through this bearing in mind the very narrow time frame. And then any other additional requests here.

I don't want to open this up to a broad fishing expedition. I don't think we need that, frankly, although we may need some additional material, both by way of exhibits to be admitted, as well as potentially a deposition or expert report or two. But that's what we're going to be here talking about.

So, if we take the exhibit list -- well, the exhibit list of the documents to be added and, of course, it's a small amount. It's this book full. So, you know, we're dealing with a fair amount of information to be added here, or requests to be added. You always, when you get that much information, you become somewhat skeptical sitting where I sit as to why we need all of that and why it wasn't put into the administrative record initially and whether it's because in a bid protest everybody's moving so fast or because really there's a hide the ball here or whether it just didn't happen for whatever reason. I'm not willing to go there and suggest that it's any of the above at this point. I have, frankly, no idea.

But, obviously, any documentation of something

that suggests a bias or bad faith is not in the administrative record the Government's going to submit at the outset. I think, frankly, looking at some of these things and listening to you all argue in the past couple times, the issue of bad faith is potentially in this case. I'm not willing to say that it's not based on what I know.

Now, bear in mind, I have the least information of any of you. Palantir was involved in this process all along, the Army was involved in this process all along. Probably the attorneys are next in line to less information and then I'm at the bottom of the heap with the least. So, you know, we're trying to sort of stumble our way through here to try to figure out what needs to be done in a very short time frame.

If we go forward, the admission of documents is easy. They get added to the administrative record and will be the fifth, or how many more we ever get, revisions to the administrative record, and that then just becomes game for some kind of supplemental briefing. That's easy enough.

If we have to do any kind of affidavits, depositions, expert reports, we all are going to feel the heat because it's going to be done on a very, very short time frame since we have a very, very short time frame as

well to issue a decision before the Army says it feels, whether correctly or not, that it has to act. I'm always very skeptical about those things. But I think you're at a disadvantage because I did contract formation for years at the Department of Energy, so I know what those words kind of mean. But be that as it may, there are times where really it has to happen and it has to happen quickly and there are times certainly at the Defense Department where that is correct. But we need -- you know, we need to always be somewhat skeptical of that.

But let's turn to the exhibits. And if I understand properly, Exhibit Number 1 is one of the documents that you all agree can be admitted. So, that's easy. There are only three of them, not a large number. It doesn't suggest a lot of hard work here or maybe it suggests such deep disagreement. But I doubt that that's the case. I mean, I think you should have been able to get more. But, anyway, Exhibit 2 -- well, Exhibit 1 now is a September 25th, 2014 letter. It is admitted.

(Exhibit Number 1 was admitted.)

THE COURT: So, we're going to need at least a fifth provision, Ms. Kirchner, of the administrative record. And that is the document relating to the DCGS-A2 acquisition.

When we get to Category B, the government-

sponsored evaluations, assessments and reports relating to Palantir Gotham Platform, we have Exhibit 2, which is the February 2012 national assessment. Now, we're going to go through this one by one. You're all going to be with me for a very long time this afternoon. I will cancel my 5:00 appointment if I have to and we'll be here until we're done. If you can figure something out as we're talking to make this move more quickly, like coming to your senses and agreeing to a few of these, it will be a whole lot better for everybody. But, otherwise, we will be sitting here and we'll just do what we need to do. And then we still have to talk about depositions and other things. We're not going to be adjourning; we're just going to do it. So, we just don't have time for that kind of luxury.

Exhibit 2 is the National Assessment Group, February 2012, Palantir Intelligence Analysis Platform Capability Demonstration, and we've looked at it, obviously, and I think have a sense of what it is and what it does. The Government has suggested that it is unique to another military service and was not considered by Army officials. I have a somewhat dim view of agencies that come with the tunnel vision, if they're a whole agency. So, tell me why this isn't a DoD document that should be, you know, in the DoD domain, so to speak,

and why the Army is insular, Ms. Kirchner?

MS. KIRCHNER: Yes, Your Honor. The Army put together a new set of requirements in the 2004-2005 time frame. These requirements are in the --

THE COURT: This is a 2012 document.

MS. KIRCHNER: That's correct.

THE COURT: Okay.

MS. KIRCHNER: That's correct. That's exactly part of my point here, Your Honor. These were new requirements. They are set forth in the administrative record, Tab 58, starting at page A2596 to page 2601. There were approximately 36,000 requirements for Increment 2. And as I understand it, the issues in the case, one of the prime issues is whether the Palantir platform would meet all of these requirements. The market research was conducted, and as we have tendered to the Court in our opposition, it was conducted within a time frame in 2014 to 2015. This is a document that doesn't bear on the question of whether the Palantir platform would meet these requirements set forth in Tab 58.

In addition --

THE COURT: So, what are you saying to me, just so I'm sure that I understand? Are you saying that because it's 2012, it's stale, or are you saying that it

is not a good evaluation of the Palantir platform?

MS. KIRCHNER: I think we're saying both. First of all, it's not relevant in the sense that these are new requirements that were the requirements --

THE COURT: Which are new requirements?

MS. KIRCHNER: The ones for Increment 2.

THE COURT: All right. Increment 2 is what we're talking about now --

MS. KIRCHNER: Right, correct.

THE COURT: -- in this case.

MS. KIRCHNER: Yes.

THE COURT: And you're saying that the 2012 report was on a different increment or what are you saying?

MS. KIRCHNER: It looks at different items. It certainly doesn't look at our requirements which are set forth in Tab 58 of the administrative record. And, so, it's not relevant. And, secondly, in terms of market research, the effort here is to get accurate, current market research by going out to industry and treating all offerors fairly, equally, asking for the appropriate information. This is not within the relevant time period that --

THE COURT: Well, what do you define as the relevant time period?

MS. KIRCHNER: The -- as we said in our papers, we looked at 18 months prior to the market research report. The market research report is dated in July of 2015. So, the period we're looking at is beginning January of 2014, moving forward.

THE COURT: How did you choose that 18 months?

MS. KIRCHNER: The 18 months is referred to in the FAR and, so, we looked back 18 months from the market research report. That's the official report that compiles all the market research for the purpose of Increment 2.

THE COURT: Mr. Hume?

MR. HUME: Your Honor, this -- I think this is actually helpful that counsel raises this three-year rule. Once the Court understands it, I think it resolves many, if not all, of --

THE COURT: What do you mean "three-year rule?" She's talking about 18 months.

MR. HUME: Sorry, here's where I got confused. First of all, the 18-month rule, if it's a rule at all, says --

THE COURT: Right.

MR. HUME: -- the regular FAR 10.002 says the Army may use its market research conducted within the 18 months prior to the award. So, it's a moving 18-month

period. It moves with the award.

There is no way the Army can credibly tell this Court that that regulation limits the information that they can and should look at when they conduct their market research. It says that the market research report, the market research findings have to be done within the 18 months before the award. That makes sense and that's a fair reading of the rule.

But there's no way the rule can be read to say that they can't look at information from before that moving 18-month period. And all you have to do is know that is look at request for information number one from the Army, which was sent out in August 2014 and asked for information going back three years. That's to August 2011. So, even they were looking for information going back to 2011.

Our complaint and our reason for wanting this in the record is that the Army did not ask for information about a commercial item. They asked for your developmental capabilities, your service -- performance of service contracts on a cost-plus basis, not your actual commercial items.

In addition, we would have thought that in conducting its market research, the Army wouldn't limit itself to the RFIs but would look at the information it

already had, the reports it already commissioned or that other DoD agencies commissioned about Palantir. The particulars of it we're talking about, from the National Assessments Group, looks specifically at the Palantir intelligence analysis platform -- that's what we're calling our data management platform -- and specifically says as its purpose, the United States Combating Terrorism Technical Support Office requires an analytical software tool capable of performing complex data mining functions in order to better support strategic and tactical military operations in locations around the world. That is the central mission of D-6.

It's focused here on a particular JUONS for that counterterrorism force, but it's the same basic product that they need, and they make findings that directly rebut what the Army relies on in its opposition to our motion for judgment.

They say we lack interoperability. This report says, Palantir's open AFI -- API allows for interoperability.

THE COURT: What about the argument that this is on a different platform? In other words, they're talking about Increment 2 as opposed to this report which is talking about an earlier iteration.

MR. HUME: I don't really think it's an earlier

-- I mean, it's 2012. But Increment 2, it's more than ironic for them to be trying to make that argument. Increment 2, as they've structured it, is a continuation of Increment 1. It's a continuation of the development process for a data management platform that still doesn't work that they've been trying to develop since before the year 2000 and have spent billions of dollars on, approximately six billion.

This is -- do I know that this document is looking at exactly the same thing? I don't. I would need some assistance from Mr. Choung or others who have special expertise, which is why we think the Court would benefit from that. But the bottom line is it's basically asking for the same thing. I can see, on the face of it, it's asking about a data management platform and it's finding that we are interoperable with most of their systems. And it's finding that the results, the overall user feedback on Palantir, was positive from people who use it and that that's people using it as a data management platform. It's providing the same basic service that Palantir seeks to offer the Government for its D-6 Program, which is --

THE COURT: But there are awards in between this 2012 and then the subsequent solicitation that led to this case, right?

MR. HUME: I'm sorry?

THE COURT: Awards for the service were there -- or for the platform in the interim between 2012 and this point in 2016 that we're dealing with.

MR. HUME: Were there --

THE COURT: I mean, what occurred between 2012 and 2016?

MR. HUME: Here's what occurred. In 2014, the Army's head of procurement met with Palantir to learn more about the Palantir Gotham system, Heidi Shyu. We submitted information to Ms. Shyu, the letter that's now admitted. That was in September 2014.

Then in December 2014, Ms. Shyu decided to terminate Increment 1. There was a third release -- a third upgrade or really probably a seventh or eighth upgrade they were trying to do. She canceled that and said that she wanted to go with a new increment. If you were to cross examine me on the difference between a release and an increment, I would tell you I don't really know. What I know is that she decided to shut down the old program and go with something new, and they called it a new start.

And then they continued doing market research and they came out with something that is not a new start, but is a continuation of the same thing they were always

with D-6, which is developmental cost-plus contracts to tweak the infrastructure and build software system upon software system, to glue code together different kinds of systems, and all they've really done that's different with Increment 2 is instead of the Government trying to fit all that together, they've said they want some prime contractor to glue everything together.

Palantir is saying, don't glue everything together. We have a commercial product that's proven and tested. It's worked with the Defense Intelligence Agency, the Marines, SOCOM, private sector clients, other U.S. Government clients throughout the U.S. intelligence and military agencies, and it's a product. We can sell it to you on a commercial item basis.

These documents, Exhibits 2 through 8 -- 2 through 7 demonstrate that and should have been considered by the Army. They're DoD documents.

THE COURT: Well, I don't think they're all in the same category at all because 3, 4 and 5, you've agreed -- agreed to supplement, so I guess we have four documents that you've agreed on. Correct?

MR. HUME: I'm not sure the Army has agreed to 3, 4 and 5.

MS. KIRCHNER: No, Your Honor, we did not agree to 3, 4 and 5. Your Honor, those are the documents that

relate to this ATEC report that was issued in April of 2012 and then there was a revision of that report in May of 2012. What's in the record, Your Honor, already is Tab 140, which is a report of investigation which goes through and analyzes the changes between the April report and --

THE COURT: My mistake. I misread something in some of the materials I had in front of me. But those are the -- those are the -- those documents go to the bad faith allegation, right?

MS. KIRCHNER: Correct.

THE COURT: Okay.

MS. KIRCHNER: That is why they are raising those documents.

THE COURT: Sorry, my mistake. So, on 2, going back to that for the moment --

MS. KIRCHNER: Could I --

THE COURT: -- I guess one of the issues that I have for the Government is is this really a continuum or is it really a break? In other words, to determine whether a 2012 document is relevant, I need to understand -- well, you've implied that it's a break, that it's a completely different point in time and that it's -- you know, Increment 2 is different from the past. And I'm trying to evaluate whether that's really the case.

MS. KIRCHNER: Your Honor, if I could speak to that, in particular. We agree with the Plaintiff that there has to be some connection between Increment 1 and Increment 2. Simply from a layman's point of view, there's all this information that's stored in Increment 1. So that when we build Increment 2, we need a means to get the information, for example, threat information, out of Increment 1 and into Increment 2. But the solicitation provides that -- it gives the contractor the opportunity to build Increment 2 and to design it -- to propose how they would design it as a new start.

THE COURT: Is there anything in this 2012 document that ties specifically to requirements for a particular year?

MS. KIRCHNER: Your Honor, the requirements that we have now for Increment 2 are new requirements that --

THE COURT: That's not what I'm asking.

MS. KIRCHNER: Okay.

THE COURT: I'm asking you whether Exhibit 2 -- proposed Exhibit 2 has in it any dating factor that would tie it to a particular year requirement. I think it does, but --

MS. KIRCHNER: I mean, I would have to look at it, but it -- more closely, Your Honor, but the new

requirements we had didn't exist at this time. So, there were a set of requirements for Increment 1. So, if it addresses it, they would be addressing the requirements for Increment 1, not the requirements for Increment 2.

THE COURT: So, Mr. Hamish, how do you -- Mr. Hume, I'm going to do it again, sorry. This says here, the executive summary, this report documents NAG observations concerning Palantir's capability to meet the requirements defined in the 2010 joint urgent operational needs statement. How do you get around that?

MR. HUME: The point is it's neither Increment 1 or 2. It's an assessment --

THE COURT: But it's a 2010 joint urgent operational needs --

MR. HUME: Yes.

THE COURT: -- statement that ties it pretty clearly to 2010 requirements as opposed to 2016 type requirements.

MR. HUME: I don't think the date of the requirements is the issue. The issue is what can Palantir do. Is it interoperable? Does it work? Does it have an effective data mining -- data management platform or not?

THE COURT: Okay. Well, what we'll do then here -- let's defer this one for a moment. I'm not going to

admit it at this point. However, if we decide to go in the direction of getting some expert reports, I'll certainly allow your expert to use that document in the report. But, at this point, we won't put it into the record.

Okay. Exhibits 3, 4 and 5, I think I misidentified what -- I think what they actually are and why we were thinking about potentially letting them in would be this goes directly -- these all go directly to the bad faith allegations, correct, incorrect, Ms. Kirchner?

