[redacted]

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

PALANTIR TECHNOLOGIES INC., and PALANTIR USG, INC.

Plaintiffs,

-vs.-

THE UNITED STATES

Defendant.

Case No. 16-784C
Judge Marian Blank Horn

# PALANTIR'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
hhume@bsfllp.com
skaplan@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

[redacted]

## TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 6

I. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIMS UNDER § 2377 (COUNTS ONE, TWO, AND THREE). ........ 6

A. The Government Asks This Court To Render § 2377 A Nullity ........ 6

1. The Clause "To The Maximum Extent Practicable" Does Not Give The Agency Discretion To Ignore § 2377(a)'s and § 2377(b)'s Requirements. ........ 6

2. The Clause "Appropriate To The Circumstances" Does Not Give The Agency Discretion To Ignore § 2377(c)'s Requirements. ........ 11

3. General Procurement Law Principles Do Not Override § 2377's Specific Requirements. ........ 15

B. The Army Did Not Make Any Of The Three Determinations Required By § 2377(c) (Count Three). ........ 18

1. The Army Failed To Make A Determination As To Whether Commercial Items Are Available To Meet The Army's Requirements, As Required By § 2377(c)(2)(A). ........ 18

a. The Army Provides No Basis For Its Conclusory Assertion That No Commercial Items Were Available That Provided Data Fusion, Intelligence Support To Cyber, And DIB Upgrade. ........ 21

b. The Record Shows That Palantir's Commercial Product Provides Data Fusion, Intelligence Support To Cyber, And DIB Upgrade. ........ 23

i. The Record Shows Palantir's Commercial Item Provides Data Fusion. ........ 23

ii. The Record Shows Palantir's Commercial Item Provides Intelligence Support To Cyber. ........ 25

iii. The Record Shows Palantir's Commercial Item Provides DIB Upgrade Capabilities. ........ 26

c. The Government Misrepresents Palantir's Feedback On The Draft Solicitation And Its Response To The Second RFI. ........ 27

[redacted]


2. The Army Failed To Make A Determination As To Whether Commercial Items Could Be Modified To Meet Its Requirements, As Required By § 2377(c)(2)(B). ........ 30

3. The Army Failed To Make A Determination As To Whether Commercial Items Are Available That Could Meet The Agency's Requirements If Those Requirements Were Modified To A Reasonable Extent, As Required By § 2377(c)(2)(C). ........ 33

4. The Army Did Not Make Any Of The Determinations Required By § 2377(c)(2) With Respect To The Availability Of Nondevelopmental Items. ........ 34

5. The July 1 Determination Does Not Cure The Army's Failure To Comply With § 2377(c). ........ 35

C. The Army Violated § 2377(a) & (b) When It When It Failed To Issue A Solicitation That Allowed Commercial Items To Be Offered To Fulfill The Entirety Of Its DCGS-A2 Requirements On A Fixed-Price, Commercial Item Basis (Count Two). ........ 37

D. The Army Violated § 2377(a) & (b) When It Bundled Together The Procurement Of The Data Management Platform With The Procurement Of The Additional Enhancements (Count One). ........ 38

1. The Data Management Platform Is The "Heart" Of DCGS-A2. ........ 38

2. The DIVA Market Study And Other Documents In The Record Show That At Least One Commercial Item Was Available To Meet The Army's Requirement For A Data Management Platform. ........ 40

3. The Record Shows That Procuring The Data Management Platform As A Commercial Item Would Diminish, Not Increase, The Risk Of A "Glue Code" Problem Caused By The Government's Flawed Developmental Approach. ........ 42

II. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIMS UNDER ADDITIONAL STATUTES AND REGULATIONS (COUNTS FOUR, FIVE, AND SIX) ........ 46

A. The Army Violated 48 C.F.R § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed-Price Contract (Count Four). ........ 46

B. The Army Violated 10 U.S.C. § 2304a(f) And DFARS Part 217.204 By Soliciting A Task Order Contract In Excess Of Five Years (Count Five). ........ 49

C. The Army Violated 48 C.F.R. § 16.504 By Soliciting An Impermissibly Expensive Indefinite Delivery, Indefinite Quantity Task Order (Count Six). 50

[redacted]

III. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIM THAT THE ARMY ENGAGED IN ARBITRARY, CAPRICIOUS, AND BAD FAITH CONDUCT (COUNT SEVEN)........ 51

IV. PALANTIR HAS BEEN PREJUDICED BY THE ARMY'S LEGAL VIOLATIONS. ........ 53

V. THE COURT SHOULD ISSUE A PERMANENT INJUNCTION........ 59

A. Palantir Will Suffer Irreparable Harm Absent An Injunction........ 59

B. The Balance Of Hardships Weighs In Favor Of An Injunction........ 60

C. The Public Interest Weighs In Favor Of An Injunction........ 60

[redacted]

TABLE OF AUTHORITIES

**Cases**

*Afghan Am. Army Services Corp. v. United States*,
106 Fed. Cl. 714 (2012) .......... 27

*AshBritt, Inc. v. United States*,
87 Fed. Cl. 344 (2009) .......... 23

*Associated Milk Producers, Inc. v. United States*,
22 Cl. Ct. 682 (1991) .......... 13

*ATA Defense Indus., Inc. v. United States*,
38 Fed. Cl. 489 (1997) .......... 31

*BINL, Inc. v. United States*,
106 Fed. Cl. 26 (2012) .......... 56

*Biodiversity Legal Foundation v. Babbitt*,
146 F.3d 1249 (10th Cir. 1998) .......... 10-11

*CBY Design Builders v. United States*,
105 Fed. Cl. 303 (2012) .......... 3, 17, 53

*Ceres Envtl. Servs., Inc. v. United States*,
52 Fed. Cl. 23 (2002) .......... 31

*CGI Federal Inc. v. United States*,
779 F.3d 1346 (Fed. Cir. 2015) .......... 56

*CHE Consulting, Inc. v. United States*,
552 F.3d 1351 (Fed. Cir. 2008) .......... 14, 16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 31

*Conservation Law Foundation v. Watt*,
560 F. Supp. 561 (D. Mass. 1983) .......... 9

*Defenders of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001) .......... 8

*Foster v. Mabus*,
103 F. Supp. 3d 95 (D.D.C. 2015) .......... 3, 16

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) .......... 8, 10

[redacted]

*Furniture by Thurston v. United States*,
103 Fed. Cl. 505 (2012) .......... 57

*Geo-Med, LLC v. United States*,
126 Fed. Cl. 440 (2016) .......... 17, 18

*Gov't Sys. Advisors, Inc. v. United States*,
847 F.2d 811 (Fed. Cir. 1988) .......... 50

*Hydro Engineering, Inc. v. United States*,
37 Fed. Cl. 448 (1997) .......... 11

*Informatics Corp. v. United States*,
40 Fed. Cl. 508 (1998) .......... 31

*Ingham Regl. Med. Ctr. v. United States*,
126 Fed. Cl. 1 (2016) .......... 8

*Knowledge Connections, Inc. v. United States*,
76 Fed. Cl. 6 (2007) .......... 57

*L-3 Commun. Corp. v. United States*,
99 Fed. Cl. 283 (2011) .......... 57

*Labatt Food Service, Inc. v. United States*,
577 F.3d 1375 (Fed. Cir. 2009) .......... 53, 55

*Leocal v. Ashcroft*,
543 U. S. 1 (2004) .......... 9

*Linc Government Services, LLC v. United States*,
96 Fed. Cl. 672 (2010) .......... 59

*Maniilaq Ass'n v. Burwell*,
72 F. Supp. 3d 227 (D.D.C. 2014) .......... 15

*McDonnell Douglas 48 Corp. v. U.S. Dep't of the Air Force*,
375 F.3d 1182 (D.C. Cir. 2004) .......... 2-3, 16

*Nat'l Air Cargo, Inc. v. United States*,
126 Fed. Cl. 281 (2016) .......... 58, 59

*Orion Tech., Inc. v. United States*,
704 F.3d 1344 (Fed. Cir. 2013) .......... 58

*Prill v. NLRB*,
755 F.2d 941 (D.C. Cir. 1985) .......... 2, 15

[redacted]

*Raymond Express Int'l, LLC v. United States*,
120 Fed. Cl. 413 (2015) .... 31

*Savantage Fin. Servs., Inc. v. United States*,
595 F.3d 1282 (Fed. Cir. 2010) .... 16

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
137 F.3d 640 (D.C. Cir. 1998) .... 2, 15

*SMS Data Products Group v. United States*,
853 F.2d 1547 (Fed. Cir. 1988) .... 2, 7, 8

*Sundowner 102 LLC v. United States*,
108 Fed. Cl. 737 (2013) .... 50

*Tyler Constr. Group v. United States*,
570 F.3d 1329 (Fed. Cir. 2009) .... 2, 17

*United Food & Commercial Workers Int'l Union Local 400, AFL-CIO v. N.L.R.B.*,
222 F.3d 1030 (D.C. Cir. 2000) .... 15

*USFalcon v. United States*,
92 Fed.Cl. 436 (2010) .... 17

*W & D Ships Deck Works, Inc. v. United States*,
39 Fed. Cl. 638 (1997) .... 15

*Wagner v. Nat'l Transp. Safety Bd.*,
86 F.3d 928 (9th Cir. 1996) .... 15

*Weeks Marine, Inc. v. United States*,
575 F.3d 1352 (Fed. Cir. 2009) .... 14, 16, 59

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
750 F. Supp. 2d 150 (D.D.C. 2010) .... 17

**Statutes**

10 U.S.C. § 2304a .... 50

10 U.S.C. § 2304a(f) .... 49

10 U.S.C. § 2377 .... 1, 6, 11

10 U.S.C. § 2377(a)(1) .... 3

10 U.S.C. § 2377(a)(2) .... 1

10 U.S.C. § 2377(c)(1) .... 14

[redacted]


10 U.S.C. § 2377(c)(2) ........ 12, 13, 18

10 U.S.C. § 2377(c)(2)(B) ........ 31

10 U.S.C. § 2377(c)(2)(C) ........ 33

10 U.S.C. § 2377(c)(2)(A)-(B) ........ 14

10 U.S.C. §2377(c)(2)(B)-(C) ........ 20


**Regulations**


48 C.F.R § 16.103(d)(1) ........ 47

48 C.F.R § 16.103(d)(1)(iv) ........ 47

48 C.F.R § 16.104 ........ 48

48 C.F.R § 16.301-2 ........ 48

48 C.F.R § 16.301-2(a) ........ 47

48 C.F.R. § 16.504(c)(1)(ii)(D)(1) ........ 51

48 C.F.R. § 17.104(a) ........ 50

48 C.F.R. § 2.101 ........ 49

[redacted]

## INTRODUCTION

The Government does not dispute that the Army has a requirement for a Data Management Platform, as Palantir defined that term in its opening brief.[1] The Government also does not dispute that Palantir has a fully developed Data Management Platform that it provides to customers, including military and intelligence agencies, on a commercial item basis. Thus, the Government does not (and cannot) dispute that Palantir has a commercial item that can fulfill the Army's requirement for a Data Management Platform. This means that the Government violated the requirements of 10 U.S.C. § 2377 by issuing a Solicitation that made it impossible for Palantir even to offer its commercial item to meet the Army's need for a Data Management Platform.

In response, the Government argues that § 2377 affords the Army "substantial discretion" in "drafting solicitation requirements." Dkt 19 at 29.[2] But § 2377 does not afford "substantial discretion." It mandates that all agencies, including the Army, "shall ensure" that its "requirements are defined so that commercial items or . . . nondevelopmental items other than commercial items, may be procured to fulfill such requirements." 10 U.S.C. § 2377(a)(2). The statute provides that this "shall" be done "to the maximum extent practicable." *Id.* That is not a delegation of "substantial discretion" to the agency. It is the imposition of a clear mandate,

---

[1] As defined in our opening brief, a Data Management Platform "is a software product that performs three essential functions: (1) it gathers data from numerous sources within a common data layer; (2) it provides an efficient and effective visualization framework, and (3) it allows the data to be shared and analyzed seamlessly across a suite of tools." Dkt. 14 at 11. The Government never disputes this definition, and it never disputes that the Army has a requirement for a Data Management Platform so defined.

[2] Throughout this brief, citations to court filings refer to the page numbers located at the bottom of the original filing, rather than to the ECF-stamped page numbers located at the top of the electronic filings.

[redacted]

subject only to a very narrow exception where the facts show that it is simply not possible or practicable to comply with the mandate. No such facts exist here.

The Government argues that it does not need to show any facts demonstrating that it would have been impracticable to comply with the statute here. Instead, the Government argues that the "Court may accept an agency's concerns *without supporting evidence for those concerns*." Dkt. 19 at 31 (emphasis added). Nothing supports such an extreme claim for deference and discretion. To the contrary, if this claim were accepted, it would render § 2377 a nullity. Where an agency is subject to a statutory mandate that it is supposed to implement "to the maximum extent practicable," the agency must comply with that mandate absent definite facts making abundantly clear that there was no way for it to comply.[3] The agency does not have discretion over what a statute requires.[4] Indeed, even under the "arbitrary and capricious" standard (which is more lenient than the standard that applies to all Counts in this case save Count Seven), the case law holds that courts "do not defer to the agency's conclusory or

[3] *Compare SMS Data Products Group v. United States*, 853 F.2d 1547, 1556 (Fed. Cir. 1988) (based on court's analysis of the underlying facts, holding that the contracting officer decision failed to meet the applicable regulation's requirement that the contracting officer obtain competition "to the maximum extent practicable" in connection with a reprocurement) *with Tyler Constr. Group v. United States*, 570 F.3d 1329, 1331-32 (Fed. Cir. 2009) (holding that the agency did not violate a statutory provision requiring agencies to avoid bundling of contractual requirements "to the maximum extent practicable" where the agency had conducted a "detailed analysis of the issue" and "extensive market research" and "demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes").

