[redacted]

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR USG, INC.<br><br>Plaintiff,<br><br>-vs.-<br><br>THE UNITED STATES<br><br>Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

**PALANTIR'S MOTION FOR ADDITIONAL DISCOVERY AND ENLARGEMENT OF THE SCHEDULE**

Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
hhume@bsfllp.com
skaplan@bsfllp.com
sgrigsby@bsfllp.com
jknight@bsfllp.com
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Palantir*

[redacted]

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

FACTS SUPPORTING PALANTIR'S BIAS CLAIM AND REQUEST FOR DISCOVERY .......... 7

A. The Army's G-2 Staff And DCGS-A Program Owners Blocked Palantir From Evaluations That Would Have Helped Demonstrate Palantir's Ability To Meet The Requirements Of DCGS-A2. .......... 7

1. The Army's G-2 Blocked Palantir From Participating In An Evaluation By The "Joint Intelligence Laboratory" That Would Have Helped Demonstrate Palantir's Capabilities. .......... 7

2. The DCGS Program Owners At The Army Blocked Palantir From Conducting A Proper Evaluation In The "Systems Integration Laboratory" ("SIL"). .......... 8

B. The Army Has Never Provided A Plausible Explanation For Blocking Palantir From Participating In The JIL And SIL Evaluations. .......... 13

1. G-2 Has Never Been Able To Give Palantir A Plausible Reason For Cancelling The JIL Evaluation. .......... 13

2. The Army Cannot Give A Plausible Explanation For Blocking Palantir From Participating In The SIL Evaluation. .......... 15

C. The Army's Expert Witness, [redacted] Admitted That The DCGS-A Program Manager Gave False Information To Congress About The SIL's "Evaluation" Of Palantir—An Evaluation That Never Occurred. .......... 18

1. The Army's Expert Witness Testified That The Army Never "Evaluated The Integration Of Palantir Workflow And User Tools Within The Existing DCGS-A Baseline"—Directly Contradicting What The DCGS-A Program Manager Told Congress In Writing. .......... 18

2. The Army's Expert Witness Gave Testimony That Directly Contradicts A Statement Made To Congress By The DCGS-A Program Manager Regarding Palantir's Alleged Unwillingness To "Integrate Into The DCGS-A Baseline." .......... 21

3. The Army's Expert Testified That He Understood Why Palantir Would Be "Shocked" By The DCGS-A Program Owners' False Representations To Congress. .......... 21

D. The Evidence Shows That By 2012 Staff Members Of The Army's G-2 Had An "Entrenched Animosity Towards Palantir," Had Altered An Objective

[redacted]

Report To Remove Favorable Assessments Of Palantir's Capabilities, Had Become "Defensive" About DCGS-A And Palantir, And Had "Lost Some Of Their Objectivity." ........ 22

1. [redacted] Emailed Palantir On March 10, 2012 And Reported That, According To [redacted] (Program Manager for DCGS-A), [redacted] of DA G-2 "Had An Entrenched Animosity Towards Palantir, Which Has Been Spread And Inculcated Into The DA Staff." ........ 22

2. "Negative Feedback" From [redacted] At G-2 "Caused Lockheed Martin To Wave Off" Working On A DCGS Project With Palantir. . 23

3. In April And May Of 2012, The G-2 Insisted On The Rescission And Alteration Of An ATEC Report That Had Highly Favorable Findings About Palantir's Capabilities. ........ 24

4. Lieutenant General Grisoli's Investigation Report Into The Rescission And Alteration Of The April 25, 2012 ATEC Report Found That G-2 Staff Were "Defensive" About Palantir And DCGS And Had "Lost Some Of Their Objectivity." ........ 25

5. Neither Lieutenant General Grisoli's Report Nor Any Of Its Supporting Documents Explain Why One Especially Favorable Finding From The April 25, 2012 ATEC Report Was Deleted. ........ 26

E. The G-2 And DCGS Program Owners Circulated Inaccurate Information About Palantir's Capabilities. ........ 27

1. In 2011, The Combatting Terrorism Technical Support Office Expressed "Suspicions About DCGS-A" And About An Army Chief Of Staff Memo That Was "Filled With Info That Is Used To Block Units" From Getting Palantir. ........ 27

2. In 2014 And 2015, DCGS-A Program Owners Circulated A Venn Diagram Showing Palantir As Having Only A Small Subset Of The Capabilities Required By DCGS-A—A Diagram That [redacted] Now Concedes Was "Dated," "Incomplete," and Not "A Full Representation" of Palantir's Capabilities. ........ 28

3. [redacted] Admitted To Giving A Reporter A "Negative" And "Not Scientific" Document About Palantir's Capabilities That Was Written By One Of Her Staffers But Made To Appear Like A Report By An Independent, International Task Force. ........ 32

[redacted]

4. [redacted] Testified That "Both Sides Misrepresent The Capabilities Of Both." ........ 33

F. The Government's Witnesses Testified That ASA(ALT) Was Responsible For Determining The Procurement Strategy For The Solicitation That Is Challenged In This Case, But That There Were "Open Lines Of Communication" And "Input" From G-2. ........ 34

ARGUMENT ........ 36

I. The Court Should Grant Palantir Leave To Serve The Attached Discovery Requests. ........ 36

II. The Army Should Be Compelled To Produce Documents Relating To The Investigation Into The Destruction Of The ATEC Report........ 40

[redacted]

## TABLE OF AUTHORITIES

**Cases**

*Keco Indus., Inc. v. United States*,
492 F.2d 1200 (Ct. Cl. 1974) .......... 2

*L-3 Communications Integrated Systems, L.P. v. United States*,
91 Fed. Cl. 347 (2010) .......... 36

*Labat-Anderson, Inc. v. United States*,
42 Fed. Cl. 806 (1999) .......... 2

*Pitney Bowes Gov't Sols., Inc. v. United States*,
93 Fed. Cl. 327 (2010) .......... 37

*Starry Associates, Inc. v. United States*,
125 Fed. Cl. 613 (2015) .......... 37

*U.S. Foodservice, Inc. v. United States*,
100 Fed. Cl. 659 (2011) .......... 2

[redacted]

Palantir USG, Inc. ("Palantir") hereby files its Motion for Additional Discovery and Enlargement of the Schedule, and its accompanying memorandum in support thereof.

**PRELIMINARY STATEMENT**

Palantir respectfully asks this Court to grant limited additional discovery relating to Palantir's allegations of bad faith and bias with respect to the challenged Solicitation for DCGS-A Increment 2 ("DCGS-A2" or "Increment 2"). The additional discovery Palantir seeks is very narrow, and consists solely of written discovery and targeted document production. The discovery focuses on information provided to the Assistant Secretary of the Army for Acquisition, Logistics & Technology Division ("ASA(ALT)") or staff members working for ASA(ALT). While there were a number of sections of the Army that are involved in writing and validating the requirements for DCGS-A2, the Government and its witnesses have emphasized that ASA(ALT) decides on the "procurement strategy" for the solicitation. It is that procurement strategy, and the failure to offer a solicitation that could be met with a commercial item, that is at issue in this case. Accordingly, the information ASA(ALT) had during the period of time from the inception of the market research to the date on which it issued the Solicitation is of utmost importance. The specific information Palantir seeks relates to (a) whether ASA(ALT) investigated allegations of bias and "blocking" actions against Palantir that were presented to ASA(ALT) while the market research was being conducted for the DCGS-A2 Solicitation (and if so, what conclusions did it reach regarding such allegations), and (b) whether ASA(ALT) received inaccurate information about Palantir's capabilities during the period from June 1, 2014 (shortly before the market research officially began with the August 2014 RFI) and the December 23, 2015 issuance of the Solicitation.

[redacted]

This discovery is justified because Palantir has established that there was definitely a bias and "animosity" towards Palantir by the Army's G-2 (Intelligence) staff and the DCGS-A program owners, and this animosity lead to repeated acts of blocking Palantir from conducting evaluations that would have proven Palantir's capabilities to do the things the Army now says (in defending this lawsuit) it does not know if Palantir can do. Palantir has also established that G-2 and the DCGS program owners circulated false information about Palantir around the Army and to Congress. The discovery Palantir now seeks is intended to uncover additional direct evidence that these bad faith actions directly infected the Solicitation process. Palantir believes this definitely occurred, and that this explains why the market research leading up to the Solicitation presupposed from the outset that the Army would satisfy its DCGS-A2 requirements solely through a developmental contract and would not even consider trying to satisfy some or all of those requirements through the acquisition of a commercial item from Palantir. If the Court concludes the Army engaged in such a "predetermination," that would support a finding of bias that constitutes an independent basis for setting aside the Solicitation. *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1204 (Ct. Cl. 1974) ("It is enough for recovery if an adequate showing is made that the Government acted in bad faith, e.g., by predetermining the awardee."); *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 849 (1999) (quoting *Keco* for same). Likewise, irrespective of any predetermination, evidence showing that the Solicitation was structured as a developmental contract based on any kind of irrational bias against Palantir would also provide an independent basis for setting aside the Solicitation. *U.S. Foodservice, Inc. v. United States*, 100 Fed. Cl. 659, 686 (2011) (finding the solicitation imposed "irrational constraints on the competition" and enjoining the solicitation). The discovery Palantir seeks

[redacted]

would provide the Court with direct and definitive evidence of how the bias of the DCGS-A Program Owners and the G-2 infected the Solicitation process.

Here is a high-level summary of what Palantir knows and can establish right now, based on the discovery and documents available to date:

- The Army's G-2 staff and the DCGS-A program owners blocked Palantir from participating in evaluation programs that would have helped demonstrate that Palantir has the capabilities needed to meet the requirements of DCGS-A2—the same capabilities for which the Army's expert says he has "insufficient information" to determine whether Palantir has them or not. *See* Section A, below.

- The Army has never been able to give a plausible explanation as to why Palantir was blocked from completing the Joint Intelligence Laboratory (JIL) and Systems Integration Laboratory (SIL) evaluations. *See* Section B, below.

- The Army's expert admits that a written statement from the DCGS-A Program Manager submitted to Congress about Palantir's supposed participation in one of these evaluations was false. Ex. D, [redacted] Depo. Tr. at 312:3-313:11; Exs. O, Q. *See* Section C, below.

- The Army's G-2 staff (the Intelligence staff) had an "entrenched animosity" towards Palantir, had altered an objective report to remove favorable assessments of Palantir's capabilities, and by 2012 had become "defensive" about DCGS-A and its relationship to Palantir, and had "lost some of their objectivity." *See* Section D, below.