MS. KIRCHNER: Your Honor, yes, that's why they are presented. I did want to address the Court further on that. We have in the record the Tab 140, I believe it's Tab 140, which is the report of investigation. We think that that is a very thorough report of this issue and it --

MR. HUME: Of which issue? What's "this issue?"

MS. KIRCHNER: The issue is why was the April 2012 report revised, what impact, if any, G2 had on the revisions, and whether there was any improper action. And all of those issues were looked at. This was a thorough investigation. I am informed that behind this investigation, the collection of documents is

approximately 1,190 pages. If you read the report at Tab 190, it goes through numerous emails. There's a lot of people that were interviewed. It makes clear that people signed affidavits.

THE COURT: This is all directed at the change in the report?

MS. KIRCHNER: Excuse me?

THE COURT: This is all directed at the change in the documents?

MS. KIRCHNER: Yes.

THE COURT: Or is it directed at a wider, broader bad faith allegation?

MS. KIRCHNER: No, it's all directed to a change in an ATEC report. ATEC issued a report in April and then ATEC issued a revised report in May. And this is in 2012. And the investigation was directed precisely to that issue. So, as I see it, what the Plaintiff would like to do is go around the report of investigation and go behind it to interview people or depose people that were interviewed during the course of this investigation and then tender their own opinions to the Court.

But what you have in the record --

THE COURT: The investigation was done by the Army, right?

MS. KIRCHNER: That is correct, Your Honor.

THE COURT: By the IG or not? We talked about this once before.

MS. KIRCHNER: It was not by the IG.

THE COURT: No.

MS. KIRCHNER: But if you look -- the report of investigation describes the method of investigation and there is a list of people that was interviewed. And the Plaintiff is not saying that they forgot or looked -- failed to interview anybody or that the investigation was conducted in an improper manner. And the report itself, if the Court reads it, it sets out numerous emails, numerous documents that were looked at that are the background for that report.

So, we think it's very, very thorough and we don't see where that gets us if the Court now is to go behind the report of investigation and reach its own conclusions, perhaps different from the report of investigation. And all this I guess would be looked into should there be depositions and discovery with regard to this matter.

Your Honor, I am informed, also, that this report was provided to Congress and --

THE COURT: All right. I'm looking at your index, Ms. Kirchner, which is Defendant's Notice of Correction to the Administrative Record, I guess, Number

4. I'm looking at your index to the administrative record. I'm looking at Tab 140, which is a GAO protest document. So, what's the right number?

MS. KIRCHNER: Your Honor, it was submitted as a exhibit at GAO.

THE COURT: What was admitted? "It" and "this" don't work.

MS. KIRCHNER: Excuse me, Your Honor. Tab 140 is the report of investigation. It was --

THE COURT: It says GAO Protest Exhibit 7. So, we don't know what it is.

MS. KIRCHNER: No, Exhibit 6, Your Honor. I'm sorry. It's Exhibit 6.

THE COURT: I'm sorry, 6? But it says, Memorandum from Lieutenant General William Troy. Is he the one who did the investigation?

MS. KIRCHNER: Yes, Your Honor. And as I said, the --

THE COURT: Well, this index isn't terribly helpful then.

MS. KIRCHNER: Your Honor, it was an attachment to the petition that was filed at GAO and it was Exhibit 6 in Palantir's petition. So, you have it there --

THE COURT: Okay. And these three documents, Exhibits 3, 4 and 5, are basically underlying documents

to that investigation, yes or no?

MS. KIRCHNER: Yes, yes, Your Honor.

THE COURT: So, if the investigation report is there, in order to understand it in context, why wouldn't we get the underlying documents?

MS. KIRCHNER: Your Honor, if the Court wishes to look into it further, to go behind the report of investigation --

THE COURT: Well, you've given me the investigation report, but you're not giving me the documents that underlie it. That doesn't -- I mean, that's a little bit self-serving, isn't it?

MS. KIRCHNER: No, Your Honor, because the rules of the Court require that we include in the record documents that were filed at the GAO.

THE COURT: But that's a different issue.

MS. KIRCHNER: That's why it's in the administrative record. It was filed at GAO.

THE COURT: Okay, all right. We're going to admit those documents.

(Exhibit Numbers 3, 4 and 5 were admitted.)

THE COURT: They do underlie the Exhibit 140 and I think they do go to the bad faith allegations, which, as I indicated earlier, I think are probably in the case.

Exhibit 6, minor corporation Palantir Platform information brief. It's another commissioned report by the Department of Defense. What's the reason here, Ms. Kirchner, for not letting it in?

MS. KIRCHNER: Your Honor, this was not part of the information that the program personnel had. It relates to --

THE COURT: How do we know that?

MS. KIRCHNER: Well, we've checked with them and that's the information that they have provided to us. It may have been presented to Ms. Shyu, her office, but it was not in the program files.

THE COURT: It was not in the program files. Was it in any of the evaluation documents or the selection documents?

MS. KIRCHNER: The evaluation documents?

MR. HUME: Well, you had a technical evaluation at some point, I assume, and you had various people looking at whether there was a commercially equivalent or commercially viable alternative.

MS. KIRCHNER: What we have is market research that was done and this was not part of the market research that was done. It also doesn't relate to the present requirements, as I said, which are developed in 2014, 2015, in that lengthy document that I had

previously identified for the Court.

THE COURT: Mr. Hume?

MR. HUME: Yes, Your Honor. This document is relevant to bad faith.

THE COURT: Yeah, that's what I was trying to figure out.

MR. HUME: This document is relevant to bad faith. And even if there weren't a bad faith allegation, this document absolutely should have been considered in the market research and should be considered for that basis, too.

In terms of bad faith, Your Honor, this -- the Army commissioned an independent study of Palantir's data management platform, a commercial product we think should have been permitted to compete for this procurement. That report turned out initial findings in the slide deck found at Exhibit 6 to our motion to supplement.

It has a great deal of very favorable findings to Palantir. It directly rebuts things that the Army has said both before and after this, particularly even after this, that is directly rebutted in this report, such as are we just a link analysis tool. This says no; other Army documents say yes. Are we interoperable? This says yes; other documents say no. It's directly relevant to the capabilities of our commercial data management

platform. It should have been considered.

More importantly, Your Honor, right after this came out, D-6 program owners got word of it and they shut down the funding. Exhibit 37 of our motion to supplement at subparagraph A shows that the funding was cut for this and it was never finalized. And the funding was cut after the results of this report were discussed in a foreign policy magazine article about favorable findings and the built-in resistance against Palantir.

And, Your Honor, if I could, the Grisoli report on the ATEC is not an isolated instance of bias on -- the structure of the ATEC report. It's part of a pattern and practice of ignoring anything favorable to Palantir. Either ignoring it, defunding it, deleting it or not allowing it to be developed.

In the Grisoli report, which the Government relies on as its great defense against bad faith, first of all, General Grisoli never explains why the G2 division, which should have nothing to do with ATEC, was interfering with the independent ATEC report, to tell them what they should be doing, what they shouldn't be doing, let alone after the fact telling them to delete them.

Secondly, in the General Grisoli report, while it really reads, in our view, like a summation of the bad

faith allegations we are alleging, or at least of some of them, and then says everything's okay, but before saying everything's okay, General Grisoli concludes, The Army G2 team, G2 being the intelligence staff who owned D-6, "is passionate and a little defensive about D-6A and its relationship with Palantir. At times, some members of the G2 staff lost some of their objectivity with respect to how they presented information on Palantir and --

THE COURT: You're reading from the Grisoli report?

MR. HUME: I am reading from their -- the document they think absolves them of any possible tint of bad faith.

THE COURT: The Grisoli report, yes, no?

MR. HUME: Yes.

THE COURT: Yes, thank you.

MR. HUME: The Grisoli report at page A6719. The reason I do so, I appreciate Your Honor's ruling on the ATEC documents coming in, but it's the same basic allegation of bias and bad faith that relates to the MITRE report and these other reports that were not considered or were defunded or were buried in some way. And, so, it's relevant to bad faith. It's also relevant to misstate that we allege they made in concluding there's no viable commercial product here because the

MITRE Corporation assessment directly disproves these misstatements about Palantir's capabilities.

THE COURT: We're sort of in a gray area in whether these documents are relative to bad faith or relative to commercial availability. It gets somewhat mixed here. This is an independent report that may have some bearing on commercial parallelism or not. I'm kind of searching for the right words here. But does it really bear on bad faith?

MR. HUME: Yes, Your Honor, directly, for two reasons. Right after this -- this was not the final report that MITRE was going to do. They were going to do a complete report. It was then defunded. If Your Honor will look at Exhibit 37, which is an internal document that we're also seeking to have added to the record, that responds with talking points to a foreign policy article that exposes some of the problems with D-6 and the bias against Palantir.

THE COURT: Exposes some of the problems with what? What was the next word you used?

MR. HUME: With respect to D-6 and the bias against Palantir. If you're at, Your Honor, the first page of Exhibit 37, it's an information paper related to D-6 and Palantir, to provide key information on D-6 and Palantir. And as background, it references a foreign

policy article from March of 2014, implying that distribution of a report commissioned by AT&L was deliberately withheld because it supported claims, that is Palantir's claims, that their software can perform the D-6A tasks at a fraction of the cost.

Then it goes on and says key points regarding that article. And it says -- there was a second bullet point -- no report was prepared by MITRE. So, they're saying a slide deck's not a report. They go on and say, due to sequestration budget cuts, a more detailed study relative to Palantir was started but not completed. We think that shows there was a deliberate defunding of the MITRE Corporation study, because it was coming up with favorable findings to Palantir.

THE COURT: How do you know that it was coming up with favorable findings to Palantir, out of Exhibit 6 or --

MR. HUME: Because Exhibit 6 shows them.

THE COURT: Mm-hmm.

MR. HUME: And, Your Honor, again, General Grisoli's report provides a solid evidentiary footing to our allegation of this claim of bad faith. It says that members of G2 had lost their objectivity, that they were defensive about G6A and the relationship with Palantir. We're not making this up.

THE COURT: Well, that's what I get to judge, right?

MR. HUME: That is, Your Honor. I would also submit that independently it is market research about our capabilities that should have been considered.

THE COURT: I mean, that -- there's a fuzzy line there between the bad faith and the commercial equivalency.

MR. HUME: If I might, Judge Horn, I don't think it's a fuzzy line. I think it's two completely independent bases for --

THE COURT: No, no, I meant fuzzy line only in terms of which documents go to which of those two issues.

MR. HUME: I think this goes to both. We think this goes to both. We think all of the documents in this category, Exhibits 2 to 7, go to both. But this and the ATEC reports are most directly relevant to bad faith, as well as demonstrating commercial capability.

THE COURT: All right. I'll admit this one, Exhibit 6.

(Exhibit Number 6 was admitted.)

THE COURT: Let's move to 7. Is this document, Mr. Hume, directed at an analysis of the Palantir Gotham Platform or data extraction capability? And if so, what's the relevance of that?

MR. HUME: Your Honor, it is directed at the Gotham Platform. I'm not sure I understand the second part of --

THE COURT: Well, it looks more like it's on Palantir's data extraction capabilities, and I don't -- I don't claim to be technically expert in any of this, which is obviously one of the reasons we may have to get a little bit further down the line. But it says right at the front, Palantir's Data Extraction Technical Paper. Is there a difference in the two or are we talking about the same thing?

MR. HUME: I think we're talking about the same thing, but a specific focus on one dimension.

THE COURT: One part of it.

MR. HUME: Exactly. The ability to extract data, the ability of the data management platform to extract data.

THE COURT: Do you want to talk to your folks?

MR. HUME: Certainly if they think they have something to add to my description of --

THE COURT: They're going to throw paper airplanes at you.

MR. HUME: I would say, Your Honor, this document that was performed by the Marines and was in the Department of Defense, we think it should have been

considered. I would argue -- I would concede it is less central than the MITRE study and the ATEC studies, but it is relevant to the capabilities of our commercial data management platform. It may be appropriate to treat it as the same category as Exhibit 2, where it's --

THE COURT: Held out for the expert issues.

MR. HUME: -- held in reserve for a possible expert.

THE COURT: Ms. Kirchner, what's your response?

MS. KIRCHNER: Your Honor, this is a document -- I'd note, if I look on page 188 of the appendix, it's directed to a particular version, 3.12.4 of the Palantir Platform. So, it's an analysis of that version of the platform. I can't find from the document any date, so it's an analysis of that particular version. Whether that's the relevant version, I simply do not know. What we do know is that we have these requirements that were developed in 2014, 2015, stated in Tab 58 beginning at page A2596. And there's no showing of any -- that this can accomplish all of our requirements.

THE COURT: I would assume that all of the documents that you've got here, none of them are classified. If they're classified, that would be the same burden that you would have to identify that for me. I mean, I haven't seen any classified stamps. But if

there is something on these, Ms. Kirchner, you in particular have to, although, Mr. Hume, you've got an obligation as well to identify it.

MS. KIRCHNER: Yes, Your Honor.

MR. HUME: Your Honor, we don't think anything's classified.

THE COURT: Yeah, I haven't seen it. I mean, I've been looking for it, but I have not seen it.

I think we will treat it like Exhibit 2 and just let it hang out there for possible use.

All right. The C category is request for Palantir Gotham Platform high level officials and -- Mr. Hume, what's your argument for these documents? We're talking, I think, Exhibits 8 through 21.

MR. HUME: Your Honor, again, I think there are two distinct reasons these documents should have been admitted into the record. The first, again, is the relevance to bias and bad faith. We submitted, with our reply brief, an email that Mr. Philippone provided to Dave Camarillo in the Army. We provided that to the Government in advance of their opposition. We simply hadn't unearthed it before our opening brief. It itemizes 44 instances of what he -- Mr. Philippone calls blocking, referring to the fact that units in the field that saw the Palantir Gotham Platform in operation when

it was being used by Special Forces, who had it first, they wanted it and they wanted it specifically instead of what the D-6 technologies were because the D-6 technologies did not work.

And, so, they would prepare these urgent operation need statement and submit them back to the Pentagon, starting in 2010 with Major General Flynn. And they repeatedly met with resistance, the 2010 example being perhaps the most pointed where that request, which was specifically based on the failings of D-6 and the capabilities of Palantir, got turned around with a response that said, we're going to meet your request with D-6. So, a request that says D-6 doesn't work, Palantir does, can I have Palantir? Response, here's D-6. We'd make a request. And that happened --

THE COURT: We don't always get what we want. Why does that prove that --

MR. HUME: It proves that there is an institutional resistance and bias against Palantir and an entrenched defensiveness protecting the existing program. We used the phrase in our complaint because it was -- captured what Palantir felt they were being told and what people in the Army felt they were being told, which is don't let your war get in the way of our program.