[4] *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'") (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C.Cir.1985)).

[redacted]

unsupported suppositions." *McDonnell Douglas 48 Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1186–87 (D.C. Cir. 2004).[5]

Moreover, the Army violated numerous requirements set forth in § 2377, not just one. It failed to make the three determinations required by § 2377(c)(2), none of which are discretionary or subject to a practicability standard. They are mandatory, and they were not made. If they had been made, they would have shown unequivocally that Palantir has a commercial item that meets the Army's requirements (if they said otherwise, they would have been completely contradicted by the facts). The Army also failed to conduct the appropriate market research required by § 2377(c)(1)—instead of researching whether commercial or nondevelopmental items were available to meet some or all of its requirements, the Army assumed from the outset that it was only going to consider procuring a developmental project.

The Army also failed to comply with numerous other requirements of § 2377(a) and (b), which direct the Secretary of the Army to "ensure" that the following things happen "to the maximum extent practicable":

- To "ensure" that the Army's "requirements" were "stated" in broad terms to identify the "functions to be performed," the "performance required," or the "essential physical characteristics," 10 U.S.C. § 2377(a)(1);

[5] *See Foster v. Mabus*, 103 F. Supp. 3d 95, 109 (D.D.C. 2015) (explaining that when "evaluating agency actions under the 'arbitrary and capricious' standard, courts 'must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment' and that "'[C]onclusory statements will not do; an agency's statement must be one of *reasoning*'") (citing cases) (emphasis in original); *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 337–38 (Fed. Cl. 2012) ("Following the variation of the 'hard-look doctrine' that the Federal Circuit has made applicable to bid protests, an agency's procurement decision may be found arbitrary and capricious when 'the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (internal citations and footnotes omitted).

[redacted]

- To "ensure" that "offerors of commercial items and nondevelopmental items . . . are provided an opportunity to compete in any procurement to fill such requirements," *id.* at § 2377(a)(3);
- To "ensure" that the Army would "acquire commercial items or nondevelopmental items . . . to meet the needs of the agency," *id.* at § 2377(b)(1);
- To "ensure" that the Army would "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or . . . nondevelopmental items," *id.* at § 2377(b)(3),
- To "ensure" that the Army would "state specifications in terms that enable and encourage bidders and offerors to supply commercial items or . . . nondevelopmental items . . . in response to the agency solicitations," *id.* § 2377(b)(4), and
- To "ensure" that the Army would "revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items," *id.* § 2377(b)(5).

The Army did none of these things. It does not seriously contend otherwise in its brief. Instead, it argues it had "substantial discretion" not to do these things, and that it could invoke that discretion based on "concerns" that can be asserted and upheld "without supporting evidence for those concerns." The Court should reject this effort to nullify § 2377.

The Army tries to argue that the Palantir Gotham Platform could not do three of the things it says were part of its requirements—"Data Fusion," "Intelligence to Cyber," and "DIB upgrade."[6] There is zero support in the record for this conclusory assertion, which the

[6] Each of these concepts is discussed in detail below. *See* Section I(B)(1)(b)(i)-(iii). ("DIB upgrade" refers to a Data Management Platform's ability to integrate with the DCGS-A Integration Backbone ("DIB"), which is the government owned software baseline created through the fifteen year DCGS-A1 effort.)

[redacted]

Government repeats constantly throughout its brief. To the contrary, as shown below, the record evidence shows that the Palantir Gotham Platform can perform these functions.

Moreover, the Government's effort to distract the Court with the claim that are supposedly "36,000 requirements" associated with DCGS-A2 is both wildly inaccurate and beside the point.[7] The inquiry under § 2377 is not whether the Palantir Gotham Platform is the mirror image of, or the "commercial equivalent" to, what the Army decided to write down as its "requirements" for DCGS-A2. Instead, the inquiry is whether the Army complied with § 2377's mandate that it "define" and "state" those requirements in a way that, "to the maximum extent practicable," allowed Palantir to offer its commercial item to meet those requirements. The Army clearly failed to do that. It did the opposite by drafting a Solicitation and Performance Work Statement (and other, related documents) that make it impossible for an offeror of a commercial or nondevelopmental item to submit a bid. Section 2377 cannot be avoided by an agency decision to define its requirements in exactly the opposite way that § 2377 requires.

None of this is to say that the Army has no discretion at all. The Army's discretion relates to what its fundamental needs are, in terms of "functions to be performed," the "performance required," or the "essential physical characteristics." But on this point there is no dispute: the Army has a requirement for a Data Management Platform. That being established

[7] *See* Tr. at 32:10-13 (July 25, 2016) (DOJ lead counsel claiming that "Tab 58" identifies "36,000 requirements" for DCGS-A2). Tab 58 is a spreadsheet with only 316 entries. We therefore do not understand the basis for the assertion that there are "36,000 requirements." In addition, the citation to Tab 58 appears misplaced. The Government's brief stated that "The total requirements for DCGS-A2" were "compiled in three documents"—identified as Tabs 11, 12, and 23. Dkt. 19 at 36. The Government did not identify Tab 58 as one of the documents showing the "total requirements for DCGS-A2." In any event, even if one looks at all four documents (Tabs 11, 12, 23, and 58), they do not list out "36,000 requirements," either individually or cumulatively.

[redacted]

and undisputed, the requirements of § 2377 are triggered, and the Army has no discretion that allows it to ignore those requirements. Through numerous provisions, both procedural and substantive, § 2377 requires the Army to go about the process of procuring the Data Management Platform it needs in a manner that "shall ensure" to "the maximum extent practicable" that such needs are met through the procurement of a commercial or nondevelopmental item. The Army simply did not come close to complying with those requirements in this case, and as a result Palantir was prohibited from bidding on a contract that it otherwise would very likely have won. The Solicitation must therefore be set aside as unlawful.

## ARGUMENT

### I. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIMS UNDER § 2377 (COUNTS ONE, TWO, AND THREE).

#### A. The Government Asks This Court To Render § 2377 A Nullity

According to the Government, 10 U.S.C. § 2377 does not meaningfully limit the Army's discretion, but rather "is *on all scores* a statute recognizing the necessity for agency discretion." Dkt. 19 at 15 (emphasis added). This is not correct, and it substantially overstates the very limited agency discretion afforded under § 2377.

##### 1. The Clause "To The Maximum Extent Practicable" Does Not Give The Agency Discretion To Ignore § 2377(a)'s and § 2377(b)'s Requirements.

The Government relies on the phrase "to the maximum extent practicable" to argue that the obligations in § 2377 are discretionary. Dkt. 19 at 16-18. As an initial matter, the phrase "to the maximum extent practicable" does not apply to any of the requirements set forth in § 2377(c). The Army did not have any discretion to avoid those requirements based on what it

[redacted]

deemed to be "practicable." In particular, there is nothing in § 2377(c)(2) that allows the Army to argue that there was anything at all discretionary about the three specific determinations it was required to make under that statute. The Army failed to make any of those determinations, and it therefore failed to comply with § 2377(c)(2). *See* Section I(B), *infra.*

With respect to the requirements set forth in § 2377(a) and (b), the plain meaning of the phrase "the maximum extent practicable" is not that it provides "discretion." Rather, the phrase merely recognizes that the mandatory directive in the statute will not apply in situations where it is impossible for the agency to comply with the statute. The Army quotes a Federal Circuit decision assessing the meaning of a similar phrase in FAR 49.402-6(b), which provides that a "contracting officer shall obtain competition to the maximum extent practicable for the repurchase." Dkt. 19 at 17-18. The Federal Circuit held that the "use of 'shall' in the phrase 'shall obtain competition to the maximum extent practicable' *denotes the imperative.*" *SMS Data Products Group v. United States*, 853 F.2d 1547, 1553 (Fed. Cir. 1988) (emphasis added). The Federal Circuit then found that the "common usage" of the word "practicable" means "possible to practice or perform,' or 'capable of being put into practice, done, or accomplished: feasible.'" *Id.* at 1553-55 (quoting Webster's Third New International Dictionary (1971)). The Federal Circuit therefore concluded: "Thus, the contracting officer did not have unbridled discretion, *but was* ***required*** *to conduct the reprocurement in the most competitive manner feasible.*" *Id.* (emphasis added).

This Federal Circuit analysis of the phrase "shall . . . to the maximum extent practicable" is helpful to Palantir, not to the Government. The Army was subject to mandatory requirements that could not be avoided unless there was clear evidence showing that it was wholly impracticable, infeasible, or impossible for the Army to comply with those requirements. That is

[redacted]

what the *SMS Data Products* case held. And in the course of doing so, that case found that the contracting officer failed to comply with its mandatory obligation under FAR 49.402-6(b) because there was nothing showing that it was impracticable for the officer to do so. *Id.* at 1556.[8]

In *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001), the Court considered the requirement in the Endangered Species Act that the Fish and Wildlife Service's recovery plans for de-listing formerly endangered species shall, "to the maximum extent practicable," include "estimates of the time required and cost to carry out [the de-listing] measures…" *Id.* at 131. Quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107 (D.D.C. 1995), the court emphasized that "the phrase 'to the maximum extent practicable' *does not permit an agency unbridled discretion. It imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible.*" *Id.* (emphasis added and internal quotations omitted). The Service submitted a recovery plan that, with respect to the time-and-cost estimate requirement, described the majority of implementation tasks simply as "ongoing." *Id.* 134. The court acknowledged that the completion timeline for certain tasks, like "determine areas preferred for pronghorn [the species at issue] activities," would be subject to ongoing revision and updating. *Id.* But the court held this did not relieve the Service of its statutory obligation to provide, "to the maximum extent practicable," definite completion estimates, and, where not practicable, an explanation of why not. *Id.* 134-35. In other words, an

---

[8] As this Court has explained, "In *SMS Data Products*, it was the addition of 'shall,' which 'denotes the imperative,' to the phrase 'to the maximum extent practicable,' which meant that the government did not have 'unbridled discretion.'" *Ingham Regl. Med. Ctr. v. United States*, 126 Fed. Cl. 1, 53 (Fed. Cl. 2016) (discussing *SMS Data Products*).

[redacted]

agency's duty to fulfill its statutory obligation "to the maximum extent practicable" requires that it demonstrate compliance with procedural requirements necessary for fulfilling that duty; an agency does not have discretion to deem requirements satisfied "to the maximum extent practicable" without first determining what is practicable.

Similarly, in *Conservation Law Foundation v. Watt*, 560 F. Supp. 561 (D. Mass. 1983), the court had to decide whether the government's plan for oil and gas leases off the coast of Massachusetts was "consistent 'to the maximum extent practicable' with the Massachusetts Coastal Zone Management Plan." *Id.* at 575. The government's final environmental impact statement said that the leases would have minimal effect, even though the government was aware of three ongoing research studies that, had they been completed, were likely to contradict the government's official position. *Id.* at 572. The court found that, since the government "proceeded without this information, [it] did not do all that was *practicable* prior to approving a project with such potentially grave environmental costs." *Id.* at 573 (internal quotation omitted) (emphasis in original). Similarly, here, the Army "***did not do all that was practicable***" in trying to define its requirements in a manner that would allow its needs to be satisfied by the procurement of a commercial or nondevelopmental item—even though extensive evidence existed demonstrating that such items existed.

The use of the word "maximum" in the phrase "to the maximum extent practicable" cannot be ignored.[9] The requirements in § 2377(a) and (b) do not just apply when "practicable" for the agency to comply. These requirements apply "***to the maximum extent*** practicable." The

[9] *Leocal v. Ashcroft*, 543 U. S. 1, 12 (2004) ("we must give effect to every word of a statute wherever possible…").

[redacted]

word "maximum" means "the greatest quantity or value attainable." Webster's Ninth New Collegiate Dictionary at 735. Thus, as a matter of plain meaning, when Congress directs that an agency "shall" do something to "the maximum extent practicable," the agency *must* make every effort to take that required action, and it may not abandon the action as "impracticable" unless it has worked to the "greatest" extent "attainable" to try to fulfill the obligations. That is not a delegation of "discretion." It is a directive to comply.

The Government relies on the Tenth Circuit's decision in *Biodiversity Legal Foundation v. Babbitt*, 146 F.3d 1249 (10th Cir. 1998). That case addressed whether agency guidelines promulgated through notice and comment were consistent with the corresponding statute, and therefore addressed an agency action that is very different from that presented here. Specifically, *Biodiversity* involved a provision of the Endangered Species Act that required the Fish and Wildlife Service to act on petitions to list a species as endangered within 90 days of receipt of the petition "to the maximum extent practicable." *Id.* at 1253. The case arose after Congress lifted a temporary moratorium on the Service's listing determinations, leaving the Service with a backlog of petitions to process (and a budgetary shortfall). *Id.* at 1251-52. In response, the Service adopted guidelines, through notice and comment procedures, prioritizing listing determinations based on "the magnitude and immediacy of [the] threat facing" each species. *Id.* at 1251. Applying *Chevron* deference to the Agency's interpretation, the Court concluded that allocation of resources based on the species that were most endangered met the statutory standard. Nevertheless, the Tenth Circuit recognized that the language "'to the maximum extent practicable' *imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible.*" *Biodiversity*, 146 F.3d at 1251 (quoting *Fund for Animals*, 903 F. Supp. at 107) (emphasis added). The circumstances faced by the agency in *Biodiversity* are very

[redacted]

different from those presented here, where the Agency has simply ignored the availability of any commercial or nondevelopmental items, rather than attempting to point to guidelines that try to prioritize the way in which it implements the requirements of § 2377. Indeed, it appears no such formal guidelines exist, even though § 2377(d) requires mandatory training on how to comply with § 2377.[10] 10 U.S.C. §2377(d).[11]

In short, the plain meaning of the phrase "to the maximum extent practicable" does not give the Army an escape clause, but instead emphasizes the importance of the requirements. The Army has made no showing at all that it would have been "impracticable" to comply with § 2377(a) and (b), and therefore its reliance on this phrase in the statute is irrelevant.