- The head of Army G-2 during the time the Solicitation was developed, [redacted] testified that (a) information about Palantir's capabilities that was still being circulated by the Army in December 2014 and possibly 2015 was "dated" and was not necessarily accurate or complete (and [redacted] testified this information was not based on any studies); (b) information she gave to a reporter about Palantir's capabilities was "not scientific" and was prepared by a staff member of hers even though it was presented as if it had been prepared by an independent, international task force; and (c) G-2 and Palantir were "talking past each other" and "**both sides misrepresent the capabilities of both**." *See* Section E, below.

- [redacted] also testified, however, that while G-2 had "input" in the process of developing the requirements for the Solicitation, she was adamant that it was the job of ASA(ALT) to decide upon these requirements. Likewise, [redacted] the G-2 Chief Information Officer, said that ASA(ALT) is the section of the Army that is responsible for defining the requirements for the Solicitation. *See* Section F, below.

[redacted]

- As shown below, on October 7, 2014, Doug Philippone of Palantir sent an email to the Deputy Assistant Secretary for ASA(ALT) providing a list of 45 specific incidents in which members of the Army's G-2 or DCGS-A program owners engaged in "blocking" actions that prevented Commanders in the field from ordering Palantir. Ex. U. Palantir relies on this document to show that the Army was on notice as to these allegations of bias when it developed the Solicitation. But Palantir does not know what, if anything, the Army did to investigate these allegations. All Palantir knows is that the Army's market research for the DCGS-A2 Solicitation presupposed from the outset that the requirements for DCGS-A2 would be satisfied through a developmental contract, and the Army never even considered satisfying some or all of those requirements through the acquisition of a commercial item from Palantir.

Thus, the record shows (a) evidence of "animosity" and bias against Palantir at G-2 and among DCGS-A program owners, (b) false information being spread about Palantir by G-2 and the DCGS-A program owners, and (c) ASA(ALT) having final responsibility for the Solicitation. These facts warrant targeted discovery into (1) whether the Army admits or denies the allegations of bias set forth in the October 7, 2014 email sent to ASA(ALT), and (2) whether false information about Palantir's capabilities was sent to ASA(ALT) during the two years leading up to the Solicitation.

The specific discovery Palantir requests consists of one Request for Admission (albeit on 45 specific allegations), five Interrogatories, and two Requests for Production of documents. These requests can be broken down as follows:

- <u>Discovery relating to 45 alleged incidents of "blocking" actions against Palantir that were sent to ASA(ALT) in October 2014:</u>
    - A Request for Admission asking the Army to admit or deny the truth of the 45 specific allegations set forth in the October 7, 2014 email sent by Doug Philippone of Palantir to Deputy Assistant Secretary for the ASA(ALT), [redacted] Ex. U.[1]

[1] If the Army has insufficient information to Admit or Deny specific allegations, it can provide that as its answer. That will at least establish that the Army did not investigate the allegation despite having it since October 7, 2014.

[redacted]

- ○ Three interrogatories relating to these 45 alleged incidents of "blocking," asking—

  - ▪ Whether the Army investigated these allegations, and if so what it did to investigate them, and what conclusions it reached (Interrogatory 1);

  - ▪ An explanation of the basis for any denial by the Army of any of the alleged incidents of blocking or bias set forth in the October 7, 2014 email (Interrogatory 2);

  - ▪ A question as to whether three specific individuals in the Army confirm or deny allegations that relate to what they said or heard (Interrogatory 3).

- ○ A Request for Production of any of the documents referenced in the October 7, 2014 email (there are only three specific documents expressly referred to in the email, though some—but not all—of the other allegations may be found in email communications).
- ○

• <u>Discovery related to information communicated to Army staff working in Acquisitions, Logistics & Technology—the Army division responsible for issuing the Solicitation:</u>

- ○ One interrogatory asking whether specific types of information (or mis-information) about Palantir's capabilities were provided to ASA(ALT) during 2014 or 2015 (the two years leading up to the Solicitation);

- ○ One Request for Production asking for any document containing any such information about Palantir's capabilities that was sent to ASA(ALT) during the two-year period leading up to the Solicitation.

- ○ One interrogatory asking for a description of any such information that was provided to ASA(ALT) that was not contained in a document that can be produced (if it was in a document, we just ask for the document to be produced per the foregoing RFP);

In addition to the foregoing, Palantir asks the Court to compel the Army to produce 6 documents that were covered by this Court's earlier order to produce all relevant documents from the Lieutenant General Grisoli investigation into the modification of the April 25, 2012

[redacted]

ATEC report. The Government has still not produced those documents, which should be produced promptly.

To allow for this requested discovery to take place, this Motion also respectfully requests a slight enlargement of the current schedule, as follows:

- Palantir's discovery attached to this brief will be deemed to have been served as of August 26, 2016;[2]
- The Government shall respond to this discovery by September 9, 2016;
- The parties shall submit their supplemental briefs addressing all of the discovery and expert reports by September 16, 2016;
- The Court shall hold any hearing it deems appropriate on any day that is convenient for the Court on or after September 23, 2016.

In order to accommodate the above schedule, Palantir asked the Army to confirm that it will not issue an award on the DCGS-A2 Solicitation before October 31, 2016. Such a representation would appear to be consistent with the declaration submitted by [redacted] which simply says that the Army anticipates "making an award in October 2016." Dkt. 19-1 at 1. Despite submitting testimony about future harm the Army might suffer if the Court were to issue an injunction in this case, [redacted] did not state in his declaration that the Army had already delayed its award by any amount of time at all. *Id.* His declaration simply states as follows:

---

[2] The discovery was provided to the Government in draft form on August 24 in substantially the same form as it is attached here. The only changes are that Palantir narrowed the date range for Interrogatories 4 and 5 and RFP 2, provided a more specific definition of ASA(ALT), and re-ordered the Interrogatories so that those relating to the October 7, 2014 email are Interrogatories 1-3, and those relating to information about Palantir's capabilities provided to ASA(ALT) are Interrogatories 4-5.

[redacted]

> "Proposals were received on 16 February 2016 and the agency began discussions with offerors on 6 July 2016. Once discussions are completed, the Army will request final proposal revisions." *Id.*

Counsel for Palantir asked the Army if it could (a) agree not to oppose the attached discovery, and (b) agree to represent that it would not issue an award before October 31, 2016, or whether it could even consider representing it would not issue such an award before November 11, 2016, in order to give the parties and the Court a little more time. Through an email sent at 6:15 pm on August 25, 2016, Army counsel refused to agree to any aspect of this request and said they would oppose it.

To provide for expedited resolution of this Motion, Palantir also asks that the Court direct the Government to respond to this Motion by 5 pm on Wednesday, August 31, 2016. Palantir will either waive its right to a reply brief or will file one by 12 pm noon on Thursday, September 1, 2016.

## FACTS SUPPORTING PALANTIR'S BIAS CLAIM AND REQUEST FOR DISCOVERY

### A. The Army's G-2 Staff And DCGS-A Program Owners Blocked Palantir From Evaluations That Would Have Helped Demonstrate Palantir's Ability To Meet The Requirements Of DCGS-A2.

#### 1. The Army's G-2 Blocked Palantir From Participating In An Evaluation By The "Joint Intelligence Laboratory" That Would Have Helped Demonstrate Palantir's Capabilities.

In 2009, Palantir attempted to undertake an evaluation at the Joint Intelligence Laboratory ("JIL"). The G-2's Chief Information Officer at the time, [redacted] explained that the JIL evaluation would have helped Palantir introduce its product to the intelligence community:

> Q. And it's accurate to say that the Joint Intelligence Laboratory is a laboratory that tests and evaluates joint intelligence technologies and prototypes?

[redacted]

A. Yes.

Q. And would you agree that it's—it would be helpful for a company that's trying to introduce their product into the intelligence community to get a favorable evaluation from the Joint Intelligence Laboratory?

A. Yes.

*See* Ex. E, [redacted] Depo. Tr. at 8:11-21.

Just before Palantir's JIL evaluation was scheduled to take place, G-2's [redacted] (who worked for [redacted] emailed Palantir's Doug Philippone to cancel the evaluation:

[redacted]

Ex. G (emphasis added).

As shown in Section B below, the Army has never given a plausible explanation for why it blocked Palantir from participating in this evaluation. To the contrary, the Army has given shifting and contradictory explanations that reveal a lack of candor and credibility as to the reasons why this evaluation was cancelled. *See* Section B, *infra*.

**2. The DCGS Program Owners At The Army Blocked Palantir From Conducting A Proper Evaluation In The "Systems Integration Laboratory" ("SIL").**

In 2010 and 2011, Palantir again sought to demonstrate its capabilities, this time at the DCGS-A Systems Integration Laboratory ("SIL"). [redacted] the Army's expert in this case, was the SIL Product Line Lead at the time. *See* Ex. D, [redacted] Depo. Tr. at 205:7-20. [redacted] testified that Palantir's participation in the SIL would have allowed Palantir to demonstrate its compatibility with the DCGS Integrated Backbone (DIB), among other things.

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 14 of 48

[redacted]

*Id.* at 51:15-53:15; 208:8-210:01; *see also* 263:11-20 (testifying that the SIL evaluation [redacted] (emphasis added). DIB compatibility is one of the capabilities the Army now says is unavailable from commercial items. *See* Tab 33 at A1840, Tab 134 at A6626. In defending its failure to solicit a commercial item as part of its DCGS-A2 solicitation, the Army and its witnesses try to rely on the lack of expansive testing of Palantir's technology—but that lack of testing resulted from the Army's *own blocking efforts*. The Army's expert [redacted] states that he has "insufficient information" about Palantir to make certain evaluations; but those evaluations could have been made had the SIL project not been blocked. Likewise, the Army's witness [redacted] criticizes Palantir in her declaration for not engaging in the very type of DIB integration evaluation it would have received at the SIL but for the Army's blocking of that evaluation. *See* Dkt 49-1 at ¶ 5.

A series of email chains between [redacted] and various Palantir employees from November 2010 through May 2011 reveal that Palantir was attempting to participate in the SIL but was repeatedly blocked from doing so. In August 2010, [redacted] sent an email to Mr. Philippone, copying [redacted] stating that he was "interested in determining how we could potentially bring Palantir capabilities into our DCGS-A architecture and am willing to recourse that effort at my System Integration Laboratory." Ex. H. Seven months later, [redacted] notified Mr. Philippone that the contract was in place, *see* Ex. D at 205:21-206:7, Ex. I, and shortly thereafter sent a "rough outline" of his "expectations" for the effort. This outline

listed fifteen specific points for the SIL evaluation, including "data integration" and "DIB integration." Ex. I.[3]

[redacted] admits that Palantir wanted to do an expansive evaluation. *See* Ex. D, [redacted] Depo. Tr. at 223:20-224:08. Palantir circulated an agenda in advance of the February 2011 kickoff meeting that included seven concrete focal points for the SIL evaluation (plus sub-parts), including:

"7. Concrete Integration Points:

a. DIB

b. Brain/Message DB

c. TED

d. Ozone Widget Framework."