Program owners for D-6 who were responsible for

billing the dollars being spent to defense contractors had developed a proprietary sense that only their program should be used even if it didn't work. And when they were told by the field, essentially by their customer, it doesn't work and Palantir has something that does work, they did not like that. They resisted it over and over and over again. And it's that resistance and that bias that led to a procurement which made it impossible for Palantir even to compete. We think it's relevant to that.

In addition to its relevance to bias, Your Honor, it is relevant to the capabilities of the data management platform because there are detailed descriptions of the capabilities of the Palantir Gotham Platform in these documents showing, time and again, how effective it was and how it led to improved operations, lifesaving decisions and the ability to do exactly what the data management platform needs to do, to gather data from disparate sources, to organize it, secure it, and allow it to be analyzed and visualized very quickly. So, it's relevant, again, both to bad faith and to our capability.

THE COURT: Ms. Kirchner?

MS. KIRCHNER: Your Honor, with regard to the allegation that this relates to bad faith, first of all,

I will say that the record already contains documents that show that Palantir was receiving contracts from the Government, from the Army. We point the Court to Tabs -- this is in the administrative record -- Tabs 145, 146, and it's also -- I think the pages are A6753 to 92. These are sole source awards that were made to Palantir by the Army. The platform was being used.

There's not a contention that the platform doesn't work, that it doesn't operate, that it wasn't being used. What they want to look into now, as I understand it, is allegations that back in 2010, when the platform was requested, that it wasn't soon enough or that there was some sort of delay. And in only one case was a request they are claiming that was denied.

So, we think this is really a tangential matter and really doesn't bear on the controversy that's before the Court, the dispute that's before the Court, what the Court needs to determine. What the Court needs to determine is looking at the 2014 to 2015 procurement, was that conducted in accordance with the law?

THE COURT: Well, Mr. Hume, they are relatively nonspecific if they're tied to bad faith. In other words, we don't really have direct evidence of bad faith in any of these documents, is that correct, or is it just a pattern that there are those people that really like

this platform, there are those people that use this platform, there are those people that prefer this platform. Is that really what we're talking about here?

MR. HUME: I think the linkage for specific bad faith can be found for the 2010 JUONS in the document that attempts to respond to that JUONS by offering --

THE COURT: Which exhibit are we talking about?

MR. HUME: Exhibit 9. So, Exhibits 8 and 9, when they go together, I think, provide at least circumstantial evidence of the kind of bad faith I'm describing.

THE COURT: But is it circumstantial? And I guess, you know, for bad faith, you really need a very specific allegation and --

MR. HUME: If you -- understood, Your Honor. The declaration that we've provided from Mr. Philippone and the contemporaneous email Mr. Philippone sent to Mr. Camarillo in 2014, itemizing specific instances of blocking, those are direct evidence --

THE COURT: But there's not these documents, right?

MR. HUME: But they go together with these documents.

THE COURT: Well, these documents, it seems to me, they may be premature on these documents, unless you

can point me to one of them in particular that has something that really documents bad faith. This just seems, you know, viewpoints of people liking the platform, wanting the platform. But, you know, that is not what procurement decisions are necessarily made of. Maybe they should be, but they're not always. So, I'm not sure how we get these into the record at this point.

If you were -- you know, they can be tied into -- potentially if we get bad faith -- to affidavits or something of that sort or -- potentially.

MR. HUME: Your Honor, I think --

THE COURT: But I just don't -- I think the nexus is a little bit tenuous.

MR. HUME: Your Honor, I understand the point that, on their own, they don't show bad faith except perhaps Exhibits 8 and 9. They do show bad faith when coupled with Mr. Philippone's declaration and his email.

THE COURT: And the declaration is in what status in the record at this point?

MR. HUME: Not in the record. It's part of our motion to supplement, as is the email. So, I'm pointing -- I'm relying -- so, for bad faith, I'm saying these documents would be direct evidence of bad faith when coupled with two other documents that we're also seeking to have admitted for the record.

Independently of that, though, Your Honor, putting bad faith aside completely, these documents provide direct evidence of the Palantir Gotham Platform's capability to do what D-6 does. And while I understand Your Honor's point that that's not necessarily how procurement programs work, in this context where the statute says you have to go out and look at what the capabilities are of commercial items, this should have been considered. As a matter of law, it should have been considered.

THE COURT: I think the answer for me, at this point at least, for Exhibits 8 through 21 is that it's premature and may be -- we're not going to put them in the record at this point and that potentially if we're doing a full-blown bad faith or a full-blown commercial viability equivalency, they might be utilized by you.

The group in Exhibit D, tell me, Mr. Hume, why you think these ought to be in there. And is this one of the areas that we've agreed to?

MR. HUME: Your Honor, I believe this is where -- Exhibits 22 and 23, the Government has agreed should be in the record.

THE COURT: What about 24?

MR. HUME: Twenty-four through 28, Your Honor, relate to evaluations -- documents that demonstrate the

failures of the D-6 development approach.

THE COURT: I'm sorry, 22, 23 and 24?

MR. HUME: Twenty-four through 28. Twenty-two and 23 have been admitted. They also do the same thing.

THE COURT: They haven't been admitted, but the Government agrees to them is what you're telling me.

MR. HUME: That's correct.

THE COURT: Is that correct, Ms. Kirchner?

MS. KIRCHNER: Your Honor, when we reached agreement, I filed a correction notice with the Court adding those particular documents, Exhibit --

THE COURT: Yeah, but that doesn't do until we -- unfortunately, at this stage, I have to bless it. So --

MS. KIRCHNER: I understand, Your Honor.

THE COURT: -- you're saying you agreed to 22 and 23, right?

MS. KIRCHNER: Yes, Your Honor, we did. And that was the disk that was delivered on Friday.

THE COURT: Well, there's so many of them, it's hard to keep track.

MS. KIRCHNER: Yes, I apologize, Your Honor.

THE COURT: Okay, so 22 and 23 are in.

(Exhibit Numbers 22 and 23 were admitted.)

THE COURT: Twenty-four, let's talk about that

one.

MR. HUME: Twenty-four, Your Honor, is a GAO report about the D-6 program from June of 2013. And it sets forth in great detail the problems and failures of the developmental approach taken in the D-6 program. Those are the exact same development cost-plus approach that the Army subsequently decided to adopt in its Increment 2 procurement. It's very critical of the D-6 system; it's critical of the approach taken and the money spent. And, again, it --

THE COURT: I think part of the problem here is even if the D-6 system doesn't work, that doesn't make your client's product commercially the alternative. You keep talking about, well, it doesn't work, it doesn't work. That's not the standard. So, why is this -- why does this document come in?

MR. HUME: Judge Horn, you are right, but one of the issues is going to be can the Palantir Gotham Platform -- or should the Army -- did the Army have any basis for concluding that the Palantir Gotham Platform isn't a commercial item that can satisfy the requirement.

THE COURT: That's right. But that's different from allegations that you've made throughout this that the other doesn't work.

MR. HUME: I'm just trying to walk through the

chain of reasoning that makes this relevant in our view, which is, yes, one of the central inquiries in this case is did the Army reasonably conclude that the Palantir Gotham Platform can't satisfy the D-6 need.

One of their rebuttal points is that they needed a developmental contract with a systems integrator who could keep glueing together all of these different developmental software projects and that the contractors were required to agree that they would leverage the existing infrastructure and to continue to develop on top of the D-6 infrastructure.

Now, Palantir can do that. Palantir can connect to the existing D-6 infrastructure. But the fact of the matter is the Army's procurement is biased in favor of continuing a developmental approach that is married to a flawed D-6A1 approach. And, so, demonstrating the flaws in the original developmental approach is relevant to showing that the Army's decision was irrational, was arbitrary and was capricious.

THE COURT: So, what you're saying is that this is relevant to the current solicitation in terms of the decision to go forward one way or the other?

MR. HUME: Yes, it's relevant to the current solicitation, which one of its flaws, in addition to its violation of 2377, is that it doubles down on the flawed

approach of D-6A1. That's our Count 7 argument.

THE COURT: Ms. Kirchner?

MS. KIRCHNER: Your Honor, this -- first of all, there's two reports. The 2013 report of the GAO --

THE COURT: Well, I'm looking at Exhibit 24. What's the other one?

MS. KIRCHNER: The -- it would be Exhibit 26. But I was going to start with Exhibit 24. That's the 2013 report of the GAO. This looks at Increment 1. If the Court looks at the administrative record, in particular, Tab 5 at A91 to 92, that's the memo of Ms. Shyu and she points out in her memo dated October 20th of 2014, that at that time Increment 1 had already been tested and fielded. So, our point is here that, although there was this criticism back in 2013 of Increment 1 not doing everything that everybody hoped, subsequently, it was further developed, it was tested, it was fielded, it is operational, and the administrative record shows that. So, the criticisms that are contained in the report are overtaken by subsequent events.

We don't believe it's properly included in the record. It doesn't go to any of the questions that the Court really needs to decide in this case.

THE COURT: Is it relevant, though, to the decision to issue the solicitation that we're dealing

with currently in the form that it was issued and not to go to a commercially available item as alleged by the Plaintiff?

MS. KIRCHNER: I don't believe so. I think it goes to their contention that there were flaws and that a lot of money was spent with Increment 1. But our point is Increment 1 is indeed operational. It's shown to be so in the administrative record. There were improvements, further developments, testing. It's out there and in use. So, the report -- the significance of the report was superseded by later events.

THE COURT: Mr. Hume?

MR. HUME: Well, Your Honor, the Government is going to argue, as they just have, that the D-6 Increment 1 program is actually fully operational doing wonderful things. That makes this even more relevant.

The whole theme of our Count 7, and it's relevant to all of our case, is that they didn't learn from the mistakes of D-6A1. They have said in opposition to our motion for judgment that we got Section 2377 all wrong and it gives them massive discretion. And don't get all carried away with the word "shall" do this and "shall" do that because it says to the maximum extent practicable and they get to decide what's practicable and they get to decide what's practicable without making any

findings about what's practicable, just by saying so after fact.

Well, if they have that much discretion, then this Court needs to review whether what they did -- I don't think they have that much discretion, obviously, and we're going to address that. But if they're claiming that much discretion, then it makes it that much more relevant to determine whether what they did was even remotely rational. Did they double-down on a failed approach or not? They've just tried to persuade you that they didn't, that they have an operational program.

THE COURT: So, what are you saying to me, that I have to decide two things not just one? I mean, I obviously have to decide whether Palantir had a commercially acceptable product or available product. Are you telling me I also have to decide that the previous methodology of doing the job that Palantir wants to do is ineffective or do I just have to decide that it's operational, which is what Ms. Kirchner is saying, and it works?

MR. HUME: I think neither one of those second things is before the Court.

THE COURT: Well, I agree.

MR. HUME: Let me try, if I might, to say what I think is before the Court. It's more than one issue.

First, we think the Court has to determine whether the Army complied with the requirements of 2377C to make specific --

THE COURT: Procedurally.

MR. HUME: Procedurally.

THE COURT: That's a different issue, okay.

MR. HUME: Okay.

THE COURT: But that's not in play with this document.

MR. HUME: I think that's correct. The first issue -- procedural issue is did they determine all the --

THE COURT: That's a separate issue.

MR. HUME: Okay. Second, whether or not -- whatever the Court finds about the determinations, did they have any support for their conclusion and sufficient support that they should issue a procurement or a developmental item and that there, according to them, was not a commercial item that could do some or all of their requirements.

THE COURT: But if that's true, then what's the relevancy of whether the other system worked or not?

MR. HUME: Because, third, I think separate from that, we have an allegation in Count 7 that irrespective of both of those two foregoing points on

2377, was this a rational procurement? Was it arbitrary and capricious for them to issue a developmental procurement that links up to a broken system? Was that rational? Was it -- or was it arbitrary and capricious?

THE COURT: But then I do have to decide that it's broken.

MR. HUME: I think you have to assess what findings did --

THE COURT: Under theory, I'd have to decide if it was broken.

MR. HUME: I think the Court has to determine whether the Army had a rational basis for procuring D-6A2 in the same way they procured D-6A1.

THE COURT: But even if it was broken, the thought of an increment on fixing it would not be irrational necessarily, would it?

MR. HUME: I think the Court would have to assess what's in the record to decide that. The precise question is was it rational to use the same approach, given the enormous volume of criticism they've faced on that from both Congress and GAO.

THE COURT: All right. I'm going to admit Exhibit 24, but I'm not sure I go the full length of what you've just said.

(Exhibit Number 24 was admitted.)

THE COURT: All right. Exhibit 25. What's this all about, Mr. Hume?

MR. HUME: Your Honor, Exhibit 25 is -- it's a more informal document.

THE COURT: It's a what?

MR. HUME: It's a more informal -- it's an email.

THE COURT: Right.

MR. HUME: That relates to an ATEC assessment of D-6 and the problems that D-6 was facing in 2012. I would -- I think, Your Honor, we include this as relevant for the same reasons the other documents in this category are. I would -- I mean, it talks about core liability, lack of suitability, et cetera, problems with the D-6 program. I think it is less significant than the GAO report.

THE COURT: All right, the one that I've admitted already. Now, the GAO report, it was issued after the solicitation, right?

MR. HUME: It was after the -- well, there were a number of solicitations under Increment 1.

THE COURT: After the 2015 solicitation.

MR. HUME: No.

THE COURT: Yes, no?

MR. HUME: No, neither of these -- there was

another GAO report -- there's a 2016 GAO report that was after the solicitation.

THE COURT: So, this one was after the 2015 solicitation? No, you're saying?

MR. HUME: No. No, these are before.

THE COURT: So, why should it be admitted? When was it issued?

MR. HUME: We're talking about Exhibit 25?

THE COURT: Twenty-six.

MR. HUME: Twenty-six. The arguments for Exhibit 26 are -- I apologize, Your Honor. Now I understand the question. I thought we were on the other exhibit. It is June 2016, so it was after the solicitation.

THE COURT: Okay. Now, what does that mean in terms of the relevancy to what we're doing here in terms of the formation of the solicitation?