### 2. The Clause "Appropriate To The Circumstances" Does Not Give The Agency Discretion To Ignore § 2377(c)'s Requirements.

The Government next argues that it had "discretion" to fashion its market research because § 2377(c)(1) provides that "The head of an agency shall conduct market research *appropriate to the circumstances*. . ." Dkt. 19 at 22 (emphasis added). But the phrase "appropriate to the circumstances" modifies only § 2377(c)(1); it does not modify the mandatory

---

[10] The Department of Defense has released a "Commercial Item Handbook" (*available at* www.acq.osd.mil/dpap/cpic/draftcihandbook08012011.docx), but its provisions are not at issue here. Its limited guidance supports Palantir's interpretation of § 2377, as it states: "Although acquisition personnel have historically engaged in market research, in today's environment, to ensure that high-quality defense solutions are provided to the end-user at a reasonable price, it is necessary to conduct market research in greater depth." Commercial Item Handbook at 18.

[11] The Government asserts that *Hydro Engineering, Inc. v. United States*, 37 Fed. Cl. 448, 474 (1997), reads the "'maximum practicable language'" in § 2377 "as qualifying the agency's obligations." Dkt. 19 at 16. The decision in *Hydro* did not address the meaning of the phrase "to the maximum extent practicable," and it did not address whether § 2377 provides "discretion" or instead an imperative obligation subject to only the narrowest of exceptions. It is therefore not relevant to the issues in this case.

[redacted]

determinations required by § 2377(c)(2). Whatever market research may have been conducted pursuant to § 2377(c)(1) that is "appropriate to the circumstances," § 2377(c)(2) provides that—

> "The head of an agency shall use the results of the market research ***to determine*** whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that—
>
> (A) meet the agency's requirements;
>
> (B) could be modified to meet the agency's requirements;
>
> (C) could meet the agency's requirements if those requirements were modified to a reasonable extent."

10 U.S.C. § 2377(c)(2).

Nothing in § 2377 provides the Army with discretion as to whether it was required to make these three determinations. To the contrary, § 2377(c)(2) unambiguously required the Army to make all three of these determinations. And the Army failed to do so. *See* Section I(B), *infra*. That is why the Army tries so hard to claim these requirements are somehow discretionary. They are not.

The Government asserts that the "statute does not mandate that the market research conducted result in evidence that demonstrates that there is an answer to each of the three questions in every procurement action." Dkt. 19 at 22. But that is exactly what the statute mandates. By providing that the "head of the agency ***shall*** use the results of the market research ***to determine***" the answer to each question, the statute requires the agency to make such a determination. It is not ambiguous, and it does not contain discretion.

Moreover, as we explained in our opening brief, the market research that was conducted in this case was not "appropriate to the circumstances" as required under § 2377(c)(1). Dkt. 14 at 36-38; *see also infra* at Section I(B). The Army's market research assumed from the outset

[redacted]

that the Army would try *to develop* its Data Management Platform and related capabilities, rather than ever considering whether it could meet its requirements by procuring a commercial or nondevelopmental item on a fixed-price basis. Dkt. 14 at 36-38. The Army also ignored the only market research that did examine the availability of commercial items. For example, the DIVA Market Study showed that commercial items *were* available to meet the Army's requirements. *See infra* at Section I(B)(1). Although no particular method of market research is dictated by the statute, the law must at least require the Army to make a good faith effort to gather information about the availability of commercial items that is sufficient to enable the agency to make the determinations required by the statute. *See Associated Milk Producers, Inc. v. United States*, 22 Cl. Ct. 682, 690 (1991) ("the Court must read the statute in a way that effectuates, rather than frustrates, the major purpose of the legislative draftsmen."). The Army did not do that here.

The Government also attempts to justify its assertions by rewriting the law's mandatory language concerning market research (e.g., "shall" and "must") as permissive language ("should" and "may"), as the following table illustrates:

| **The Government says:** | **The Law Says:** |
|---|---|
| "That section [FAR 10.001] provides that the results of the agency's market research ***should*** be used to 'determine if sources capable of satisfying the agency's requirements exist.'" Dkt. 19 at 21 (emphasis added). | "Agencies ***must*** . . . use the results of market research to . . . Determine if sources capable of satisfying the agency's requirements exist." FAR 10.001(a)(3)(i) (emphasis added). |

[redacted]

| The Government says: | The Law Says: |
|---|---|
| "Pursuant to the statute, the determinations that ***may*** be made as a result of the agency's market research include determining whether commercial items or nondevelopmental items 'are available that—(A) meet the agency's requirements; could be modified to meet the agency's requirements; (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." Dkt. 19 at 22 (citing 10 U.S.C. § 2377(c)(2)) (emphasis added). | "The head of an agency ***shall*** use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that—(A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. § 2377(c)(2). |
| "The statute recognizes that market research ***may be*** conducted ***at various points in a procurement***." Dkt. 19 at 20 (citing 10 U.S.C. § 2377(c)(A)&(B) [sic]) (emphasis added) | "The head of an agency ***shall*** conduct market research appropriate to the circumstances—(A) ***before*** developing new specifications for a procurement by that agency; (B) ***before*** soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and (C) ***before*** awarding a task order or delivery order in excess of the simplified acquisition threshold." 10 U.S.C. § 2377(c)(1) (emphasis added). |

The Army argues that its interpretation "is consistent with established procurement principles that a court may accept an agency's concerns *without supporting evidence for those concerns*." Dkt. 19 at 22 (emphasis added). But in support of that assertion, the Army cites two cases that apply only a rational basis review to agency decisions that did not involve clear statutory commands such as those set forth in § 2377. *Id.* (citing *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1370 (2009) and *CHE Consulting, Inc. v. United States,* 552 F.3d 1351, 1355 (Fed. Cir. 2008)). It is well-established that a Court must review the meaning of a statute, and the agency's compliance with a statute, on a *de novo* basis. *See W & D*

[redacted]

*Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 641 (1997) (in a case under its bid protest jurisdiction, "the court applies the review provisions of 5 U.S.C. § 706 . . . [which] states: 'To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law'").[12] Reviewing an agency's compliance with a statute on a *de novo* basis is, by definition, a more exacting judicial review than "rational basis" review. Thus, the Government's argument that it need not have *any* evidence to support its failure to make the determinations required by § 2377(c)(2) is simply wrong. Likewise, its invocation of a "rational basis" review standard cannot justify any of its efforts to sidestep the plain language of § 2377.[13]

### 3. General Procurement Law Principles Do Not Override § 2377's Specific Requirements.

In the opening subsection of its response to Count One, the Government argues that (i) "Procurement law establishes that Federal agencies possess *substantial discretion in both determining their needs and drafting solicitation requirements* to meet them;" (ii) a Court "*may accept the agency's concerns without supporting evidence for those concerns*;" and (iii) agencies also have "*substantial discretion to determine how best to acquire their requirements*." Dkt. 19 at 29-34 (emphasis added).

If accepted, these assertions would effectively nullify § 2377, or at best would convert it into a purely advisory statute. Most of the cases the Government cites in support of its effort to

[12] *See also Sea-Land*, 137 F.3d at 646 ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'") (quoting *Prill*, 755 F.2d at 947); *Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 234 (D.D.C. 2014) ("Questions of law are reviewed *de novo* under the APA as in ordinary cases."); *United Food & Commercial Workers Int'l Union Local 400, AFL-CIO v. NLRB*, 222 F.3d 1030, 1035 (D.C. Cir. 2000); *Wagner v. Nat'l Transp. Safety Bd.*, 86 F.3d 928, 930 (9th Cir. 1996) ("Purely legal questions are reviewed *de novo*.").

[13] Further, as discussed in Section I(A)(3), even under an arbitrary and capricious standard, the agency may not rely on conclusory and unsupported assertions.

[redacted]

nullify § 2377 are cases that analyze claims that agency action was "arbitrary and capricious." They do not involve claims under § 2377 or any analogous statute that sets forth clear commands to take specific actions "to the maximum extent practicable." Nor do they involve claims under a statute that specifically requires an agency to conduct market research and to use that market research to make specific determinations set forth in the statute.

For example, in *Savantage Financial Services, Inc. v. United States*, 595 F.3d 1282 (Fed. Cir. 2010), the protestor did not allege a legal violation, but instead alleged only that the procurement officer's decision lacked a rational basis. *Id.* at 1286. Similarly, in *Weeks Marine,* the court concluded it was not necessary to decide whether the procuring agency violated the procedures of the Engineering Federal Acquisition Regulation Supplement because the protestor "stated at oral argument that the case turns on the question of whether the Corps demonstrated a rational basis for its procurement action," *Weeks Marine*, 575 F.3d at 1371, and because the agency had recently rescinded the regulation. *Id.* The court therefore considered only whether the agency's conduct was supported by a rational basis. *Id.* The same is also true of *CHE Consulting*, which involved "'highly deferential' rational basis review." *CHE Consulting*, 552 F.3d at 1354.

Even in the context of arbitrary and capricious review, courts do not accept conclusory and unsupported statements to justify a challenged decision. *See McDonnell Douglas Corp.*, 375 F.3d at 1186-87 (courts "do not defer to the agency's conclusory or unsupported suppositions"); *Foster v. Mabus*, 103 F. Supp. 3d 95, 109 (D.D.C. 2015) ("at the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a rational connection between the facts found and the choice made; conclusory statements will not do, as an agency's statement must be one of *reasoning*"); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the*

[redacted]

*Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (courts "do not defer to the agency's conclusory or unsupported suppositions"). Relatedly, this Court has held it should apply the "hard-look" doctrine to bid protests. That doctrine requires this Court to give a "hard look" to determine if the agency action was supported by the record and was well-reasoned; this doctrine "*involves verifying that objective elements contained in the agency's analysis . . . correspond to the evidence in the record.*'" *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 338 (2012) (quoting *USFalcon v. United States,* 92 Fed.Cl. 436, 462 (2010) (latter emphasis added) (ellipses in original).

The two cases cited by the Government that address a statutory provision (rather than a purely arbitrary and capricious challenge) provide examples of precisely the type of analyses and determinations the Government should have conducted here to meet its obligations under § 2377, but failed to do. *See* Dkt. 19 at 32 (citing *Tyler Constr. Group v. United States*, 570 F.3d 1329 (Fed. Cir. 2009)); Dkt. 19 at 31 (citing *Geo-Med, LLC v. United States*, 126 Fed. Cl. 440 (2016)). The statute at issue in these two cases required Federal agencies to take various steps "to the maximum extent practicable" to facilitate the ability of small businesses to compete, including by avoiding "unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." *Tyler Constr. Group*, 570 F.3d at 1332 (internal quotation marks omitted); *Geo-Med*, 126 Fed. Cl. at 448. In *Tyler*, a protester challenged a solicitation as violating this provision. 570 F.3d at 1331. While the court ultimately rejected the protest, it did so only after concluding that the Army Corps of Engineers had conducted a "***detailed analysis of the issue***" and conducted "***extensive market research***" and "***demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes.***" *Id.* at 1335 (emphasis

[redacted]

added). Similarly, in *Geo-Med*, the court concluded that the contracting officer had "carefully documented her reasoning," 126 Fed. Cl. at 449, and that the Veterans Administration had "conducted market research and identified a number of small business [sic] that asserted that they could meet the solicitation's requirements," *id.* at 448.

None of the things that the agencies did in *Tyler and Geo-Med* were done by the Army in this case. And nothing in those cases supports the Government's assertion that it is allowed "substantial discretion" in deciding whether and how to comply with its obligations under § 2377, and that it can make judgments not to comply with those requirements "without supporting evidence."

**B. The Army Did Not Make Any Of The Three Determinations Required By § 2377(c) (Count Three).**

The Army was required to "use the results of market research to determine whether there are commercial items or . . . nondevelopmental items" that "(A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. § 2377(c)(2). As shown below, the Army failed to make these determinations.

**1. The Army Failed To Make A Determination As To Whether Commercial Items Are Available To Meet The Army's Requirements, As Required By § 2377(c)(2)(A).**

The Army did not determine whether commercial items are available to meet the Army's needs. With respect to at least six issues having nothing to do with § 2377, the Army did make formal determinations set forth in official pre-Solicitation documents.[14] But the Army did not

[14] *See* Tab 8 ("Determination & Findings" document discussing the Army's use of incentive fees); Tab 45 ("Determination & Findings" document discussing the Army's use of a cost-plus-

[redacted]

produce a "Determination & Findings" document with respect to the three determinations it was required to make under § 2377(c)(2). This shows that the Army simply did not make the determinations required by § 2377(c)(2).