Ex. J; *see also* Ex. D, [redacted] Depo. Tr. at 252:8-253:3.

[redacted] also circulated a revised list of "likely integration points" that identified "4 key areas of integration." Ex. K. The "integration points" included ones related to integrating with the "DIB." *Id.* In deposition, [redacted] testified that the four key "touch points" he recalled the parties agreeing to evaluate in the SIL were "integration" with the "Brain," the "DIB," the "TED," and "Ozone." Ex. D, [redacted] Depo. Tr. at 259:17-21.

As [redacted] confirmed in deposition, Palantir never got the opportunity to do any of these evaluations. In February 2011, [redacted] informed Palantir that "[redacted]

---

[3] [redacted] testified that the SIL review ended up focusing on only *portions* of two of these fifteen topics—those relating to the virtual cabinet files (VCAB). Ex. D, [redacted] Depo. Tr. at 209:19-210:1; 213:7-15; 221:20-21; Ex. I. [redacted] also explained this work was *not* an evaluation, and did not even require logging into the Palantir system. *See*, *e.g.*, Ex. D, [redacted] Depo. Tr. at 213:19, 217:20-218:1, 236:1-7.

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 16 of 48

[redacted]

[redacted] Ex. K. The following month, just before Palantir employees were scheduled to fly to the SIL, [redacted] again alerted Palantir to a [redacted] that resulted in a [redacted] and further delays. Ex. L. As [redacted] testified, the [redacted] narrowed, resulting in a [redacted] Ex. D, [redacted] Depo. Tr. at 250:16-251:14; 285:22-286:8. He admitted to have [redacted] *id.* at 223:20-224:08, and he testified that such direction [redacted] *Id.* at 251:15-19. [redacted] testified that only an individual in the program office has "[redacted] *Id.* at 301:13-302:6.

This blocking of the SIL evaluation triggered an April 19, 2011, email from Palantir's Mr. Philippone to [redacted] Ex. N. Mr. Philippone explained that the SIL evaluation was supposed to assess how Palantir could "interoperate cleanly into the DCGS-A POR" (program of record), and to that end Palantir had "offered a project plan that showed how we can integrate with the brain data sources, the TED, the DIB, and with the ozone framework." He continued:

> "My concern right now is that we have shipped and installed Palantir to the SIL, nothing has been done with it, we have been told specifically not to integrate with the Brain and after over a month of work, a project plan is still not approved. ***Since this is a technical integration and not a business decision, I can't see any specific reasons not to integrate with all aspects of DCGS-A (Brain, Ted, DIB, ozone and Cloud) as all it does is show what is possible to help the warfighter*** and it's already included in the cost of the technical exchange."

Ex. N (emphasis added).

[redacted]

This plea from Mr. Philippone fell on deaf ears. A couple of weeks later, on or around May 4, 2011, [redacted] reported to Palantir that the SIL was "more or less dead," as recorded in an email made by the Palantir employee to whom [redacted] conveyed this news (Mr. Jason Payne). *See* Ex. M.[4] Mr. Payne's email reports that [redacted] had conveyed that "everyone is yelling at everyone for the SIL/Palantir project," and that [redacted] was "really pissed at the way they've treated the Palantir eval." *Id.* The email also reports that "They want to know 'How do we fit some of Palantir as a capability into the DCGS architecture' and to not want a data integration." *Id.* It further states that [redacted] made the following statements, none of which he denied making:

- "You don't even know my level of frustration"
- "If I could I would forward you my emails with diametrically opposite advice from leadership"
- "I'm Literally getting yelled at several levels above me for executing"
- "As a tax payer I am disgusted that we paid for 90 days of this"
- "[redacted] just as frustrated with our bosses, who are above [redacted]
- "I apologize for a lack of vision, we're a bunch of idiots."

*Id.*[5]

[4] This email consists of a call summary written by Jason Payne, a Palantir employee, who recorded his telephone call with [redacted] immediately after getting off the call. [redacted] did not deny having the call and conveying most of the points set forth in the email. Ex. D ([redacted] Dep. Tr.) at 264-97.

[5] Palantir will be asking that Ex. M be admitted as a present sense impression of a party admission under FRE 801 and 803. During his deposition [redacted] did not deny that this phone call took place, and he even explained that it was "most likely" that he was expressing his frustration with the situation. Ex. D, [redacted] Depo. Tr. at 276:2-20 ("Q: The next page, it says: 'You don't even know my level of frustration.' That is Payne quoting what you said. Do you think it's possible that you said that? A: Yes, most likely. Q. The next bullet—he's quoting

[redacted]

Mr. Payne then wrote the following at the end of his email:

> "I read [redacted] the following quote from a [redacted] email. He LOLed. 'We remain committed to interacting with our industry partners on cutting-edge technologies that we can leverage to support DCGS-A." *Id.*

When shown this in deposition, [redacted] did not deny laughing, though he claimed not to remember doing so. He testified that he would just have been laughing at the "politically correct" nature of the statement by [redacted] Ex. D, [redacted] Depo. Tr. at 296:13-297:17.

In deposition, [redacted] also explained that part of his frustration stemmed from being "told in one breath . . . from [redacted] to integrate it and then later on be told by [redacted] that leadership wants us not to do something." *Id.* at 276:13-17. In summary: "I had a much longer list when we first started the engagements. I thought we were going to accomplish a lot more. But given the change in direction from leadership to refine that, we ended up not accomplishing as much as I would have liked." *Id.* at 287:22-288:4.

### B. The Army Has Never Provided A Plausible Explanation For Blocking Palantir From Participating In The JIL And SIL Evaluations.

#### 1. G-2 Has Never Been Able To Give Palantir A Plausible Reason For Cancelling The JIL Evaluation.

At the time G-2 cancelled Palantir's JIL evaluation, [redacted] informed Mr. Philippone that the "rationale for this decision is that the best way to focus your efforts at this time is with the DCGS-A Mobile lead systems integrator, [redacted] Ex. G.

---

you—says: 'If I could, I would forward you my emails with diametrically opposite advice from leadership.' Do you think it's possible you said something like that to him? A: That goes to my frustration where I'm told in one breath to—you know, from Colonel—you know, from [redacted] to integrate it and then later on be told by [redacted] that leadership wants us to not do something. So that would be multiple—you know, 'diametrically opposed,' that doesn't sound like me, but okay."); *see also id.* at 297:14-17.

[redacted]

As shown in Exhibit E, Ms. [redacted] the G-2 CIO, authorized [redacted] to cancel of Palantir's JIL evaluation. Ex. E, [redacted] Depo. Tr. at 15:16-16:1.[6] During her deposition in this case, [redacted] effectively admitted that the rationale given by [redacted] for the cancellation did not make any sense, since there is no reason why Palantir could not undertake a JIL evaluation while also working with Northrop Grumman:

> Q. Do you have any reason to believe that a company, which is a subcontractor, would be precluded from participating in the Joint Intelligence Laboratory evaluations?
>
> A. I don't know, but I would assume it would be okay.

*Id.* at 9:7-12.

> Q. Why would working with Northrop Grumman be mutually exclusive from getting an evaluation under the JIL?
>
> A. I wouldn't think it is mutually exclusive.

*Id.* at 21:9-12.

Given her admission that the reason given by [redacted] for cancelling Palantir's JIL evaluation made no sense, it is not surprising that [redacted] gave a different reason. When she was asked why the JIL evaluation was cancelled, [redacted] said that it was because of a "funding issue." Ex. E, [redacted] Depo. Tr. at 10:6-14; 14:3-8. But this answer is directly contradicted by a contemporaneous document, as [redacted] later admitted. In a February 25, 2009, email exchange between [redacted] and Mr. Philippone, [redacted] wrote, "I want to reiterate that the JIL nor G2 [sic] pays vendors to do this." Ex. G. In response, Mr. Philippone wrote:

---

[6] While [redacted] tried to avoid admitting that she cancelled the JIL, she could not avoid admitting that she "authorized [[redacted] to handle the matter," resulting in his email to Doug Philippone canceling the evaluation. Ex. E, [redacted] Depo. Tr. at 15:16-16:1.

[redacted]

> "No problem, we don't care about the money. There was some confusion where the JIL and [redacted] had agreed that our hardware costs would be covered and then it changed for some reason last week right when they were going to send the money over. ***It's not about money here, as I am sure you know, we just want our chance to compete***."

*Id.* (emphasis added).

When confronted with this email in deposition, [redacted] appeared to recognize that this email was inconsistent with her testimony that a "funding issue" caused the cancellation of the JIL evaluation, and she changed her testimony to "I don't recall," and then tried to go back to the implausible Northrop Grumman explanation:

> Q. Your recollection was incorrect?
>
> A. I'm telling you what I recall. And now that I read this, there must have been some question, but I just don't recall.
>
> …
>
> Q. Sitting here today, is it your understanding that Palantir did not participate in the 2009 JIL because of funding issues?
>
> A. Sitting here today, based on what you've shown me, it looks as if the recommendation was to not move forward with a JIL evaluation but to have them work directly with Northrop Grumman to move things forward in a direct manner to help get Palantir capability into the program.

Ex. E, [redacted] Depo. Tr. 14:12-16; 20:22-21:8.

### 2. The Army Cannot Give A Plausible Explanation For Blocking Palantir From Participating In The SIL Evaluation.

[redacted]

Despite his personal involvement in the thwarted Palantir SIL evaluation, [redacted] was unable to provide a plausible reason why the project was shut down.[7] Primarily, [redacted] claims the change in direction stemmed from "programmatic concerns" regarding what would happen "if we built it -- if we built a prototype interface in the SIL and that somehow made its way to theater." Ex. D, [redacted] Depo. Tr. 279:9-20; *id.* at 278:8-11 [redacted] had communicated to us that there was concerns from leadership about the operational impact of potentially the brain interface pulling data in and impacting current op -- military operations."). But these "programmatic concerns" are entirely speculative, and relate only to what would happen if they deployed Palantir into the combat theater. It has no relationship at all to conducting an *evaluation* of Palantir in a *laboratory*. Moreover, Palantir had already been deployed in active theater operations for SOCOM, the Marines Corps, and the Army itself—without any of the concerns voiced by [redacted] ever arising.