MR. HUME: Well, we do think that the Court can admit documents from after the time of the solicitation if they are relevant to -- if they directly correct a mistake that the Army made or if they go to bad faith. I think our view is this GAO report from 2016 is really relevant for our arguments that they did double-down the rationale on the same system. I think it may be a slightly harder argument for us to get this in. I think

the Court could potentially take judicial notice of it, but we would be -- as compared to the earlier GAO reports, our argument may be a little less strong on this one.

THE COURT: Ms. Kirchner?

MS. KIRCHNER: Your Honor, this is a subsequent report as the Court pointed out. The record, as it stands, does show that as of -- as shown in Tab 5 in October of 2014, Increment 1 was tested and fielded and operational. This report that the Tab -- excuse me, Exhibit 26, the 2016 report is also directed to Increment 1, although it comes out after the solicitation is issued, what it's really looking at is Increment 1. It's not an investigation of what's before the Court, which is Increment 2. And, so, it really doesn't go to the truth of the matters that are before the Court.

I also do not see in here anything that bears on bad faith.

THE COURT: Is there something, Mr. Hume, on bad faith?

MR. HUME: Your Honor, not directly. I think it's simply -- it bears on bad faith only in the sense that we think the D-6 program --

THE COURT: All right, we're not going to admit this one.

MR. HUME: Okay.

THE COURT: All right, 27. This document has relevance because, Mr. Hume?

MR. HUME: Your Honor, again, I think it's relevant to Count 7. However, it's less central than the GAO report. It's a report from Kabul, Afghanistan about the failures of D-6 from November 2013.

THE COURT: Ms. Kirchner?

MS. KIRCHNER: Your Honor, this is another request -- I don't see that it bears on the issues before the Court, which are really the Government's requirements for Increment 2 and whether Palantir would meet all of those requirements, not just some, but all.

MR. HUME: Your Honor --

MS. KIRCHNER: So, I don't see how it helps the Court in determining the truth of the issues before it.

MR. HUME: What I would ask, Your Honor, on Exhibits 26 through 28 -- I understand the Court has already ruled on 26, that's not admitted -- is that we are content with the Court's rule that it not be admitted for present purposes. We simply would ask the Court to consider whether it may become relevant as the arguments unfold, depending on what --

THE COURT: I have no problem with the ones that were not admitted at this time, but if something

develops that you revisit any of them, frankly, but we're not going to add them to the administrative record right now. So, 27 is not admitted at this time.

MR. HUME: Your Honor --

THE COURT: Twenty-eight --

MR. HUME: I would say we will be content with the same ruling on that, Your Honor.

THE COURT: On 28?

MR. HUME: Yes.

THE COURT: All right.

MR. HUME: And if I might, Your Honor, it may make sense -- I know that the Court has urged us to see if we can reach agreement. Perhaps if we took a five-minute recess and I spoke with my client and with the Government, we could expedite the remainder of the exhibits. I appreciate the Court's thoroughness with this and I'm happy to address the Court's questions.

THE COURT: You don't want to be here all night with me?

MR. HUME: No, I'm happy to -- I'm looking forward to discussing the depositions.

THE COURT: All right. On the congressional category E, if it's a plea to a congressman to look into something or it's a letter from a congressman saying we're going to look into it or something of that sort,

it's probably not going to take me a very long way down the line towards credibility, not because these people aren't inherently credible, but because they're obviously just allegations from your client and then, you know, requests for further investigation or information from the agency. Having dealt with many of them when I was solicitor at Interior, I know that they do not carry weight as such. There may be information, there may be attachments, that's a whole different boat. But if they're just the back and forth, they're probably not particularly useful. So, take a look at those when you do it. That was the one category where I can honestly say to you I was quite skeptical.

MR. HUME: Understood, Your Honor.

THE COURT: Now, the exception would be -- and we'll get to that -- as we talk about General Legere because I am inclined more than likely -- and we'll hear from the Government before we make an absolute ruling. And that would impact Exhibit 34. I am inclined probably to let you depose her and I'm not going to make a firm decision until we hear from the Government. But look at these, you know, and see what you think with respect to how much information is really included in this Category D as opposed to Plaintiff cries for help.

MR. HUME: Yeah, no, I think, Your Honor, I

understand completely and I don't think we included any pleas from the Plaintiffs to Capitol Hill, but I do agree --

THE COURT: The letter from the Army to Congress, was that a response? That's the kind of thing I'm asking about.

MR. HUME: But that's from the Army, not from us.

THE COURT: No, I'm not talking about you, I'm talking about your client. Your client and I'm talking about the DOJ client as well. Just back and forth. If it has substantive information, that's one thing. If it's just the back and forth, not so much.

MR. HUME: I think --

THE COURT: Talk to your client. We'll take a five-minute recess and we'll sit back and dig down into the balance of this and then talk about the other bad faith issues and possible depositions and possible affidavits or manners of handling it or expert reports. And bear in mind, I'm going to back you up schedule-wise so that we have some time on some fairly complicated matters, especially with me not being a technical expert, to be able to, you know, give this the proper consideration. So, you're going to be doing this all in the next couple of weeks if we're going down that line.

MR. HUME: Understood, Your Honor.

THE COURT: So, that's also, you know, for the benefit of the Army, it's going to happen one way or the other in all likelihood. So, think schedule.

All right.

MR. HUME: Thank you, Your Honor.

(Court in recess.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Marian Blank Horn presiding.

THE COURT: Okay, go ahead and be seated.

So, tell me about all the progress you've made. I don't know why you should have been surprised that we were going to go one by one.

MR. HUME: No.

THE COURT: I don't think we had a choice.

MR. HUME: It wasn't a surprise, Your Honor. Unfortunately, it wasn't really a surprise at all. We did make an offer to the Government, but the Government did not want to admit any of the documents in our offer.

THE COURT: So, we will continue to go one by one.

MR. HUME: No, only up to a point. We -- despite the Government's not accepting the offer, we're not going to -- the offer was to ask for a smaller number

of the documents. We are still prepared to withdraw our request for some of these documents.

THE COURT: All right, that's fine.

MR. HUME: So, for -- in Category E, the document -- we will only ask -- at least for the time being, we will only seek supplementation of Exhibit 34 and not Exhibits 29 to 33. And the reason for that is Exhibit 34 relates directly to our allegations of bad faith and lends support for them. For Category --

THE COURT: Let's start -- wait a minute, slow down. So, categories -- the category in Category E, Exhibits 29 through 33 are withdrawn for the moment, and then Category 20 -- 34, I'm sorry -- this is a letter from Congressman Hunter to the Secretary of Defense and the director of the National Intelligence Agency. Why do you think this one is different?

MR. HUME: Your Honor, this letter, by nature of it -- I think all the letters support our allegations of bad faith, but this is the most --

THE COURT: Well, you just withdrew them, so I think we can stop with that.

MR. HUME: -- pertinent. It says specifically that Congress has received false assurances regarding D-6. This is on May 1st, 2014. Those false assurances are part and parcel of the same pattern of conduct in the D-6

program owners --

THE COURT: False assurances specifically as to what?

MR. HUME: Regarding the supposed progress that was being made in D-6 that made it unnecessary to purchase Palantir and that the Army pointed to as reasons for not procuring Palantir. This was sent to Lieutenant General Mary -- or referred directly to information provided by Lieutenant General Mary Legere, who was referenced in a number of other documents as being central --

THE COURT: Okay. All it says about Lieutenant Legere -- I'm sorry, Lieutenant General Legere is that she's going to replace Lieutenant General Flynn, right?

MR. HUME: That's correct. She was --

THE COURT: It doesn't say anything about her views or beliefs or anything else, right?

MR. HUME: It directly complained that she should not be put into that position given the false assurances Congress believed that it received from her, both about D-6 and about Palantir and about a program supposedly called Red Disk, which was a D-6 program that Lieutenant General Legere was involved in and that used operations and maintenance funds improperly to fund it, all of which resulted in the Army withdrawing Lieutenant

General Legere from consideration for the head of DIA.

THE COURT: Okay. Ms. Kirchner?

MS. KIRCHNER: With regard to Exhibit 34, the exhibit itself does not specify which particular statements are supposed to be the false statements. And then, for example, if I turn to the statement June 2013, which is attributed to an interview with Lieutenant General Legere for the New Republic, an interview with the New Republic. That statement there is about expectations.

THE COURT: Where are you looking for that?

MS. KIRCHNER: Okay, I'm -- it has -- it's Appendix page 452. This is the chart that goes with the letter.

THE COURT: Okay.

MS. KIRCHNER: And it's entry for June of 2013. This is from -- attributed to an interview with Lieutenant General Legere. And the statement that is attributed to her is in the nature of an expectation, a prediction. So, if that's the false statement --

THE COURT: Is this the June 2013 statement you're talking about?

MS. KIRCHNER: The June 2013.

THE COURT: 2013.

MS. KIRCHNER: Yes, yes. And I'm just pointing

out that the statement -- if that's supposed to be a false statement, it's a prediction. It's an anticipation and --

THE COURT: We're not looking at the same thing then. I'm looking where it says they've already shifted to a new cloud. That's the June 2013.

MS. KIRCHNER: Right, I see that there, also. I would agree that that's not --

THE COURT: It has nothing to do about anticipation.

MS. KIRCHNER: Right. But the next statement is, that it would be operational by the end of 2013. But my points are two. First, what exactly is the false statement, which statements within these documents are supposed to be the specific false statements. And, secondly, how are we -- if we assume for a moment that there is a false statement -- I don't know which statement it is; perhaps it's the one about already shifted to a new cloud called Red Disk -- then the question becomes was she misinformed? Did she misunderstand something? Is it true, is it false? Is this intentional?

Really, this is a -- with all respect, Your Honor, I think this is a tangent to the issues that the Court has to decide the truth of the matters of. This is

a very serious allegation that there were misstatements to Congress and there's no real specificity as to what exactly was the false statement. And then, further, you'd have to look into was it a mistake, was she misinformed, is this intentional, and then how does it tie up with the procurement that goes forward pursuant to Ms. Shyu's decision in 2014?

THE COURT: I agree with you that it's pretty vague. I think what we're going to do with this one is after we -- we'll double back to it after we decide on whether we're going to depose Ms. Legere, in which case you can use the document during that deposition. But we're not going to admit it at this time.

Inaccurate Army presentation on DCGS-A and the Palantir Gotham Platform, which is Category F. Exhibit 35.

MR. HUME: Your Honor, on this entire category, we only wish to -- we will withdraw our requests excepts for Exhibits 36 and 39.

THE COURT: Okay. I appreciate --

MR. HUME: Again, that's understood to be without prejudice to seeking it later.

THE COURT: If we have to. It will be judicious in your doing that. So, 36 and 39, what makes them special? Let's talk about 36 first.

MR. HUME: Thirty-six, Your Honor, is an information paper written about Palantir in July 2012 by Lynn Schnurr, a director of intelligence within G2. And Ms. Schnurr has been identified in other documents, in Exhibit 54 to our motion, which is an email sent by Major General Moore to Mr. Philippone. He specifically says that Lynn Schnurr is one of the main obstacles and has developed -- I think the word is "hostility" towards Palantir and a dislike of Palantir. And she has been identified as having an entrenched animosity towards Palantir.

THE COURT: And what was her decision-making authority in this process?

MR. HUME: My understanding, Your Honor, is that Lynn Schnurr had -- was the person who created informational documents that had --

THE COURT: What does that mean?

MR. HUME: She created information like this that said things that were inaccurate about Palantir that would lead to people who made the decision about Palantir to make the wrong decision. She's spreading this information about Palantir. And that is shown in this document and in Exhibit 39 --

THE COURT: Was that also a Schnurr document?

MR. HUME: Exhibit 39 is not authored by Lynn

Schnurr, but we think was probably -- it was offered by General Odierno and Secretary McHugh, but we suspect -- the information is repeating the same information that Lynn Schnurr has in Exhibit 36.

THE COURT: Okay. Now, Lynn Schnurr is not in your complaint as part of the bad faith allegation.

MR. HUME: She is mentioned as someone we would like to depose as part of the bad faith.

THE COURT: That's not my question.

MR. HUME: Yes.

THE COURT: She is not in your complaint, correct --

MR. HUME: I don't know --

THE COURT: -- as someone for whom you allege bad faith?

MR. HUME: I don't know if our complaint specifically --

THE COURT: It doesn't.

MR. HUME: I'm not aware of any requirement that says the complaint has to list a specific individual.

THE COURT: No. Well, you have to have an allegation of bad faith that's specific enough for us to deal with. So --

MR. HUME: The allegation here is that she

wrote documents that have inaccurate information and continued to do so even after the ATEC and MITRE study showed that to be inaccurate information.

THE COURT: And where do those documents go?

MR. HUME: I'm sorry, Your Honor.

THE COURT: Can you trace the path --

MR. HUME: Yes.

THE COURT: -- that they went to someone who made -- who would have decision-making authority?

MR. HUME: We certainly can't do that without discovery, Your Honor. All we know -- we know what we were told about Lynn Schnurr. We know that she wrote things that were inaccurate. We know that those inaccurate things were repeated by the Secretary of the Army and by the Army in its defense of the procurement. The path is there between those documents, and it's inaccurate.

THE COURT: Repeated by the Secretary of the Army. That's at -- in what document?

MR. HUME: Tab 39.

THE COURT: All right. And they're the same as the ones that Ms. Schnurr made or are they different ones?

MR. HUME: They're the same statements. If you look at Tab 36, on the first page in subsection C, she

says, the commonality found in D-6A and Palantir lies in the link analysis function. That's what we do is link analysis. If you then look at Tab 39, on the second page in the fourth paragraph that begins, as you undoubtedly -- or as you are undoubtedly aware, if you look four lines up from that, it says, "Although a useful tool, Palantir provides only a subset of the capability of D-6A, primarily in the link analysis of peoples, places and events." Again, all they do is link analysis. The MITRE Corporation study --

THE COURT: That's not what this says. It says primarily and it doesn't say only.

MR. HUME: But it's not true that that's primarily what Palantir does, and the MITRE Corporation and ATEC studies prove that that's not true.

THE COURT: Ms. Kirchner?

MS. KIRCHNER: I'm sorry, Your Honor. We would agree with the Court's comment that this does not -- it's not an assertion that it does only link analysis.

THE COURT: All right. Well, let's start with the chronologically -- or numerically chronologically, 36 first.