The Army's failure to make the determinations required by § 2377(c)(2) was further confirmed the day after this lawsuit was filed. Faced with the allegation that it had failed to make the determinations required by § 2377(c)(2), the Army executed a July 1, 2016 "Determination" that purports to make one of the determinations required by § 2377(c)(2). But this *ex post* document does not comply with the requirements of § 2377(c)(2), which require these determinations to be made *before* the solicitation is issued. *See* Dkt. 14 at 3-4; 10 U.S.C. §2377(c). By the time it filed its Cross-Motion, the Government appears to have recognized this, and it made no effort to argue that the July 1 Determination satisfied the requirements of § 2377(c).[15]

Unable to identify any document containing any Determination & Findings under § 2377(c)(2), the Government instead suggests that these determination can somehow be found in two sentences of a July 2015 Market Research Report. Those sentences state:

---

fixed-fee contract); Tab 46 ("Determination & Findings" document discussing the Army's use of a single-award IDIQ contract); Tab 47 (Approval Memorandum discussing the Army's use of a contract exceeding five-years); Tab 51 ("Determination & Findings" document discussing the Army's use of options); Tab 52 ("Determinations & Findings" document discussing the use of government furnished property).

[15] Instead, the Government argues that the July 1 Determination was produced to comply with the Fiscal Year 2016 ("FY16") National Defense Authorization Act ("NDAA"), and had nothing to do with § 2377(c). *See* Dkt. 19 at 62; *see also infra* at Section I(B)(5). But this also makes no sense: that the July 1 Determination purportedly was submitted as a *post hoc* response to one statute (FY16 NDAA) instead of another statute (§ 2377(c)) does not make the document any less *post hoc*, as the Government appears to suggest.

[redacted]

[redacted]

Tab 33 at A1840 (cited at Dkt. 19 at 60).[16] This is not a determination as to the three things that § 2377(c)(2) requires. It fails to make a determination on whether commercial items are available that "meet the agency's requirements." Other documents in the Army's market research records show that commercial items were available that could meet the agency's requirement for a Data Management Platform. *See* Tabs 36, 38, 40; Tab 43 at A2230; Tab 41 at A1923; Tab 43 at A2251; Tab 50 at A2363; Tab 94 at A4244; *see also* Section I(B)(1)(b)-(d). Those findings are not addressed in the two conclusory sentences set forth above. Moreover, these two sentences say nothing about whether commercial items "could be modified to meet the agency's requirements" or whether commercial items "could meet the agency's requirements if those requirements were modified to a reasonable extent." 10 U.S.C. §2377(c)(2)(B) & (C). Thus, the July 2015 Market Research Report fails to make any of the three determinations required by § 2377(c)(2).

Nevertheless, these two conclusory sentences are the centerpiece of the Government's brief, which repeats this language, or some variation of it, at least half-a-dozen times. *See, e.g.*, Dkt. 19 at 4, 9, 12, 41-43, 60. But repeating it does not make it true. Nor does repeating it many

[16] The Government also cites the Contracting Officer's and the Deputy Product Manager's declarations. *See* Dkt. 19 at 65. But each of those declarations, which parrot the Market Research Report, were executed on March 17, 2016, one month *after* Palantir filed its GAO protest, *see* Tab 4 at A61, and nearly three months *after* the Solicitation was issued, *see* Tab 20 at A842. Thus, just as the Government submitted its July 1 "determination" document as a *post hoc* response to this lawsuit, it appears to have filed the two declarations as a *post hoc* response to the GAO protest. In any event, the two declarations are substantively wrong for the same reasons the Market Research Report is wrong.

[redacted]

times create a factual basis for concluding that § 2377 has been satisfied. As we show below, these two conclusory sentences find no support in the record; instead, they are contradicted by the record. Moreover, they are demonstrably inaccurate. Thus, even if the quoted language from the Market Research Report were considered to be a formal determination under § 2377(c)(2)(a) (which it is not), that determination should be rejected as having no factual support.

**a. The Army Provides No Basis For Its Conclusory Assertion That No Commercial Items Were Available That Provided Data Fusion, Intelligence Support To Cyber, And DIB Upgrade.**

The July 2015 Market Research Report does not explain *why* or *how* the Army concluded that "significant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB upgrade are not available as a commercial product." Tab 33 at A1840.[17] It does not say whether the Army actually tested any commercial items to determine whether those items could provide the listed capabilities (and there is no evidence in the Administrative Record that the Army did so).[18] The Market Research Report does not say whether the Army asked other Government customers who had procured commercial items to meet similar needs whether those commercial items could provide the identified capabilities (and

[17] The Market Research Report does say who contributed to it: many of the same DCGS-A Program Owners whose bias against commercial items is at issue in this case. *See* Tab 33 at A1792[redacted]

[18] The Army failed to test or evaluate any commercial items *even though its own market research explained the need to do so*. *See* Tab 43 at A2252 ("It is very difficult to appropriately evaluate these architectural considerations from *solely* reviewing technical documentation.") (emphasis in original); *id.* ("The product selection should be based on technical/laboratory/operational evaluations and product track record with other customers.").

[redacted]

there is no evidence in the Administrative Record that the Army did so).[19] The Market Research Report does not say whether the Army asked offerors of commercial items whether (or how) their products could provide those capabilities (and there is no evidence in the Administrative Record that the Army did so).[20]

There is therefore nothing in the record that could even potentially support the Market Research Report's conclusory, unsupported, oft-repeated, and incorrect statement about commercial items' capabilities. That is why the Army is forced to plead that the Court should hold that the Army can make whatever determinations it wants under § 2377(c)(2) "without supporting evidence." Dkt. 19 at 22. But that is not what § 2377 says, and there is no principle of law that can support such an extreme proposition. Any such result would nullify § 2377(c).

[19] One would think that other Government customers' experiences with commercial items—and the Army's *own* experience with half of its brigades—would be a logical starting place for any meaningful market research into the availability of commercial items. *See* § 2377(c)(2). Yet we are aware of nothing in the Administrative Record, and the Government has not cited to anything, which indicates that the Army considered *any* of these real-world experiences as part of its market research.

[20] The Government says a "further breakdown of these capabilities is provided in the DCGS-A Increment 2 COTS capability blocks chart," which is a slide in an October 2015 presentation that appears to have been authored by [redacted] Dkt. 19 at 60 (citing Tab 48 at A2307, A2322). The Government does not claim that this slide provides support for the Market Research Report, nor could it, as the October 2015 slide *post-dates* the July 2015 Market Research Report. *See* Tab 48 at A2307. The slide appears to be a visual representation of the Market Research Report's conclusory statements (though it omits any reference to DIB upgrade and includes other capabilities not mentioned in the Market Research Report). *See* Tab 48 at A2322.

[redacted]

**b. The Record Shows That Palantir's Commercial Product Provides Data Fusion, Intelligence Support To Cyber, And DIB Upgrade.**

**i. The Record Shows Palantir's Commercial Item Provides Data Fusion.**

Data fusion is the process by which particular types of information are identified in a data set and then extracted for easier analysis. Dkt. 16-5 at Exhibit 50, ¶ 25 (Choung Declaration).[21] The Army defines data fusion as a [redacted] Tab 11 at A322. The Army knew, or at least should have known, that the Palantir Gotham Platform, at a minimum, is a commercial item that provides data fusion capabilities.

First, the MITRE Corporation's "Qualitative Assessment" of the Palantir Gotham Platform, which the Army commissioned, concluded that the Palantir Gotham Platform had [redacted] *See* Tab 156 at A7814, A7847.

Second, the Army's *own commercial item contracts with Palantir* demonstrate that the Palantir Gotham Platform has "exceptional" data fusion capabilities. *See e.g.*, Tab 159 (Palantir's Contract with the Army to provide an "Integrated Fusion and Analysis Platform"); *see also* Tab 165 at A8183-84 (CPARs review noting the Palantir Gotham Platform performed

[21] This Motion cites to the previously filed Declaration of Mr. Bryant Choung, dated July 14, 2016. As ordered by the Court, Palantir will provide a revised declaration. We recognize that the Court has not yet admitted any declaration from Mr. Choung into the Administrative Record, but we cite to it here as part of the judicial record for the purpose of providing basic support for the plain meaning of the technical terms set forth above. *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 367 (2009) ("it is appropriate to add evidence pertaining to prejudice and the factors governing injunctive relief to the record in a bid protest—not as a supplement to the AR, but as part of this Court's record"). Even if no declaration from Mr. Choung were ever admitted, these explanations are accurate and should be accepted.

[redacted]

"rapid analysis of massive amounts of data in order to provide their commanders with a comprehensive understanding of the highly complex and dynamic counterinsurgency (COIN) environment" and giving it an "EXCEPTIONAL" rating) (capitals in original).

Third, Palantir contracts with other agencies, including its contract with the Defense Intelligence Agency ("DIA"), required Palantir to perform data fusion on a commercial item basis. The DIA contract expressly required Palantir to "fuse and synthesize" the "big data capabilities . . . across the intelligence community." Tab 164 at A8154. Palantir notified the Army of this contract and other contracts in response to the Army's first Request for Information ("RFI"), and it specifically told the Army that "proven data fusion platforms" were "already in use in the DoD and the IC [i.e., Intelligence Community]." *See* Tab 36 at A1892; *see also id.* at A1887 (listing as an example a Palantir contract with the DIA, "Contract Number: GS-35F-0086U"); Tab 164 at A8137 (DIA contract number "GS-35F-0086U").

Fourth, Commanders in the field submitted Operational Needs Statements ("ONS") which made clear that commercial items can perform data fusion capabilities. [redacted] Tab 139 at A6648-49.[22]

[22] There are even more examples of such requests from Army Commanders in the field showing Palantir's data fusion capabilities that were the subject of our Motion to Supplement the Administrative Record but have not yet been admitted to the record. *See, e.g.*, Dkt. 16-4, Ex. 21 at 4 (noting that the Palantir Gotham Platform [redacted]

[redacted]

The Army does not acknowledge, much less address, *any* of this evidence. Instead, it concludes, without any evidentiary support, that data fusion is simply "not available as a commercial product." The Army cannot explain, and has not even tried to explain, how it could reach such a conclusion in the face of independent reports, its own contracts, other Government contracts, market research responses, and Commanders' requests to the contrary.

**ii. The Record Shows Palantir's Commercial Item Provides Intelligence Support To Cyber.**

"Intelligence Support to Cyber" refers to a Data Management Platform's ability to use cyber-related information in support of cyber-related missions. *See* Dkt. 16-5 at Exhibit 50, ¶ 28 (Choung Declaration). In other words, Intelligence Support to Cyber refers to a Data Management Platform's ability to integrate, visualize, and facilitate analysis of information that can be used to detect and prevent attempted hacks, breaches, and other cybersecurity threats. *See, e.g.,* Tab 22 at A1073 (explaining that Intelligence Support to Cyber refers to a Data Management Platform's ability to "ingest, manage[], and access" data to support both offensive and defensive cyber operations). The Army defines it as the ability to provide "cyber data ingest, management, and access to support the Cyber Electromagnetic (CEM) Cell in both Defensive Cyber Operations (DCO) and Offensive Cyber Operations (OCO)." Tab 11 at A279. The Palantir Gotham Platform can provide Intelligence Support to Cyber because it can integrate, visualize, and facilitate analysis of cyber-related information, just as it can integrate, visualize, and facilitate analysis of other types of information. *See* Dkt. 16-5 at Exhibit 50, ¶¶ 28-30 (Choung Declaration). The Army knew this: Palantir has had a contract with Army Cyber command for several years whereby Palantir provides direct intelligence support to Cyber workflows, *id.* at ¶ 30, and the Army-commissioned MITRE Corporation assessment [redacted]

[redacted]

[redacted] Tab 156 at A7851. Again, the Army did not address any of this evidence. Instead, it concludes without any support or explanation that commercial items simply cannot provide Intelligence Support to Cyber capabilities.

**iii. The Record Shows Palantir's Commercial Item Provides DIB Upgrade Capabilities.**

"DIB upgrade" refers to a Data Management Platform's ability to integrate with the DCGS-A Integration Backbone ("DIB"), which is the government-owned software baseline created through the fifteen year DCGS-A1 effort. Dkt. 16-5 at Exhibit 50, ¶ 31 (Choung Declaration). As the Army put it: "DCGS-A shall comply with the DCGS Integration Backbone (DIB) interoperability standards." Tab 11 at A270; *see also id.* at A273. The Army knew or should have known that a commercially available Data Management Platform can provide DIB upgrade (i.e., is interoperable with the DIB). First, the Army has tested and certified the Palantir Gotham Platform as conformant to the specifications set by the DIB Management Office. *See* Dkt. 16-5 at Exhibit 50, ¶ 33 (Choung Declaration). Second, Palantir's RFI response specifically discussed DIB connection capabilities. *See* Tab 36 at A1891, 1893. Third, the MITRE assessment concluded [redacted] Tab 156 at A7814. Fourth, Palantir's contracts demonstrate that Palantir can provide DIB upgrade on a commercial item basis. *See, e.g.*, Tab 167 at A8270-71 (Special Operations Command contract procuring the Palantir Gotham Platform and specifying that the Platform shall be used to "enable all customer data in the system to be discoverable through DoD standard query interfaces (DIB and CDR)" and that the Platform's "Data structure shall support evolving

[redacted]

DIB standards and upgrade to new DIB versions within 1 year of adoption by the DMO").[23] Again, the Army did not address any of this evidence, stating in wholly conclusory fashion that commercial items cannot provide DIB upgrade.