[redacted] also tried to blame the SIL shutdown on the expiration of the temporary license: the "license term was 90 days. We began effort in February, so this is about the time frame when the license would be expiring. I'm not really sure that I got direction to stop work." Ex. D, [redacted] Depo. Trans. 273:10-14. This justification not only denies the Army's role in

[7] [redacted] at times attempted to deny that he received guidance to narrow the scope of the SIL, a point that he later conceded. *Compare* Ex. D, [redacted] Depo Tr. at 226:16-22 ("Q. What was the reason given to you by leadership for why Palantir couldn't do work on this SIL pilot program on DIB integration which would have allowed it to demonstrate or achieve integration with the DIB? A. I don't believe we received guidance to not do it.") *with, e.g.*, *id.* at 224:6-11 ("So we had received leadership direction to refocus the effort to move away from the brain integration."), *and* 286:4-8 ("by the time we got to the kickoff and we were given the refined guidance through [redacted] to myself about what we were supposed to do, we ended up with a much smaller stack of requirements on what we were directed to execute."), *and* 301:3-11 ("this was all tied back in to the same discussion we've been having about the leadership direction to descope the effort."), *and* Ex. L (referring to a "standdown" order on Palantir's SIL evaluation).

[redacted]

causing repeated delays of the SIL evaluation, but also fails to provide any support for *why* the Army repeatedly delayed, and eventually gutted, the SIL evaluation. *See id.* at 206:16-207:12 (testifying about a more than six-month delay between original discussions about the SIL in April 2010 and the contract award in November 2010). The temporary license obviously could have been extended.

Eventually, when confronted with a contemporaneous account of what he said at the time, [redacted] let slip a different articulation of what caused the shutdown of the SIL evaluation. A Palantir email dated May 4, 2011 recounts a conversation with [redacted] in which (among other things) he states that the official reason to stop the "Brain" interoperability work as part of the SIL evaluation was "Even if software doesn't leave the lab, **you've opened the door for Palantir to say we are DCGS-A interoperable**, and we can't give that access for everyone, and someone would cry foul . . ." Ex. M (emphasis added). When shown this in his deposition, [redacted] testified that "I'm not denying" that he said "something along those lines," and then explained as follows:

> "I think what I was probably saying here was, **now you've almost given a seal of approval on the interface of Palantir**. And without any formal testing or formal evaluation, that would have to occur to actually be declared interoperable in the name of the Army. So as I previously stated, there's formal processes for interop. And so I go on to state there -- it says that, we can't give that access to anyone and someone would cry foul. This could potentially be viewed as preferential treatment to one vendor that they had access to data that was not available to everyone else."

Ex. D, [redacted] Depo. Tr. at 289:6- 290:13.

Thus, [redacted] effectively admitted that one reason the SIL evaluation was shut down was to avoid giving Palantir the "seal of approval." He claims that this was due to a concern that other contractors might "cry foul," but he admitted that he had no recollection of any legal

[redacted]

advice ever being sought or given on this issue. *Id.* at 291:12-15. Moreover, it would not violate any law or regulation for Palantir (or anyone else) to be given the opportunity to demonstrate its interoperability with DCGS through the SIL. After all, the purpose of the SIL is to test new software products and to evaluate their ability to integrate with DCGS. *Id.* at 51:15-52:10. That would be meaningless if the SIL was prevented from evaluating highly effective products that could actually successfully demonstrate their "interoperability."

### C. The Army's Expert Witness, [redacted] Admitted That The DCGS-A Program Manager Gave False Information To Congress About The SIL's "Evaluation" Of Palantir—An Evaluation That Never Occurred.

#### 1. The Army's Expert Witness Testified That The Army Never "Evaluated The Integration Of Palantir Workflow And User Tools Within The Existing DCGS-A Baseline"—Directly Contradicting What The DCGS-A Program Manager Told Congress In Writing.

[redacted] the DCGS-A Program Manager, signed a September 30, 2011, "Information Paper," the stated purpose of which was to "provide information on DCGS-A in preparation for a session with HASC [i.e., House Armed Services Committee]." Ex. O. Thus, the purpose of this September 30, 2011 Information Paper was to provide information *to Congress*. Palantir is aware of the fact that this September 30, 2011 Information Paper was itself given to Congress. The Information Paper has a heading entitled "DCGS-A Integration Laboratory," Ex. O, which [redacted] testified was another name used for the SIL. Ex. E, [redacted] Dep. Tr. at 73:17-22. In this section about the SIL, the Information Paper states:

> "***PM DCGS-A evaluated the integration of Palantir workflow and user tools within the existing DCGS-A baseline***."

*Id.* (emphasis added).

[redacted] testified that this evaluation never occurred:

[redacted]

Q. . . . So just to be clear, ***you're saying that the SIL and the PM DCGS-A did not evaluate—did not evaluate the integration of Palantir workflow and user tools within the existing DCGS-A baseline. Am I correct, you did not do that***?

A. ***Yes. We did not do any formal evaluation or determination of whether or not the tools could live inside—completely inside the baseline***.

Ex. D, [redacted] Depo. Tr. at 238:16-239:2 (emphasis added). He also explained:

[redacted]

*Id*. at 236:16-237:3 (emphasis added).

When then asked whether the statement in the [redacted] Information Paper was inaccurate, [redacted] testified "based on how the pilot was actually executed, that is probably not a good characterization of what actually occurred." *Id*. at 312:3-11. Indeed, [redacted] repeatedly testified that the SIL never performed *any* evaluation of Palantir. *See, e.g.*, Ex. D, [redacted] Depo Tr. at 213:19 ("So there was no formal test"); *id*. at 215:15 ('there was no test"); *id*. at 216:12 ("We did not perform a test of the Palantir system"); *id*. at 217:2-3 ("We didn't actually exercise the Palantir system itself."); *id*. at 217:20-218:1 ("…the end state, you know, there was no formal test, as I stated, that required us to sit on the Palantir system and exercise the system itself as part of the pilot"); *id*. at 236:1-7 ("We did not actually evaluate or test or pilot—or whatever we want to call it—whatever the activities of my engineers in the SIL working on software and looking at what it does and how it can work together—that was never fully

[redacted]

executed to determine how we could bring it into the architecture."); *id.* at 238:22-239:2 ("We did not do any formal evaluation or determination of whether or not the tools could live inside—completely inside the baseline.").

The September 30, 2011 Information Paper that was signed by [redacted] makes another false statement about Palantir. It says that the "evaluation" of Palantir (which never occurred) had "[redacted]." Ex. O (emphasis added). This misrepresentation of Palantir's capabilities relates directly to the DCGS-A2 procurement, where the Army continues to say, without support, that commercial items are not interoperable because they have commercial software code provided under a proprietary license agreement. *See* Tab 134 at 6626; Tab 1 at 34. But this is completely baseless: as the Army's expert admitted, the fact that software may be "proprietary" does not mean it is not "interoperable." *See* Ex. D, [redacted] Depo. Tr. at 71:3-6 ("So the use of an API would allow two systems to -- you know, an interoperability API, let's say, would allow two systems to share data with one another."); 323:6-12 (agreeing that with APIs and software with extensibility, a user can make enhancements to proprietary software "without having to change or own the internal software code"); 360:5-9 (agreeing that "Palantir was designed to be interoperable in the sense of having open APIs" with as many extensibility points as possible).

[redacted]

2. **The Army's Expert Witness Gave Testimony That Directly Contradicts A Statement Made To Congress By The DCGS-A Program Manager Regarding Palantir's Alleged Unwillingness To "Integrate Into The DCGS-A Baseline."**

[redacted] September 30, 2011, Information Paper also stated: "[redacted] Ex. O. Similarly, an October 18, 2011, Information Paper signed by [redacted] and [redacted] stated: "[redacted] Ex. P. Both of these statements to Congress are directly contradicted by Mr. Philippone's April 19, 2011 email to [redacted] in which Mr. Philippone specifically requested to "integrate with all aspects of DCGS-A (Brain, Ted, DIB, ozone and Cloud)."[8] Ex. N. During his deposition, [redacted] acknowledged that the Army's statements to Congress on this point were wrong, explaining, "there's nothing that demonstrates to me that they [i.e., Palantir] did not want to examine all opportunities for interoperability or integration." Ex. D, [redacted] Depo. Tr. at 241:1-4; *id.* at 223:20-224:4.

3. **The Army's Expert Testified That He Understood Why Palantir Would Be "Shocked" By The DCGS-A Program Owners' False Representations To Congress.**

On October 21, 2011, Mr. Philippone emailed [redacted] quoting the misinformation that had been presented to Congress about the SIL and stating:

> "I am not sure if you saw this or not, but ***I was shocked when I saw it***. From the information that I have and my recollection of events, ***this note to congress [sic] from*** [redacted] ***could not be further from the truth***. We made a good faith effort to build a

[8] The stated purposes of this Information Paper were to "provide a response to the Congressional request for information on delivery of Palantir Government 3.0 Software to the DCGS-A Software Integration Laboratory (SIL)." Ex. P ([redacted] Depo. Ex. 22).

[redacted]

> plan to fully integrate with every touching point of the DCGS-A architecture and even offered to integrate with the cloud, I have multiple emails offering to do whatever they wanted to put the technical arguments to bed (see attachment) but we were prevented from doing it. I felt like you at least knew that we made a good faith effort and were blocked, but I am curious if you viewed the sequences of events differently or agree with the response above and there was something we failed to do."

Ex. Q. When he was confronted with that email during his deposition, [redacted] said the following:

> Q. Reading it now, can you understand why Mr. Philippone was shocked to read this description by [redacted]
>
> A. Yes.

Ex. D, [redacted] Depo. Tr. at 313:14-17; *see also id.* at 314:10-11 ("I can understand why he would be shocked.").

### D. The Evidence Shows That By 2012 Staff Members Of The Army's G-2 Had An "Entrenched Animosity Towards Palantir," Had Altered An Objective Report To Remove Favorable Assessments Of Palantir's Capabilities, Had Become "Defensive" About DCGS-A And Palantir, And Had "Lost Some Of Their Objectivity."

#### 1. [redacted] Emailed Palantir On March 10, 2012 And Reported That, According To [redacted] (Program Manager for DCGS-A), Ms. [redacted] of DA G-2 "Had An Entrenched Animosity Towards Palantir, Which Has Been Spread And Inculcated Into The DA Staff."

On March 10, 2012, [redacted] sent an email to Mr. Philippone in which he recounted a "three-hour discussion" with [redacted] Ex. S. [redacted] stated that "[redacted] would really like to find a way to incorporate Palantir into DCGS-A." *Id.* However:

> "The biggest obstacles for [redacted] to bringing Palantir in are finding how the Army and Palantir can find a win-win relationship, and opposition from [redacted] for the DA G2. [redacted]

Case 1:16-cv-00784-MBH Document 72 Filed 09/01/16 Page 28 of 62

[redacted]

> ***appears to have an entrenched animosity towards Palantir***, which has been spread and inculcated into the DA staff, and supposedly a personal dislike for Doug by name."