MS. KIRCHNER: Yes, that is in 36.

THE COURT: No, it's in -- it's in 39. It's what we were just talking about.

MS. KIRCHNER: I'm addressing 36, the information paper. It does not say that it only does link analysis. Also, this procurement did not go forward, based on a finding that Palantir only does link analysis. So, this really is not connected to the issues that are before the Court.

With regard -- Your Honor had questions as to her role as the information officer. Could I ask agency counsel to speak to --

THE COURT: On whose role?

MS. KIRCHNER: Lynn Schnurr.

THE COURT: Schnurr. Sure, absolutely.

MS. KIRCHNER: Yes. If he could address that, thank you.

MR. FLESCH: Your Honor, my understanding is she's left the Government presently. But at the time, approximately in 2012, in August, her position was the CIO -- Army Intelligence CIO, Chief Information Officer, and Director Intelligence Community Information Management, which means that she provided vision, strategy and oversight in all management of all IM or TT assets. I am not sure what IM or TT stands for. So, effectively, she was the CIO for Army Intelligence.

THE COURT: So, she would have had some influence?

MR. FLESCH: Yes, ma'am. I mean, she had informational -- yes.

THE COURT: She had policy authority?

MR. FLESCH: I don't know about that.

THE COURT: No?

MR. FLESCH: No.

THE COURT: It's a bad job as the CIO if you don't have any policy authority. All right.

MR. HUME: Your Honor, Major General Greg Moore certainly thought she had something to do with it because he said that's the biggest obstacle Palantir faced, opposition from Lynn Schnurr from the GA -- Department of Army G2. Ms. Schnurr appears to have an entrenched animosity towards Palantir. That's our Exhibit 54.

THE COURT: How are you planning to prove that she had an entrenched animosity? Those are big words.

MR. HUME: Well, first of all, this is a party admission in a document written by a general, Your Honor. Second, we would obviously like to depose her and/or General Moore to further investigate that. One of our central themes from the beginning is that there --

THE COURT: So, what are you alleging then? We've been talking in the past, up to today, we've been talking primarily about Lieutenant General Legere. Are you now broadening that to include all these other people

or what are you saying to me? Because we're not going to have the time or the ability on the schedule that we're on to depose a lot of people. We know that Lieutenant General Legere made a fairly ugly statement, which may have been taken entirely out of context, by the way, and may mean absolutely nothing. But I can see where you might have a basis for arguing that she should be deposed.

You know, how broad is this going to be --

MR. HUME: I don't think it needs --

THE COURT: -- according to you if you get your way?

MR. HUME: Your Honor, I think both the Court and the Plaintiff are in a difficult position. We certainly think we're in a difficult position because my client feels, and I believe justifiably, that they have faced six years of bias and prejudice and irrational behavior from the Army. And who did it? Who were the people? There are certain middle managers within the Army, they believe, who have spread misinformation about them, given false information to Congress, false information to senior DoD management. And the result of all that --

THE COURT: Well, Congress is not the one making the procurement decision.

MR. HUME: No, but it certainly lends credibility that if they're willing to tell something false to Congress, they're probably willing to say false things within the --

THE COURT: Too many jumps don't get you the bad faith determination.

MR. HUME: Well, it means we're not the only one saying that. Lynn Schnurr would be the second most important candidate for bad faith. Maybe she should have been on our original list of four. Our original list of four, Your Honor, was Lieutenant General Legere -- there were two that we believe were bad actors and two we believe were good actors, or probably, and would have information about bad acts. We don't only want to depose people who are going to be defensive and try to hide the truth. We also want to depose people --

THE COURT: So, who are the original four?

MR. HUME: The four people we originally gave you were Christopher Fisher, the contracting officer. I believe he's on the phone. We think he made inaccurate statements and facially invalid arguments about Palantir to the GAO and perhaps before. However, I would say Lynn Schnurr is probably more central in terms of starting this train of misinformation years ago.

THE COURT: Do you know where to find her?

MR. HUME: Lynn Schnurr? Do you know where Lynn Schnurr works? General Dynamics.

THE COURT: I have no idea where Lynn Schnurr works.

MR. HUME: General Dynamics, Your Honor. I won't mention the revolving door other than to say I'm not mentioning it.

THE COURT: Well, that was a helpful comment, wasn't it?

MR. HUME: Yeah. Well, she --

THE COURT: Let's not go in that direction, please.

MR. HUME: Well --

THE COURT: We don't need to have the histrionics or the theatrics.

MR. HUME: We'd like to depose Lynn Schnurr. We'd like to depose Lieutenant General Legere. I think Christopher Fisher would be third on the list of potential bad actors. After that, Your Honor, we're asking for two people who wrote favorable reports about us.

THE COURT: Richardson and Kelly.

MR. HUME: Correct.

THE COURT: All right. So, the reason I did this in this order was I was trying to get some more

information to make a decision as to who should or could be deposed here. But it's all intertwined, obviously.

So, Ms. Kirchner, what's your final argument on Exhibit 36?

MS. KIRCHNER: Your Honor, this is the information paper of Lynn Schnurr. As I was pointing out earlier, this does not say that Palantir only does link analysis and, secondly, the procurement did not go forward based on a finding or understanding that Palantir only does link analysis. So --

THE COURT: Well, how about 39?

MS. KIRCHNER: Excuse me?

THE COURT: How about 39?

MS. KIRCHNER: Thirty-nine?

THE COURT: That's the General --

MS. KIRCHNER: Right.

MR. HUME: -- Odierno document.

MS. KIRCHNER: Those are -- right. Here again, I think they're relying on this for the statement about link analysis. But I think initially they wanted to bring this to the Court's attention because, as I understood it, this was supposed to be an inaccurate statement. I don't know which portion of this -- you know, which sentence is supposed to be the inaccurate statement to Congress. But it's not a document that has

in it findings that were findings on which the Government went forward with regard to this procurement, and it does not help the Court in determining the issues that the Court has to decide in this case. If the Court will recall, I think in the first status conference that we had where we went through these documents with regard to Category 4 -- Category F, these were supposed to be the statements that had something in them that was inaccurate.

THE COURT: All right. We're going to deny it at this time. I think that it's too tenuous. It's one little subset. It doesn't really get us there. Ms. Schnurr was -- we'll talk about whether you get to change who you want to depose to Ms. Schnurr as your number two person after Lieutenant General Legere, but let's move through these documents as effectively as we can.

The excerpts from Palantir's contract, for the life of me, I do not understand why you all can't just stipulate to what contracts Palantir had and even the existence of those contracts unless there's something about them that makes them privileged or classified or something. They exist or they don't exist. This isn't a fight. And I don't get it.

Ms. Kirchner?

MS. KIRCHNER: Your Honor, if that's the issue.

I think --

THE COURT: What's the issue if that's not it?

MS. KIRCHNER: I do not believe that is the issue.

THE COURT: All right, that's fine. What is the issue?

MS. KIRCHNER: According to the Plaintiff, these contracts are supposed to demonstrate that the Palantir platform can meet all of our requirements. They don't do that. We don't dispute the fact --

THE COURT: Well, I don't know whether they do it or not. That's part of the commercial equivalency determination at some point. So, but they either have those contracts or they don't. Those contracts have specifications that either demonstrate or don't, and I'll readily admit that I am, you know, probably going to need some expert help to determine commercial compatibility or whatever the right word is or similarities sufficient to meet the commercial clause in the FAR.

But, you know, they either exist or they don't exist. There's nothing --

MS. KIRCHNER: Your Honor --

THE COURT: -- there's nothing --

MS. KIRCHNER: -- we will --

THE COURT: -- particularly allegational about

these; they just are contracts they have.

MS. KIRCHNER: Your Honor, we will stipulate that the contracts exist. We don't think that helps the Court with the questions that are before the Court.

THE COURT: So, right now, we're in a debate amongst us as to whether we admit these documents or not because you're saying basically they're something that's, you know, too remote or inaccurate or whatever. These -- we're not talking inaccuracy here.

MS. KIRCHNER: I agree. We're not saying that there's an inaccuracy. Certain excerpts from the contracts were tendered to the Court.

THE COURT: Well, 44 through 46 were submitted by Palantir in response to market research, right?

MS. KIRCHNER: They were not submitted. They say they were identified in response to --

THE COURT: Oh, so, they were available for the Government if they wanted to look at them.

MS. KIRCHNER: Correct, Your Honor, yes. And --

THE COURT: So, 44 through 46, I'm not sure how you have an argument here. I'm going to -- you know, I don't want to fatten up the record here, but these I just have a hard time -- they're documents -- they're government documents. I have a hard time saying don't

let them in. And if what you're arguing is relevancy, I think when we're talking about the commercial capability of a company that's protesting under the commercial clause, it seems to me we ought to let those in. So, we're going to let that category in.

(Exhibit Numbers 44 through 46 were admitted.)

MS. KIRCHNER: Your Honor, we think that the -- then if the contracts come in, the whole contract should come, and also these were awarded on sole source --

THE COURT: Be my guest. We'll look at what you point us to. We'll probably do some searches in there. Now, everything that comes in, obviously, is going to be text searchable because, otherwise, we can't use it in this short time. So, that's a prerequisite.

All right. Let's talk about the potential depositions that you want to put in, Mr. Hume, or take, and then presumably go from there.

Ms. Kirchner, anything -- any reason why you think Lieutenant General Legere should not be deposed? A, is she still in the military?

MS. KIRCHNER: I am informed, Your Honor, that she is retired. That she -- her address -- her residence address is in New Hampshire.

THE COURT: Well, that doesn't stop anybody.

MS. KIRCHNER: I understand, Your Honor. I'm

just giving the information to the Court.

THE COURT: Right.

MS. KIRCHNER: With regard to the Court's question, if there is to be a deposition, we think we need clear understanding as to the scope of the deposition. It's our view that a deposition is not necessary. And if I could just address that, Your Honor. Specifically, one topic that was raised for deposition is the revision of the ATEC report which occurred back in May of 2012. That is a -- you have Tab 140, the report of the investigation. If you read that document, you will see that Lieutenant Legere was interviewed. The report of investigation refers to --

THE COURT: All right. I mean, that's part of why you depose somebody as to whether they're consistent or not. So, I'm not sure that that forms a bar.

MS. KIRCHNER: All right, Your Honor. Well, I'll just note that that report refers to Exhibit C, which I haven't seen it yet. It may be a report of an interview with her or perhaps an affidavit. But she was a part of that investigation.

THE COURT: And you haven't seen it because? You certainly knew that this was going to be discussed today.

MS. KIRCHNER: Excuse me?

THE COURT: You certainly knew that we were going to discuss deposing her today.

MS. KIRCHNER: Yes, Your Honor. I just -- I have not --

THE COURT: Why haven't you seen it? Has anybody in the Army seen it?

MS. KIRCHNER: Army counsel has the documents.

THE COURT: All right. So, what is the document?

MR. FLESCH: Your Honor, we acquired the support for the 15-6 on Friday, I believe. And, so --

THE COURT: Well, you had a nice long weekend to look at it, so what are we talking about?

MR. FLESCH: Bear with me one second, Your Honor.

THE COURT: I know that I worked over the weekend. I don't know about you, but...

MR. FLESCH: Your Honor, in reference to General Legere, we have a sworn statement from August 7th of 2012, which is five pages typed.

THE COURT: And that's in the record of the documentation that underlies that report?

MR. FLESCH: Yes, Your Honor.

THE COURT: What are you saying should happen to that document, Ms. Kirchner, if there's a deposition?

Should it be handed over to the Plaintiff or not?

MS. KIRCHNER: Well, if the deposition goes forward, I would anticipate that in preparation she would review her prior signed statement, Your Honor.

THE COURT: That wasn't my question. Would you hand it over to the Plaintiff?

MS. KIRCHNER: Oh, surely, Your Honor.

THE COURT: All right.

MS. KIRCHNER: Absolutely. We may need to redact her Social Security number.

THE COURT: Personal information needs to be redacted, obviously. Social Security number, tax numbers, anything like that obviously has to come out.

MS. KIRCHNER: Yes, Your Honor.

And the second item that they wish to depose her on is this alleged statement that she said "Kill Palantir." I did want to note for the Court that we have seen this video from Blaze TV, and if you look at that video, the -- all that you see is a snapshot, some image appears in the video, and there's no attribution as to what this is. I will say that it's in the video at approximately -- the image is at 21 minutes, 52 seconds, and it contains comments which are attributed to unnamed Army officers. There are no names in the document and --

THE COURT: But she could be asked about that,

right?

MS. KIRCHNER: That's what the Plaintiffs want to do, but that's -- we have no understanding of what this image is. There's -- it doesn't appear to be --

THE COURT: She would get to explain that, right?

MS. KIRCHNER: Excuse me?

THE COURT: She would get to explain that.

MS. KIRCHNER: Your Honor, I'm sure she'll answer the questions truthfully. I can't tell what it is. It doesn't appear to be in -- an email. It's just an image and we don't know how that image was created. There are no names, there's no to and from. It doesn't look like an email.

THE COURT: Why does it have to look like an email?

MS. KIRCHNER: Well, how would we -- it doesn't have to look like an email, but we don't know what it is.

THE COURT: I understand.

All right. What about deposing Ms. Schnurr that's been added here today unfortunately?

MS. KIRCHNER: Could I just address one more thing?

THE COURT: Sure.

MS. KIRCHNER: The other item that was raised

in their papers is alleged misstatements to Congress, and if that's going to be addressed in her deposition, we need to know specifically what it is that they specifically say is the false statement.

THE COURT: Mr. Hume, what are they?

MR. HUME: Your Honor, we'd be happy to provide that. I think the --

THE COURT: What are they?

MR. HUME: In Exhibit 39, the precise formulation used by -- in Congressman Hunter's false assurances to Congress about the deadlines and the deliverability of the cloud or the various cloud roll-outs for D-6. He said that he had been given false assurances by her repeatedly that the cloud or various cloud initiatives were going to be imminently rolled out. And I think in one instance she said it was done and there was a report from the field that it wasn't operational.

But we'd be happy to provide those false statements or false assurances that we -- to Congress in advance. I think mostly they're contained in Exhibit 39 or the other exhibits relating to congressional statements that we were originally seeking to have admitted.

MS. KIRCHNER: Well, Your Honor did rule on

that as being not admitted, Exhibit 39.

THE COURT: At this point. But, obviously, if the deposition -- it might be usable at the deposition. They're not in the administrative record now is what we decided.