**c. The Government Misrepresents Palantir's Feedback On The Draft Solicitation And Its Response To The Second RFI.**

The Government tries to excuse the Army's failure to comply with § 2377(c) by blaming what it describes as "Palantir's refusal to participate" in the market research process. Dkt. 19 at 69. This is a remarkable accusation. Palantir submitted a response to the first RFI. *See* Tab 36. Palantir submitted a response to the second RFI. *See* Tab 38. Palantir submitted a response to the third RFI. *See* Tab 40. Palantir provided feedback on the draft Solicitation. *See* Tab 18. Palantir provided feedback on the draft Performance Work Statement for Task Order 0001. *See* Tab 15. Palantir hand-delivered a letter to Assistant Secretary Heidi Shyu that provided detailed support for a series of concerns about the Army's DCGS-A procurement decisions. *See* Tab 149.[24] Palantir attended and participated in multiple Industry Days. *See* Tab 15 at A698. Overall, Palantir provided the Army nearly 60 pages of single-spaced written feedback, telling the Army time and again that *commercial items were available to meet the Army's needs*. *See* Dkt. 14 at 19-21 (itemizing Palantir's substantial responses to the Army's market research

[23] While this contract was entered into after the market research was performed, it further rebuts the conclusory assertion made by the procuring agency about Palantir's capabilities with respect to the DIB. *See Afghan Am. Army Services Corp. v. United States*, 106 Fed. Cl. 714, 724 (Fed. Cl. 2012), *as supplemented,* 106 Fed. Cl. 751 (Fed. Cl. 2012).

[24] Palantir included this letter in its Motion to Supplement the Record. *See* Dkt. 16-3 at 5. The Government initially said that it could not locate the letter and refused to include it in the Administrative Record. The Court instructed the Government to look again. Only then did the Government locate the letter and add it to the Administrative Record. *See* Dkt. 23.

[redacted]

inquiries);[25] For the Government to state that Palantir *refused* to participate in the market research process is simply not accurate. It is also inaccurate for the Government to contend that Palantir's submissions to the Army somehow support the Army's conclusion that commercial items cannot fulfill the Army's needs—that is the opposite of what Palantir's submissions demonstrate.

First, citing Palantir's comments on the draft Solicitation, the Government asserts "Apparently Palantir believed that the Government's requirements [for Data Fusion, Intelligence Support to Cyber, and DIB upgrade] were unnecessary or was not willing to meet such requirements." Dkt. 19 at 55. That is not accurate. Palantir told the Army that there were *better ways* to procure the desired capabilities, including through the procurement of commercial items. Specifically, with respect to Data Fusion, Palantir informed the Army that its requirements for a Data Management Platform "should include the requirements that the platform be able to exploit and use various automatic entity extraction [i.e., Data Fusion] capabilities." Tab 15 at A694 (emphasis added). With respect to Intelligence Support to Cyber, Palantir said, [redacted]

[25] The Army's Statement of the Facts omits any discussion of the third RFI, in which the Army continued to ignore Palantir's feedback about the availability of commercial items and continued to exclusively ask potential bidders about their software development capabilities. *See* Tab 39 at A1912. Palantir responded to that RFI, as it had responded to the first and second RFIs, by expressing its concern that the Army was intent on issuing an expensive, risky, and unlawful cost-plus development contract. *See* Tab 40 at A1918. The Army's failure to address Palantir's third RFI response is unsurprising. This response highlighted the fact that the Army structured the Solicitation to exclude commercial items, Tab 40 at A1918-19, and it further undercuts the Army's supposed conclusion that a commercial item could not satisfy the requirements of DCGS-A2, *id.* at A1919-22.

[redacted]

[redacted] *Id.* (emphasis added). With respect to DIB upgrade, Palantir explained that "DIB should be treated as an interoperability standard" that applies to the Data Management Platform. *Id.* Thus, Palantir did not say that it was unwilling or unable to satisfy the Army's requirements; it merely told the Army that these requirements could be obtained more efficiently through the procurement of a Data Management Platform as a commercial item. *See* Tab 15 at A694.

Second, the Government argues that Palantir "declined to answer" a question in the Army's second RFI, but the Government misstates both the question asked and the answer given. *See* Dkt. 19 at 39, 69. As it did in its Motion to Dismiss, the Government says the Army asked prospective bidders to "complete a chart identifying their capabilities across the different DCGS-A domains." *Id.* at 68; *see also* Dkt. 13 at 12. That is not what the Army requested. Rather, it asked prospective bidders for which "Agency or Gov't Customer"—including procurement "contract number"—they had certain experience within "the last three (3) years." Tab 37 at A1904. Palantir had *already provided* the Army with information about its prior Government contracts. *See, e.g.* Tab 36 at A1886-88 (Palantir's first RFI response listing contracts). There was no reason to do so again.

By contrast, there was a pressing need to address the fact that this RFI, like the prior RFI, was inquiring only into potential bidders' experience "managing software *development projects*," and not into their ability to provide commercial items. Tab 37 at A1900, 1904; *see also* Dkt. 20 at 25-26. Thus, Palantir responded to this RFI by telling the Army that *commercial items were available on a fixed-price basis to meet the Army's needs*. *See* Tab 38 at A1910 ("We believe the acquisition of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities."); *see*

[redacted]

*also* Tab 36 at A1894-95 (noting that commercial items already exist that provide the requirements for the "Core Intelligence Platform" including "Data Fusion," "Data Analytics," "Data Visualization," "Data Sharing," "Data Management," and "Data Integration"); *id.* at A1897-99 (noting that [redacted] Yet the Army would have this Court believe that Palantir's response to this RFI somehow supports the Army's conclusion that commercial items are *not* available to meet the Army's needs. *See* Dkt. 19 at 69.

**2. The Army Failed To Make A Determination As To Whether Commercial Items Could Be Modified To Meet Its Requirements, As Required By § 2377(c)(2)(B).**

The Government makes no effort to point to any document that predates the Solicitation and that satisfies the requirement in § 2377(c)(2)(B) to make a determination as to whether commercial items "could be modified to meet the agency's requirements." No such document exists because no such determination was ever made. The July 2015 Market Research Report says nothing at all about modifications to commercial items. *See* Tab 33 at A1840. It does not even have the kind of conclusory assertion on which the Government relies in trying to show compliance with § 2377(c)(2)(A). There is literally nothing that predates the Solicitation that even vaguely suggests the Army made any effort at all to consider, let alone make a determination, whether commercial items "could be modified to meet the agency's requirements." The Army therefore failed to comply with § 2377(c)(2)(B).

[redacted]

The Government's only effort to show compliance with § 2377(c)(2)(B) is to cite exclusively to documents that were created after the Solicitation was issued, and *after* Palantir initiated its protest. *See* Dkt. 19 at 65-66 (citing the Contracting Officer's declaration submitted in the GAO protest, the Deputy Product Manager's declaration submitted in the GAO protest, and the July 1, 2016 "Determination"). These *ex post* justifications should be given little or no weight in determining whether the Army did what § 2377(c)(2)(B) required it to do *before* issuing the Solicitation.[26]

Even if those *ex post* documents were considered to be purported "determinations" under § 2377(c)(2)(B), they still failed to answer the question posed by the statute: they merely state that there are no commercial items that can meet the government's requirement "through ***minor*** modifications." Tab 2 at A56 (emphasis added); Tab 3 at A59 (same use of "minor"); Tab 134 at A6626-27 (same use of "minor"). Section 2377(c)(2)(B) does not require the Army to determine whether commercial items could meet its requirements through "***minor*** modifications." It requires the Army to determine whether commercial items "could be modified to meet the agency's requirements." 10 U.S.C. § 2377(c)(2)(B). The word "minor" cannot be found in the

---

[26] *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (cautioning courts against allowing post hoc rationalization to explain agency's action); *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413, 424 (2015) ("in the court's experience, declarations from the contracting officer and other agency officials may proffer, in many cases, post-hoc rationalization and argument rather than a fact-driven explanation of the agency's decision-making process."); *Ceres Envtl. Servs., Inc. v. United States*, 52 Fed. Cl. 23, 31 (2002) ("the balance of the documents are post hoc rationalizations for the CO's determination, having been created after the solicitation was issued" and hence are accorded little or no weight); *Informatics Corp. v. United States,* 40 Fed. Cl. 508, 519 (1998) (determining that defendant's justifications for agency decision amounted to post hoc rationalizations); *ATA Defense Indus., Inc. v. United States,* 38 Fed. Cl. 489, 502 (1997) (determining that defendant's argument was a post hoc rationalization by government counsel that did not represent any decision actually made by contracting officer).

[redacted]

statute. Nor can it be found in any of the statute's implementing regulations. FAR 10.000-10.003. Thus, the Army's failure to comply with § 2377(c)(2)(B) is confirmed by the fact that it tries to demonstrate compliance through conclusory assertions made in *ex post* documents that rely on an altered and diluted version of what the statute requires.

The Government therefore resorts to the argument that the statute does not really matter, stating: "Whether the Palantir platform itself could possibly be modified and thereby meet all of the Army's requirements is *not significant in the context of this procurement*." Dkt. 19 at 67 (emphasis added). That view is irreconcilable with the plain text of § 2377(c)(2)(B), which states that the Army "shall" determine whether commercial items "could be modified to meet the agency's requirements." Once again, the Army's failure to comply with the statute is revealed by its effort to turn the statute into a dead letter.

The Army's position is also irreconcilable with the facts in the record, which demonstrate that (a) a commercially available Data Management Platform could meet all of the Army's requirements for a Data Management Platform, *see infra* Section I(D)(2); (b) Palantir could also provide all of the Additional Enhancements on a fixed-price, commercial item basis, *see infra* Section I(C); and (c) Palantir's commercial item has been repeatedly ordered and used by other military and intelligence agencies to satisfy the same requirements the Army has, and any "modifications" that may be required to meet a specific customer's needs are routinely made, *see id.*; *see also* Dkt. 16-5 at Exhibit 50, ¶¶ 12-15 (Choung Declaration); Tab 36 at A1889-90; Tabs 158-167. In short, the record shows that Palantir has a commercial item that meets the Army's requirements even without modification. But even if there could somehow be doubt about that proposition, there is nothing at all in the record that could cause any doubt that Palantir's

[redacted]

commercial product "could be modified" so as to ensure with certainty that it completely meets all of the Army's requirements.

### 3. The Army Failed To Make A Determination As To Whether Commercial Items Are Available That Could Meet The Agency's Requirements If Those Requirements Were Modified To A Reasonable Extent, As Required By § 2377(c)(2)(C).

The Government argues, "Regarding the question whether the commercial items that are available 'could meet the agency's requirements if those requirements were modified to a reasonable extent, 10 U.S.C. § 2377(c)(2)(C), the Army answered that question." Dkt. 19 at 66. But instead of identifying for the Court *where* in the record that determination can be found or even *what* that determination purportedly was, the Government immediately pivots to an excuse as to why it did *not* actually make the determination, stating that modifications to the Army's requirements "can only be instituted by the Vice Chief of Staff for the Army and then the process still takes time; the DCGS-A Project Manager has no power to directly change the requirements." *Id.* at 66-67. This is irrelevant. The need to obtain internal approvals to comply with § 2377's mandates could not possibly be an excuse for refusing to comply with those mandates.[27] Besides, § 2377(c) imposes requirements on "the head of an agency," language which contemplates action at levels *above* the Vice Chief of Staff for the Army.

---

[27] Moreover, the Government does not cite to anything in the law or in the record which provides any support for the proposition that the Army's requirements can only be modified with the Vice Chief of Staff's approval. Insofar as the Government is arguing that its internal bureaucracy and approval process are such an impediment as to render the Army unable to comply with § 2377(b)(3) & (c)(2)(B), then the Government would be admitting a violation of § 2377(b)(5), which requires agencies to "revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items."

[redacted]

The Army also argues: "Further, the DCGS-A Increment 2 requirements do not fit the definition of a commercial item in FAR 2.101, whether it is considered a software suite or a service, or both. The DCGS-A Increment 2 requirements are not for 'installation services, maintenance services, repair services, training services, and other services or other services' within the meaning of the definition of commercial item in FAR 2.101." *Id.* at 67.[28] This is circular. The Army is arguing that it could not acquire a commercial item to meet the requirements of DCGS-A2 because the requirements of DCGS-A2 were for a developmental item, not a commercial item. If that argument works, no agency will ever have to comply with § 2377. The agency just needs to assert that it needs to procure a developmental item, and that is the end of the matter. Again, this would make § 2377 a dead letter.

**4. The Army Did Not Make Any Of The Determinations Required By § 2377(c)(2) With Respect To The Availability Of Nondevelopmental Items.**

The Army does not identify any determination with respect to the availability of "nondevelopmental" items. Neither the Market Research Report (which is not a formal Determination & Findings document anyway) nor the July 1 Determination (which post-dates both the Solicitation and this lawsuit) says anything about whether nondevelopmental items (or modified nondevelopmental items) are available to meet the Army's requirements (or modified requirements). *See* Tab 33 at A1840; Tab 134 at A6626. The Army does not even argue that it made a determination regarding the availability of "nondevelopmental" items.

[28] As with other aspects of the Government's brief, this language, along with the language about the Vice Chief of Staff's approval, appears to have been copied verbatim from the Contracting Officer's Statement. *See* Tab 1 at A27.

[redacted]

The failure of the Army to make any determinations regarding a nondevelopmental item is important. A nondevelopmental item includes "(1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement," (2) any such item "that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency," or (3) any item "being produced that does not meet the requirements of paragraphs (1) or (2) solely because the item is not yet in use." *See* FAR 2.101.