*Id*. (emphasis added). When asked about this email during her deposition, [redacted] said:

> Q. Do you have any explanation for this document at all?
>
> A. I do not. That's [redacted] That's what he's saying. That's not from [redacted] Those are not his words.

Ex. E, [redacted] Depo. Tr. at 92:12-16.

**2. "Negative Feedback" From [redacted] At G-2 "Caused [redacted] To Wave Off" Working On A DCGS Project With Palantir.**

Even as G-2 was telling Palantir to work with defense contractors instead of participating in the JIL, *see supra* at Section B.1, G-2 was telling defense contractors *not* to work with Palantir. In a December 15, 2011, email to Mr. Philippone and [redacted] of the Combatting Terrorism Technical Support Office (CTTSO), [redacted] reported that Lockheed Martin had been "looking at integrating Palantir into our DCGS AF, A, N, and SOF offerings," but "***Negative feedback from the DA G2 CIO at the time caused Lockheed Martin to wave off*** and we instead got into discussions with ISS, ESRI, and i2, and focused heavily on Ozone and the traditional tools." Ex. R. During her deposition, [redacted] acknowledged that "DA G2 CIO" referred to her, Ex. E, [redacted] Depo. Tr. at 32:2-4, and that she had conversations with [redacted] about Palantir, *id*. at 33:7-9, but she said that she had no recollection of giving Lockheed Martin negative feedback about Palantir, *id*. at 33:20-22.

[redacted]

### 3. In April And May Of 2012, The G-2 Insisted On The Rescission And Alteration Of An ATEC Report That Had Highly Favorable Findings About Palantir's Capabilities.

In April 2012, the Army Test and Evaluation Command (ATEC) published a report summarizing the results of a study it had conducted of Palantir's capabilities. *See* Tab 153. The ATEC Report included language favorable to Palantir, including a recommendation that the Army install more Palantir servers in Afghanistan, *id*. at A7710, a recommendation that intelligence analysts receive training on Palantir, *id*., and the following paragraph:

[redacted]

*Id*. at A7708.

Shortly after the ATEC Report was published, staff within G-2 demanded that it be rescinded, destroyed, and replaced. Specifically, after a telephone conversation with "several members of the DA G-2," [redacted], the Executive Director of ATEC's Operational Test Command, wrote to [redacted], Deputy Commander of the Forward Observational Assessment team that had studied Palantir: [redacted] Tab 140R at A6687-88 (emphasis added). This order was carried out and recipients were told to [redacted] Tab 154 at A7752.

[redacted]

The revised report that ATEC ultimately issued removed the recommendation to install additional Palantir servers, the recommendation to provide additional Palantir training, and, perhaps most importantly, *the paragraph describing Palantir's capabilities with respect to several key databases, including M3 and MX, both of which are human intelligence (or HUMINT) databases*. *Compare* Tab 153 at A7708 *with* Tab 155 at A7761-62. In its July 1, 2016 "Determination of Non-Commercial Item," the Army proclaimed, without any support or explanation, that commercial items *cannot* provide HUMINT capabilities, an assertion that would have been directly contradicted by the ATEC Report—had G-2 not insisted that the paragraph about Palantir's capabilities be removed. *Compare* Tab 134 at A6626 (stating that commercial items cannot provide HUMINT capabilities) *with* Tab 153 at A7708 (praising Palantir's capabilities with respect to HUMINT).

**4. Lieutenant General Grisoli's Investigation Report Into The Rescission And Alteration Of The April 25, 2012 ATEC Report Found That G-2 Staff Were [redacted] About Palantir And DCGS And Had [redacted]**

After the April 25, 2012 ATEC report was rescinded and altered, Lieutenant General Grisoli was tasked with investigating, among other things, whether there had been [redacted]" Tab 140R at A6654. Lieutenant General Grisoli found:

[redacted]

*Id.* at 6719 (emphasis added).

[redacted]

**5. Neither [redacted] Report Nor Any Of Its Supporting Documents Explain Why One Especially Favorable Finding From The April 25, 2012 ATEC Report Was Deleted.**

The rescission and alteration of the April 25, 2012 ATEC report removed a key paragraph describing Palantir's strengths and capabilities, opening the door for the Army to conclude in this procurement that no commercial item had these capabilities. *See supra* Section D.2; Tab 153 at A7708. Yet neither Lieutenant General Grisoli's investigative report nor the documents he relied upon explain why this paragraph was removed.

According to the investigative report, the Army G-2 provided [redacted] to ATEC on May 8, 2012 which [redacted] Tab 140R at A6688-6691. The Grisoli report includes a chart showing the original ATEC report language and the corresponding [redacted]." *Id.* For the paragraph detailing Palantir's capabilities, the chart states:

[redacted]

*Id.* at A6690.

There is no evidence in either the Grisoli Report or its supporting documents that anyone ever checked or confirmed whether Palantir could [redacted] Had the Army investigated those points, it would have discovered from its very own contracts with Palantir that Palantir had these capabilities. The Army's December 2010 Integrated Fusion and Analysis Platform (IFAP) contract with Palantir required Palantir to access, among other things, CIDNE, M3, and BAT data. Tab 158 at A7916 (statement of work paragraph C.2.2.1). Palantir received multiple "EXCEPTIONAL" ratings for its performance of the Army IFAP contract, providing "software and services that exceed the Government's

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 32 of 48

[redacted]

expectations with minimal issues." *See* Tab 165 (CPARS for the Army IFAP contract). Nonetheless, ATEC followed the G-2's recommendation and deleted this paragraph from the ATEC report.

### E. The G-2 And DCGS Program Owners Circulated Inaccurate Information About Palantir's Capabilities.

#### 1. In 2011, The Combatting Terrorism Technical Support Office Expressed [redacted]

In December 2011, a contractor working for the Combatting Terrorism Technical Support Office ("CTTSO") wrote an email to [redacted] of Regional Command–South (i.e., the regional command for southern Afghanistan). In that email, [redacted] states:

> "Have shared your comments with our CTTSO staff in DC. Your perspective is very much appreciated and ***confirms our suspicions about DCGS-A***. If you have time, please review the attached memos and this article and let us know what you think. ***The Army Chief of Staff memo in particular is filled with info that is used to block efforts by units like yours to get Palantir***. If it is inaccurate we'd like to know and be able to explain why it is so to people here in DC."

Ex. N.

In response, [redacted] wrote back with an extensive email explaining the benefits of Palantir and its superiority to DCGS-A. *Id.* For example, [redacted] explained:

- "…the effect seen is that units and sections using Palantir are doing more of their basic work faster and easier, and taking on more advanced tasks." *Id.* at 1.
- "Once we set them up on a trial Palantir license during our proof of concept, they were knocking out activity and trend analysis in less than an hour….." *Id.* at 1.
- "Being able to do basic tasks exponentially faster, and use intuitive interfaces to explore the data, makes it possible to do advanced analytics for real." *Id.* at 1.

[redacted]

- "In a side by side comparison, the Palantir user is already way ahead of the DCGS-A user in the first minute as the DCGS-A user builds a query in Querytree or draws a polygon in ArcGIS or 2D Map to import in for a geographic search area, vs being able to do this with a mouse click in Palantir." *Id.* at 2.

- "They are getting into some meaningful analysis 10-15 minutes into their effort and the DCGS-A user is literally hours behind in how much work they have to do to run queries." *Id.* at 2.

- "Once I saw the outcome of that event, I was convinced it [Palantir] was not just cosmetically better but there was a definitive difference in effectiveness…..There is a new understanding of what is in the realm of possible." *Id.* at 2.

Thus, far from agreeing with the memo that had been used "to block efforts by units like yours to get Palantir," [redacted] wrote a ringing endorsement of Palantir, and explained its superiority over DCGS-A. This shows that the Army Chief of Staff memo was relying on inaccurate or at least incomplete information, and was totally inconsistent with the experience of Palantir users in the field. In closing his email response to [redacted], [redacted] wrote that Palantir made him believe things were now possible that he previously would have thought would require "future technology in 2020," and stated: "It is edge of the seat exciting stuff, as an intel officer on my 6th combat tour, and I'm very optimistic of what we're going to be able to accomplish here." *Id.* That optimism has now been destroyed by the actions of the DCGS-A program owners to prevent a commercial item procurement for any part of DCGS-A Increment 2.

**2. In 2014 And 2015, DCGS-A Program Owners Circulated A Venn Diagram Showing Palantir As Having Only A Small Subset Of The Capabilities Required By DCGS-A—A Diagram That [redacted] Now Concedes Was "Dated," "Incomplete," and Not "A Full Representation" of Palantir's Capabilities.**

Beginning in or around 2012, the Army G-2 created a Venn diagram that supposedly showed the overlap between the requirements of the DCGS-A program and the capabilities of the

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 34 of 48

[redacted]

Palantir Gotham Platform. *See* Ex. Z. This diagram showed the only overlap as being "Link Analysis, Visualization, Mapping." *Id.* As shown in other independent studies and as explained in the expert report of Bryant Choung, that is (and always has been) a grossly inaccurate presentation of Palantir's capabilities. Tab 156 at A7806-7815; Tab 158 (Statement of Work from Army contract with to provide a complete Integrated Fusion and Analysis Platform); Tab 153 at A7708 (describing one of Palantir's ability to connect and interoperate with HUMINT, BATS, and other intelligence systems); Dkt. 16-03 (Ex. 2) at 15 (National Assessment Group finding that the Palantir Gotham Platform met [redacted]" of the 2010 Flynn JUONS); Dkt. 16-03 (Ex. 7) at 180 (Marine Corps describing Palantir as providing "rich set of features that collectively support scalable data storage and access, as well as fast searches, access control, revisioning, and analysis"); Dkt. 44-02 (Choung Decl.) at 15-22; Ex. T.

When questioned about this Venn diagram, [redacted] admitted these Venn diagrams are "dated," and did not dispute that they are "incomplete" and "weren't a full representation of what Palantir can do."

> Q. Is this—is this description of what Palantir can do and what it cannot do consistent with what you were saying earlier in your testimony before the break about what Palantir can do and cannot do in showing us Exhibit 12?
>
> A. For the time horizon of what we were discussing in terms of what Palantir has offered to present previously, which is the only judgment—I mean it's the only assessment I have, I don't think this is completely—I think it's changed. I think there's been some progress between the Army and Palantir and Palantir and the Army on interoperability. ***So I think this is a little dated, if that makes sense***.
>
> …

[redacted]

Q. What I'm saying is that you have these Venn diagrams that Palantir believes are inaccurate and that you yourself have said are incomplete and only dated—and are dated.