MS. KIRCHNER: I understand, Your Honor.

THE COURT: So, all right.

MS. KIRCHNER: I understand.

THE COURT: What about Ms. Schnurr, that Mr. Hume wants to seek to add to our list to make our life even more complicated?

MS. KIRCHNER: Yes, Your Honor. That was not a person that they identified --

THE COURT: No, it was not identified in the 7/15 submission.

MS. KIRCHNER: Correct. And there's no showing of her being connected to the procurement that's at issue.

THE COURT: What issue?

MS. KIRCHNER: Excuse me?

THE COURT: What's that issue?

MS. KIRCHNER: In 2014 --

THE COURT: What is "that issue" in your sentence? What are you referring to? What issue are you referring to?

MS. KIRCHNER: What's at issue is the procurement for Increment 2, and there's no showing that she is connected to the decision to go forward with Increment 2.

THE COURT: What is she connected with?

MS. KIRCHNER: Well, she's an information officer who, as agency counsel spoke, addresses Army information. She's not a -- I'm sorry, I don't have any more information.

THE COURT: This is information that is being collated, collected, spun back for utilization, right?

MS. KIRCHNER: As I understand it, yes.

THE COURT: So, and that's probably the level of my understanding as best I can articulate it at this point. But we'll get smarter before we issue a decision.

But, Mr. Hume, why do you think Ms. Schnurr now becomes relevant? She's new to our consideration here.

MR. HUME: Your Honor --

THE COURT: Or is too late to add her to the list?

MR. HUME: No, we will stick with our request for Christopher Fisher. Your Honor, we tried to be as narrow as we could.

THE COURT: But you didn't include Ms. Schnurr.

MR. HUME: That's because we were trying to be

as narrow as we could.

THE COURT: Okay. So, who do you want, Ms. Schnurr or Mr. Fisher?

MR. HUME: We would take either one, Your Honor. We'd like both.

THE COURT: Which one would you take?

MR. HUME: I think Ms. -- you know, I don't know --

THE COURT: You have a Hobson's choice here, so make it.

MR. HUME: I might want to have my client's input on that before I make that decision.

THE COURT: All right, talk to them.

MR. HUME: Thank you, Your Honor.

(Counsel conferring with clients.)

MR. HUME: Your Honor, I think if we have to choose, we would choose Lynn Schnurr over Mr. Fisher. I'm sorry we weren't -- didn't make that judgment in our opening motion. We were told we weren't specific enough about specific individuals so we mentioned her in our reply. And the reasons, Your Honor, are not only the inaccurate document I pointed the Court to earlier, but in the General Grisoli report -- I really would like to emphasize the importance of that document, because the Government seems to think it's helpful for them. We

actually think it adds to the evidentiary footing that's needed for our bad faith allegation.

They say -- and I think either Ms. Schnurr is either referenced directly by person or she's referenced in terms of what she did in terms of destroying information, and the D-6 -- and the Army G2 team of which Lynn Schnurr is a part, General Grisoli found they had become a little defensive about D-6 and its relationship with Palantir, had lost some of their objectivity, and General Grisoli said, I have become concerned with whether the DoD and Army policies and procedures for the acquisition process are being properly implemented.

So, I think there is enough there in his report to actually confirm our allegations of bad faith.

THE COURT: Do you have any specific allegations that Mr. Fisher, the contracting officer, had a bad faith issue or is it more that he got information that you think was inaccurate?

MR. HUME: I think that -- it's hard for us to know for sure, but it may well be the latter.

THE COURT: Okay. So, clearly, you don't have a direct nexus to him that you can tell me about right now, is that what you're saying?

MR. HUME: I think that's -- I think that's probably correct. I think he jumped out at us as of

interest because he signed that July 1 document --

THE COURT: Well, he's always of interest because he's the contracting officer. But --

MR. HUME: That is correct.

THE COURT: Are there any documents in the record that he issued when he made the selection? I mean, do you get a lot of the information out of that or not?

MR. HUME: Your Honor --

THE COURT: So, I know they used the post hoc one, but beyond that.

MR. HUME: I think the two things that jumped out for us on Mr. Fisher was the post hoc document and the submission to GAO where he made some, we thought, facially inaccurate arguments. It may just have been a mistake, but invoking this statute that's expired, for example.

THE COURT: Okay, all right. So, with respect to what you're describing as the positive arguments, at this point, I mean, I can see where you might be entitled to some depositions for allegations of bad faith. I'm not sure why you get depositions for people who want to say we've got a good platform that we like using. That more -- I mean, that's more on the commercial viability issue. I don't know that you should get some depositions

there. We can talk about, later on, whether we have, you know, affidavits submitted in terms of commercial equivalency, but I don't see where you'd get depositions on that.

MR. HUME: No, let me be clear on what I was trying to say. The depositions of Laura Richardson and Kevin Kelly, they do -- we do perceive them as potentially more objective. But it's not that we are wanting to depose them on issues unrelated to bad faith. We want to depose them because we think they will have information about bad faith because they authored -- Ms. Richardson authored the April 2012 ATEC report and then she and her group are told to change it and destroy the old one. She would, therefore, be able to give us more information about why that happened, who told her, who was involved. The same with Mr. Kelly on the MITRE report.

THE COURT: What's your response, Ms. Kirchner, to those?

MS. KIRCHNER: With regard to Richardson?

THE COURT: Richardson and Kelly.

MS. KIRCHNER: Yes, with regard to Richardson, the Tab 140, which is the report of investigation reports along with the change, the change to the report. The change was not -- Ms. Richardson signed the original

report, but the changes were made in her absence. They were made by a Mr. Amato who was the ATEC director at the time. He revised the report. So, she's not involved in the changes of the report. And the revised report is signed by Mr. Amato, and that's all reported in the report of investigation.

Now, she was interviewed with regard to that investigation. That's also reported in the report of investigation.

But the allegation that she was involved with the specific changes, no, it was done by Mr. Amato, who was the ATEC director at the time.

THE COURT: How about Kelly?

MS. KIRCHNER: Mr. Kelly? Mr. Kelly is the individual -- he was a MITRE employee and he drafted the MITRE report, which is the report from 2013. As I understand it, they want to depose him now because they think he might know why the funding -- there was no additional funding to complete that MITRE report. I would suggest to the Court that if he does, he -- you know, it's not really something within his purview.

If funding is withdrawn or funding is not provided, that's really an Army matter. It's not something that Mr. Kelly can really tell of his own personal knowledge that this is why the report was not

fully funded. So, I don't see that this helps the Court really in deciding the issues before it.

And, Your Honor, with regard to the deposition of Major Legere, if it's to go forward, we would request that you identify the topics and set a time limit, and also for Ms. Schnurr.

THE COURT: Okay. I don't see the benefit, at this time, for those depositions. And the MITRE report speaks for itself. I agree with Ms. Kirchner that funding for any project from the Government is never guaranteed and it is often made for a variety of different reasons. And unless we get a better nexus developed that it was a bad faith type decision, which I don't -- I mean, I haven't heard yet. Bad faith is a very, very tough bar to prove. Bad faith is a very specific set of proofs.

And, so, you know, I'm willing, I think, to let you have a deposition of the Lieutenant General Legere or retired or of Ms. Lynn Schnurr, who's also retired. And I'm assuming that the Government will assist in trying to make those people available, even though they're no longer within the government purview. I understand that. But I think in terms of the deposition, these depositions need to be focused in terms of relevancy to the issue of bad faith, not a lot of other information, not a lot of

big fishing expeditions.

A, these are retired folks, so we need to be respectful of them. They're no longer government employees. But more important than that, our time is very limited. And I know that you've asked for 3.5 hours. That's a lot of time. But, you know, that's hopefully a morning or an afternoon. So, I'll let you do that. But we'll talk about how quickly you have to do that.

We've got one other category, which is Exhibit 50 and 51, the declarations. And, again, what is the purpose of those declarations? What's the issue to which they will speak? Is it the capability of the Palantir product or is it specifically bad faith? What are you trying to submit those for?

MR. HUME: Two different declarations, two different purposes.

THE COURT: Which is which?

MR. HUME: Mr. Brian Choung's declaration, which is Exhibit 50, is a declaration from somebody who has -- is an expert in software engineering and has specific knowledge and information about D-6, the procurement, the performance work statement, and the Palantir Gotham Platform.

THE COURT: But, nonetheless, an employee of

Palantir.

MR. HUME: He is an employee of Palantir.

THE COURT: Now, it’s not absolutely forbidden that an expert be a member of the operation that’s trying to prove something, but it does certainly shed some credibility issues into the evaluation. So, is that who you’re proposing as your one expert that you would get?

MR. HUME: We do propose that Mr. Choung could be certified as an expert. We also think the case law allows him to testify as an employee with expertise. In other words --

THE COURT: But he’s the one?

MR. HUME: We are still in the process of considering and reviewing who --

THE COURT: You get one. Make a decision.

MR. HUME: Yes, Your Honor.

THE COURT: Given our schedule, this isn’t a decision whether it’s an outside expert or Mr. Choung.

MR. HUME: Given the schedule, I think we’re putting forth Mr. Choung.

THE COURT: All right. And no more consideration of somebody else at this point.

MR. HUME: Not if you say I only get one.

THE COURT: All right, you get one. Now, the one thing, too, I want to remind you all with any

declarations that you make, because there's some insinuation in here that there will be some comments on what are essentially legal conclusions. I don't want to see those in there.

MR. HUME: Absolutely not.

THE COURT: But some of what's been talked about here come awful close to a legal conclusion.

MR. HUME: Well, there are factual conclusions about can the Palantir Gotham Platform --

THE COURT: That's fine. Just be careful how you phrase it.

MR. HUME: Understood. Now, the --

THE COURT: Now, Mr. Philippone?

MR. HUME: Mr. Philippone is the business lead for this unit in Palantir. He has been working on this consistently since 2008, and he -- his declaration is definitely relevant to our allegations of bad faith because he has had direct dealings with the Army, with the people who want -- who recognize that Palantir has a product and they want it and with the people who have resisted it. And I think his declaration --

THE COURT: I will remind you that want is not the equivalent for anything here.

MR. HUME: I understand. His -- the purpose of his is not so much to satisfy factual standards of

whether there is an item, although it could speak to that. It's to recount the story of the relationship between Palantir and the Army and why we think there is something irrational and bad faith and biased in that relationship.

THE COURT: Well, I would also remind you that unless there are specific allegations of bad faith, we're going to strike that affidavit. So --

MR. HUME: But he -- related to Mr. Philippone's declaration, and if we had been more diligent we would have attached these to his declaration, are these two emails that we attached to our reply brief, Exhibits 53 and 54.

THE COURT: Okay.

MR. HUME: One of those exhibits -- I'm sorry.

(Court conferring with clerk.)

THE COURT: Go ahead.

MR. HUME: I'm sorry. I misidentified -- the two final exhibits that we seek to have admitted to the record --

THE COURT: Fifty and 51.

MR. HUME: I'm sorry, 52 and 53.

THE COURT: Okay. Well, you've got the declarations of Mr. Choung and Mr. Philippone as 50 and 51.

MR. HUME: That's correct.
THE COURT: And what are the next ones?
MR. HUME: The reply brief attaches two emails, Exhibits 52 and 53. The first is an email --
THE COURT: Hold on one second.
MR. HUME: We do have copies, Your Honor.
THE COURT: No, we've got the -- okay. I'm looking -- we did some preparation here and I'm just looking at the file here.
Okay. So, one is the Palantir email from Doug Philippone with alleged incidents of bias. And the other Major Greg Moore to Douglas Philippone.
MR. HUME: Exactly, Your Honor.
THE COURT: Okay. And how different are these or are they just really exemplary to the declaration of Mr. Philippone?
MR. HUME: The first where Mr. Philippone lists out, I think, 44 instances of blocking, has additional information not in the declaration and certainly additional support for what is in the declaration. And on the second page, Your Honor, counsel for the Government referenced the "Kill Palantir" quote. On the second page of this 2014 email, Mr. Philippone reports to the Army, to Mr. Camarillo, to look at the sixth entry on the second page, August 13th, Major Phil Mann, at 4ID,

that's the Fourth Infantry Division, states that Lieutenant General Legere told him to, "Kill Palantir use in RC-S for future units."

So, while that's written by Mr. Philippone, it's written in 2014 --

THE COURT: And neither of these letters are referenced in his affidavit? Is that what you're telling me?

MR. HUME: Before I answer that, I'd have to be 100 percent sure, but I believe -- neither of these emails, these two emails as Exhibits 52 and 53, are not referenced in Mr. Philippone's declaration.

THE COURT: All right. Why?

MR. HUME: They came to our attention after we submitted that declaration.

THE COURT: Really?

MR. HUME: They came to our -- outside counsel's attention after. And I think what happened, Your Honor, Mr. Philippone, in looking for -- through his emails, as this dispute continued, unearthed them -- they are a couple of years old -- and sent them to us.

THE COURT: When did you get them?

MR. HUME: Within -- I can tell you exactly if you give us two seconds. We have the emails from the client sending them to us.

THE COURT: So, the affidavits were prepared when?

MR. HUME: The affidavit was filed with our opening brief on July 15th.

(Counsel conferring.)

MR. HUME: So, the first email, Your Honor, Exhibit 52, we received on July 20th from Mr. Philippone. And the other one, Exhibit 53, the Major General Moore email, I think we got more recently than that.

THE COURT: I'm sorry, what was that day?

MR. HUME: So, the Exhibit 53 -- 52 document between Mr. Philippone and Gabe Camarillo with the "Blocking" title, we received that from Mr. Philippone on July 20th. And we received the Exhibit 53 email from Major Moore to Mr. Philippone, we received that from Mr. Philippone on July 22nd, this Friday -- this past Friday.

THE COURT: Okay. All right.

Ms. Kirchner, so if we allow depositions of Major General Richardson, retired, and Lynn Schnurr -- pardon? I'm sorry, I misspoke. Legere and Schnurr, sorry about that, but not of Richardson and Kelly at this point -- obviously, a lot of this changes potentially if there's a real showing of bad faith, obviously. Regrettably, if there's a real showing of bad faith, which is not there yet necessarily, we're in a very

difficult arena, obviously, and at that point, we'll have to revisit a lot of stuff. But I'm hoping that we can resolve it with what we get here or it just goes away. Either way, I don't know what will happen. Obviously, I haven't seen the information.