**5. The July 1 Determination Does Not Cure The Army's Failure To Comply With § 2377(c).**

The Army does not argue that the July 1 Determination satisfies its obligations under § 2377(c) or even that the document was intended to do so. *See* Dkt. 19 at 11-12 (explaining that the July 1 Determination was prepared to respond to Palantir's allegations relating to FY16 NDAA, *not* § 2377(c)). The Government has therefore waived any argument that it complied with § 2377(c) by issuing the July 1 Determination. Regardless, any such argument would have to be rejected on the merits, as *post hoc* agency rationalizations of this nature are entitled to little if any weight. *See* Dkt. 14 at 36. Moreover, the July 1 Determination suffers from the same procedural and substantive defects as the Market Research Report: it fails to address several questions under § 2377(c) and the one answer it purports to provide is based on no evidence, no analysis, and no explanation—and, it is demonstrably wrong. *See* Tab 134 at A6626.[29]

[29] The July 1 Determination repeats the same language from the Market Research Report about Data Fusion, Intelligence Support to Cyber, and DIB upgrade that is quoted in Section I(B)(1) above. It also asserts that commercial items cannot provide certain capabilities relating to Signals Intelligence, Human Intelligence, Military Weather, and Interoperability. *See* Tab 134 at

[redacted]

The Government argues that the July 1 Determination was intended to satisfy the Army's requirements under FY16 NDAA, but that argument is without merit, too.[30] First, the fact that the Government submitted the July 1 Determination at such a late stage, and only in response to this litigation, demonstrates that the document is a *post hoc* rationalization for the Solicitation. Second, as explained above, the July 1 Determination is both incomplete and inaccurate.

The Government resorts to arguing that FY16 NDAA does not apply at all because FY16 NDAA applied to the acquisition of "information technology products or services." According to the Government, "the DCGS-A Increment 2 procurement is not for the acquisition of 'information technology products or services,'" which the Government interprets to mean, without any citation, "help desk support and similar activities." *See* Dkt. 19 at 63-64. That assertion flies in the face of both common sense and the Army's own documents. *See, e.g.*, Tab 11 at A253 (designating DCGS-A as a "Major Information Technology Program");[31] Tab 6 at A103 (describing DCGS-A as a "major automated information system"); Defense Acquisition Guidebook at 134 (2013) (*available at* https://acc.dau.mil/docs/dag_pdf/dag_ch7.pdf)

---

A6626. These additional conclusions are not supported by any analysis or evidence, and they are not accurate. *See* Dkt. 16-5 at Exhibit 50, ¶ 21 (Choung Declaration).

[30] FY16 NDAA provides, *inter alia*, that the head of an agency may not enter into a contract in excess of the simplified acquisition threshold for information technology products or services that are not commercial items unless the head of head of the agency determines in writing that no commercial items are suitable to meet the agency's needs. P.L. 114-92, § 855, 129 Stat. 919.

[31] This designation remains current. *See* Defense Acquisition Portal, Information Technology and Automated Information Systems (available at https://dap.dau.mil/gateways/ma/Pages/InformationTechnology.aspx (last accessed July 22, 2016) (identifying DCGS-A as one of 35 "Major Information Technology Programs").

[redacted]

(explaining that acquiring a major automated information system is acquiring information technology).[32]

**C. The Army Violated § 2377(a) & (b) When It When It Failed To Issue A Solicitation That Allowed Commercial Items To Be Offered To Fulfill The Entirety Of Its DCGS-A2 Requirements On A Fixed-Price, Commercial Item Basis (Count Two).**

Palantir told the Army that it could satisfy the entirety of the Army's needs on a commercial item basis, as it has done for the United States Marine Corps, the Defense Intelligence Agency, the United States Immigration and Customs Enforcement, the Special Operations Command, and half of the Army's own brigades. *See* Dkt. 16-5 at Exhibit 50, ¶15 (Choung Declaration); Tab 15 at A689; Tab 36 at A1886-88; Tab 158 at A7916-17. But the Army ignored that feedback, and the Government continues to ignore it to this day, incorrectly stating in its brief that the "administrative record does not demonstrate that Palantir, or another possible offeror, could or would propose a solution to all of the Army's requirements through the acquisition of only available commercial or nondevelopmental items." Dkt. 19 at 55. The Army never explains why a commercial item procurement approach that was good enough for other Government customers is not good enough for the Army. At the very least, the law requires the Army to address that question; instead, the Army ignores it altogether.

---

[32] The Government also suggests that DCGS-A cannot be "information technology" because it is a "national security system." That is wrong. The Department of Defense has expressly defined "information technology" to include "national security systems." *See* Defense Acquisition Portal, Information Technology and Automated Information Systems (available at https://dap.dau. mil/gateways/ma/Pages/InformationTechnology.aspx (last accessed July 22, 2016) (citing Chairman of the Joint Chiefs of Staff Instruction 6212). An information technology system does not cease to be an information technology system just because it is used for national security. And the FY16 NDAA (a "National Defense Authorization Act," after all) was obviously was intended to apply to information technology used in national security systems.

[redacted]

Had the Army structured its Solicitation so as to encourage (instead of preclude) bids from offerors of commercial items, Palantir would have offered to provide its Data Management Platform as a commercial item, and it would have offered to provide any Additional Enhancements necessary to configure that Data Management Platform to meet the Army's specific needs. *See* Dkt. 16-5 at Exhibit 50, ¶17 (Choung Declaration); Tab 18 at A713; Tab 36 at A1886-89; Tab 158 at A7916-17. The Army violated § 2377(a) & (b) when it refused to define its requirements to allow for such bids.

**D. The Army Violated § 2377(a) & (b) When It Bundled Together The Procurement Of The Data Management Platform With The Procurement Of The Additional Enhancements (Count One).**

Even if the Army could not procure the entirety of its requirements as a commercial item, it at least could have defined its requirements to procure a Data Management Platform, which is the heart of DCGS-A2, as a commercial item. *See* Dkt. 14 at 32-35. The Government offers three arguments as to why it did not do this. None of these arguments withstands scrutiny.

**1. The Data Management Platform Is The "Heart" Of DCGS-A2.**

The Government says that "The 'heart' of Increment 2 is not only a Data Management Platform, as Palantir argues." Dkt. 19 at 36. According to the Government, Palantir "highlights the Data Management Platform, and ignores other components," namely the "Data Integration Layer," the "Data Access Layer," and "glue code." *Id.* at 43; 36-37. The Army is playing word games here. The Army itself admits that the "Data Integration Layer" and the "Data Access Layer" (also known as the "Data Analytics Platform") "*together make up the Data Management Architecture* (DMA)." Tab 1 at A16. As we explained in our opening brief, "Data Management Architecture" is another term for "Data Management Platform." *See* Dkt. 14 at 15. The Government never disputes this. The Government also never disputes that the Palantir Gotham

[redacted]

Platform is a commercial item that performs the functions of a "Data Integration Layer," a "Data Access Layer," and a "Data Analytics Platform" (among other things). Thus, the Government does not (and cannot) dispute that the Palantir Gotham Platform is a commercial item that provides all the functions of a Data Management Platform—whether called by that name or by the name "Data Management Architecture." And the Government admits that the Data Management Architecture "will serve as the *architecture foundation and the heart* with which the rest of the capabilities will depend on to function." Dkt. 19 at 36 (citing Tab 1 at A17) (emphasis added).

With respect to "glue code," much of the Government's argument becomes irrelevant if the Army acquires a Data Management Platform as an already developed commercial item—since there is then no need to "glue" different components together to develop a Data Management Platform. In any event, the key functionality of "glue code" is the ability of the Data Management Platform to be interoperable with other systems, including any Additional Enhancements the Government may procure. *See* Tab 1 at A22; Tab 2 at A57; Tab 36 at A1886. The record shows that the Palantir Gotham Platform has a high level of interoperability, and thus performs the functions of "glue code" needed by the Government. *See, e.g.*, Tab 156 at A7814. Finally, even if the Army for some reason needed to procure different "glue code" from someone other than Palantir, that does not explain or justify the Army's decision not to even consider meeting its need for a Data Management Platform with Palantir's commercial item (i.e., the Palantir Gotham Platform).

[redacted]

### 2. The DIVA Market Study And Other Documents In The Record Show That At Least One Commercial Item Was Available To Meet The Army's Requirement For A Data Management Platform.

The Government says, [redacted] Dkt. 19 at 45 (citing Tab 43 at A2254). The Government does not actually quote any language in the DIVA Market Study for the stated proposition, nor could it, because *that is not what the study says.*[33] The DIVA Market Study [redacted]

First, throughout its brief, the Government appears to conflate the term "commercial item" with the term "commercial off-the-shelf" (or "COTS") item. COTS items are a *subset* of commercial items. A COTS item is, as its name implies, a commercial item that is sold in substantial quantities in the commercial market place—i.e., a mass-produced product that can be offered to the Government on an "off-the-shelf" basis. *See* FAR 2.101. By contrast, a "commercial item" includes more than just mass-produced, identical products that qualify as COTS items. *See id.* (defining "commercial item" to include items sold to the general public whether they typically require customer-specific modifications or not). By definition, when §§ 2377(b)(3) & (c)(2)(B) direct the Army to consider modifications to "commercial items," those directives apply to all "commercial items," including those that are not mass-produced but instead are typically subject to some level of customization or customer-specific

---

33 [redacted] *See* Dkt. 19 at 45 (citing Tab 43 at A2254). Later in its brief, the Government cites to a different page for the same proposition, but that page does not support the Government's position, either, because it discusses commercial *cloud infrastructures*, not commercial Data Management Platforms. *See id.* at 47 (citing Tab 43 at 2249).

[redacted]

configuration. Section 2377 does not even refer to "commercial-off-the-shelf" or "COTS" items, and it certainly does not limit any of its requirements to such items. as the Government appears to suggest.

Second, the DIVA Market Study demonstrates that even COTS Data Management Platforms are available to meet the Army's needs. The DIVA Market Study's proposed implementation approach involves three steps: [redacted] Tab 41 at A1924 (emphasis in original).[34] The DIVA Market Study explains that a [redacted] Tab 43 at A2251 (first emphasis added). Though it generally misstates the DIVA Market Study's findings, the Government does at least concede that [redacted] Dkt. 19 at 45.

Meanwhile, the Government does not even attempt to address key language from the DIVA Study, the Information Paper, or other documents that Palantir quoted in its opening brief and that indisputably show that it was possible for the Army to procure a Data Management Platform as a commercial item. Among other things, these documents say:

---

[34] The DIVA Study [redacted] *See* Dkt. 14 at 11 n.6 [redacted]

[redacted]

> [redacted] Tab 50 at A2363 (emphasis added).

> [redacted] Tab 43 at A2230 (emphasis added).

> [redacted] Tab 94 at A4244 (emphasis added).

> [redacted] Tab 41 at A1923 (first emphasis added).

> [redacted] Tab 43 at A2251 (emphasis added).

*See also* Dkt. 14 at 21-27. These documents stand for the undeniable proposition that a Data Management Platform can be acquired as a commercial item.[35]

**3. The Record Shows That Procuring The Data Management Platform As A Commercial Item Would Diminish, Not Increase, The Risk Of A "Glue Code" Problem Caused By The Government's Flawed Developmental Approach.**

Finally, the Government argues that "the acquisition approach favored by Palantir would increase risk due to splitting of developmental work of a highly complex nature." Dkt. 19 at 34.

[35] The Government also misreads the Trade Space Analysis, which [redacted] Tab 42 at A1946, A1976-77.

[redacted]

That is wrong: Palantir does not advocate for "splitting developmental work" at all; the point of this case is that developmental work is unnecessary because commercial items are available. The Government's argument about the risks of hiring multiple software developers is based on a misreading of the record, and it is irrelevant to the issue of whether the Army could have defined its requirements to procure commercial items.

The Administrative Record shows that the Army could have fully (and more rationally) satisfied all of its requirements by structuring the DCGS-A2 procurement in two releases using two different contractual procurements: acquiring a Data Management Platform as a commercial item in one release and acquiring Additional Enhancements in the other release. *See* Dkt. 14 at 21-26. The Army does not dispute that a two release approach is appropriate. *See* Dkt. 19 at 43 ("We agree that there will be at least two software Releases for DCGS-A Increment 2."). Nor could the Government dispute this, as the Administrative Record overwhelmingly demonstrates the propriety of a two-release approach, with the first release focused on the Data Management Platform.[36] The Army's Acquisition Strategy even recommends "utilizing multiple contract methods" for the two releases. *See* Tab 6 at A106-07.[37] Thus, under Count One, there is no

---

[36] *See* Dkt. 14 at 26 (citing Tab 6 at A105, Tab 33 at A1841-42, Tab 71 at A2748, Tab 73 at A3075, Tab 87 at A3883-84).

[37] The cover memorandum accompanying the Acquisition Strategy Report states: [redacted] Tab 6 at A93. The Acquisition Strategy Report itself reiterates this approach. *See* Tab 6 at A106-07 [redacted]

[redacted]

question as to whether two releases are appropriate; the only dispute is whether the first release should procure the Data Management Platform as a commercial item or instead should procure it by commissioning another cost-plus developmental project. Section 2377 unequivocally requires the Army to procure the Data Management Platform as a commercial item to "the maximum extent practical." And the Government's own documents admit that the Palantir Gotham Platform is a commercial item that satisfies its requirements for a Data Management Platform. *See* Tab 41 at A1923; Tab 43 at A2230, A2251; Tab 50 at A2363; Tab 94 at A4244. Thus, the Government violated § 2377 by issuing a Solicitation that failed to seek to procure a Data Management Platform as a commercial item—and that even made it impossible for Palantir to submit a bid offering its commercial item.

The Government responds by citing an October 21, 2015 "Determination & Findings" document signed by Assistant Secretary [redacted] *See* Dkt. 19 at 5-6 (citing Tab 46); *id.* at 28 (citing Tab 46). The Army cites this document for the proposition that "the choice of having a single contractor serve as the system integrator in charge of developing and selecting components and making sure that they can be successfully integrated reduces technical risks, schedule risks, and cost uncertainty." *Id.* at 28.