A. Right.

Q. Okay. They're incomplete, they're dated, and they weren't a full representation of what Palantir can do.

A. Okay.

[redacted] Depo. Tr. 100:11-24; 161:5-14. [redacted] was not able to identify any studies or assessments this "dated" Venn diagram was based upon. *Id.* at 212:11-18.

Similarly, the G-2's CIO, [redacted] also tried to dodge this inaccurate information by claiming it was only meant to be accurate "[a]s of February of 2012". Ex. E, [redacted] Depo. Tr. at 65:1-4. But she also admitted that she did not "know of any study on any of those specifics" representing the Army's claims about Palantir's capabilities. *Id. at* 61:7-14.

It is simply not correct that this Venn diagram was accurate in 2012. It was not, as shown by the Army's own 2010 IFAP contract with Palantir (Tab 156) and by independent reports prepared by the National Assessment Group in February 2012, by ATEC in the spring of 2012, and by the Marine Corps in 2012.

In any event, the incorrect Venn diagram presentation of Palantir's capabilities has continued to this day. In 2013, General Odierno and Secretary of the Army McHugh wrote to Congressman Duncan Hunter, stating: "Although a useful tool, Palantir provides only a subset of the capabilities of DCGS-A, primarily in the link analysis of people, places and events." Dkt. 16-05 (Ex. 39) at 475. In December 2014 (while the Increment 2 procurement was being structured), this Venn diagram surfaces once again, this time as part of a document used by the Army Special Operations Command. Ex. V. Indeed, in this incarnation, the Venn diagram

[redacted]

shows Palantir's capabilities as including only "Link Analysis," "Visualization," and "Ease of Use." Ex. V. The Army's own expert, [redacted] testified that it is not accurate to describe Palantir's capabilities as only "Link Analysis" and "Visualization," Ex. D, [redacted] Depo. Tr., at 379:22-380:3, and admitted that Palantir has a full "Data Management Platform" as defined in Mr. Choung's report, *id.* at 378:2-5.[9]

Thus, during the supposed "market research" for the Increment 2 Solicitation, false information about Palantir was still floating around the Army. The Army's own expert admitted that (a) this description of Palantir is not accurate, and (b) it was nonetheless the description of "how it was being characterized":

> Q. Would you agree that the Palantir Gotham Platform is not simply a link analysis or visualization tool?
>
> A. Yes.
>
> Q. And did you ever hear anyone in the Army say that Palantir was only a link analysis tool or only a visualization tool?
>
> A. I know that was the characterization that it was being -- how it was being described.

Ex. D, [redacted] Depo. Tr. 379:22-380:8.

Inaccurate assertions about Palantir's capabilities are not limited to the Venn diagram. In June 2013, [redacted] the Deputy of Acquisition and Systems Management for ASA(ALT), stated on national television that "Palantir does 8-10% of the functions required by

[9] This inaccurate Venn diagram appears once again in a February 2015 draft information paper comparing intelligence systems that appears to have been prepared by the Army G-2 for Special Operations. See Ex. W (February 2015 Information Paper) at 2. Once again, the diagram falsely shows Palantir's areas of overlap with DCGS as limited to "Link Analysis" and "Visualization."

[redacted]

DCGS."[10] That is totally false, as shown by the numerous documents evaluating Palantir and comparing it favorably to DCGS. *See e.g.* Tab 156; Tab 153; Dkt. 16-04 at 254 ([redacted] requesting Palantir because of numerous deficiencies with the DCGS "current tools"); Ex. N. In May 2013, General Odierno stated "DCGS-A is this iPhone . . . Palantir is an app."[11] The Government's own expert agreed that the Palantir Gotham Platform is "***not just an app***." Ex. D at 275:13-276:1 (emphasis added).

**3. [redacted] Admitted To Giving A Reporter A "Negative" And "Not Scientific" Document About Palantir's Capabilities That Was Written By One Of Her Staffers But Made To Appear Like A Report By An Independent, International Task Force.**

On May 2, 2013, [redacted] gave a document about Palantir's capabilities to the reporter Robert Draper with The New Republic. Ex. F, [redacted] Depo. Tr. at 217:17-218:1; *see also* Ex. Y. The document purports to be prepared by the International Security Assistance Force ("ISAF"). However, [redacted] admitted that the document was actually prepared by one of her staffers (who was temporarily seconded to ISAF). Ex. F at 227:11-228:15. [redacted] also admitted that she did not inform the reporter to whom she gave this document that it was prepared by one of her staffers, rather than being an independent assessment by ISAF. *Id.* at 230:12-18.

The document states that "Palantir's poor performance in data and latency results in a significant risk to timely and accurate analytical production." Ex. F, [redacted] Depo. Tr. at 214:24-

---

[10] FoxNews.Com, "US Army Defends Data System Under Fire By Critics," June 4:50-5:05, available at https://video.foxnews.com/v/2518662092001/us-army-defends-data-system-under-fire-by-critics/?#sp=show-clips

[11] Brenden McGarry, Army Chief Compares Intel Database to iPhone, DefenseTech (May 7, 2013) available at http://www.defensetech.org/2013/05/07/army-chief-compares-intel-database-to-iphone/

[redacted]

215:5; *see also* Ex. Y. The document also states there is a "significant intelligence gap" between Palantir and DCGS-A, claiming the gap is as high as "99%" in some instances. Ex. F, [redacted] Depo. Tr. at 216:11-22; [redacted] Depo. Ex. 15 at 2.

[redacted] admitted this document was a "negative presentation of Palantir's capabilities," Ex. F, [redacted] Depo. Tr. at 216:22-217:1, that it was "not scientific output," *id.* at 230:12-231:4, and that she could "not endors[e] the qualitative analysis here," *id.* at 216:9-10. Yet, in spite of this, she gave the document to a reporter who was doing a story on DCGS-A and Palantir because she wanted to "illustrate the tension" between DCGS-A and Palantir. *Id.* 231:11-16. And as shown above, she did this without explaining that it was prepared by one of her former staffers (and presumably without expressly disclaiming that it was "not scientific output").

**4. [redacted] Testified That "Both Sides Misrepresent The Capabilities Of Both."**

[redacted] deposition revealed that the Army has misrepresented Palantir's capabilities. Palantir's counsel confronted [redacted] with evidence from the Grisoli report, the GAO, and Congress that criticized the success of the DCGS-A program and found that Army G-2 had become "a little defensive" and "lost objectivity" when discussing Palantir's capabilities. Ex. F, [redacted] Depo. Tr. at 168:16-174:15. [redacted] initially refused to admit that these independent reports about the DCGS-A program and the G-2's attitude towards Palantir were correct, instead blaming Palantir for "frequently describing it [i.e., the Palantir Gotham Platform] incorrectly." *Id.* at 169:16-170:12. She ultimately admitted, however, to feeling "besieged," though she then tried to blame this on the

[redacted]

multiple inquiries from Congress about DCGS. *Id.* at 53:2-8. She also testified that "both sides misrepresented the capabilities of both." *Id.* at 174:11-15.

### F. The Government's Witnesses Testified That ASA(ALT) Was Responsible For Determining The Procurement Strategy For The Solicitation That Is Challenged In This Case, But That There Were "Open Lines Of Communication" And "Input" From G-2.

Both [redacted] and [redacted] (former CIO of G-2) testified that ultimately it was ASA(ALT)—not them—that was responsible for determining the procurement strategy for the DCGS-A2 solicitation (which includes whether it would include a solicitation for a commercial item or not). For example, [redacted] disclaimed any involvement in the decision of how to structure the Solicitation, and testified that it likely would have been ASA(ALT) that decided not to solicit a commercial item. Ex. F, [redacted] Depo. Tr. at 176:7-24.

Similarly, [redacted] testified as follows regarding the role of the Program Manager ("PM") and ASA(ALT) in drafting the actual procurement language in the Solicitation:

> Q. So, okay. I think I understand this. So G2 works with TRADOC to set the requirements, right?
>
> A. Functional -- functional requirements.
>
> Q. And then TRADOC works with the PM to draft the procurement language?
>
> A. Yeah. Correct, and ASA(ALT).

[redacted] Depo. Tr. at 125:3-8.

Likewise, the Government's expert testified that it was the DCGS Program Manager [redacted] and the Program Executive Office ("PEO")—both of which are part of ASA(ALT)—that had responsibility for the "procurement strategy." Ex. D, [redacted] Depo. Tr. at 17:1-2; *see also* 18:12-21. The Government also states that ASA(ALT) makes the "Final

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 40 of 48

[redacted]

Decision on Acquisition Strategy" and the "Agency Recommendation For Issuance Of Solicitation." Dkt. 19 at 6-7.

Nevertheless, while ASA(ALT) may ultimately be responsible for the "acquisition strategy," the record shows that G-2 had significant input and communication with ASA(ALT) about the procurement. [redacted] agreed that "basically everybody who is involved in DCGS-A is working collaboratively together," and there were "open lines of communication" between G-2 and those involved in drafting the procurement. Ex. E at 132:21-133:15. Similarly, [redacted] testified that, as controlling general of INSCOM, she was the "functional proponent" of DCGS-A. Ex. Fat 34:22-35:20. She further testified that she "concur[ed]" with the statement that, as Deputy Chief of Staff for G-2, she "approved the priority and requirements that [would] support development DCGS Increment 2." *Id.* at 22:11-22. She also agreed that she "provided input" to and was "involved in" "the requirements process for changes to our program of record." *Id.* at 14:3-5; *see also* 16:13-15. [redacted] also testified that she was "a functional lead," that requirements "would certainly have to come to me for review," and that she was "technically an important reviewer and participant in the process . . ." *Id.* at 18:18-19:11.

[redacted]

## ARGUMENT

### I. The Court Should Grant Palantir Leave To Serve The Attached Discovery Requests.

Palantir seeks written discovery and targeted document productions on two specific topics:

- First, Palantir asks whether the Army admits, denies, or has insufficient information to admit or deny each of the 45 allegations of "blocking" and bias that Palantir's Mr. Philippone sent to the Deputy Assistant Secretary of ASA(ALT) on October 7, 2014. In connection with this request, Palantir asks the Army to describe what if any investigation it has conducted as to these allegations, to describe the basis for any denial it asserts as to any specific allegation, and to answer whether three of the specific individuals listed in Mr. Philippone's email as having been the target of "blocking" actions confirm that such actions occurred (we limited this request to three individuals to minimize burden). *See* Ex. B at Interrogatories 1-3; Ex. C at RFP 1.