So, if we do Legere and Schnurr, what does the Government feel it needs to do? And a similar question with respect to if we admit the affidavits and associated backup material for Mr. Philippone on the affidavit of Mr. Choung as an expert, what would the Government want to do in response to that?

MS. KIRCHNER: Your Honor, in response with regard to Mr. Choung, as I understand it, that's Exhibit 50, if that affidavit comes in, we would like the opportunity to see whether we have a technical -- someone with technical expertise that could assist the Court.

THE COURT: Well, obviously. Who would that be?

MS. KIRCHNER: Your Honor --

THE COURT: Hold on one second.

(Court conferring with clerk.)

MS. KIRCHNER: Your Honor, to --

THE COURT: Yes, go ahead.

MS. KIRCHNER: To answer your question of we don't -- we have not yet figured that out as to who it

would be or whether that person that we think might be appropriate actually is appropriate. And, secondly, we may want to depose Mr. Choung, who's offered now as an expert.

THE COURT: Right. I would assume you would.

MS. KIRCHNER: And, Your Honor, with regard to Exhibit 51, that declaration and the two exhibits now tendered to go with it, I would say that I have gone through Exhibit 52 and this is referred to as the "blocking" email. When I read this email, I can't find anything in this email from Palantir where in the email itself it characterizes this as blocking. This is supposed to be evidence that the Army is blocking requests from the field for Palantir. But the email itself doesn't say blocking. I think that's a characterization put on the email by Plaintiff's counsel.

THE COURT: Well, the email will speak for itself. What's --

MS. KIRCHNER: Yes, Your Honor. And, again, I see the email as really being a tangential matter that deals with requests coming in for Palantir back in 2010. And as I said, the administrative record already shows that Palantir had a product that the Army had contracts for it, they were sole source awards made to use the Palantir platform, and that is already in the

administrative record.

THE COURT: Well, are you willing to stipulate that Palantir had an effective platform?

MS. KIRCHNER: They had a platform that was in use. As I understand it, it was in use by soldiers in the field. That does not go to the issues before the Court. The issue before the Court is these new requirements that were developed in 2014, 2015, very, very technical, copious requirements for Increment 2, which are not the requirements on which Increment 1 was built. So, I don't see how this really, really helps the Court in the end to determine the truth of the matters that are at issue before the Court. Rather, I see this as tangential matters that are, in the Government's view, burdening the Court.

THE COURT: They're certainly burdening all of us this afternoon. But it is what we have to do. So --

MS. KIRCHNER: And if his affidavit comes in, we would like the opportunity to depose him.

THE COURT: All right. A couple of comments, Mr. Hume. You're going to have to scrub Exhibits 50 and 51 before we'll take them. Just pull out the legal conclusions that appear to be in there. Take a hard look at it. Mr. Choung will be -- I'll allow you to put in an affidavit with respect to the expert issues, but be sure

there aren't any legal conclusions in there.

As for Mr. Philippone, looking at, you know, Exhibits 52 and 53, you seem to think that they are a way to exhibit bad faith, correct?

MR. HUME: Yes, Your Honor.

THE COURT: I'm not sure that's right. And understand the high burden of bad faith. I'll take them as part of Mr. Philippone's declaration, but you're going to have to scrub both of those declarations.

Now, you've also asked for interrogatories and other production-type issues. I'm not sure what those other requests for production are and interrogatories. I'm not sure that that is necessarily appropriate at this point. What were you thinking about?

MR. HUME: Well, I think more related -- relevant in light of what the Court's already ruled, I've reviewed to see which ones of these could potentially survive the Court's current ruling because some of them, I think, could not. The -- I do think that at least two of our document requests are consistent with everything the Court has ruled today and should be allowed, the third and the fourth on page 41.

THE COURT: Which is what?

MR. HUME: The third is all documents, including emails, concerning the April '12 ATEC report,

its destruction and modification, and the investigation into its destruction and modification. In other words, there must have been communications between ATEC and G2, emails, other documents, discussing that directed -- direction to modify or change that. And we would want to see what was communicated between ATEC and G2 or others or within ATEC about those changes. We think that may reveal what ATEC thought about it, whether it did reflect bias or bad faith and what a full assessment of that incident really involved. So, we would ask to go forward with that document request.

THE COURT: And the funding -- the funding issues related to MITRE, we've already talked about that. I don't see where that is really particularly relevant here. They asked for a report, they decided they didn't need the report. It's not a decisional document that goes to the procurement; it's an outside report. Agencies have reports or don't have reports all the time. They stop them all the time. I'm not sure I get the basis for that.

MR. HUME: We will accept the Court's ruling for now. To be clear, we think that there was --

THE COURT: Well, I think request for production four doesn't work.

Now, what about number three, Ms. Kirchner?

All documents, including emails, concerning the ATEC forward operational assessment of the Palantir system report, its destruction and modification.

MS. KIRCHNER: Your Honor, this is category -- the third bullet, and it's my understanding that what they're asking for is all of the documents that were the background for that report.

THE COURT: Well, certainly, you're going to give them Lieutenant General Legere's report. What else is there that would bear on that issue? No, it's the background material.

MS. KIRCHNER: I'm not clear. The issue of Legere is -- would relate to her statement.

THE COURT: Right.

MS. KIRCHNER: And certainly we'll give you her statement.

THE COURT: Right, that's right.

MS. KIRCHNER: But this is a very broad document request.

THE COURT: It is.

MS. KIRCHNER: And we've got more than 1,000 pages of documents, Your Honor, that were the background for the report. Now, if the Court orders it produced, we will produce it. We will just need to redact out all the personal identification information. But we don't really

think that this goes to the issue as to whether Lieutenant General Legere had any bad faith or whether she acted in bad faith.

THE COURT: No, but she's going to be asked about bad faith in general, I assume. And is the way -- I'm trying to be practical here. Is there a way to work with those thousand pages or less or more that you could pull out anything that is pertinent to Palantir?

MR. HUME: Your Honor, it's all relevant to Palantir.

THE COURT: I'm not sure it is, but is it?

MS. KIRCHNER: Well, Your Honor, the ATEC report was about Palantir.

THE COURT: Okay.

MS. KIRCHNER: So, I think what you're really focusing on is Lieutenant General Legere and we can look through --

THE COURT: No, I'm not, I'm not.

MS. KIRCHNER: You're not?

THE COURT: I'm trying to figure out how we get around this destruction issue, which you're saying to me Legere can't testify to or -- what are you saying to me?

MS. KIRCHNER: The -- first of all, it's not really a destruction issue. There were two versions --

THE COURT: You can call it destruction or

modification. You'll call it modification; he'll call it destruction.

MS. KIRCHNER: Okay, revision. There was an April report, a May report, and then the April report was revised by Mr. Amato, the ATEC director. Now, there were certain communications --

THE COURT: Okay, let me put it differently then. Maybe I wasn't good at articulating it before. Can you take a look at those -- that volume that Army counsel is now holding in his hand of roughly 1,000 pages or whatever the actual number is, and go in there and see if, in fact, there are documents, and as an officer of the Court, if there are documents that speak to the modification or destruction, that you hand those over?

MS. KIRCHNER: Yes, Your Honor, we can do that.

THE COURT: That's good. That's what you'll get, Mr. Hume.

MR. HUME: Thank you, Your Honor.

THE COURT: All right. So, let's talk about calendaring. With respect to the declarations from Mr. Choung -- and, Mr. Hume, I should add that not only do you need to take the legal conclusions out, but you do need to address much more specifically, because that's, in fact, what I think the Government is going to have to address as well and I think Ms. Kirchner indicated she

would, or at least that it's a core issue for the Government, all of the differences in the requirements between this solicitation and the previous. Because, ultimately, I think Ms. Kirchner's correct that one of the issues that is going to be formative to this decision is whether or not -- there are two of them really in my head, and I could be way off base here because I'm just starting to get my head into it.

But whether or not the requirements really were different and the commercially available product that Palantir had really couldn't meet those requirements. And if Mr. Choung is going to be your expert, then he's going to have to be the one to talk to that, and Ms. Kirchner is going to have to get an expert or do something that she thinks is appropriate to counter that. We're then in the tennis match of the experts.

But the other thing would be also, you know, I'm going to need some help in that regard, obviously. That's the technical side of this that we're going to start looking at the experts on. Whether or not there's bad faith, I'm much more comfortable doing. I do that all the time. But I think that, you know, these exhibits really have to be very pointed. And I think that Mr. Philippone's affidavit, you may want to kind of redo them, is also going to have to be very targeted at bad

faith. I don't know that it really is. It makes pretty broad and very bold allegations.

So, I'm not going to admit them at this time. I'm going to give you one last shot really to make those work for the subjects that are at issue here with very specific need for you to document that, you know, these were not new requirements, that these were -- essentially what I think you've alleged at one point, the kinds of modifications that a platform like this would make in any event to tailor it to a particular client. Now, obviously, anything off the shelf isn't going to be directly client need-specific. The question is going to be, in part -- and it's going a very hard determination for a non-expert to make, obviously -- whether the tinkers, if that's what they are, are so minor that they really don't defeat the off-the-shelf product or whether the change in the requirements is so great that your product couldn't meet it. I mean, they are two sides of a similar question, but they're different questions.

So, anything else, sir? Mr. Hume?

MR. HUME: Your Honor, I just wonder if we should address scheduling.

THE COURT: Oh, yes, we will address scheduling. But anything else that we need to talk about?

MR. HUME: My understanding is the Court's going to consider the declarations of Mr. Choung and Mr. Philippone and the two exhibits to Mr. Philippone's declaration after we resubmit them.

THE COURT: Well, I reserve the right, obviously, to strike them if I think that they don't address the issues that we have to deal with. And --

MR. HUME: The only other -- I understand, Your Honor.

THE COURT: Now, there are still interrogatories above and beyond that?

MR. HUME: Yes, Your Honor, there are. The only thing I would ask for -- to be considered, Your Honor, there are two interrogatories and one document request that go directly to the Government's or the Army's implementation of Section 2377. Now, it may be unusual to have such requests granted, but it's also unusual in a case for the Army to -- for the agency to say that -- I think it's an unusual case in terms of the disconnect between what the statute says on its face and what the agency appears to have done.

THE COURT: Are you saying to me that in the record -- in the record are not all the agency documents as to -- I mean, do you know specifically that something's missing?

MR. HUME: No, no, let me make sure it's clear what I'm saying. The other document requests, Section 2377D, Your Honor, specifically requires the agency to provide mandatory training to its procurement people in order to instruct them how to implement 2377. If the Army did that, there must be documents showing what they did. We would like --

THE COURT: Why does that change the individual decision here? I mean, you're looking at a much broader -- now you're looking at a much broader issue.

MR. HUME: If the Army has made no effort to ever comply with --

THE COURT: That doesn't give you a win.

MR. HUME: I don't see how it doesn't. If the Army --

THE COURT: I don't see how it does.

MR. HUME: Well, let me try --

THE COURT: I mean, they get a slap on the wrist, they're bad boys.

MR. HUME: I'm not -- I'm only here to complain about what they did in this case.

THE COURT: That's right. So --

MR. HUME: If I can show -- I think this case shows that they have made no effort to comply with Section 2377, and I'd like to know, since they have

written in their brief to Your Honor that they have total discretion under 2377, I'd like to know, well, what -- how do they describe it internally? What do they say -- how do they train people? They have mandatory training. How do they do it? Because I want to see how it applies --

THE COURT: Was this your Interrogatory 1?

MR. HUME: This is Document Request 1 and Interrogatories 1 and 2. I simply wanted to raise it for the Court's consideration.

THE COURT: All right. No, denied.

All right, Interrogatory Number 3.

MR. HUME: Yes, Your Honor. Those are requests for the authors of documents that, as we say in the footnote here, that contain inaccurate assertions about Palantir and, so, we'd like to know who's behind them. Given everything the Court said about how we're going to approach a bad faith discovery, I would -- we obviously would like an answer. But I was --

THE COURT: This is Number 38, right?

MR. HUME: Exhibit 38, Tabs 41, 42 and 43.

MR. MACGRIFF: Thirty-eight was withdrawn.

THE COURT: It was withdrawn, right?

MR. HUME: Yes, I understand that. That's why I'm saying, given what the Court has already ruled, Your

Honor.

THE COURT: All right. Well, then they're done.

MR. HUME: I assume you're not going to let me know the author of the document. Having said that, Tabs 41, 42 and 43 are in the record already. Are we allowed to know who wrote those?

THE COURT: Why don't you talk -- I mean, there shouldn't be any secrets as to who authored a document. I don't see why the Army and the Justice Department can't let you know who authored a document. I don't know what significance or what help that's going to give you, but I think you all could get together and figure this out. Those are not secrets. I would urge you to talk to each other on that one.

Let's talk scheduling. So, the -- you know, we have to go backwards here. We start with a drop-dead moment, thanks to the Army, of October 15th. I am actually speaking at a construction ABA forum during the week of October 3rd and I am out for another conference actually the end of the week previous. So, for me, that time is not terribly useful. I've got the week of the 15th. But it -- I mean, I can work at the places where I am, but it's not particularly useful time.

So, we're talking, in my case, getting

everything teed up by the middle of September at the very latest and maybe even a little bit earlier than that.

The odds are relatively good that you'll get an oral decision followed by a written decision if you want it in this case, but we'll see. I mean, we try to do written decisions and not do that. I don't like to do that, but it may happen here. But, basically, the depositions and -- in this case, will have to be completed -- and, obviously, we have some issues with the availability of these proposed deponents. Their schedule will obviously dictate some of this. But if you can't meet the schedule, then you don't get the deposition at some point. It's just that simple.

And I understand the Army might think, oh, wow -- the Justice Department, here's an opportunity for us. It's not, because we'll figure this out. Tactical maneuvering isn't going to work here.

So, my goal here would be to get any depositions or declarations -- well, the declarations can be filed with the Court by the end of next week, Mr. Hume. So, that would be August 5th.

MR. HUME: Understood, Your Honor.

THE COURT: They're not going to be part of the administrative record until we can look at them because of the legal conclusions and --

MR. HUME: Understood.

THE COURT: If they're useful to the two issues that I raised a little bit okay, they're not going to be germane and they're not going to be relevant. So, you know, we have to understand, if these are truly -- if Mr. Choung's, for example, is truly an expert report, it's going to have to address these compatibility issues. But Mr. -- I'm getting --

MR. HUME: Philippone.