However, a careful reading of the Determination & Findings document shows that it is referring to the risks of having *multiple vendors develop the Data Management Platform*, not the risks of having *multiple procurements for the entirety of DCGS-A2*. In other words, the document explains that a single entity should deliver the Data Management Platform (a proposition with which Palantir agrees); it does not say *anything* about the risks of acquiring the Data Management Platform in one procurement and the Additional Enhancements in another

[redacted]

procurement. The entirety of the relevant language, the first two sentences of which were omitted from the Government's brief, states as follows:

[redacted]

Tab 46 at A2299 (emphasis added). Thus, the point of this document is to explain why it makes sense to have one contractor deliver the Data Management Platform.[38] But the question in this case is not whether one contractor or multiple contractors should deliver the Data Management Platform; the question is whether the Data Management Platform should be delivered as a

[38] As we explained in the Complaint, one of the reasons the Army failed to acquire a functioning Data Management Platform in the first place was its design-by-committee approach in DCGS-A1. Dkt. 1 at ¶¶ 44-48. The Army is correct that having one entity develop a Data Management Platform is preferable to having many entities develop the Data Management Platform, but the Army is wrong that having one entity develop the Data Management Platform is preferable to having one entity provide the Data Management Platform as a commercial item, and that latter point is at issue in this case.

[redacted]

developmental effort or as a commercial item. The Determination & Findings document does not address that issue because it assumes a development project.

Moreover, the Government's argument seeks to outsource its obligations under § 2377 to a private contractor (or systems integrator). But those obligations cannot be delegated because the statute applies to the agency. Regardless, the Government does not even argue that a private contractor would be bound to follow § 2377's requirements, so the Government's "outsourcing" approach would essentially nullify the statute.

Even if it were necessary, from a technical standpoint, to hire one contractor (or systems integrator) to perform the entirety of DCGS-A2's requirements, the Government has not explained why that contractor cannot be an offeror of commercial items who would provide the needed capabilities on a fixed-price basis, as Palantir would have offered to do. *See supra* at Section I(C). And even if it were somehow necessary to hire one development contractor to oversee the integration of DCGS-A2's various components, that still would not relieve the Army of its legal obligation to procure commercial items to fulfill its needs to the greatest extent practicable by, for example, procuring the underlying components as commercial items. The bottom line is that the Army has not explained why it needs to develop a Data Management Platform—the heart of DCGS-A2—when it can instead purchase one as a commercial item.

## II. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIMS UNDER ADDITIONAL STATUTES AND REGULATIONS (COUNTS FOUR, FIVE, AND SIX).

### A. The Army Violated 48 C.F.R § 16.301-2(a) By Soliciting A Cost-Plus Contract Instead Of A Fixed-Price Contract (Count Four).

Addressing FAR 16.301-2, the Government argues that because it allegedly could not meet *all* its requirements through commercial and nondevelopmental items, it had no obligation

[redacted]

to use a firm-fixed price contract. *See* Dkt. 19 at 70. As discussed above, commercial items *were* available to meet all of the Army's needs in this case, and § 2377 establishes a preference for commercial or nondevelopmental items *even if* those items do not meet each and every one of its needs. *See supra* Section I(A)(2). The Government also argues that it has "broad discretion" to structure this acquisition in any way it chooses and points to market research and Ms. Shyu's October 21, 2015 Determination and Findings as justifying the use of a cost-plus contract. *See* Dkt. 19 at 70-71. This argument fails because FAR Part 16, including 48 C.F.R § 16.301-2(a), expressly circumscribes the Army's discretion to solicit goods and services using cost-reimbursement contracts, and because the Army never makes the determinations necessary to justify use of this type of contract.

Although the Government insists that "The FAR does not establish a preference for fixed-price contracts or disfavor cost-reimbursement contracts," *id.* at 70, the FAR embodies a clear preference for the use of firm-fixed price contracts over cost-reimbursement contracts. The FAR imposes specific requirements for a contract "other than a firm-fixed price contract," including that an agency make detailed findings to justify its choice to use this type of contract. 48 C.F.R § 16.103(d)(1). These findings must include a "discussion of the actions planned to minimize the use of other than firm-fixed-price contracts on future acquisitions for the same requirement and to transition to firm-fixed-price contracts to the maximum extent practicable." FAR 16.103(d)(1)(iv), 48 C.F.R § 16.103(d)(1)(iv). Furthermore, in determining the appropriate contract type, the FAR instructs that "If the entire contract cannot be firm-fixed-price, the contracting officer shall consider whether or not a portion of the contract can be established on a firm-fixed-price basis." FAR 16.104(e), 48 C.F.R § 16.104(e). The FAR indicates that a cost-reimbursement contract may only be used in limited circumstances. Even then, the agency must

[redacted]

consider how it will transition from a cost-plus contract to a firm-fixed price contract for the same requirements and if portions of the contract can be performed on a firm-fixed price basis.

Additionally, FAR 16.301-2(a) allows an agency to use a cost-plus contract "*only*" when certain conditions are met, namely that (1) the agency cannot "define its requirements sufficiently to allow for a firm-fixed price contract" or (2) the uncertainty of performance does not allow the agency to estimate its costs "with sufficient accuracy to use any type of fixed-price contract." FAR 16.301-2, 48 C.F.R § 16.301-2.[39] As a corollary, FAR 16.301-2 does not permit an agency to use a cost-reimbursement contract if it can define its requirements to allow for a fixed-price contract or if there is little uncertainty involved in contract performance.

The Army claims that the "market research makes clear that a fixed-price contract was not a viable contract type for this procurement." Dkt. 19 at 72. There is no indication, however, that the Army ever explored the viability of using a firm-fixed price contract. *See* Tab 33 at A1840[redacted] Nor did the Government request additional information from contractors on the type of contract apart from asking potential offerors which type of *cost-plus* contract they preferred. *See* Tab 35 at A1880

---

[39] The FAR provides additional guidance on selecting contract type. *See* FAR 16.104, 48 C.F.R § 16.104 (setting forth the "many factors" that contracting officers must take into account in selecting a contract type, including price competition, price analysis, cost analysis, the type and complexity of the requirements, urgency, period of performance, whether portions of the contract should be a fixed-price, the contractor's technical capability and financial responsibility, adequacy of the contractor's accounting system, concurrent contracts, subcontracting history, and acquisition history).

[redacted]

(informing potential offerors that "Proposed contract types under consideration for this effort are cost-plus-incentive-fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years."). The market research did not make any specific findings that a fixed-price contract was appropriate here. To the contrary, as noted previously without response from the Government, the Army's own Market Research Report specifically advised the Army to consider the availability of a fixed-price contract, and offerors such as Palantir would have submitted fixed-priced bids to meet the Army's requirements. *See* Dkt. 14 at 39.

The Army also relies on [redacted] October 21, 2015 Determination and Findings to support its assertion that DCGS-A2 was appropriately structured as a cost-plus contract. *See* Dkt. 19 at 72. But that determination addresses the Army's decision to award the contract as a single source task order contract, not whether the contract should be fixed-price or cost-reimbursement. *See* Tab 46 at A2299. Indeed, this determination does not even address the requirements of FAR 16.301-2. *Id.* Moreover, the "cost uncertainty" alluded to in [redacted] document was not the uncertainty of development generally, but rather the uncertainty of what she was recommending against, i.e. using more than one contract to develop the data integration layer. Dkt. 19 at 72 (quoting Tab 46 at A2299). The document thus provides no support for the Army's decision to award the contract on a cost-reimbursement basis.

**B. The Army Violated 10 U.S.C. § 2304a(f) And DFARS Part 217.204 By Soliciting A Task Order Contract In Excess Of Five Years (Count Five).**

The Government claims that "The six-year contract term does not clearly violate the statutory and regulatory requirements." Dkt. 19 at 75. The Government only cites provisions that allow *options* that go beyond five years. This is not the same thing as a base term that goes

[redacted]

beyond five years. An "option" gives the Government "a unilateral right in a contract by which, for a specified time, the Government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." FAR 2.101, 48 C.F.R. § 2.101. An option is not part of the performance period of the contract. *See Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed. Cir. 1988) ("An option is normally an option, and nothing in Provision 102, or in Article XVIII, or in any other contract clause, limited the circumstances under which the government could decline to exercise that bargained-for right in this case."); *Sundowner 102 LLC v. United States*, 108 Fed. Cl. 737, 741 (2013) (holding that the Government had no obligation to exercise an option) (citing *Gov't Sys. Advisors,* 847 F.2d at 813). Because the law distinguishes between an option and the performance period of the contract, the fact that the Army could have entered into a five-year task order contract with options to extend the contract does not imply that the law authorizes the Army to enter into a six-year contract. *See* 10 U.S.C. § 2304a. The contract term therefore violates 10 U.S.C. § 2304a(f) and DFARS Part 217.204.

**C. The Army Violated 48 C.F.R. § 16.504 By Soliciting An Impermissibly Expensive Indefinite Delivery, Indefinite Quantity Task Order (Count Six).**

According to the Government, the Army complied with FAR 16.504(c)(1)(ii)(D) because [redacted] October 2015 Determination & Findings parrots the language for an exception to the general prohibition against task order awards over $112 million. *See* Dkt. 19 at 78. Specifically, the Government argues that the Army determined that the "task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the

[redacted]

work." Dkt. 19 at 78 (quoting Tab 46, A2299).[40] This argument fails for all of the same reasons that Palantir has demonstrated success on the merits of its claim under Count One, namely, the Administrative Record overwhelmingly demonstrates the viability of two procurements, one for a Data Management Platform and one for Additional Enhancements. *See supra* at Section I(D); Dkt. 14 at 32-36. The October 2015 Determination and Findings cannot be reconciled with the record, or with FY16 NDAA, which required the Army to analyze the extent to which DCGS-A2 could be divided into segments. *Compare* Tab 46 at A2298-2304 (October 2015 finding), *with* Tab 41 at A1923 (DIVA Market Study); P.L. 114-92, § 855, 129 Stat. 920 (FY16 NDAA). Thus, the exception in FAR 16.504(c)(1)(ii)(D)(1)(i) does not apply here.

## III. PALANTIR HAS DEMONSTRATED SUCCESS ON THE MERITS OF ITS CLAIM THAT THE ARMY ENGAGED IN ARBITRARY, CAPRICIOUS, AND BAD FAITH CONDUCT (COUNT SEVEN).

The Government argues it has not acted arbitrarily and capriciously because it reasonably determined that "the Army's needs would best be met by a single contractor," there is "no evidence that . . . Palantir or any other potential source, could or would propose a commercial or nondevelopmental item only solution to meet all DCGS-A Increment 2 requirements," that "market research showed no commercial or nondevelopmental item could

[40] It appears that [redacted] made a determination under an outdated version of FAR 16.504, which prior to October 1, 2015 set the dollar threshold for single source task order awards at $103 million. *Compare* FAR 16.504(c)(1)(ii)(D)(1) ("No task or delivery order contract in an amount estimated to exceed $*112* million (including all options) may be awarded to a single source unless the head of the agency determines in writing that" certain exceptions are met) *with* Tab 46, A229 (Title 10, United States Code (U.S.C.), Section 2304a(d)(3), as implemented by Federal Acquisition Regulation (FAR) 16.504(c)(1)(ii)(D)(1), prohibits award of a Task Order or Delivery Order contract that exceeds $*103* million (M) to a single source, unless the head of the agency determines in writing that the contract meets one (1) of four (4) exceptions listed . . . .") (emphasis added).

[redacted]

meet all DCGS-A Increment 2 requirements," and that its selection of a cost-reimbursement, six-year, single award contract was appropriate. Dkt. 19 at 83-84. But, as shown above, these assertions simply are not true and reflect the Army's incorrect interpretation of § 2377. *See supra* Section I(D) (showing the Army violated § 2377 by bundling requirements for a single contractor), Section I(C) (showing the Army violated § 2377 by failing to issue a solicitation that allowed for commercial items to be offered to fulfil all of the DCGS-A2 requirements), Section I(B) (showing the Army violated § 2377 by failing to perform the necessary market research), and Section II (showing the Army violated multiple regulations by selecting a cost-reimbursement, six-year, single award contract).

The Government's brief never addresses, other than in a conclusory fashion, the core elements of Palantir's Count Seven. The Government never explains how it can be rational to develop what already exists as a commercial item, and the Palantir Gotham Platform already exists in a way that meets the Army's needs. *See supra* Section I(B)(1). The Government never shows how it makes sense to continue the flawed development approach DCGS-A1 which will cause further delay, expense, and ineffectiveness. *See, e.g.*, Tab 150 at A6935-36 (Director, Operational Test and Evaluation 2013 Report on DCGS-A1 failures); Tab 151 at A7356-57 (Director, Operational Test and Evaluation 2015 Report on DCGS-A1 [redacted] Tab 130 [redacted] Dkt. 16-4 at Ex. 26 [redacted] It has manufactured *ex post* justifications for its decisions in a blatant attempt to disguise its facially unreasonable procurement decisions.

[redacted]

In sum, the Government's bald assertions of reasonableness are not entitled to deference and instead must be given a "hard look," that "*involves verifying that objective elements contained in the agency's analysis ... correspond to the evidence in the record.*'" *CBY Design Builders*, 105 Fed. Cl. at 338 (quoting *USFalcon v. United States,* 92 Fed.Cl. 436, 462 (2010) (final emphasis added) (ellipses in original).[41] Here, the record unequivocally demonstrates that the Government's procurement decisions are arbitrary, capricious, and unreasonable and Palantir should be awarded a judgment in its favor for Count Seven.