- Second, Palantir asks whether ASA(ALT) received certain kinds of information about Palantir's capabilities during the period of time from June 1, 2014 to December 23, 2015. Related to that, we ask that any such information that was conveyed be provided to us (if it is in documentary form) or described to us (if it is not in documentary form). *See* Ex. B at Interrogatories 4-5; Ex. C at RFP 2.

The Court should order the Army to provide this targeted discovery to Palantir in order to ensure that the Court has a meaningful opportunity to conduct effective judicial review over Palantir's claims of bias and bad faith. As we have shown previously, the standard for determining whether to permit discovery and supplementation of the record due to allegations of bad faith or bias is substantially less than is required to demonstrate bad faith on the merits. *See* Dkt. 16 at 29-30. The need to show "clear and convincing" evidence of bad faith or bias applies only to the ultimate merits determination on bad faith and bias, not to the determination of whether to permit discovery or supplementation. *See e.g. L-3 Communications Integrated Systems, L.P. v. United States*, 91 Fed. Cl. 347, 355 (2010). Without requiring "clear and convincing" or "irrefragable" evidence, this Court may "entertain extrarecord evidence and

[redacted]

permit discovery when there has been a 'strong showing of bad faith or improper behavior' such that without discovery the administrative record cannot be trusted." *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010). Similarly, the Court may permit supplementation or discovery where the protestor has set forth a "credible allegation of motivation for the Government employees in question to have acted in bad faith or conduct that is hard to explain absent bad faith." *Starry Associates, Inc. v. United States*, 125 Fed. Cl. 613, 623 (2015) (internal citations omitted).

In this case, Palantir has presented extensive evidence of improper conduct and bias. That conduct is amply set forth in the Fact section above. We respectfully submit that this evidence should alone be enough to support a finding of bad faith and bias that would provide an independent basis for setting aside the Solicitation (in addition to each of the other legal bases set forth in Counts I–VI of our complaint).

At a minimum, Palantir has presented enough evidence to justify additional discovery that is narrowly targeted on the personnel within the Army who were responsible for determining the "procurement strategy" in this case—i.e., who decided not to solicit a commercial item to meet any of the needs of DCGS-A2. Moreover, Palantir has demonstrated that there is no plausible explanation—in the record or elsewhere—for the Army's unlawful refusal to issue a solicitation to procure a commercial item to provide the Data Management Platform that the Army admits it needs. Dkt. 14 at 32-35; Dkt. 52 at 38-46. As shown above, discovery into bad faith is warranted where there is "conduct that is hard to explain absent bad faith." *Starry Associates*, 125 Fed. Cl. at 623. Here, the procurement itself constitutes such conduct. The same is true for the blockage of Palantir's ability to demonstrate its capabilities in the JIL and the SIL.

[redacted]

Perhaps most egregiously, the fact that the Army's Program Manager for DCGS would provide false information to Congress is impossible to explain absent bad faith. *See* Section C, *supra*.

Palantir seeks information sufficient to show (a) whether the ASA(ALT) staff investigated the 45 allegations of bias they were sent on October 7, 2014 or not, and whether the Army admits or denies those allegations (or says it has insufficient information—which would show that it never investigated the allegations), and (b) whether ASA(ALT) received any of the misleading and inaccurate information about Palantir that G-2 and others had been sending to Congress and Army leadership.

Palantir has tried to make its requests as narrow as possible. Palantir is more than willing to stipulate to simple document search terms that would be deemed sufficient to respond to Interrogatories 4-5 and RFP 2. But the Army should be required to make some reasonable effort to provide the information sought by the attached discovery requests.

It bears emphasizing that the Government is simultaneously asserting that (a) Palantir should not be entitled to rely on the allegations of bias and blocking set forth in Mr. Philippone's October 7, 2014 email to the Deputy Assistant Secretary of ASA(ALT), and (b) Palantir should be prevented from finding out whether the Government thinks those allegations are true or false, and the basis for any such position. That position is untenable, even in a bid protest. The allegations set forth in Mr. Philippone's email are very specific, and provide names and dates. These allegations of bias are inherently credible because they are of a piece with the extensive evidence Palantir has provided showing that (a) G-2 had an "entrenched animosity" toward Palantir (Section D(1), *supra*), (b) G-2 insisted on deleting findings in the supposedly independent ATEC report that were favorable to Palantir (Section D(3)-(5), *supra*), (c) G-2 and DCGS Program Owners blocked Palantir from participating in the planned JIL and SIL

[redacted]

evaluations that would have confirmed the full extent of Palantir's "interoperability" and other capabilities (Sections A & B, *supra*), and (d) G-2 and DCGS Program Owners disseminated inaccurate information about Palantir, including to Congress (Sections C & E, *supra*).

The allegations set forth in Mr. Philippone's October 7, 2014 email are extremely serious, and deserve to be read in full. When read in sequence and in full, they present a devastating picture of the extent to which G-2 officials and perhaps others who were heavily invested in the DCGS program repeatedly acted to block Palantir's use by commanders in the field who were repeatedly requesting Palantir, and who repeatedly praised Palantir's capabilities. *Compare* Ex. U *with* Ex. R, Tab 156, *and* Tab 153. A short sample of the allegations in the October 7, 2014 email includes reports that [redacted]," that Army units "[redacted] that Army units were [redacted] that they should [redacted] that a G2 staffer said he "[redacted] that people "[redacted] that specific G2 staffers were [redacted] Ex. U. All this despite (or perhaps *because of*) rave reviews of Palantir from Army intelligence officers and independent evaluations. *See* Ex. R ([redacted] email describing superiority of Palantir to DCGS); Dkt. 16-03 at 15 (National Assessment Group finding that the Palantir Gotham Platform met [redacted] of the 2010 [redacted]JUONS); Dkt. 16-03 at 180 (Marine Corps describing Palantir as providing "rich set of features that collectively support scalable data storage and access, as well as fast searches, access control, revisioning, and

[redacted]

analysis"); Dkt. 16-04 at 254 ([redacted] [redacted] requesting Palantir because of numerous deficiencies with the DCGS "current tools").

## II. The Army Should Be Compelled To Produce Documents Relating To The Investigation Into The Destruction Of The ATEC Report.

Palantir also asks the Court to compel the Army to fully comply with this Court's previous order requiring the Army to produce documents relating to its internal investigation of the modification and destruction of the April 2012 ATEC report—specifically, the documents relied on in the report produced by Lieutenant General Grisoli ("Grisoli Report") (Tab 140R), which investigated and reported on the alteration and rescission of the April 25, 2012 ATEC report. *See* Dkt. 31 at 2. While the Army appears to have produced most of those documents, it has not produced the following six Exhibits, which are listed as follows in the Index to the Grisoli Report (attached hereto as Exhibit AA):

- Exhibit DD.13: HQDA EXORD 524-04 (Secret);
- Exhibit EE.1: [redacted] request for Palantir during SRU, 26 Jan 2012 (Secret);
- Exhibit FF.9: Email, [redacted] to [redacted], 31 Mar 2012, 10:41 AM
- Exhibit HH4: Email, [redacted] to [redacted], regarding comments on FOAR Report and [redacted] provide non-technical comments, 13 Apr 2012, 1:49 PM; 18 Apr 2012, 4:14 PM (Secret);
- Exhibit HH5: Email traffic between [redacted] [redacted] [redacted] [redacted] and [redacted] regarding draft Palantir FOAR, 15 Apr 2012, 10:34 AM; 18 Apr 2012, 11:55 AM (Secret); and
- Exhibit HH9 to the [redacted] Report: Email, [redacted] to [redacted], Palantir Draft, 19 Apr 2012, 8:17 AM (Secret).

[redacted]

Of these six documents, all but one (Exhibit FF.9) have a slip sheet in the location within the actual production of the underlying exhibits where that exhibit should have been placed, with the slip sheet stating “CLASSIFIED EXHIBIT.”

Even assuming that all six of these exhibits are classified, that is not a basis for the Army’s failure to produce them to counsel for Palantir, subject to the protections of the Protective Order. Palantir can, and has offered to, work with the Army to establish a proper mechanism to review those documents by lawyers who are working on this case and have obtained the relevant security clearances in the past (including Stacey Grigsby, who used to work in the Department of Justice, and Jon Knight, who is a former clerk on this Court who worked on classified bid protests). It is not unusual to have classified material produced in a bid protest, so long as it is done in an appropriate manner that protects the confidentiality of the material involved. The Army has not given a justification for its refusal to do this.

Production of these documents is important because (1) the Court has already ordered it, and (2) the documents may provide further support for the Grisoli Report’s conclusion that “some members of the G-2 staff lost some of their objectivity with respect to how they presented information on Palantir and DCGS-A to Army senior leaders,” Tab 140R at A6719; and (3) the documents may explain why G-2 asked ATEC to remove from its April 2012 report an accurate paragraph stating that Palantir had certain capabilities, including HUMINT capabilities, which the Army now claims are unavailable from commercial items—the Grisoli Report and its other underlying documents fail to explain why this paragraph was deleted (*see* Section D(5), *supra*).

In addition, with the possible exception of the undated Exhibit DD.13: HQDA EXORD 524-04 (Secret), all of these missing Exhibits predate the April 25, 2012 ATEC report. They therefore may contain additional favorable descriptions or findings on Palantir’s capabilities that

Case 1:16-cv-00784-MBH Document 70 [redacted] Filed 08/26/16 Page 47 of 48

[redacted]

did not find their way into even the April 25, 2012 report. Several are from or between senior members of the ATEC Forward Operational Assessment team (e.g., [redacted] was a commander of this team). That makes them especially relevant, as that is the team that was assessing Palantir's capabilities. Palantir and the Court are entitled to see these documents to fully understand and assess the extent to which ATEC's independent evaluation of Palantir was compromised.

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: August 26, 2016

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th of August, 2016, a copy of the **MOTION FOR ADDITIONAL DISCOVERY AND ENLARGEMENT OF THE SCHEDULE** was served electronically on counsel for the defendant, whose address appears below.