THE COURT: I'm sorry, I looking for his name here.

MR. HUME: Philippone.

THE COURT: Philippone. If Mr. Philippone's affidavit doesn't have real bad faith allegations, it, too, is not going to be admitted into the record. So, those you get to me by Friday, August 5th.

The depositions need to be done no later than August 10th, and I would anticipate and expect that all parties would cooperate, make themselves available. This is a bid protest, so excuses that I'm on vacation or I'm just not going to be there won't fly. We've already had one instance in this case where that, frankly, appalled me. So, that's not going to work. And that would be August 10th.

You're getting, Ms. Kirchner, theoretically,

the expert report of Mr. Choung, assuming that's what it is, on the 5th. So, any expert that you would want to tender in response would be due on the 12th and, likewise, any deposition that you would want to conduct of Mr. Philippone would be completed by the 12th.

Now, you know, this is one of those team efforts, obviously. The Plaintiff has a team; the Justice Department has a team. You're going to have to use the team here on both sides to get this done in the amount of time that we've got.

Ms. Kirchner, when you get the Philippone affidavit, you're going to have to look at that obviously and see whether there's a bad faith standard -- an elementary standard that's been met. Are you thinking -- how would you counter that or how are you thinking that you would counter that? Is that an affidavit of your own? Is that a counter-deposition of Mr. Philippone or what are you thinking? That's on the issue of bad faith.

MS. KIRCHNER: Yes, I understand, Your Honor. I think it really depends upon how specific that affidavit is. If it identifies a specific individual and a specific bad act by that bad individual, then we would address, you know, address the specific allegations. And I'm not quite sure, until we see them, how we would go about --

THE COURT: All right. Well, that will also be due on the 12th, whatever it might be. I have very little room for extensions here, unfortunately. So, you know, we're going to deal with what we can.

MS. KIRCHNER: Your Honor, can I just request clarification. Is it two affidavits that are coming in from Plaintiff?

THE COURT: Two affidavits that are coming in, one from Mr. Choung and one from Mr. Philippone.

MS. KIRCHNER: Okay, all right. So -- and we would respond to both of those on the 12th?

THE COURT: On the 12th.

MS. KIRCHNER: Okay.

THE COURT: Now, and the 12th, also, is when your expert report will be in.

And, Mr. Hume, would you want to depose the Defendant's expert?

MR. HUME: We would, Your Honor. Thank you.

THE COURT: So, that would have to be done by the 19th and the Justice Department would have to make that expert available within that time frame.

Are you thinking you're going to have an expert report, Ms. Kirchner, or are you going to have a similar affidavit or --

MS. KIRCHNER: I don't know at this point. We

were trying to identify someone with expertise and we have not yet been able to talk to them. So, I can't really say at this point.

THE COURT: I mean, you may be forced, in this time frame, to go inside the Army.

MS. KIRCHNER: I understand, Your Honor.

THE COURT: Then you offset the credibility on both sides and you're on a more equal playing field anyway. But potentially if you have an outside -- you know, it's a time frame issue, obviously.

Now, we obviously don't have time really for rebuttal, so any rebuttal information would have to be in your briefs which -- supplemental briefs which you would file and attach the expert rebuttal statement, if there is such a thing, to the briefs that you -- the supplemental briefs that you have to file in the form of affidavits. And those briefs, assuming we really meet this remarkably tight schedule, your briefs would be due on the 6th of September. The more specific you are, the easier it is. I don't think we'll have time for reply briefs, but we can visit that or the request for that if you think that's necessary once we get those briefs from both simultaneously on the 6th.

We'll probably need to schedule an oral argument, which we can do October 15th.

LAW CLERK: September.

THE COURT: I'm sorry, September 15th. And concise, focused oral arguments. We're going to do it at 2:30 in the afternoon. And we're not going to stay as late as we're staying tonight, hopefully.

MS. KIRCHNER: Your Honor, could we clarify one thing? Is the supplemental brief limited to the supplemental documents?

THE COURT: Limited to, you know, the issues that haven't been covered, which unfortunately here I think is the very core of what's going on here with bad faith and also the nature of the requirements as to whether there's a match or not between what Palantir has to offer and what the Army is trying to procure. I think that, you know, unfortunately, that wasn't very focused in what you've already submitted.

MR. HUME: Your Honor --

THE COURT: And here's where you have your information at the -- you know, the bottom line information.

MR. HUME: Your Honor, I have a question that may turn --

THE COURT: The existing brief schedule stays as it is, so --

MR. HUME: That was going to be my question.

THE COURT: Yep.

MR. HUME: That maybe it's turned into a request. I don't know -- and, obviously, whatever the Court prefers, we'll do. We're just wondering if the existing reply briefs could be submitted in the same sequence with the supplemental information as opposed to --

THE COURT: I've got to get this down so we can start working, frankly.

MR. HUME: So, you want the reply briefs next week -- or this --

THE COURT: I do, yeah. I want us to be able to get our head into it.

MR. HUME: In that case, Your Honor, may I ask whether it would be possible for us to have what I think amounts to a 12-hour extension?

THE COURT: Sure.

MR. HUME: To file by noon on Wednesday.

THE COURT: That's not a problem if that's all you need.

MR. HUME: We should be fine by then.

MS. KIRCHNER: Your Honor, then, could have an extension to file on Monday --

THE COURT: The same 12 hours?

MS. KIRCHNER: Well, Your Honor, there's -- my

filing date is Friday.

THE COURT: So, you want Monday.

MS. KIRCHNER: I'm requesting the --

THE COURT: All right, that's fine.

MS. KIRCHNER: Thank you, Your Honor.

THE COURT: All right, all right. Does that cover everything that we need to cover? It's been a bit of a marathon, but I think we've made a fair amount of progress.

You know, I would say to you again, Mr. Hume, you know, we've defined the critical issues as I see it, having looked at what you have, and we need to understand in my view, which unfortunately or fortunately for you, is the operative view at this point. Bad faith is a very high bar. I haven't heard anything yet that says to me there's bad faith. I've heard a couple of allegations that say to me maybe something was going on, but I'm really at the maybe stage. So, you know, unless you can come forward with a great deal more concrete kind of demonstration, you know, that's going to be a problem.

So, with respect to a revised administrative record, I think it needs to come in very quickly so that Mr. Hume can refer to it in the reply brief. So, let's see if we can't get it -- and I think we really have no choice at this point other than to tack the additional

documents, even though they're chronologically out of order, to the end with sequential numbers from where we started. As much as I would like to change that, I don't think you want to repaginate and do all of that.

So, I think we need to go forward and add them as additional exhibits with additional pagination numbers from where the last exhibit in the last and fourth revision, this will be the fifth revision, left off.

So, Mr. Hume, are we done then with any additional discovery requests that you have? Have we covered them all?

MR. HUME: I think you have explicitly or implicitly covered them all, Your Honor.

THE COURT: All right. Any other questions, Mr. Hume?

MR. HUME: The only -- in terms of the timing, you made a point about the pagination. I will have a team of people pulling in cites to the new material on Wednesday. If we don't get that by noon tomorrow, can we have until the end of the day Wednesday to file our brief?

THE COURT: Sure, oh, yeah, no problem.

MR. HUME: Thank you.

THE COURT: But I do want, you know, from this point forward, everything to refer to the administrative

record as we have it at that point. And if there is a bad faith showing, potentially there is an open door, you know, or a crack in the door or something to add something. But we'll see. I'm not there, by any means, on bad faith, Mr. Hume.

MR. HUME: I understand.

THE COURT: I'm not even close. So, that doesn't mean I couldn't get there, but I'm not there yet.

Anything else from you, sir, Mr. Hume?

MR. HUME: No, Your Honor, thank you.

THE COURT: How about Ms. Kirchner?

MS. KIRCHNER: The revised administrative record that we're going to be submitting, Your Honor, do we have until the end of tomorrow to get that to the Court?

THE COURT: Yes.

MS. KIRCHNER: All right.

MR. HUME: That's fine. As long as we then have until the end of the day Wednesday --

THE COURT: That's fine.

MR. HUME: -- to file our brief.

THE COURT: So, you can run the numbers.

MS. KIRCHNER: And then, Your Honor, what I do is when I've got them Bates stamped, I will send them email. So, you may get the sooner than the Court.

MR. HUME: That would be great, thank you.
(Court conferring with the clerk.)

THE COURT: The time frame for -- I'm getting a lot of help here, too. This is a team effort at my end, too, and I've got the assistance of two really able law clerks, fortunately, to help me through this. It's a lot of information. And, fortunately, they're both experienced lawyers, one with a great deal of experience and one with specific procurement experience for a couple years.
So, the question I was just asked, which is a fair question, was the documents that you're going to look at in that thousand-page volume that Army counsel was holding gingerly, that obviously needs to be turned over to Mr. Hume before the deposition with enough time for him to take a look at it. So, when you schedule the deposition, make sure that you schedule a couple of days for him to have a look at those documents if you should identify any in there.
MR. HUME: We --
THE COURT: And I assume you all can work together on stuff like this.
MR. HUME: Absolutely. We appreciate that -- noticing that issue. Your Honor --

THE COURT: Well, thank my law clerk because I didn't notice that.

MR. HUME: Well, I am, I thank you both. Would it really prejudice the schedule, Your Honor, if we -- if we had -- both we and the Government might benefit if the depositions of Lieutenant General Legere and Ms. Schnurr could be taken any time between the time we get those documents and August 19th.

THE COURT: Too vague, too -- and the 19th -- no, because you can't get me all these briefs in time.

MR. HUME: Well, I --

THE COURT: Because you also have to have a deposition of the Defendant's expert who's going to counter your expert.

MR. HUME: I just don't think -- the rest of the schedule could stay the same that you laid out except that our deposition of those two individuals could be pushed out to the 19th. We would get transcripts the next day. We'd have plenty of time to put in the brief. It would just make scheduling a little easier, I think, in the near term, if the Government agreed.

THE COURT: Ms. Kirchner, what do you say to that?

MS. KIRCHNER: Your Honor, we have not checked yet on availability and --

THE COURT: Well, I think that's what Mr. Hume is talking about.

MR. HUME: Yeah, I'm certainly not going to -- if you tell me they're only available for certain days, I'm giving you more days in which they might be available.

MS. KIRCHNER: I understand. I think we should work together and work to get it done as soon as possible.

THE COURT: All right. We'll keep, you know, the earlier date as our hopeful slate and we'll allow you to go to the 19th if you absolutely have to. I really would like you to do this sooner rather than later for the simple reason that if there's really something there, this dynamic is going to change. You know, right now, we've got a dynamic that works in part on my skepticism that there's bad faith. If that really changes, we've got a whole new ball game to worry about. At that point, the contracting officer becomes relevant potentially. Bunches of other people become relevant and we've got to do a lot more work.

This is all, of course, dependent on the Army's reasonableness, and if that happens, I would hope that they would look at that October 15th date and give us a little more time here. But, you know, we don't have to

go there just yet, and we'll get this done.

You know, if the Army feels so inclined, you know, they can make it easier for all of us now. But you need to be sure, too -- I mean, obviously, you need to work together. But in the event that there is a snag that occurs, you need to contact us sooner rather than later so that we can resolve it sooner rather than later.

So, that oral argument is on the whole works that we've just scheduled. Now, we have an oral argument scheduled on standing and we'll give you an opinion on standing in advance. As it looks now to me, and it's very preliminary, I think we probably may -- I don't make any promises here, but I think we may get past standing. So, I think you can assume that we're going to go forward. I don't know that that's the case. I haven't dug in deeply enough yet. But operate as if that were the case, and if there are any snags, we need to be sure -- so, we're going to be spending a lot of time together in the next few weeks and, you know, we're all going to be spending a lot of time on this case, obviously.

Our bid protest wheel is whipping around and I'm back on the wheel again, even though I got three cases just less than two weeks ago. So, you know, we keep plugging. So, don't feel too sorry for yourselves. I think we've all got problems.

MS. KIRCHNER: Your Honor?

THE COURT: Ms. Kirchner?

MS. KIRCHNER: Before you conclude, can I just consult with agency counsel? There's some issue they want me to raise with the Court.

THE COURT: All right, sure.

(Counsel conferring.)

MS. KIRCHNER: Your Honor?

THE COURT: Yes.

MS. KIRCHNER: Can my agency counsel address this matter, please?

THE COURT: Sure.

MS. KIRCHNER: Thank you.

MR. FLESCH: Your Honor, thank you. There's -- this report, the 15-6 has been released to Congress, but the supporting materials -- there are over 1,000 pages of supporting materials -- have not been released at all. We are clear that the Court has ordered production of only those emails that relate to --

THE COURT: Only those documents, don't go -- put down emails.

MR. FLESCH: That's why I'm asking. Because this report is about the revision of the ATEC report.

THE COURT: Right.

MR. FLESCH: And multiple witnesses made

statements. They're all asked the same questions. Do you know anything about it? So --

THE COURT: Then you've got an issue, you've got a problem.

MR. FLESCH: Well, I would say it's probably -- you ordered that it be produced, clear?

THE COURT: To the -- so that they can actually ask questions about it.

MR. FLESCH: The second question is, we have a modified protective order that -- well, they've been admitted to the protective order. Is it clear that the protective covers these documents that now we've been ordered to produce?

THE COURT: Absolutely. It covers everything in the case.

And, Mr. Hume, you're going to get signed -- we've bound your Palantir employees as of this hearing today. They understand that, but you need to get that signed and over to the DOJ promptly.

MR. HUME: Absolutely, Your Honor.

MS. FLESCH: Thank you, Your Honor.

THE COURT: All right. Now, it is past the witching hour. You cannot go out the front door. You will be guests for the night in our courtyard should you attempt to do that. There is a side door that you could

all find, and if you get out into the courtyard, there's a big steel door that comes down over the steps. So, we will make sure that you get out. So, if you wouldn't mind gathering your materials and walking out with -- one of my two law clerks will take you down and you've got to go through the basement. They'll take you down and out. And we want to be sure that you're all gone so that the marshals don't hold us accountable for the person that's wandering around here in the middle of the night.

All right, we stand adjourned and we're off the record.

(Whereupon, at 6:34 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, Elizabeth M. Farrell, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-titled matter.

DATE: 7/27/2016 S/Elizabeth M. Farrell

ELIZABETH M. FARRELL, CERT