Additionally, there is clear evidence of bias and bad faith. *See* Dkt. 16 at 29-36; Dkt. 29 at 2-10. The Court has allowed discovery into bias and bad faith, and Palantir will provide further briefing on this issue once this discovery is complete in accordance with the Court's scheduling order.

## IV. PALANTIR HAS BEEN PREJUDICED BY THE ARMY'S LEGAL VIOLATIONS.

Placing principal reliance on *Labatt Food Service, Inc. v. United* States, 577 F.3d 1375 (Fed. Cir. 2009), the Government argues that Palantir has failed to establish that it has been prejudiced by the violations asserted in Palantir's Complaint. Dkt. 19 at 51-54. The Government argues with respect to Count One that "the rules and procurement procedures . . . were applied to all potential offerors equally" and that Palantir has not been prejudiced by the violations because Palantir did not submit a proposal in response to the Solicitation and because it purportedly did not provide requested information in response to the second RFI. *Id.* at 53-54.

[41] *Foster*, 103 F. Supp. 3d at 109 ("To satisfy the arbitrary and capricious standard of the Administrative Procedure Act (APA), at the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a rational connection between the facts found and the choice made; *conclusory statements will not do, as an agency's statement must be one of reasoning*.") (emphasis added).

[redacted]

As a result, the Government says, Palantir became a "stranger to the process" and was disqualified from the procurement. *Id.* at 53. The Government further argues that Palantir cannot show that "but for the error, it would have a substantial chance of securing the contract" and thus does not have the requisite economic interest. *Id.* at 53-54 (internal citations and quotations omitted). Alternatively, the Government argues that Palantir cannot establish a "non-trivial competitive injury" because "Palantir has not demonstrated that it could have and would have submitted a proposal that met all of the Army's requirements with only commercial or nondevelopmental items." *Id.* at 54. The Government repeats a truncated version of the same arguments for Counts Two, Three, Four, and Six. *See id.* at 55, 69, 73, 78. The Government additionally argues with respect to Count Five that the length of the contract affects all contract offerors equally such that Palantir is not prejudiced. *Id.* at 75-76.

The Government's contentions are uniformly wrong and they ignore Palantir's claims. As explained in our opening brief, the Army's Solicitation prejudiced Palantir by preventing it from offering to provide a commercial item to meet the Government's requirements. *See* Dkt. 14 at 27. Instead, the Government framed the DCGS-A2 acquisition as a development project and included terms that are required for cost-plus developmental contracts but that would be unnecessary in a solicitation seeking proposals for commercial or nondevelopmental items (or even for the award of any fixed-price contract). *Id.* at 28. Such terms include the requirement that offerors have in place Cost Accounting Standards and an Earned Value Management System. *Id.* The fact that Palantir did not submit a proposal is therefore irrelevant because the very illegalities that Palantir challenges prevented it from doing so. The Government claims that "the Army did not preclude Palantir from submitting a proposal," Dkt. 19 at 53, but its assertions are purely conclusory and do not address the basis for Palantir's claims of harm.

[redacted]

*Labatt* is therefore inapposite because, unlike here, the challenged government conduct in that case had nothing to do with the protester's failure to submit a response to the solicitation. Instead, in that case, the protester missed the deadline for submission of responses and then brought a challenge that addressed an unrelated issue—whether the Government's acceptance of e-mail responses during the procurement process improperly deviated from the method of transmission called for in the RFP. *Labatt*, 577 F.3d at 1378. The Court found: "There is *no connection* between the government's method of transmission and Labatt's failure to secure the contract. Without a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue." *Id.* at 1381 (emphasis added).

Here, by contrast, Palantir has directly shown "harm specific to the asserted error"—*i.e.*, the loss of the ability to bid to supply commercial items as the result of defects in the Solicitation. Relatedly, whereas the alleged error in *Labatt* did not disadvantage any bidder in particular (or cause any discernible harm to the plaintiff at all), the illegalities challenged here particularly disadvantaged Palantir by preventing it from bidding to satisfy the Government's needs by providing the Palantir Gotham Platform.

The Government's reliance on the fact that Palantir did not submit a proposal is additionally misplaced because Palantir submitted a GAO bid protest objecting to the terms of the Solicitation prior to the close of the Solicitation's deadline. By contrast, in *Labatt*, the protester did not submit a protest prior to the solicitation deadline. *Id.* at 1378-79. This further refutes the Government's contention that Palantir rendered itself a "stranger to the process" by not submitting a bid. Under the Government's logic, no prospective bidder could ever challenge a solicitation defect because, by protesting instead of submitting a bid by the bid-solicitation deadline, they would lose the ability to demonstrate prejudice. That is not the law. *See, e.g.*,

[redacted]

*CGI Federal Inc. v. United States*, 779 F.3d 1346, 1351-1352 (Fed. Cir. 2015) (rejecting the Government's standing argument where the protester submitted a pre-solicitation deadline bid protest and alleged that the illegal payment terms caused it to protest instead of bid).

The Government does not even attempt to demonstrate that Palantir's response to the second RFI could somehow have barred Palantir from the procurement. Among other things, it ignores the fact that the RFI expressly stated that (i) it did "not constitute a solicitation" (ii) it was "issued *solely* for information and planning purposes," and (iii) "Participation in response to this RFI will *not* preclude any vendor from responding to future acquisitions, either individually or as part of a team." Tab 35 at A1881 (emphasis added). Because the Government itself made clear that there was no legal significance to responding to or even failing to respond to the RFI and that it was purely for information-gathering purposes, the Government has no basis for arguing that Palantir's RFI response somehow barred Palantir from the procurement. The Government's argument also is wrong because as shown previously and above, it misstates the RFI and Palantir's response. *See supra* at Section I(B)(1)(c) and Dkt. 20 at 25-26.

Palantir also has demonstrated the requisite economic interest. Palantir has sustained a non-trivial competitive injury because the Government's illegal actions have prevented it from bidding to satisfy the requirements of the DCGS-A program by providing commercial items. *See also* Dkt. 20 at 33-34; *see also CGI Federal, Inc.*, 779 F.3d at 1351-52 (inclusion of illegal payment terms that caused plaintiff to protest rather than bid constituted a non-trivial competitive injury); *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 38 (2012) (inability to compete in bidding because of inclusion of illegal terms in solicitation constituted a non-trivial competitive injury). The Government argues that Palantir has not demonstrated a "non-trivial competitive injury" because it "has not demonstrated that it could have and would have submitted a proposal with a

[redacted]

solution that met all of the Army's requirements with only commercial or nondevelopmental items." Dkt. 19 at 54. This is false. As noted above in Section I(B)(1), the Palantir Gotham Platform can perform the very capabilities that the Government's market research claims were missing from commercial items. As ordered by the Court, Palantir also will provide a revised declaration from Mr. Choung that provides additional information on Palantir's capabilities to meet the requirements of DCGS-A2, the Government will provide a declaration on the same issue, and the parties will depose the experts on these issues during the month of August.[42] As such, further evidence on this issue will be included in Palantir's supplemental briefing due September 6, 2016.

The Government also offers no legal basis for applying the "substantial chance" standard though the available evidence makes clear that Palantir would readily meet that standard if it applied.[43] As discussed previously, the "non-trivial competitive injury" test applies when, as

---

[42] The Government's argument makes clear that the Choung Declaration is properly part of the *judicial* record on the issue of standing as well as the administrative record. *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 511 (Fed. Cl. 2012) (explaining that in order to rule on certain "jurisdictional issues," including to find that the plaintiff had standing, the Court "considered evidentiary submissions outside the complaint and administrative record"); *L-3 Commun. Corp. v. United States*, 99 Fed. Cl. 283, 289 n.4 (Fed. Cl. 2011) (finding jurisdiction and standing in a pre-award bid protest based in part on a submitted declaration because, although it was "not part of the administrative record, it is part of the Court's record and may be used to establish a jurisdictional fact"); *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 6, 15 n. 23 (Fed. Cl. 2007) (finding standing based in part on a sworn declaration filed with the plaintiff's motion for judgment on the administrative record that was not part of the administrative record because "the material sought to be added to the record relates to the threshold jurisdictional issue of whether [the Plaintiff] has standing") (citing cases) (internal citations omitted).

[43] *See* Dkt. 1 ¶¶ 63-73, 144-150 [redacted] Dkt. 14 at 16-19 [redacted] Dkt. 20 at 34 [redacted]

Case 1:16-cv-00784-MBH Document 37[redacted]Filed 07/27/16 Page 66 of 70

[redacted]

here "'a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid.'" *Nat'l Air Cargo, Inc. v. United States*, 126 Fed. Cl. 281, 293 (2016) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)). Here, Palantir has challenged the terms of the Solicitation prior to submitting a bid and thus the non-trivial competitive injury standard applies.[44]

The Government asserts that the determination of which test applies "depends upon the particular facts of the case," Dkt. 19 at 27, but never attempts to justify applying the "substantial chance" standard under the facts of *this* case. The Government vaguely references the fact that there were proposals submitted in response to the Army's Solicitation, *see id.* at 54. Those proposals could not provide a factual foundation for a but-for prejudice analysis because Palantir was prevented from submitting a bid and because the proposals responded to a solicitation that sought proposals for a development effort on a cost-plus basis, not a solicitation for commercial items on a fixed-price basis. *See Nat'l Air Cargo*, 126 Fed. Cl. at 293 (stating that the "operative language" in *Weeks Marine* makes clear that the "non-trivial competitive injury" standard should

[redacted] Tab 50 at A2363 [redacted] *see* Dkt. 19 at 50 (noting that the author of Army information paper [redacted] for the DCGS-A Increment 2 infrastructure was [redacted]

[44] The Government cites no case applying the substantial chance standard where a pre-award protester brings a challenge to the terms of a solicitation prior to submitting a bid. In the only case cited by the Government applying the "substantial chance" standard to a pre-award challenge, the protester did not challenge the terms of the solicitation and had submitted a bid that the Court found to be within the competitive range. *See* Dkt. 19 at 40; *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013).

[redacted]

apply where "there is no factual foundation for a 'but-for' prejudice analysis"). They therefore provide no "factual foundation" for application of the "substantial chance" analysis because they cannot show how Palantir would have fared if its claims are upheld and the Government issues a legally-compliant solicitation. The fact that the Army did not even bother to include these proposals with the Administrative Record only further confirms their irrelevance.

With respect to Count Six, the Government ignores the fact that this violation has prejudiced Palantir by, at a minimum, denying it the opportunity to compete for any subsequent DCGS-A contracts for an entire additional year. *See* Dkt. 1 ¶ 194. Further, the Government argues that the term of the contract has helped to facilitate the overall contractual framework that the Government has proposed here. *See* Dkt. 19 at 75. Palantir has thus been prejudiced by the violation for the additional reason that it enabled all of the harm that Palantir has sustained from the decision to issue a solicitation for the development of a new system, rather than through procuring commercial items. *See Linc Government Services, LLC v. United States*, 96 Fed. Cl. 672, 696 (2010) (prejudicial impact of the Government's conduct is to be assessed based on the "*combined impact* of any agency decisions *adjudged* to be unlawful") (first emphasis added).

## V. THE COURT SHOULD ISSUE A PERMANENT INJUNCTION.

### A. Palantir Will Suffer Irreparable Harm Absent An Injunction.

The Government claims that Palantir has not suffered irreparable harm because it can continue to sell its software licenses to the Government in other procurements. *See* Dkt. 19 at 87. That argument is completely untethered from the law. As we explained in our opening brief, irreparable harm is established where, as here, a potential bidder is denied an opportunity to compete. Dkt. 15 at 43. If the Government's alternative formulation correct, an injunction would issue only in the very rare case (if ever there has been one) where the Government's

[redacted]

wrongdoing was so severe as to completely extinguish a protestor's entire business with the Government.

**B. The Balance Of Hardships Weighs In Favor Of An Injunction.**

The Government argues that an injunction would delay the acquisition of DCGS-A2 and that the Army would have to continue using DCGS-A1 during that time. Dkt. 19 at 87. As we explained in our opening brief, the Government's arguments are legally meritless and factually inaccurate. First, delay alone is not sufficient to defeat a motion for an injunction. Dkt. 14 at 44. Second, an injunction in this case would not cause delay; it would lead to the procurement of a commercial item, which the Army could have *today*, whereas the Army contemplates as much as a six-year delay as DCGS-A2 is designed and developed. Third, even if there were delay, it would be marginal in the context of the DCGS-A program's overall lifespan. Fourth, that the Army will continue to use DCGS-A1 for some period of time is true regardless of whether an injunction issues because the Army's procurement schedule calls for the Army to continue using DCGS-A1 while DCGS-A2 is designed and developed. (In fact, the Government's argument about continued reliance on DCGS-A1 counsels in *favor* of Palantir's argument that an injunction, and subsequent procurement of a commercial item, is the quickest way to replace DCGS-A1.)

**C. The Public Interest Weighs In Favor Of An Injunction**

The Government emphasizes that the public interest "is of 'paramount import' especially regarding national defense and national security." Dkt. 19 at 89. We agree. The public has a strong interest in correcting the Army's Solicitation, not only because it is unlawful for the many reasons set forth in our Complaint, but also because it would perpetuate an ineffective

[redacted]

intelligence system that has not served our Soldiers well. The public interest weighs strongly in favor of Palantir's requested injunctive relief.[45]

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: July 27, 2016

[45] Pursuant to this Court's Order, *see* Dkt. 7, Palantir hereby respectfully requests a hearing on its Motion.

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th of July, 2016, a copy of the **REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO THE GOVERNMENT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD** was served electronically on counsel for the defendant, whose address appears below.

Domenique Kirchner
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044

/s/ Hamish P.M. Hume

HAMISH P.M. HUME
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*