Domenique Kirchner
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C. 20044

/s/ Hamish P.M. Hume

HAMISH P.M. HUME
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
hhume@bsfllp.com
(202) 237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

INDEX OF THE EXHIBITS TO PALANTIR'S MOTION FOR ADDITIONAL DISCOVERY AND ENLARGEMENT OF THE SCHEDULE

| Ex. | Date | Used | Description |
|---|---|---|---|
| **A** | | | Proposed Request for Admission |
| **B** | | | Proposed Interrogatories |
| **C** | | | Proposed Requests for Production |
| **D** | 8/19/2016 | | [redacted] Deposition Transcript |
| **E** | 8/9/2016 | | [redacted] Deposition Transcript |
| **F** | 8/3/2016 | | [redacted] Deposition Transcript |
| **G** | 2/27/2009 | [redacted] Ex. 4 | Email chain between [redacted], D. Philippone, and [redacted] , *RE: JIL* |
| **H** | 8/13/2010 | [redacted] Ex. 27 | Email from [redacted] to D. Philippone, *Introduction* |
| **I** | 12/10/2010 | [redacted] Ex. 12 | Emails among [redacted] D. Philippone, *Contract Status* |
| **J** | 2/4/2011 | [redacted] Ex. 13 | Email from [redacted] to [redacted] *Agenda For Griffin-PG Integration Meeting* |
| **K** | 2/14/2011 | [redacted] Ex. 14 | Email from [redacted] to [redacted], *RE: Agenda For* [redacted]*-PG Integration Meeting* |
| **L** | 3/28/2011 | [redacted] Ex. 15 | Emails between [redacted] and [redacted] *RE:UNCLASS Brain or Safe Move Repository (UNCLASSIFIED)* |
| **M** | 5/4/2011 | [redacted] Ex. 20 | Email from [redacted] to D. Philippone, [redacted] *Phonecon* |
| **N** | 5/9/2011 | [redacted] Ex. 19, [redacted] Ex. 9 | Email from D. Philippone to [redacted] (Army), *RE Collaboration* |
| **O** | 9/30/2011 | [redacted] Ex. 21, [redacted] Ex. 11 | Information Paper on DCGS-A |
| **P** | 10/18/2011 | [redacted] Ex. 22, [redacted] Ex. 12 | Information Paper on DCGS-A engagement with Palantir |
| **Q** | 10/21/2011 | [redacted] Ex. 23 | Email from D. Philippone to S. [redacted] *integration effort* |
| **R** | 12/15/2011 | [redacted] Ex. 14 | Email from [redacted] (MAJ) to [redacted] and D. Philippone, *RE: (UNCLASSIFIED)* |
| **S** | 3/10/2012 | [redacted] Ex. 17 | Email from [redacted] to D. Philippone, *Meeting with* [redacted] *(UNCLASSIFIED)* |
| **T** | 5/6/2013 | [redacted] Ex. 30 | Memo from S. Sankar to [redacted] |
| **U** | 10/7/2014 | [redacted] Ex. 8 | Email from [redacted] to D. Philippone, *RE: Blocking* |
| **V** | 12/5/2014 | | DCGS-A Presentation |

INDEX OF THE EXHIBITS TO PALANTIR'S MOTION FOR ADDITIONAL DISCOVERY AND ENLARGEMENT OF THE SCHEDULE

| | | | |
|---|---|---|---|
| **W** | 02/2015 | | Draft Intel Comparison White Paper |
| **X** | | [redacted] Ex. 12 | DCGS-A Presentation |
| **Y** | | [redacted] Ex. 15 | Data and Latency Comparison |
| **Z** | 7/26/2012 | [redacted] Ex. 16 | Information Paper on DCGS-A |
| **AA** | 7/27/2016 | | [redacted] Supporting Documents Index |

# Exhibit A

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR USG, INC.<br>Plaintiff,<br>-vs.-<br>THE UNITED STATES<br>Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to this Court's Order and Rule of the Court of Federal Claims 36, Palantir USG, Inc. ("Palantir") hereby request that within fourteen (14) days of the date of service of this document, Defendant United States answer the following requests for admissions.

**DEFINITIONS AND INSTRUCTIONS**

1. "October 7, 2014 Email" means the October 7, 2014 email from Doug Philippone to [redacted] attached as Exhibit 1 to Dkt. 44-01 (Declaration of Doug Philippone).

2. The phrase "Allegation of Bias" refers to each one of the 45 specific assertions set forth in the October 7, 2014 Email, beginning with "SEP 2012, 82nd G2 [redacted] was told not to use Palantir by 18th ABC G2, [redacted]," and ending with "OCT 14 after a positive AAR on the use of Palantir by the 19th SFG, The Deputy Army G2 sent an email to [redacted] asking if SOCOM was providing Palantir servers to 19th SFG, and if so that providing Palantir to Army units was 'unacceptable.'"

3. When answering this RFA, wherever the words "yells" or "yelled" are found in the October 7, 2014 Email, those words should be interpreted to mean "communicates" or "communicated." Your response to the request for admission may provide clarification as to the

nature of the communication if needed.

4. When answering this RFA, wherever the words “intimidate” or “intimidated” are found in the October 7, 2014 Email, they should be interpreted as encompassing the terms “discouraged,” “directed,” “dissuaded” or any variation thereof.

5. In responding to this Request for Admission, the Government should either Admit, Deny, or state that it does not have sufficient information to Admit or Deny.

6. Where the Government’s response is that there is not sufficient information to Admit or Deny, state what additional information would be needed to determine whether to Admit or Deny and from whom that information could be obtained.

7. For any Allegation of Bias that contains more than one assertion, if the Government’s answer to the Request for Admission would be different for each assertion, the Government should provide a separate response for each such assertion.

8. The phrase “substantially accurate description of facts that actually occurred” should be given its plain meaning, and should be understood to apply whenever the Allegation of Bias is itself true, is an accurate reflection of what was said or done, or is accurate in all respects except for minor discrepancies, such as minor differences in wording, timing, or location, any of which could be identified as part of an answer that Admits an allegation is substantially accurate.

## REQUESTS FOR ADMISSION

### RFA No. 1

Admit that each Allegation of Bias in the October 7, 2014 Email is a substantially accurate description of facts that actually occurred.

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: August 26, 2016

# Exhibit B

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR USG, INC.<br><br>Plaintiff,<br>-vs.-<br><br>THE UNITED STATES<br><br>Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to the Court's Order and Rule of the Court of Federal Claims 33, Palantir USG, Inc. ("Palantir") hereby request that within fourteen (14) days of the date of service of this document, Defendant United States answer the following interrogatories.

**<u>DEFINITIONS AND INSTRUCTIONS</u>**

1. "October 7, 2014 Email" means the October 7, 2014 email from Doug Philippone to [redacted] attached as Exhibit 1 to Dkt. 44-01 (Declaration of Doug Philippone).

2. The phrase "Allegation of Bias" refers to each one of the 45 specific assertions set forth in the October 7, 2014 Email, beginning with "SEP 2012, [redacted] was told not to use Palantir by [redacted]," and ending with [redacted]

3. The phrase ASA(ALT) means the Assistant Secretary of the Army for Acquisition, Logistics, and Technology and any staff members working under ASA(ALT) or within ASA(ALT)'s chain of command, including but not limited to staff members working in

the office of the Distributed Common Ground System-Army Program Manager (DCGS-A PM). ASA(ALT) includes, but is not limited to, [redacted]

**INTERROGATORIES**

**Interrogatory No. 1**

Did the Army do anything to investigate the Allegations of Bias set forth in the October 7, 2014 Email? If so, please state what investigation was done, when it was performed, and what determinations were made as to the accuracy of those allegations.

**Interrogatory No. 2**

For each Allegation of Bias in the October 7, 2014 email from Mr. Philippone to Mr. Camarillo that the Government does not Admit is true in its response to Palantir's Requests for Admission, provide a statement explaining the Government's basis for refusing to Admit that the allegation is true, and include in that statement an explanation of (a) whether the Government has spoken with the individuals referenced in that Allegation of Bias, and (b) an explanation of whether any communication about Palantir took place between the individuals referenced in that Allegation of Bias at or around the time of the communication referenced in the Allegation.

**Interrogatory No. 3:**

After contacting the following individuals, please confirm:

- Whether [redacted] believes that on or around January of 2013, [redacted] made a statement that [redacted] or something substantially similar;
- Whether [redacted] believes that on or around August of 2012, [redacted] told him to "[redacted] or something substantially similar;
- Whether [redacted] believes that [redacted] communicated on or around October of 2014 that providing Palantir to Army units was unacceptable, or something substantially similar.

**Interrogatory No. 4**

Between June 1, 2014 and December 23, 2015, did ASA(ALT) receive any information that:

- Discussed Palantir's capabilities in any way, including in particular any description of Palantir's capabilities as only providing Link Analysis, Visualization, and Mapping (or any subset of those);

- Described Palantir's technology as proprietary and therefore as not being either "interoperable," "open," or otherwise suitable for meeting any of the needs of DCGS Increment 2;

- Recommended against trying to satisfy any of the requirements for DCGS Increment 2 through a procurement of a commercial item, or through the procurement of any Palantir product or service;

- Discussed the problems of acquiring any proprietary software because of private ownership of the underlying source code or technology.

**Interrogatory No. 5:**

To the extent your answer to Interrogatory Number 4 identifies any communications that are not contained in documents that are produced to Palantir pursuant to Request for Production 2, provide a description of that communication and state whether it was oral or in writing.

Respectfully submitted,

/s/ Hamish P.M. Hume

Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: August 26, 2016

# Exhibit C

**UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| PALANTIR USG, INC.<br><br>Plaintiff,<br><br>-vs.-<br><br>THE UNITED STATES<br><br>Defendant. | Case No. 16-784C<br>Judge Marian Blank Horn |

## PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to the Court's Order and Rule of the Court of Federal Claims 34, Palantir USG, Inc. ("Palantir") hereby request that within fourteen (14) days of the date of service of this document, Defendant United States produce the following documents.

## DEFINITIONS AND INSTRUCTIONS

1. "October 7, 2014 Email" means the October 7, 2014 email from Doug Philippone to [redacted] attached as Exhibit 1 to Dkt. 44-01 (Declaration of Doug Philippone).

2. The phrase "Allegation of Bias" refers to each one of the 45 specific assertions set forth in the October 7, 2014 Email, beginning with [redacted] was told not to use Palantir by [redacted]," and ending with [redacted]

## REQUESTS

**Request No. 1**

Produce all documents referenced in the October 7, 2014 Email or that contain the

communications set forth in one of the Allegations of Bias contained in that email.

**Request No. 2**

For any communication identified in response to Interrogatory Number 4, produce the documents containing that communication and any directly related correspondence, communications, or documents.

Respectfully submitted,

/s/ Hamish P.M. Hume
Hamish P.M. Hume
Samuel C. Kaplan
Stacey K. Grigsby
Jon R. Knight
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
(202)-237-2727 (Telephone)
(202) 237-6131 (Fax)

*Counsel for Plaintiff Palantir*

Dated: August 26, 2016